UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | Civil Action No. |
| Plaintiff, ) ) | CLASS ACTION |
| vs. ) ) | DEMAND FOR JURY TRIAL |
| PSYCHIATRIC SOLUTIONS, INC., JOEY A. JACOBS, BRENT TURNER and JACK E. POLSON, ) ) ) ) | |
| Defendants. ) ) ) ) | |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Psychiatric Solutions, Inc. ("Psychiatric Solutions" or the "Company"), between February 21, 2008 and February 25, 2009, inclusive (the "Class Period"), against Psychiatric Solutions and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Psychiatric Solutions provides inpatient behavioral healthcare services in the United States. The Company offers its services for children, adolescents, and adults through acute inpatient behavioral healthcare facilities and residential treatment centers. Its services include nursing observation and care, daily interventions and oversight by a psychiatrist, and coordinated treatment by a physician-led team of mental health professionals.

3.      For years many of the hospitals owned by Psychiatric Solutions suffered from systemic quality of care and patient safety problems. The deficiencies led to a failure by the Company to: protect patients from sexual abuse; provide patient care in a safe environment; ensure its patients were adequately monitored; ensure its facilities were adequate staffed; adequately train and supervise its staff; and ensure incidents were properly reported to state and federal authorities. These incidents of neglect led to the Company being cited for many state and federal deficiencies from at least 2005 through 2007.

4.      On February 20, 2008, Psychiatric Solutions issued its 2007 financial results, increasing earnings guidance for 2008. Just over a week later, the Company filed its Form 10-K for 2007, representing it had "higher quality care" than its competitors and assuring that Psychiatric Solutions was in compliance with applicable government regulations.

5.      As a result of these positive statements, Psychiatric Solutions' stock traded above $32 per share for most of 2008.

6.      On July 17, 2008, the *Chicago Tribune* ("*Tribune*") issued an investigative report entitled "Tribune investigation: hospital thwarts police inquiry" which disclosed unreported violence among juvenile patients at Riveredge Hospital ("Riveredge"). Riveredge, a facility owned by Psychiatric Solutions, is Illinois' largest psychiatric facility. As a result of the *Tribune*'s investigation, the state of Illinois' Department of Children and Family Services ("DCFS") placed a hold on admitting youths in the custody of the state to Riveredge. As a further result, the Department of Justice initiated an investigation into the facility and its operations.

7.      As news of the investigative article and the DCFS hold came to light, Psychiatric Solutions stock traded lower. However, due to defendants' false statements and material omissions, the stock continued to trade at artificially inflated levels.

8.      Then, on February 25, 2009, Psychiatric Solutions announced disappointing fourth quarter and year-end financial results due to the problems at Riveredge. The Company missed its 2008 guidance of income from continuing operations of $2.02 to $2.03 per diluted share, instead reporting $1.92 per diluted share. The guidance miss was based upon the problems at the Company's Riveredge facility, including the effect of the continuing hold at the facility by DCFS, additional charges related to the investigation and an increase in the Company's general and professional liability reserves. The Company further reduced its guidance for 2009 from $2.40 to $2.44 per diluted share to $2.24 to $2.32 per diluted share. The guidance reduction was due in large part to the problems at Riveredge, including the continuing investigations and admissions hold and the trending of general and professional liability expense. In fact, DCFS had started an investigation in November 2008 based on the *Tribune* investigation, such that defendants had known that the DCFS hold was unlikely to be lifted soon.

9.      On the conference call following the release of this news, at least one analyst questioned why the Company had not released adverse information sooner:

> [ANALYST:] *I guess just a question with regard to your philosophy about preannouncing. It did seem like you had some information available by January, so maybe Joey, can you just share with us your thought process with regard to that and why you didn't want to get this information into the marketplace, this is probably the biggest miss you had since being a public Company. So I think your shareholders would like to hear that.*

10.     On this news, Psychiatric Solutions' stock collapsed $9.79 per share to close at $17.50 per share on February 26, 2009, a 1-day decline of 35%, on volume of more than 17 million shares or over 19 times the average 3-month daily volume. This was the lowest the Company's stock had traded at in over four years.

11.     Thereafter on April 3, 2009, DCFS released a report prepared by the University of Illinois at Chicago's department of psychiatry ("UIC"). DCFS commissioned the UIC report following the *Tribune*'s investigation in July 2008. The independent report confirmed the findings by the *Tribune* that administrators at the Riveredge facility failed to protect young patients from sexual assault and did not properly report the attacks to the authorities. The report further confirmed that incidents at the facility continued into 2008, including two incidents which occurred in August 2008.

12.     UIC did not limit its investigation to the Riveredge facility but also examined reports of abuse and neglect at facilities owned by Psychiatric Solutions in California, Texas, Florida, Virginia and North Carolina, finding a reoccurring "pattern of quality of care and patient safety problems." The report detailed "longstanding or reoccurring problems" at certain of the Company's facilities, including "harm to patients in unsafe treatment environments; inadequate staffing; sexual assaults; poor medical care; unqualified or incompetent staff; unreliable incident reporting; ineffective treatment and aftercare planning; and a general failure of professional clinical leadership."

13.     The report further found:

There is compelling data about the tendency of this organization's leadership to avoid taking direct responsibility for longstanding and reoccurring clinical/administrative failures – in effect, placing the onus for the chronic quality of care problems downward: first, onto the hospital staff "who do not perform their duties"; [and] second, onto mentally ill patients who "refuse to comply with the rules." . . .

Such resistance to critical self-examination, and the organizational tendency to "blame downward" and/or "outward" when quality of care problems arise, is by no means limited to Riveredge officials. *In fact, the earlier brief review of similar problems in PSI facilities around the United States shows a corporate culture operating from one crisis to the next – always primed to immediately spring into action to fix problems that were otherwise ignored until yet another crisis eventually forces attention to be paid.*

14.     In light of the report, DCFS stated that it would continue its intake hold at the Riveredge facility. According to DCFS spokesman Kendall Marlowe, "[t]he care provided by the Riveredge was completely unacceptable" and the state remained "outraged at the pain and violence suffered by innocent children in this facility's care."

15.     During the Class Period, defendants issued materially false and misleading statements concerning the Company's safeguards and controls over its operations, including its Riveredge facility. Defendants downplayed incidents at its facilities, indicating that the deficiencies had all been resolved. Defendants assured investors that corrective actions had already been taken at the Company's facilities to improve the quality, safety and risk management. Defendants further downplayed the effect the DCFS admissions hold may have on its operations, portraying the hold as being short-term and assuring investors the hold would likely be resolved during the fourth quarter 2008.

16.     Additionally, defendants issued materially false and misleading statements regarding the Company's financial results and compliance with Generally Accepted Accounting Principles ("GAAP"). Specifically, the Company failed to properly account for its contingent liabilities related to the deficiencies surrounding its operations. As a result of defendants' false

and misleading statements, Psychiatric Solutions stock traded at artificially inflated prices during the Class Period, reaching a high of $39.71 per share on July 8, 2008.

**JURISDICTION AND VENUE**

17.     Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

18.     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

19.     Psychiatric Solutions' principal executive offices are located at 6640 Carothers Parkway, Suite 500, Franklin, Tennessee.

**PARTIES**

20.     Plaintiff Garden City Employees' Retirement System purchased Psychiatric Solutions common stock as described in the attached certification and was damaged thereby.

21.     Defendant Psychiatric Solutions provides inpatient behavioral healthcare services in the United States.  The Company offers its services for children, adolescents, and adults through acute inpatient behavioral healthcare facilities and residential treatment centers.  Its services include nursing observation and care, daily interventions and oversight by a psychiatrist, and coordinated treatment by a physician-led team of mental health professionals.  Psychiatric Solutions also provides contract management and employee assistance program ("EAP") businesses, which involve the development, organization, and management of behavioral healthcare programs within medical/surgical hospitals.  Psychiatric Solutions was founded in 1988 and is headquartered in Franklin, Tennessee.

22.     Defendant Joey A. Jacobs ("Jacobs") co-founded the Company in 1988. Defendant Jacobs is, and at all relevant times was, Executive Chairman of the Board, President and Chief Executive Officer ("CEO") of Psychiatric Solutions.

23.     Defendant Jack E. Polson ("Polson") is, and at all relevant times was, Executive Vice President and Chief Accounting Officer ("CAO") of Psychiatric Solutions. During the Class Period, Polson reaped over $1.85 million in insider trading proceeds by selling 50,000 shares of his Psychiatric Solutions stock at artificially inflated prices.

24.     Defendant Brent Turner ("Turner") is, and at all relevant times was, Executive Vice President, Finance and Administration of Psychiatric Solutions. During the Class Period, Turner reaped over $3.8 million in insider trading proceeds by selling 95,800 shares of his Psychiatric Solutions stock at artificially inflated prices.

25.     Defendants Jacobs, Polson and Turner (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Psychiatric Solutions' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

26.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Psychiatric Solutions. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Psychiatric Solutions

common stock was a success, as it: (i) deceived the investing public regarding Psychiatric Solutions' prospects and business; (ii) artificially inflated the price of Psychiatric Solutions' common stock; (iii) allowed certain of the defendants to reap over $5.6 million in insider selling proceeds; and (iv) caused plaintiff and other members of the Class to purchase Psychiatric Solutions common stock at inflated prices.

27.     Defendants were also motivated by the compensation arrangements of Psychiatric Solutions. Defendants' compensation was in large part determined by the reported financial performance of the Company.

28.     Defendants received the following compensation:

| Name and Principal Position | Year | Salary ($) | Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Joey A. Jacobs | 2008 | $1,490,384 | $1,227,267 | $1,372,670 | $ 1,108,000 | $ 11,360 | $5,209,681 |
| Chairman of the | 2007 | 1,236,250 | 519,250 | 1,814,031 | 1,535,250 | 11,923 | 5,116,704 |
| Board, President and | 2006 | 890,865 | — | 2,174,920 | 1,204,200 | 11,272 | 4,281,257 |
| Chief Executive | | | | | | | |
| Officer | | | | | | | |
| Jack E. Polson | 2008 | 438,462 | 661,813 | 373,144 | 216,686 | 11,255 | 1,701,360 |
| Executive Vice | 2007 | 397,740 | 414,215 | 524,530 | 265,200 | 11,602 | 1,613,287 |
| President, Chief | 2006 | 340,625 | 68,729 | 538,999 | 230,344 | 11,154 | 1,189,851 |
| Accounting Officer | | | | | | | |
| Brent Turner | 2008 | 438,462 | 661,813 | 373,144 | 216,686 | 11,211 | 1,701,316 |
| Executive Vice | 2007 | 397,740 | 414,215 | 529,559 | 265,200 | 11,611 | 1,618,325 |
| President, Finance | 2006 | 340,625 | 68,729 | 544,181 | 230,344 | 11,115 | 1,194,994 |

(Footnotes omitted.)

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Psychiatric Solutions common stock during the Class Period (the "Class"). Excluded from the Class are defendants.

30.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court. Psychiatric Solutions has more than 55 million shares of stock outstanding, owned by hundreds if not thousands of persons.

31. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      (a)     whether the 1934 Act was violated by defendants;

      (b)     whether defendants omitted and/or misrepresented material facts;

      (c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

      (e)     whether the price of Psychiatric Solutions common stock was artificially inflated; and

      (f)     the extent of damage sustained by Class members and the appropriate measure of damages.

32. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

33. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

34. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

35.     Psychiatric Solutions, founded in 1988, is a provider of inpatient behavioral healthcare services in the United States.    The Company operates 95 inpatient behavioral healthcare facilities with approximately 10,000 beds in 31 states, Puerto Rico, and the United States Virgin Islands.  Through its inpatient behavioral healthcare facilities, Psychiatric Solutions offers a range of inpatient behavioral healthcare services for children, adolescents and adults. The Company offers these services through a combination of acute inpatient behavioral facilities and residential treatment centers ("RTCs"). Other behavioral healthcare services consist of its contract management and EAP businesses.  Psychiatric Solutions operates 88 owned and seven leased inpatient behavioral healthcare facilities. These facilities offer a range of inpatient behavioral healthcare services for children, adolescents and adults. Its inpatient facilities work with mental health professionals, including licensed professional counselors, therapists and social workers, psychiatrists, non-psychiatric physicians, emergency rooms, school systems, insurance and managed care organizations, company-sponsored EAP, and law enforcement and community agencies that interact with individuals who may need treatment for mental illness or substance abuse.  Many of the Company's inpatient facilities have mobile assessment teams who travel to prospective clients in order to assess their condition and determine if they meet established criteria for inpatient care. Those clients not meeting the established criteria for inpatient care qualify for outpatient care or a less intensive level of care, which is also provided by the facility.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

36.     On February 20, 2008, Psychiatric Solutions reported its fourth quarter and year-end 2007 financial results, in a release which stated in part:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2007. For the quarter, revenue increased

44.1% to a record $403.4 million compared to the fourth quarter of 2006. Income from continuing operations increased 27.3% to $0.42 per diluted share from the fourth quarter of 2006.

*　　*　　*

"PSI continued to produce outstanding profitable growth for the fourth quarter and full year 2007," remarked Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "Demand for high quality inpatient psychiatric care continues to expand in this capacity constrained and very fragmented industry. We are well positioned to achieve further significant profitable growth for 2008 and beyond through organic growth initiatives and acquisitions.

"We are targeting 7% to 9% same-facility revenue growth for 2008 once again. Work is already underway to add nearly 600 beds in existing and new facilities by the end of 2008, double our normal targeted pace of expansion, allowing us to treat patients that we do not have the capacity to treat today.

"We are highly confident that we will be able to acquire at least six inpatient facilities during 2008. The pipeline of potential acquisition opportunities remains strong, enhancing our ability to continue to build a platform for future growth."

*PSI is increasing its 2008 earnings guidance range by $0.10 per diluted share to $1.93 to $1.97 to reflect the benefit of lower interest rates.* As a result, growth in 2008 earnings per diluted share is expected to be 30% to 32% compared to 2007. In addition, PSI established its guidance for earnings from continuing operations for the first quarter of 2008 in a range of $0.42 to $0.43 per diluted share. The Company's guidance does not include the impact from any future acquisitions.

37.     On February 29, 2008, Psychiatric Solutions filed its Form 10-K for the fourth quarter and year-end 2007, which included the same financial results previously reported. The Form 10-K included the following statements:

**Overview**

We are a leading provider of inpatient behavioral health care services in the United States. We operate 90 inpatient behavioral health care facilities with more than 10,000 beds in 31 states, Puerto Rico, and the U.S. Virgin Islands. We generated revenue of approximately $1.5 billion and $1.0 billion, respectively, for the years ended December 31, 2007 and 2006. *We believe that our primary focus on the provision of inpatient behavioral health care services allows us to operate more efficiently and provide higher quality care than our competitors.*

Our inpatient behavioral health care facilities accounted for 91.6% of our revenue for the year ended December 31, 2007. These inpatient facilities offer a

wide range of inpatient behavioral health care services for children, adolescents and adults. We offer these services through a combination of acute inpatient behavioral facilities and residential treatment centers ("RTCs"). Our acute inpatient behavioral facilities provide the most intensive level of care, including 24-hour skilled nursing observation and care, daily interventions and oversight by a psychiatrist and intensive, highly coordinated treatment by a physician-led team of mental health professionals. Our RTCs offer longer term treatment programs primarily for children and adolescents with long-standing chronic behavioral health problems. Our RTCs provide physician-led, multi-disciplinary treatments that address the overall medical, psychiatric, social and academic needs of the patients.

*      *      *

**Our Competitive Strengths**

We believe the following competitive strengths contribute to our strong market share in each of our markets and will enable us to continue to successfully grow our business and increase our profitability:

- *Singular focus on behavioral health care* – We focus primarily on the provision of inpatient behavioral health care services. We believe this allows us to operate more efficiently and provide higher quality care than our competitors. In addition, we believe our focus and reputation have helped us to develop important relationships and extensive referral networks within our markets and to attract and retain qualified behavioral health care professionals.

- *Strong and sustainable market position* – Our inpatient facilities have an established presence in each of our markets, and many of our owned and leased inpatient facilities have the leading market share in their respective service areas. We believe that the relationships and referral networks we have established will further enhance our presence within our markets. In addition, many of the states in which we operate require a certificate of need to open a behavioral health care facility, which may be difficult to obtain and may further preclude new market participants.

- *Demonstrated ability to identify and integrate acquisitions* – We attribute part of our success in integrating acquired inpatient facilities to our rigorous due diligence review of these facilities prior to completing the acquisitions as well as our ability to retain key employees at the acquired facilities. We employ a disciplined acquisition strategy that is based on defined criteria including quality of service, return on invested capital and strategic benefits. *We also have a comprehensive post-acquisition strategic plan to facilitate the integration of acquired facilities that includes improving facility operations, retaining and recruiting*

11

*psychiatrists and expanding the breadth of services offered by the facilities.*

*   *   *

## Our Growth Strategy

We have experienced significant growth in our operations as measured by the number of our facilities, admissions, patient days, revenue and net income. We intend to continue successfully growing our business and increasing our profitability by improving the performance of our inpatient facilities and through strategic acquisitions. The principal elements of our growth strategy are to:

- *Continue to Drive Same-Facility Growth* – We increased our same-facility revenue by approximately 6.5% for the year ended December 31, 2007 compared to the year ended December 31, 2006. Same-facility revenue also increased by approximately 9.0%, 8.0%, and 9.0% for the years ended December 31, 2006, 2005, and 2004, respectively, compared to the immediately preceding years. Same-facility revenue refers to the comparison of the inpatient facilities we owned during a prior period with the comparable period in the subsequent period, adjusted for closures and combinations for comparability purposes. We intend to continue to increase our same-facility growth by increasing our admissions and patient days and obtaining annual reimbursement rate increases. We plan to accomplish these goals by:

  - expanding bed capacity at our facilities to meet demand;

  - expanding our services and developing new services to take advantage of increased demand in select markets where we operate;

  - building and expanding relationships that enhance our presence in local and regional markets;

  - developing formal marketing initiatives and expanding referral networks; and

  - *continuing to provide high quality service.*

*   *   *

- *Enhance Operating Efficiencies* – Our management team has extensive experience in the operation of multi-facility health care services companies. *We intend to focus on improving our profitability by optimizing staffing ratios, controlling contract labor costs and reducing supply costs through group purchasing. We believe that our focus on efficient operations increases our*

> *profitability and will attract qualified behavioral health care professionals and patients.*

*   *   *

**Regulation and Other Factors**

*Licensure, Certification and Accreditation*

Health care facilities are required to comply with extensive regulation at the federal, state and local levels. Under these laws and regulations, health care facilities must meet requirements for state licensure as well as additional qualifications to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, fire prevention, maintenance of adequate records, hospital use, rate-setting, and compliance with building codes and environmental protection laws. Facilities are subject to periodic inspection by governmental and other authorities to assure continued compliance with the various standards necessary for licensing and accreditation.

All of the inpatient facilities operated by us are properly licensed under applicable state laws. Most of the inpatient facilities operated by us are certified under Medicare and/or Medicaid programs and accredited by The Joint Commission, a functional prerequisite to participation in the Medicare and Medicaid programs. Should any of our inpatient facilities lose its accreditation by The Joint Commission, or otherwise lose its certification under the Medicare and/or Medicaid program, that inpatient facility may be unable to receive reimbursement from the Medicare and/or Medicaid programs. If a provider for who we provide contract management services is excluded from any federal health care program, no services furnished by that provider would be reimbursed by any federal health care program. If one of our facilities is excluded from a federal health care program, that facility would not be eligible for reimbursement by any federal health care program.

***We believe that the inpatient facilities we own and operate generally are in substantial compliance with current applicable federal, state, local and independent review body regulations and standards.*** The requirements for licensure, certification and accreditation are subject to change and, in order to remain qualified, it may be necessary for us to affect changes in our inpatient facilities, equipment, personnel and services. Additionally, certain of the employed and contracted personnel working at our inpatient facilities are subject to state laws and regulations governing their particular area of professional practice. We assist our managed client hospitals in obtaining required approvals for new programs.

*   *   *

*Regulatory Compliance Program*

*We are committed to ethical business practices and to operating in accordance with all applicable laws and regulations. Our compliance program was established to ensure that all employees have a solid framework for business, legal, ethical, and employment practices. Our compliance program establishes mechanisms to aid in the identification and correction of any actual or perceived violations of any of our policies or procedures or any other applicable rules and regulations. We have appointed a Chief Compliance Officer as well as compliance coordinators at each inpatient facility. The Chief Compliance Officer heads our Compliance Committee, which consists of senior management personnel and two members of our board of directors. Employee training is a key component of the compliance program. All employees receive training during orientation and annually thereafter.*

**Insurance**

We are subject to medical malpractice and other lawsuits due to the nature of the services we provide. At December 31, 2007, all of our operations have professional and general liability insurance in umbrella form for claims in excess of a $3.0 million self-insured retention with an insured excess limit of $50.0 million. The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors, and other actuarial assumptions calculated by an independent third-party actuary. This self-insurance reserve is discounted to its present value using a 5% discount rate. This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations. We have utilized our captive insurance company to manage the self-insured retention. While claims are monitored closely when estimating professional and general liability accruals, the complexity of the claims and wide range of potential outcomes often hampers timely adjustments to the assumptions used in these estimates.

38.     On April 30, 2008, Psychiatric Solutions reported its first quarter 2008 financial results, in a release which stated in part:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the first quarter ended March 31, 2008. Revenue increased 33.3% to a record $429.7 million for the quarter from $322.4 million for the first quarter of 2007. Income from continuing operations rose 39.4% to $0.46 per diluted share from the comparable prior-year quarter.

\*      \*      \*

Joey Jacobs, Chairman, President and Chief Executive Officer of PSI, remarked, "PSI performed extremely well during the first quarter of 2008, enabling us to exceed earnings guidance for the quarter and to again raise our earnings guidance for the year. Our focus on execution enabled us to achieve our same-facility revenue and EBITDA targets and implement our plans for adding new beds. With the March acquisition of five inpatient psychiatric facilities from

United Medical Corporation, we also added more than 400 beds in a transaction expected to be accretive to our 2008 financial results.

"Market dynamics in the inpatient behavioral health industry remain favorable, supporting our ability to continue implementing our proven business model. We remain confident of our prospects for driving further significant growth in our same-facility metrics, while continuing to build our platform for future growth through the accretive acquisition of at least six inpatient facilities each year."

*Based on its first quarter results and outlook for the remainder of the year, PSI is increasing its guidance for earnings from continuing operations per diluted share for 2008 to a range of $2.00 to $2.03 from the previous range of $1.97 to $2.01.* As a result, growth in 2008 earnings per diluted share is expected to be 34% to 36% compared to 2007. The Company's guidance does not include the impact from any future acquisitions.

39.     On July 17, 2008, the *Tribune* issued an investigative report entitled "Tribune investigation: hospital thwarts police inquiry" which disclosed unreported violence among juvenile patients at Riveredge. The investigation found that Riveredge had "left sexual predators unguarded despite allegations that at least 10 mentally disabled children were assaulted." The investigation further discovered that Riveredge failed to advise the appropriate government authorities about the attacks despite being legally obligated to do so under state law. The article discussed 10 separate instances of neglect that had occurred at Riveredge from 2005 to 2007.

40.     The week prior to the publication of the article, the DCFS placed a hold on admitting youths in the custody of the state to the facility due in part to the *Tribune*'s inquiry about the attacks to the agency and due in part to a violent melee that occurred at Riveredge in early July 2008. The melee involved the facility's adolescent girls unit and required police intervention.

41.     In early July 2008, the Company's stock was trading in the $38 to $39 per share range, hitting its Class Period high of $39.71 on July 8, 2008. As news of the investigative article and the DCFS hold came to light, Psychiatric Solutions stock traded lower hitting $35.57

per share by July 18, 2008. However, due to defendants' false statements and material omissions, the stock continued to trade at artificially inflated levels.

42. On July 30, 2008, Psychiatric Solutions reported its second quarter 2008 financial results, in a release which stated in part:

> Psychiatric Solutions, Inc. ("PSI") today announced financial results for the second quarter ended June 30, 2008. Revenue was a record $451.0 million for the quarter, up 28.4% from $351.2 million for the second quarter of 2007. Income from continuing operations increased 40.5% to $0.52 per diluted share for the second quarter of 2008 from adjusted income from continuing operations of $0.37 per diluted share for the second quarter last year, which excluded a loss on debt refinancing of $0.09 per diluted share after tax.

*  *  *

> "We expect to continue benefiting from strong industry growth trends in 2008 and beyond. In this environment, we remain highly focused on executing a proven business model that has enabled us to build a long-term record of outstanding performance, while also becoming the leading provider in the inpatient psychiatric care industry. We are confident we have the opportunities, the resources and the expertise to further strengthen our leadership position and enhance stockholder value."

> Based on the Company's results for the second quarter and first half of 2008 and its outlook for the remainder of the year, *PSI today updated its guidance range for earnings from continuing operations per diluted share for 2008 to $2.02 to $2.03*, reflecting growth of 36% compared to 2007. The Company's guidance does not include the impact from any future acquisitions.

43. On July 31, 2008, Psychiatric Solutions filed a Form 8-K with the SEC, which stated in part:

> Psychiatric Solutions, Inc. (the "Company") has received a subpoena from the Department of Justice requesting certain information regarding Riveredge Hospital, one of the Company's inpatient psychiatric facilities in Chicago, Illinois. The Company intends to provide the requested information to the Department of Justice.

44. After issuing its second quarter 2008 financial results, Psychiatric Solutions hosted a conference call for analysts, media representatives and investors on July 31, 2008, during which defendants represented the following:

[JACOBS:]    Before closing my remarks, I'll add that many of you are aware of a story that was published in a Chicago newspaper on July 17 about incidents that occurred in 2007 and 2006 at Riveredge Hospital. This is not the first story about incidents at one of our facilities, and it won't be the last. So I'd like to share my perspective.

First, these types of unfortunate incidents do occur in this patient population. *Minimizing and eliminating these types of incidents is one of PSI's top priorities. We take continuous improvement of quality, safety and risk management very seriously, and we have built a very effective infrastructure over the past several years.*

\*        \*        \*

[POLSON:]    PSI's revenue for the second quarter increased 28.4% to $451 million from the second quarter last year. Adjusted EBITDA increased 34.7% to $81.5 million, or 18.1% of revenue, from 17.2% for the prior-year period. Income from continuing operations for the second quarter increased 44.2% compared to adjusted income from continuing operations for the second quarter last year, which excluded the loss on debt refinancing, while earnings per diluted share on the same basis rose 40.5% to $0.052.

\*        \*        \*

Based on our results for the second quarter and the prospects for the second half we have updated our guidance for earnings from continuing operations to a range of $2.02 to $2.03. As always, this guidance does not include any impact from future acquisitions.

\*        \*        \*

[ANALYST:] And then just on the Riveredge Hospital, maybe just comment a little bit more about what the impact has been since some of this noise first surfaced with the Chicago Tribune article. Just to the extent you can provide any commentary, would appreciate it.

. . . [JACOBS:]        [T]here's not a lot more I can talk about it. It did create noise for us, and the article was visible enough that, quite frankly, we expected that all parties, whether it's the state of Indiana or a Joint Commission or the Department of DOJ, we expect them to take a look and review. And if they find something that we can improve on, absolutely we will improve it.

*As I mentioned in the comments, these incidents actually occurred back previous years, and we've made considerable improvement there.* And so we'll get through this, and as my comments mentioned, we have a weekly meetings with DCFS and we've got our fingers crossed here. And if it was material, we would disclose that right now; we do not think it is. They are working hard up there, taking care of their patients and working through the process

. . . [ANALYST:]     Maybe if you guys would talk a little bit about your compliance program. Just with some of this noise, it would just be helpful to hear just about how you guys manage that. I don't know if you can provide any commentary, but would love to hear more just in terms of your overall compliance program.

. . . [JACOBS:]     Compliance for us, we have 23,000 employees, so compliance for us starts at the single employee taking care of that single patient. And it's the responsibility of the CEO at that facility to make sure they are in compliance and great quality there.

We also have a risk management process improvement person at each facility, and that is where we began gathering data for the corporation, both to our risk management department, which has, I think, about 10 employees, and to our quality compliance department, which has about 25 employees.

And we are capturing real-time incidents that might be occurring, and especially, if we internally classify it as a grave incident, that it is real-time to us and that we immediately began a root-cause analysis to is there a way we can approve the facility and improve the process there. And then the compliance quality department reports back to the Board of Directors – there are two board members, Dr. Bill Petrie and Ed Wissing – that get to see the value lines call, the incidents, what we are doing, how we are doing.

And there is multiple indicators that we track real-time. For example, medication errors, we track that real-time. And so – and that is something we really built over the past three years, and we will continually be putting more resources to that. And unfortunately, the story dealt with past years where we've made processes improvements.

I'm much more pleased about yesterday's e-mail from one of our facilities in Indiana, [David Bell], they just went through their Children's Services survey, and quite frankly, scored, quite frankly, perfect. There was no plan of correction needed for that facility. The state was very complimentary of their inspiration, and that is what we want them all to be. And we are getting close, but there is more resources, more work to be done.

But internally, that is how we handle it, Adam, and *we constantly are improving the safety, looking at ways to improve the safety, quality, meeting standards and regulations.*

\*     \*     \*

[JACOBS:]     *But we are in compliance with those states on reporting. We know when to report, how to report.* And also PSI captures incidents that you don't report, that we are looking for minor incidents. We want to fix those so those don't become major incidents. So for PSI, we capture much more than we actually have to report, but *we do diligently report anything that an agency needs to see.*

45.     As a result of defendants' reassurances concerning the Company's exposure at Riveredge, Psychiatric Solutions stock closed up $1.48 per share on August 1, 2008, at $36.50 per share. Throughout August 2008, Psychiatric Solutions' stock continued to increase, reaching as high as $39.20 by August 11, 2008.

46.     On October 30, 2008, Psychiatric Solutions reported its third quarter 2008 financial results, in a release which stated in part:

> Psychiatric Solutions, Inc. ("PSI") today announced financial results for the third quarter ended September 30, 2008. Revenue was $448.0 million for the quarter, an increase of 13.0% from $396.4 million for the third quarter of 2007. Income from continuing operations rose 39.1% to $28.6 million for the quarter from $20.6 million for the third quarter of 2007. Income from continuing operations per diluted share increased 37.8% to $0.51 for the third quarter of 2008 from $0.37 for the third quarter of 2007.

> *          *          *

> "The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments. We plan to continue expanding our ability to serve this demand, both through the addition of new beds in our facilities and the ongoing execution of our proven acquisition strategy in a fragmented, capacity-constrained industry. We are well positioned to fund our anticipated growth over the next year through substantial cash flow from operations, our existing cash and the availability under our credit facility."

> Based on the Company's results for the third quarter and first nine months of 2008 and its outlook for the remainder of the year, *PSI today affirmed its guidance for earnings from continuing operations per diluted share for 2008 in a range of $2.02 to $2.03*, reflecting growth of 36% compared with 2007. In addition, *PSI also today established its guidance for earnings per diluted share for 2009 in a range of $2.40 to $2.44*, reflecting growth of 18% to 21%. The Company's guidance does not include the impact from any future acquisitions or reflect any change in interest rates associated with refinancing the Company's revolving credit facility that matures in December 2009, as the timing and impact of this refinancing are difficult to estimate at this time.

47.     After issuing its third quarter 2008 financial results, Psychiatric Solutions hosted a conference call for analysts, media representatives and investors on October 31, 2008, during which defendants represented the following:

[JACOBS:]   PSI continued to perform very well for the third quarter. We produced growth of 8.7% in same-facility revenue for the third quarter. The third consecutive comparable quarter increase. This growth by 13% increase in revenue for the quarter, and also margin improvement that resulted in a 38% increase in earnings per diluted share.

As a result of this growth, we are on track to achieve our earnings guidance for full year 2008.

\*      \*      \*

Riveredge Hospital in Chicago which as we've discussed in our conference call last quarter, had an admissions hold placed on it by the Illinois Department of Family Services in July. During the third quarter, our same-facility patient day growth was negatively impacted by approximately 70 basis point[s] due to the lower census levels resulting from this DCF admissions hold. *This hold is still in place; however we expect it to be lifted in the current quarter*. The financial impact of the admissions hold in complying with the DOJ investigation cost us approximately 2% to 3% earnings per share hit in the third quarter.

\*      \*      \*

[POLSON:]   As a result of the margin improvement Joey discussed, income from continuing operations increased 39.1% to a $28.5 million for the latest quarter from 20.3% for the third quarter of last year.

Income from continuing operations per diluted share increased 37.8% to $0.51 from $0.37. . . .

. . . Consolidated adjusted EBITDA for the third quarter rose 18.1% to $80.6 million for the third quarter of '08 while the margin increased to 18% of revenue from 17.2% for the third quarter of 2007.

\*      \*      \*

Based on our results for the first nine months of 2008, and our outlook, we are affirming our guidance for 2008 earnings from continuing operations in a range of $2.02 to $2.03. In addition, as the news release indicates, we are establishing our guidance for 2009 earnings from continuing operations in a range of $2.40 to $2.44.

\*      \*      \*

[ANALYST:] In the fourth quarter what effect do you expect from Riveredge?

[JACOBS:]   *Probably $0.02, John. I haven't (inaudible) a lot to that. $0.02, maybe up to $0.03, but it could drop down to $0.01. So our range is $0.01 to $0.03 I guess.*

[ANALYST:] And what about for calendar '09? What are you putting in for that, or is that (multiple speakers)?

[JACOBS:] *No, no. We have that coming back strong in '09. So we would not have any thoughts there.*

*          *          *

[ANALYST:] I wanted to just follow-up again on the '09 guidance to just make sure I understand some of the key components much of which I think you've mentioned throughout the call. Can you just maybe highlight what your thoughts are, what you built into the guidance for legal expenses related to the investigation, if there's any at all that you've built in.

[JACOBS:] We've built in some, but it's a lot less than we had occur in the third quarter.

*          *          *

[ANALYST:] And last thing, you had said, I guess, some of the legal expenses, or litigation expenses around Riveredge are going to comedown in the fourth quarter, and –

[JACOBS:] I didn't say fourth quarter. It was for '09.

[ANALYST:] For '09.

[JACOBS:] Yes, but in the fourth quarter I think we'll less [sic] than in third quarter but most of if not all those legal expenses are due to document production, and that's just a one time event.

[ANALYST:] Okay, so I guess should we think about where things stand today. I mean, if you're [sic] expenses are going to be coming down, what's sort of the next step the investors or data point that investors should be looking for other than a resolution of the issue. Is there something that we can sort of look to?

[JACOBS:] No, the next thing to look to is the admission hold lift.

*          *          *

[JACOBS:] And then after that, many times an investigation, they get into it, and it never reaches resolution. They just close the file. So but once again, through our due diligence, through our looking back at Riveredge, we think we've done a very good job there whether it's a couple of unfortunate incidents, yes, but we take care of very sick kids there, and adults, and could things we do better, yes, and have we done them better, yes, and so – but looking back through the incidents that have occurred, we feel good about the quality of care at Riveredge, and it's been reevaluated by numerous people since the admissions hold. We just basically have one more agency that needs to come through and approve it and lift the hold.

*    *    *

[ANALYST:] First it sounds like your [sic] optimistic you're going to lift the admissions hold at Riveredge in the fourth quarter, and I know you've had some optimism that was going to be resolved sooner. What's your level of confidence around that Joey?

[JACOBS:] I think its 80%. I think it's 80%. I think it's 80%, it may be January 1, be the date. But it could be next week.

*    *    *

[ANALYST:] Maybe you've said this, and maybe I'm just not under – didn't hear it right, but in terms of Riveredge, you're expecting the admission's hold again, to be lifted sometime, let's call it soon. I guess, what I'm asking is, if an admission's hold. So in other words there's not going to be any sort of ongoing census restriction at that facility once the admission hold is lifted, you can sort of full bore again?

[JACOBS:] Yes.

48.    On November 23, 2008, the *Los Angeles Times* and *ProPublica* co-issued an investigative report entitled "Psychiatric care's peril and profit." The article discussed quality care problems at the Company's facilities in California, including Sierra Vista Hospital in Sacramento, as well as mentioning instances of neglect that occurred in facilities owned by Psychiatric Solutions in other states, including Texas, North Carolina and Virginia. The incidents discussed occurred from 2005 to 2007. According to the article, "Sierra Vista had the single highest rate of state and federal deficiencies – about eight times the statewide average" among private psychiatric hospitals in California. The article assessed that many of Psychiatric Solution's problems resulted from the Company reducing its expenses in order to boost its bottom line at the expense of maintaining a high quality of care. Many of the Company's problems resulted from its facilities being understaffed and its employees being undertrained. An analysis done by the *Los Angeles Times* and *ProPublica* revealed that "The five PSI hospitals in California had a profit margin of more than 25% in 2007, according to data from the Office of

Statewide Health Planning and Development. The average for the state's other for-profit psychiatric hospitals was about 6%."

49.     On December 5, 2008, defendant Turner hosted a conference call with analysts at JPMorgan Chase & Co.'s small mid-cap conference, representing the following:

> [TURNER:]   Lastly, our earnings-per-share growth, very strong. We have averaged just inside of – right at 47% compound annual growth rate EPS. Most recent quarter was up 38% over third quarter 2007. *And then for 2008, we have [$2.02 to] $2.03 as our current guidance over $1.49 last year. So that's a – right at 30% growth or actually in the mid 30s. And then $2.40 to $2.44 is our guidance for 2009 which is 19 to 21% growth over 2008's projected earnings.*

*      *      *

> [ANALYST:]   And then just a different question -- the DOJ admissions hold at the Riveredge facility, where does that stand?

> [TURNER:]   The admissions hold at Riveredge is really directly from the Department of Children and Family Services. They are the party that has the admission hold. We are still under the same – there is no change since our last update on the earnings call there. That is still in place.

> [ANALYST:]   Any sense for the timing on that?

> [TURNER:]   *Joey mentioned (inaudible) this quarter and I don't have anything updating from that.*

50.     On January 11, 2009, *The Dallas Morning News* issued its own investigative report entitled "State of Neglect: Texas law lets hospitals hide problems." The article detailed examples of harm to patients that had gone unreported or had reoccurred in certain facilities owned by Psychiatric Solutions in Texas. The incidents discussed by the article occurred from 2005-2007. The article provided in part:

> There was plenty of good news last year when the chief executive officer of Psychiatric Solutions Inc. addressed investors: Earnings had risen, the business of mental hospitals was growing and the prospect of even bigger profits looked solid. Missing, however, from the triumphant message by Joey Jacobs to shareholders were details of PSI's Texas operations: State inspectors cited its hospitals for more than 75 violations in 2007. Patients died under questionable circumstances. The federal Medicare program temporarily yanked its certification for two hospitals.

And the company racked up $230,000 in fines – far more than any health care provider – in a state not known for rigorous regulation.

The CEO's silence on these matters fits the Texas regulatory culture well. That's the way hospitals conduct business in the state.

51.     On January 13, 2009, defendants Jacobs and Turner hosted a conference call with analysts at a JPMorgan Healthcare Conference, representing the following:

[TURNER:] From the financial highlights, revenue growth has been outstanding for our Company as we have been able to deliver the topline organic growth complemented by the acquisition activity. You can see 67% compound annual growth rate over the last five years.

We were at about $1.320 billion of revenues for the first nine months. That annualizes to probably about $1.7 billion for the full year and then you can see our growth for the third quarter, our most recently reported quarter, we were up 13% in revenue over the prior year third quarter.

Our ability to expand our operating margins or our EBITDA margins are paramount to our operations and you can see that reflected here. Annual EBITDA growth on a compound annual basis up 84% as compared to the 67% that we saw on the topline growth and similarly EBITDA for the third quarter up 18% on a 13% revenue growth; so very strong growth there.

And then lastly from the earning side, EPS compound annual growth rate of 47% over the last five years. Most recent quarter $0.51 over $0.37 Q3 '07 was 38% growth and currently *we have our 2008 guidance of $2.02 to $2.03 and then also 2009 guidance $2.40 to $2.44 a share*.

52.     On February 25, 2009, Psychiatric Solutions reported its fourth quarter 2008 financial results, which included its full year results, in a release which stated in part:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2008. Revenue increased 12.0% for the quarter to $445.9 million from $398.1 million for the fourth quarter of 2007. Income from continuing operations was $24.6 million, or $0.44 per diluted share, for the fourth quarter of 2008 compared with $23.2 million, or $0.42 per diluted share, for the fourth quarter of 2007.

For the year ended December 31, 2008, revenue rose 20.9% to $1.766 billion from $1.461 billion for 2007. Income from continuing operations increased 39.4% to $107.9 million from $77.4 million. Income from continuing operations per diluted share was $1.92 for 2008, up 38.1% from $1.39 for 2007. Results for 2007 included a loss on debt refinancing of $8.2 million, or $0.09 per diluted share after tax.

*The fourth quarter 2008 results included a negative impact of $0.05 per diluted share related to one of the Company's facilities in Chicago and $0.05 per diluted share related to an increase in the Company's reserves for professional and general liability coverage resulting from PSI's annual actuarial assessment of claims. Professional and general liability insurance expense increased during 2008 compared to 2007, primarily as a result of an increase in PSI's reserves for self-insured professional and general liability related to the revised assessment of certain claims at amounts higher than those originally anticipated and the actuarial implications of such revisions.*

*       *       *

PSI today adjusted its guidance for 2009 earnings from continuing operations per diluted share for 2009 to a range of $2.24 to $2.32, reflecting growth of 17% to 21% compared with 2008. The Company's guidance does not include the impact from any future acquisitions.

Joey Jacobs, Chairman, President and Chief Executive Officer of PSI, remarked, "PSI's business fundamentals remain strong, with substantial same-facility revenue growth during 2008, the successful addition of approximately 500 beds to new and existing facilities for the year, a robust pipeline of potential facility acquisitions and an improved financial position through the extension of our revolving credit facility maturity. Our adjustment to 2009 guidance primarily reflects an increased level of caution regarding the potential impact of the recessionary economic environment on our business."

53.     After issuing its fourth quarter 2008 financial results, Psychiatric Solutions hosted

a conference call for analysts, media representatives and investors on February 26, 2009, during

which defendants represented the following:

[ANALYST:] Good morning, everyone. I wanted to just follow-up a little bit more on the professional liability issue and maybe if you can just kind of give us a sense for the timing of the actuarial review and when it became known to you that you would have to take reserves? I just want to get a sense here for the timing of that process and I think, Brent, you said that you have a new quarterly look at this. So maybe can you just tell us what you're doing differently on a quarterly versus what you did annually before.

[TURNER:]    Darren, the timing of this is always done in the middle of the fourth quarter, so that we have good results and can study it for year-end. We hadn't previously had any significant changes outside of our expectations from that. This is the first year it happened there. And so going forward, what we've done is put some – a monthly internal analysis in place to roll our experience forward. And then quarterly, we'll be having our outside actuarial actually do a study before the end of each quarter.

[ANALYST:]   And when did you complete the actuarial review this go-round?

[TURNER:]   Well, the final, we got initial indications late in December, the final didn't come out until January. But these things are – they put out a number of drafts and we go through that, so it was initiated the beginning of December and so it's a process.

[ANALYST:]   *I guess just a question with regard to your philosophy about preannouncing. It did seem like you had some information available by January, so maybe Joey, can you just share with us your thought process with regard to that and why you didn't want to get this information into the marketplace, this is probably the biggest miss you had since being a public Company. So I think your shareholders would like to hear that.*

[JACOBS:]   *The review of the malpractice, the general and professional insurance reserves took the whole month of January and the audit committee and the review of the financial numbers were scheduled for mid February. I thought it would be – I thought it would be a disservice not to be able to put out one piece of information without being able to really talk about the whole quarter in its entirety during that and it was just $0.05, $4.9 million and so that was the decision and, it was somewhat of an unusual occurrence in that our history had not had those sort of adjustments and we wanted to take the time in January, maybe even the first couple weeks in February to review with the actuaries and make sure that we understood the details on what they were recommending to us and it coincided, it was within a few days of when we would be having this call.*

\*          \*          \*

[ANALYST:] *And it just relates to Riveredge. Can you just give us a sense for kind of where we stand at Riveredge right now, kind of where your sense is today versus a year ago and at least to what you can reveal, kind of what the status of the current investigation that the DFS review is?*

[JACOBS:]   *Okay. First, it's probably costing us 50 to 70 basis points against the same store patient day comparison. Now, that comparison will get smaller as we get into the third quarter of this year and hopefully in the second quarter as we're diversifying the patient load at that facility it will get smaller. The status, we continue to work with the Department of Justice on their investigation and respond to their needs. The DCFS, they're waiting on a report from the University of Illinois Medical Center in Chicago and since the incidents have occurred, we've had the Joint Commission survey, which the facility did well with. We've had the DCFS. We've had licensing ECMS in there. So we've had many surveys and inspections since the summer of last year. And so – and we're just waiting on DCFS and they're kind of waiting on this report.*

54.     Additionally, on February 26, 2009, *ProPublica* issued an investigative report entitled "Psychiatric Hospital Pledged Change, But Some Problems Persist" which reported that despite defendants' assurances in July 2008 that the deficiencies at Riveredge had been corrected and that the problems were behind them, the problems at the facility actually persisted into 2008. The article discussed two incidents that occurred at the facility in August 2008 where patients were sexually assaulted and the facility failed to properly document the attacks.

55.     On this news, Psychiatric Solutions' stock collapsed $9.79 per share to close at $17.50 per share on February 26, 2009, a 1-day decline of 35%, on volume of more than 17 million shares or over 19 times the average 3-month daily volume.  This was the lowest the Company's stock had traded at in over four years.

56.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company had failed to properly account for its contingent liabilities in violation of GAAP;

(b)     The Company's operations were much worse as far as patient safety than represented;

(c)     The Company had failed to maintain effective risk management controls over its operations, including controls to ensure the Company properly reported any incidents at its facility to the proper authorities; and

(d)     Given the ongoing and serious quality of care and risk management problems at its facilities, the Company had no reasonable basis to make projections about its 2008 or 2009 financial results.

57.     As a result of defendants' false statements, Psychiatric Solutions' stock price traded at inflated levels during the Class Period.  The drop in the Company's stock price

removed the inflation from the stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## PSYCHIATRIC SOLUTIONS' FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

58.     In order to inflate the price of Psychiatric Solutions' stock, defendants caused the Company to falsely report its results for fiscal 2007 and the first, second and third quarters of fiscal 2008 by failing to timely record contingent liabilities related to the quality of care and risk management problems at its facilities nationwide, including its Riveredge facility, which overstated the Company's assets and net income.

59.     Psychiatric Solutions' Class Period financial results were included in a Form 10-K and Form 10-Qs filed with the SEC. The results were also included in press releases disseminated to the public. Defendants' SEC filings claimed that the financial information presented therein was a fair statement of Psychiatric Solutions' financial results and that the results were prepared in accordance with GAAP.

60.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Psychiatric Solutions' financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

61.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim

financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

62. Under GAAP, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss. *See* Statement of Financial Accounting Standards ("SFAS") No. 5, ¶1. Pending or threatened litigation or actual or possible claims or assessments are examples of loss contingencies. GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: (a) *information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements*; and (b) *the amount of loss can be reasonably estimated*. *See* SFAS No. 5, ¶8.

63. Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "*reasonable possibility*" that a loss or an additional loss may have been incurred.[1] SFAS No. 5, ¶10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. *See* SFAS No. 5, ¶10.

64. Psychiatric Solutions maintains professional and general liability insurance to cover medical malpractice and other potential claims facing the Company. For fiscal years 2005 through 2008, the Company maintained professional and general liability insurance coverage in

---

[1] GAAP defines "reasonably possible" as "[t]he chance of the future event or events occurring is *more than remote but less than likely*." SFAS No. 5, ¶3.

umbrella form for claims in excess of a $3 million self-insured retention with an insured excess limit of $50 million.

65.  Despite persistent operational failures at its facilities, Psychiatric Solutions failed to increase its insurance reserves during the Class Period or to adequately record potential liabilities related to its ongoing system-related quality of care issues.

66.  Moreover, despite the problems facing its Riveredge operations, the Company failed to increase its insurance reserves in the second and third quarters of 2008 or to record a potential liability related to costs of the ongoing investigations. The Company further failed to provide adequate disclosures concerning the potential effect the Riveredge investigations and the intake hold could have on its operations.

67.  Ultimately, Psychiatric Solutions increased its self-insured reserves for its general and professional liability by $4.9 million or by $0.05 per share at year-end 2008. The Company further recorded a $0.03 per diluted share charge related to the cost of the ongoing Riveredge investigation. Moreover, Psychiatric Solutions increased its insurance coverage from an excess limit of $50 million to an excess of $75 million effective December 31, 2008.

**Psychiatric Solutions' Financial Statements Violated Fundamental Concepts of GAAP[2]**

68.  Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

---

[2]  The FASB Concept Statements set fundamental objectives and concepts and qualitative characteristics to guide recognition and measurement of economic events for financial reporting purposes, though they are considered to be non-authoritative GAAP.

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well

as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

69.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

70.     By misrepresenting the Company's business, the defendants presented a misleading picture of Psychiatric Solutions' business and prospects. Thus, instead of truthfully disclosing during the Class Period that Psychiatric Solutions' business was not as healthy as represented, Psychiatric Solutions concealed problems in its operations.

71.     These claims of favorable data caused and maintained the artificial inflation in Psychiatric Solutions' stock price throughout the Class Period and until the truth was revealed to the market.

72.    On February 25, 2009, defendants were forced to publicly disclose poor financial results and reduced guidance due in large part to ongoing problems at the Company's Riveredge facility, causing Psychiatric Solutions stock to collapse from $27.29 per share to close at $17.50 per share, a one-day decline of 35%.

73.    As a direct result of defendants' admissions and the public revelations regarding the truth about Psychiatric Solutions' overstatement of income and its actual business prospects going forward, Psychiatric Solutions' stock price fell more than 55% from its Class Period high, falling from $39.71 per share on July 8, 2008 to as low as $17.50 per share on February 26, 2009. This drop removed the inflation from Psychiatric Solutions' stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

74.    Plaintiff incorporates ¶¶1-73 by reference.

75.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)　　engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Psychiatric Solutions common stock during the Class Period.

77.　　Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Psychiatric Solutions common stock. Plaintiff and the Class would not have purchased Psychiatric Solutions common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

78.　　Plaintiff incorporates ¶¶1-77 by reference.

79.　　The Individual Defendants acted as controlling persons of Psychiatric Solutions within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Psychiatric Solutions stock, the Individual Defendants had the power and authority to cause Psychiatric Solutions to engage in the wrongful conduct complained of herein. Psychiatric Solutions controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.　　Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.　　Awarding plaintiff and the members of the Class damages, including interest;

C.　　Awarding plaintiff reasonable costs and attorneys' fees; and

D.　　Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 21, 2009

BARRETT, JOHNSTON & PARSLEY
DOUGLAS S. JOHNSTON, JR., #5782
GERALD E. MARTIN, #20193
TIMOTHY L. MILES, #21605


GERALD E. MARTIN
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)
djohnston@barrettjohnston.com
gmartin@barrettjohnston.com
tmiles@barrettjohnston.com

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

*Attorneys for Plaintiff*

# CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Garden City Employees' Retirement System v. Anixter International Inc., et al.,* No. 09-5641 (N.D. Ill.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

PSYCHIATRIC SOLUTIONS

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _11th_ day of _September_, 2009.

GARDEN CITY EMPLOYEES'
RETIREMENT SYSTEM

By: _Ann Beth_

Its: _SECRETARY / TREASURER_

PSYCHIATRIC SOLUTIONS

## SCHEDULE A

## SECURITIES TRANSACTIONS

### Acquisitions

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 09/05/2008 - SD | 1,400 | $36.82 |

### Sales

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 10/06/2008 - SD | 300 | $37.89 |
| 10/07/2008 - SD | 300 | $38.05 |

*Settlement dates are indicated with "SD" attached to the date.