UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM,<br><br>Plaintiff, and<br><br>CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Lead Plaintiff,<br><br>vs.<br><br>PSYCHIATRIC SOLUTIONS, INC., et al.,<br><br>Defendants. | Civil Action No. 3:09-cv-00882-WJH<br><br><u>CLASS ACTION</u><br><br>District Judge William J. Haynes, Jr.<br><br>Magistrate Judge E. Clifton Knowles |

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................1

II. JURISDICTION AND VENUE ...............................................................9

III. PARTIES ...............................................................................................9

IV. SOURCES OF ALLEGATIONS.............................................................11

V. PSI'S MISLEADING AND INJURIOUS COURSE OF BUSINESS ...........12

    A. PSI Embarks on an Ambitious Program of Growth by Acquisition – and Becomes Addicted to the Debt Needed to Fund Its Roll-Up Scheme ..................12

    B. To Assure Investors of the Success and Sustainability of Its Roll-Up Scheme, PSI Boosts Revenues and Profits by Secretly Cutting Hospital Staffing Below Levels Necessary to Protect or Treat the Children, Teens and Adults Under Care................................................................................15

    C. Numerous Assaults on Children Continue Even as Defendants Assure Investors and the Public of the Safety of Its Hospitals and the Sufficiency of Its Staff ..............................................................................................19

        1. Defendants Falsely Downplay and Disparage the *Tribune's* Report of Children and Teens Placed in Harm's Way by Understaffing at Riveredge Hospital........................................................................22

        2. Defendants Continue Misleading Investors by Falsely Downplaying and Minimizing Subsequent Accounts of Injuries Arising from Failures to Provide Sufficient Staff to Treat and Protect Patients at Other PSI Facilities ......................................26

    D. PSI Stuns Investors by Missing Its 2008 Earnings by 20% and Reducing Its 2009 Guidance as a Direct Result of Lost Profits and Increased Expenses Arising from the Riveredge Investigation and Professional Liability Claims ....................................................................................31

    E. After the Class Period, Evidence of the Extent of PSI's Misleading and Injurious Business Practices Continues to Come to Light....................36

VI. FRAUDULENT STATEMENTS, OMISSIONS AND COURSE OF BUSINESS BY DEFENDANTS DURING THE CLASS PERIOD ...................38

    A. FY07/4Q07 Earnings Release and Conference Call (February 20-21, 2008) ................................................................................................38

        1. Underreporting of Operating Expenses and Malpractice Reserves ..........42

2.      Misleading Reports of Expenses and Financial Metrics that Understated the True Costs of Properly Staffing and Operating PSI's Hospitals and Residential Treatment Centers ..................................49

3.      Misleading Guidance that Lacked a Reasonable Basis.............................51

4.      Misleading Omissions About PSI's Business Model and Its Current and Future Ability to Improve Operations at Acquired Facilities and Generate Growth in Same Facility Revenues.....................51

5.      Misleading Characterization of PSI's Compliance and Quality Assurance Programs and Results ...............................................54

B.      1Q08 Earnings Release, Conference Call and Report on Form 10-Q (April 30 – May 1 and May 6, 2008)................................................................58

C.      2Q08 Earnings Release, Conference Call and Report on Form 10-Q (July 30-31 and August 6, 2008)....................................................................63

D.      3Q08 Earnings Release, Conference Call and Report on Form 10-Q (October 30-31 and November 5, 2008)................................................73

E.      December 5, 2008 and January 12, 2009 JPMorgan Conferences ........................82

VII.    ADDITIONAL EVIDENCE IN SUPPORT OF A STRONG INFERENCE OF SCIENTER ........................................................................................................85

A.      Active Monitoring of Patient Safety, Treatment and Regulatory Compliance Issues ...............................................................................87

B.      Experience in the Industry and Knowledge of Regulatory Requirements.............90

C.      Hands on Management ...........................................................................91

D.      Regular Meetings Attended by and Reports Received by Management ...............92

E.      Whistleblower Retaliation ......................................................................94

F.      Deliberate Concealment of Illegal Activity ................................................96

G.      Jacobs' and Polson's Sarbanes-Oxley Certifications...........................................96

H.      Bonuses and Other Incentive Compensation ...............................................98

1.      Class Period Compensation ........................................................98

527027_1

Case 3:09-cv-00882   Document 109   Filed 06/15/10   Page 3 of 135 PageID #: 1415

2.     PSI's Bonus Plan for Facility CEOs Encouraged the Minimization of Staffing ............................................................................................101

3.     Defendants Continued to Seek Improper and Inflated Compensation and Stock Awards After the Class Period Ended, and Actively Sought to Shield Their Actions From Investors .................102

I.     Insider Trading ..................................................................................................105

VIII.   ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS CAUSATION & DAMAGES ............................................................................107

A.     Applicability of Presumption of Reliance: Fraud on the Market Doctrine ..........108

B.     Plaintiffs Suffered Damages When PSI's Stock Price Dropped as Information Concealed by Defendants' Fraud Scheme Leaked into the Market ..................................................................................................................110

IX.    ADDITIONAL CONTROL PERSON ALLEGATIONS ................................................113

X.     CLASS ACTION ALLEGATIONS ............................................................................115

XI.    CLAIMS FOR RELIEF ..........................................................................................117

XII.   PRAYER FOR RELIEF ..........................................................................................120

XIII.  JURY DEMAND ..................................................................................................121

## I.  INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the securities of Psychiatric Solutions, Inc. ("PSI" or the "Company"), between February 21, 2008 and February 25, 2009, inclusive (the "Class Period"), against PSI and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.     PSI, based in Franklin, Tennessee, is in the business of providing inpatient behavioral healthcare services at 95 hospitals and residential treatment centers located in 31 states, Puerto Rico and the U.S. Virgin Islands.  The majority of the patients treated in these facilities are children and adolescents, many of them wards of the state who have been placed under protective care after incidents of abuse or neglect by their former caregivers.  Between 2002 and 2008, and continuing during the Class Period, PSI was engaged in an aggressive roll-up acquisition strategy by which it acquired numerous psychiatric hospitals and residential treatment centers in order to grow its business.  Between 2002 and 2007, PSI expanded from a small regional operator with just five facilities and 699 beds to a major national provider with over 90 facilities housing more than 10,000 beds.  During this same period, the Company increased its revenue from $76 million to $1.5 billion and its profits from $5.7 million to $114 million, and repeatedly told investors to expect – and claimed to have delivered – growth in "same facility" revenues of 7% to 9% per year.

3.     Plaintiffs allege that PSI ran its business in a manner which operated as a fraud or deceit upon investors and other members of the public by: (i) understaffing its treatment facilities below levels necessary to assure adequate patient care or protect patients from physical or sexual abuse from other patients; (ii) failing to promptly or accurately report patient safety incidents or quality of care problems when they arose; and (iii) using revenues and earnings from newly acquired facilities to cover up operating problems at its older facilities and weaknesses in its roll-up acquisition strategy.  In connection with this fraudulent course of business, plaintiffs allege that

527027_1

defendants deliberately or recklessly made false and misleading statements or omissions to investors about: (i) the quality of patient care provided by PSI; (ii) the safety of children and adolescents and other patients under its care; (iii) the nature and adequacy of PSI's policies, procedures and internal systems and controls for detecting patient safety and quality of care problems before they occurred and for properly responding to and reporting such incidents after they occurred; (iv) the costs of providing purported "high quality" treatment to children and adolescents in a safe environment; (v) the adequacy of reserves for insurance, malpractice claims and other costs arising from negligent care of patients being treated or housed at PSI facilities; and (vi) the financial success of and expected earnings from its roll up scheme. In addition, plaintiffs allege that defendants deliberately or recklessly misled investors by making false statements or omitting material information about on-going regulatory violations and patient care and safety issues that came to light prior to and during the Class Period, including by falsely downplaying the significance of the incidents when they were reported by the media, falsely claiming the incidents were isolated occurrences that had been corrected and were not reflective of conditions at other PSI facilities, and falsely assuring investors of the adequacy of PSI's regulatory compliance and quality of care programs.

4.      The Class Period begins when PSI issued its financial results for 4Q07, reporting that same facility revenues – *i.e.*, revenues from hospitals and treatment centers that had been owned by the Company for more than a year – were more than 20% below historical levels. Fending off concerns that the negative results were a harbinger of slowing growth going forward, defendants assured investors that the fourth quarter was an aberration and the Company was primed to deliver its historical 7% to 9% same-facility revenue growth in the coming year and for the foreseeable future. To lend credence to those assertions, PSI lowered its reserves for malpractice claims, raised its financial guidance, and announced plans to "double our normal targeted pace of expansion" by adding nearly 600 new beds by the end of 2008. Although defendants claimed that the accelerated

pace of expansion was due to the strength of demand and number of potential acquisition targets in the marketplace, in fact it was required in order to conceal the increasing difficulties the Company was having in increasing revenue and profits while staffing facilities at levels necessary to address the mounting patient safety and quality of care problems at its existing facilities.

5.     At the outset of and even prior to the Class Period, PSI was facing increasing difficulties in squeezing more revenues out of its existing facilities, particularly those it had acquired early in its expansion spree.  PSI was able to attain significant revenue growth at facilities in the first few years after they were acquired by reducing administrative and overhead expenses, building out approved beds, and increasing occupancy rates through improved marketing efforts.  Thereafter, however, it became increasingly difficult to squeeze additional profits and revenue out of acquired facilities.  Facing hundreds of millions of dollars in debt it had incurred to fund its acquisition spree, and needing to demonstrate continued growth in same facility revenues to assure investors and lenders of the strength of its roll up acquisition strategy, PSI put increasing pressure on managers to reduce expenses below reasonable levels.  PSI increasingly looked at reductions in full-time employees as the solution to its financial problems, cutting the number of nurses, medical records personnel and other staff below the levels necessary to adequately protect, monitor and treat patients, or to comply with medical recordkeeping, incident reporting and other regulatory requirements.

6.     Reduced staffing and lower expenditures on patient care led to repeated and systemic problems with both the quality of care being provided to patients and their safety while housed at PSI facilities.  Repeated incidents of sexual abuse and physical attacks on children perpetrated by unmonitored patients occurred at PSI facilities across the country, as did numerous suicide attempts by at-risk teenagers who were not properly monitored by overtaxed nurses and facility staff.  Unable to cope with the increased patient load, some PSI facilities resorted to the excessive use of "chemical restraints," deliberately overmedicating the most troublesome youths consigned to their care.

527027_1

7.     On July 17, 2008, the *Chicago Tribune* ("*Tribune*") published an exposé about a pattern of violations at one of PSI's oldest facilities, the 224-bed Riveredge Hospital that had been acquired in 2002.  The article described a series of physical and sexual assaults perpetrated by unmonitored high-risk patients on at least 10 mentally disabled children housed at the facility, as well as numerous other incidents of violence that had repeatedly occurred at the facility.  The newspaper revealed that many of the incidents had not been properly reported to authorities, and described repeated instances of hospital workers interfering with efforts by law enforcement authorities to investigate alleged crimes that occurred there.  The violations caused the state to issue an administrative hold on the facility, preventing the referral of new patients by the state and potentially reducing PSI's revenues.  Defendants rapidly and publicly attacked the *Tribune's* report, claiming its articles were sensationalized accounts of isolated, historical incidents that did not reflect the nature or quality of current operations at Riveredge or other PSI facilities, and assuring investors of the sufficiency of its staffing and the strength of its reporting, compliance and quality of care programs.  Defendants said the impact of the regulatory hold at Riveredge would be inconsequential, and falsely claimed they had reason to believe the hold would be lifted before the end of the year.

8.     On November 22, 2008, a public interest news room run by professional journalists, *ProPublica*, co-published a similar series of articles with the *Los Angeles Times* ("*LA Times*") describing widespread incidents of violence, understaffing, mistreatment, and injuries to patients housed at PSI's facilities in California and elsewhere.  *ProPublica* described a pattern of violence perpetrated by and against children and teenagers housed at PSI's facilities, reporting that many of the incidents appeared to have arisen because the Company had cut nurses and staff at its hospitals and treatment centers well below the levels of its competitors in an effort to increase profitability. As they had done following the *Tribune* report, defendants again embarked on a highly orchestrated public relations campaign to attack the media and deny or downplay the accusations in its articles.

- 4 -

On January 12, 2009, the *Dallas Morning News* ("*Morning News*") followed up with a series of articles describing widespread problems at PSI's facilities in Texas similar to those previously reported by the *Tribune* in Illinois and *ProPublica* and the *LA Times* in California. Once again, the Company's public relations machine sprung into action to deny and minimize the accounts. Although PSI's stock price declined following each of these reports, causing injury to Class Period investors who had purchased the Company's shares in reliance upon the purported quality and safety of its operations and strength of its roll up business model, defendants' repeated efforts to minimize the significance of the incidents reported in the media ameliorated the effect of these price declines, which were not as deep as they would have been had the full extent and cause of PSI's problems and the risks to its operations been revealed. In the wake of defendants' fraudulent reassurances, PSI's stock regained some of the artificial price inflation previously eliminated in the wake of those reports.

9. On February 25, 2009, PSI reported its FY08 and 4Q08 financial results, announcing earnings of just $0.44 per share in 4Q08, nearly 20% lower than forecast EPS estimates of $0.54. For the year, PSI reported it earned just $1.92 per diluted share – more than 5% below its prior EPS guidance of $2.02 to $2.03. Defendants admitted that the earnings miss was caused by lost business and increased costs resulting from the still-ongoing Riveredge investigation (which had by then expanded to other PSI facilities around the nation), and an increase in its malpractice expenses. Defendants admitted that they had known business was slowing since the past October, and that malpractice expenses had been steadily increasing ever since PSI had reduced its reserves at the outset of the Class Period based on a purported expectation that those expenses would decline. Admitting that these conditions would continue to hang over the Company for at least the remainder of the year, PSI reduced its 2009 EPS guidance by nearly 7%, slashing it to $2.24 – $2.32 versus its prior range of $2.40 – $2.44.

527027_1

10.      The announcements stunned investors, causing PSI's stock price to immediately decline by $9.79 – a staggering 35% – on February 26, 2009 on volume of more than 17 million shares, 17 times its average.  The price of PSI common stock fell as low as $16.76 that day before closing at $17.50 – the lowest the Company's stock had traded at in over four years, causing millions of dollars in damages to investors who had purchased shares at the fraud-inflated prices prevailing in the market during the Class Period.

11.      On April 3, 2009, the Illinois Department of Children and Family Services ("DCFS") released a report prepared by the University of Illinois at Chicago's department of psychiatry ("UIC") which largely confirmed the prior media accounts, finding a recurring "***pattern of quality of care and patient safety problems***" at PSI facilities nationwide, including at hospitals in California, Texas, Florida, Virginia and North Carolina.  The report detailed numerous incidents of "harm to patients in unsafe treatment environments; inadequate staffing; sexual assaults; poor medical care; unqualified or incompetent staff; unreliable incident reporting; ineffective treatment and aftercare planning; and a general failure of professional clinical leadership."  According to the report:

> There is ***compelling data*** about the tendency of this organization's leadership to avoid taking direct responsibility for ***longstanding and reoccurring clinical/ administrative failures*** – in effect, placing the onus for the chronic quality of care problems downward: first, onto the hospital staff "who do not perform their duties"; [and] second, onto mentally ill patients who "refuse to comply with the rules." . . .

> Such resistance to critical self-examination, and the ***organizational tendency to "blame downward" and/or "outward" when quality of care problems arise***, is by no means limited to Riveredge officials.  In fact, the earlier brief review of ***similar problems in PSI facilities around the United States shows a corporate culture operating from one crisis to the next*** – always primed to immediately spring into action to ***fix problems that were otherwise ignored until yet another crisis eventually forces attention to be paid***.

12.      Following issuance of the UIC report, DCFS refused to lift the intake hold at Riveredge.  "The care provided by Riveredge was completely unacceptable," DCFS spokesman Kendall Marlowe said in explaining the reasons for the continuation of the hold.  The state, he said,

was "***outraged at the pain and violence suffered by innocent children in this facility's care***." As news of UIC's findings and its impact on PSI's operations reached the market, the value of PSI stock plunged again on increased trading volumes, causing millions of dollars in additional injury to Class Period investors who had not yet sold the PSI securities they acquired at inflated prices during the Class Period.

13. Thereafter, additional information about the continued mistreatment of patients placed in PSI's care during the Class Period continued to come to light, further demonstrating the falsity of defendants' claims that the incidents at Riveredge and elsewhere were isolated events that had long since been corrected and were not reflective of conditions at other PSI facilities:

- On June 9, 2009, the State of Nevada announced that it was moving to shut down PSI-owned West Hills Hospital in Reno following three serious incidents at the facility in the preceding eight months, including one which had resulted in a three-day ban on admissions in April. The 95-bed hospital was acquired by PSI in 2005.

- On June 23, 2009, the Chief Executive Officer ("CEO") and Chief Medical Officer of PSI-run Friends Hospital in Philadelphia were replaced after regulators found inadequate oversight of patients, including one who committed suicide after being left without adequate supervision. The facility, the oldest privately-run psychiatric facility in the nation, had been acquired by PSI in 2007.

- On December 10, 2009, the Illinois DCFS announced that it was expanding its investigation of PSI to include Streamwood Behavioral Health facility, a 314-bed hospital near Riveredge that was acquired by PSI in 2005. UIC found that foster children were being given dangerous combinations of mood-altering drugs, including use of the drugs as chemical restraints. The facility was "***so understaffed as to be counter-therapeutic***," leading staff to resort to "extraordinarily high" rates of use of psychiatric drugs and physical restraints to control violent outbursts by young patients under their care. "***Profiteering at the expense of the mental health of vulnerable children will not be tolerated in Illinois***," DCFS Director Erwin McEwen said in a statement issued with UIC's report on the conditions at Streamwood. "***PSI needs to develop a different business model if they want to continue caring for our children. Unless and until this corporation pays attention to children with the same fervor that they devote to the bottom line, we will seek alternatives to reduce and eventually eliminate our dependence on this provider***."

- On April 16, 2010, the State of Florida cut off admissions at Manatee Palms Youth Services, a 60-bed facility acquired by PSI in 2003 that serves patients aged 6 to 17. Florida previously moved to suspend the treatment center's license in 2007, after finding that the facility failed to put 18 patients on suicide watch because its "staffing

patterns were insufficient" to do so, and many staff it had hired lacked basic qualifications and/or should have been disqualified from employment based on information turned up in criminal background checks. Although defendants claimed during the Class Period that these problems have been corrected and operations at the facility were much improved, the state found that the facility still continues to "suffer[] from substandard conditions and deficient practices." The most recent suspension came after the state found that PSI had failed to live up to promises to correct continuing safety violations there, including failing to monitor or protect a patient who used broken glass to cut herself, and making two other patients with bone fractures wait hours before obtaining treatment.

14. These incidents, and others like them, continue to occur because PSI continues to restrict staff at the facilities it operates in order to improve its apparent operating results. In October or November of 2009, PSI laid off approximately 150 employees and by the end of the year had laid off as many as 450 employees company-wide. The layoffs were not revealed until PSI's FY09 conference call on February 24, 2010, when Jacobs characterized the headcount reduction as involving "slight adjustments" averaging four or five workers per facility to "improve their productivity slightly." A former PSI hospital CEO during that period said that, in fact, the 150-person layoff involved an "unbelievable number" of people and was initiated so that the Company could meet its earnings projections for the year.

15. On the heels of its FY09 results, defendants set about trying to cash out of the Company before their roll-up strategy collapsed under the weight of their prior acquisitions. On March 10, 2010, defendants announced that PSI had hired Goldman Sachs & Co. to evaluate potential offers to acquire the Company, causing PSI's stock price to rebound by more than 20%. Defendants did not reveal that they had been secretly exploring and negotiating a sale of the Company since at least February 2010, when PSI's five highest-paid executives had demanded and been awarded spring-loaded grants that would collectively provide them more than five times the number of shares they had been awarded the prior year, all priced at levels far below those prevailing in the market once the buyout interest became known. Although the Department of Justice ("DOJ") immediately launched an investigation into the outsized compensation awards, defendants waited

- 8 -

until May 10, 2010 – just days before the annual meeting at which they would seek shareholder approval for the new compensation arrangements – to admit that the DOJ was investigating the grants.

## II.    JURISDICTION AND VENUE

16.    Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

17.    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

18.    PSI's principal executive offices are located at 6640 Carothers Parkway, Suite 500, Franklin, Tennessee, where each of the Individual Defendants are employed.

## III.    PARTIES

19.    Plaintiff Garden City Employees' Retirement System purchased PSI common stock as described in the certification attached to its Complaint for Violation of the Federal Securities Laws filed on September 21, 2009, and was damaged thereby.

20.    Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States," collectively with Garden City Employees' Retirement System, "plaintiffs") purchased PSI common stock as described in the certification attached hereto as Exhibit 1 and was damaged thereby.  Central States was named Lead Plaintiff for this case by the Court's Order of April 30, 2010 (Dkt. #100).  With approximately $20 billion in assets, Central States, a Taft-Hartley defined benefit fund located in Illinois, provides pension services and benefits to more than 360,000 participants.

21.    Defendant Psychiatric Solutions, Inc. ("PSI" or the "Company," as previously defined) provides inpatient behavioral healthcare services in the United States through a network of

527027_1

95 hospitals and other healthcare facilities it owns or operates. PSI's common stock is regularly traded on the NASDAQ market under the ticker symbol "PSYS." During the Class Period, there were more than 55 million shares of PSI common stock issued and outstanding. The Company was founded in 1988 and is headquartered in Franklin, Tennessee.

22.     Defendant Joey A. Jacobs ("Jacobs") co-founded the Company in 1988, and has served as Executive Chairman of the Board of Directors, President and CEO of PSI since April 1997. As CEO, Jacobs is charged with overseeing and directing the day-to-day business of PSI. Jacobs is subject only to the oversight of PSI's Board of Directors – of which Jacobs is also Chairman. Prior to founding PSI, Jacobs worked for 21 years for Hospital Corporation of America ("HCA," formerly known as Columbia and Columbia/HCA) in various capacities, most recently as President of HCA's Tennessee Division. At HCA, Jacobs also served as President of the Central Group, Vice President of the Western Group, Assistant Vice President of the Central Group and Assistant Vice President of the Salt Lake City Division. During the Class Period, Jacobs signed PSI's Securities and Exchange Commission ("SEC") filings and Sarbanes-Oxley certifications. Jacobs has served as a Director for numerous health care industry organizations, including the Federation of American Hospitals, the National Association of Psychiatric Health Systems and the Monroe Carell, Jr. Children's Hospital at Vanderbilt. He is also on the Board of the Nashville Health Care Council, serving as Chairman for the 2009-2010 year.

23.     Defendant Jack E. Polson ("Polson") has served as Chief Accounting Officer ("CAO") of PSI since August 2002. Prior to being appointed CAO, Polson served as PSI's Controller since June 1997. From June 1995 until June 1997, Polson served as Controller for Columbia Healthcare Network, a risk-bearing physician health organization. From May 1992 until June 1995, Polson was internal audit supervisor for HCA. During the Class Period, Polson signed SEC filings and Sarbanes-Oxley certifications. As CAO, Polson participates in monthly executive

review meetings with each of PSI's Division Presidents at the Company's corporate headquarters in Franklin, Tennessee. During these meetings, which Jacobs and other PSI executives also attend, detailed financial reports covering each Division and PSI inpatient facility were discussed. Polson also works with Jacobs and Defendant Brent Turner to set every aspect of PSI's facilities' budgets, which include capital allocated to staffing.

24. Defendant Brent Turner ("Turner") has served as Executive Vice President, Finance and Administration of PSI since August 2005. Turner previously served as PSI's Vice President, Treasurer and Investor Relations since February 2003. From April 2002 until August 2005, Turner served as Executive Vice President ("EVP") and Chief Financial Officer for a privately held owner and operator of schools for children with learning disabilities. From November 2001 until March 2002, Turner was Senior Vice President of Business Development for The Brown Schools. As EVP of Finance and Administration, Turner works with Jacobs and Polson to set every aspect of PSI's facilities' budgets, which include capital allocated to staffing.

25. Defendants Jacobs, Polson and Turner are collectively referred to herein as the "Individual Defendants."

## IV. SOURCES OF ALLEGATIONS

26. Plaintiffs' allegations are based upon information contained in SEC filings by PSI, other regulatory filings and reports, records and reports of government investigations of PSI's operations, press releases and media reports about the Company, reports of securities analysts about the Company, transcripts of conference calls and analyst presentations by PSI or its officers, and other reports of oral statements made by defendants. The allegations contained herein are also based upon an investigation conducted at the direction and under the supervision of lead counsel, including information obtained from former employees of PSI and others with knowledge about the Company's operations.

527027_1

## V.     PSI'S MISLEADING AND INJURIOUS COURSE OF BUSINESS

27.     PSI was founded by defendant Jacobs in 1988 and initially offered a broad based platform of both inpatient and outpatient behavioral health care services.  PSI provides inpatient treatment for children, adolescents and adults at acute care psychiatric hospitals and also operates residential treatment centers where children with long-standing chronic behavioral health problems are treated and housed.  By FY07 PSI's inpatient facilities were accounting for more than 90% of the Company's revenue.

### A.     PSI Embarks on an Ambitious Program of Growth by Acquisition – and Becomes Addicted to the Debt Needed to Fund Its Roll-Up Scheme

28.     In 1999, PSI's management began repositioning PSI to focus on inpatient hospitals. During 2002, PSI merged with and into PMR Corporation, with PSI emerging as the surviving entity.  By the end of 2002, PSI had acquired five hospitals and embarked on an aggressive debt-financed growth strategy.  By the end of 2007, it had more than 90 facilities and revenues topping $1 billion dollars.  The Company's apparently strong and sustainable track record of growth led a Credit Suisse analyst on December 17, 2007 to proclaim that the Company "has been among the more successful health care service roll-ups in recent memory."

29.     PSI's roll up acquisition strategy produced impressive growth, but placed substantial pressure on PSI and the defendants as it became increasingly harder to maintain.  Between 2002 and 2007, PSI acquired an average of 17 facilities per year, funded by debt in excess of $1 billion.

| End of Period | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|
| Facilities | 5 | 24 | 34 | 58 | 75 | 90 | 94 |
| Licensed Beds | 681 | 3,100 | 4,337 | 6,689 | 8,420 | 10,155 | 10,677 |
| Total Debt ($M) | 44 | 175 | 174 | 482 | 743 | 1,172 | 1,314 |

30.     To fund these acquisitions, PSI had issued $620 million in guaranteed Notes and obtained a revolving line of credit and a senior secured term loan with various lenders.  At the end of

2007, PSI had $80 million in borrowing outstanding on its revolving credit facility at between 6.4%
and 6.7% interest and $573 million of debt on the term loan facility at 6.8 and 7.1%. As a result of
restrictive covenants imposed in May 2007 limiting the incurrence of additional debt and imposing a
maximum leverage ratio of 5.5x Adjusted EBITDA, PSI's access to further capital was becoming
more limited at the outset of the Class Period, potentially jeopardizing its roll up acquisition strategy.

31. While defendants claimed the Company could leverage this debt by squeezing
7% to 9% growth out of existing facilities on an annual basis, they had essentially reduced
themselves to purchasing earnings – *i.e.*, using debt to buy facilities that would add to PSI's annual
revenue. During the Class Period, this led some investors to question the sustainability of PSI's
business and whether it was overpaying for assets. After PSI announced the 1Q08 acquisition of five
facilities but failed to disclose the purchase price, a Credit Suisse analyst wrote in March 2008: "A
continued focus of ours is that historically, the firm has overpaid for assets, in an attempt to drive the
income statement, yet disregarding the balance sheet." As a result of such concerns, defendants
were under intense pressure to demonstrate that PSI could sustain revenue growth at acquired
facilities, both to justify the purchase prices and to demonstrate the continued viability of its business
model. The pressures on defendants were heightened by the sudden and unexpected decline of
same-facility revenues that had occurred at the end of 2007, leaving some investors wondering
whether PSI's roll-up strategy had reached the end of its lifecycle.

32. PSI's 2007 Report on Form 10-K, issued at the outset of the Class Period on
February 28, 2008, assured investors of the continuing viability of the Company's plans to continue
its growth by acquisition strategy of rolling up existing psychiatric hospitals and residential
treatment centers under the PSI umbrella:

**Our Growth Strategy**

We have experienced significant growth in our operations as measured by the
number of our facilities, admissions, patient days, revenue and net income. We

- 13 -

intend to continue successfully growing our business and increasing our profitability by improving the performance of our inpatient facilities and through strategic acquisitions. The principal elements of our growth strategy are to:

- Continue to Drive Same-Facility Growth – We increased our same-facility revenue by approximately 6.5% for the year ended December 31, 2007 compared to the year ended December 31, 2006. Same-facility revenue also increased by approximately 9.0%, 8.0%, and 9.0% for the years ended December 31, 2006, 2005, and 2004, respectively, compared to the immediately preceding years. Same-facility revenue refers to the comparison of the inpatient facilities we owned during a prior period with the comparable period in the subsequent period, adjusted for closures and combinations for comparability purposes. We intend to continue to increase our same-facility growth by increasing our admissions and patient days and obtaining annual reimbursement rate increases. We plan to accomplish these goals by:

  - expanding bed capacity at our facilities to meet demand;

  - expanding our services and developing new services to take advantage of increased demand in select markets where we operate;

  - building and expanding relationships that enhance our presence in local and regional markets;

  - developing formal marketing initiatives and expanding referral networks; and

  - continuing to provide high quality service.

- Grow Through Strategic Acquisitions – Our industry is highly fragmented and we plan to selectively pursue the acquisition of additional inpatient behavioral health care facilities. There are approximately 500 freestanding acute and residential treatment facilities in the United States and the top two providers operate approximately one-third of these facilities. We believe there are a number of acquisition candidates available at attractive valuations, and we have a number of potential acquisitions that are in various stages of development and consideration. We believe our focus on inpatient behavioral health care provides us with a strategic advantage when assessing a potential acquisition. We employ a disciplined acquisition strategy that is based on defined criteria, including quality of service, return on invested capital and strategic benefits.

- Enhance Operating Efficiencies – Our management team has extensive experience in the operation of multi-facility health care services companies. We intend to focus on improving our profitability by optimizing staffing ratios, controlling contract labor costs and reducing supply costs through

group purchasing. We believe that our focus on efficient operations increases our profitability and will attract qualified behavioral health care professionals and patients.

33.     The 2007 Report on Form 10-K touted PSI's "[d]emonstrated ability to identify and integrate acquisitions" as one of its competitive strengths, assuring investors of its rigorous due diligence review, disciplined acquisition strategy, and comprehensive post-acquisition strategic plans to improve both revenues and the quality of care provided to patients:

> We attribute part of our success in integrating acquired inpatient facilities to our rigorous due diligence review of these facilities prior to completing the acquisitions as well as our ability to retain key employees at the acquired facilities. We employ a disciplined acquisition strategy that is based on defined criteria including quality of service, return on invested capital and strategic benefits. We also have a comprehensive post-acquisition strategic plan to facilitate the integration of acquired facilities that includes improving facility operations, retaining and recruiting psychiatrists and expanding the breadth of services offered by the facilities.

34.     The 2007 Report on Form 10-K further assured investors that PSI was able to manage this growth without sacrificing "our reputation for the quality of our services" or jeopardizing its "recruitment of first rate medical staff," both of which had helped the Company "differentiate ourselves from our competition." In fact, the Report boasted at length about the purported quality of PSI's treatment facilities, bragging about the "intensive, highly coordinated treatment by a physician-led team of mental health professionals" at its acute care facilities, the "[t]wenty-four hour observation and care" provided at its residential treatment centers and its ability to "provide services to patients with multiple issues and specialized needs" that led to numerous out-of-state referrals of patients to its facilities.

**B.     To Assure Investors of the Success and Sustainability of Its Roll-Up Scheme, PSI Boosts Revenues and Profits by Secretly Cutting Hospital Staffing Below Levels Necessary to Protect or Treat the Children, Teens and Adults Under Care**

35.     In order to continue generating profits and assuring investors of the profitability and sustainability of its roll-up strategy, PSI had to continually improve revenues and profits at the

- 15 -

facilities it had acquired because, as the size of the Company increased, it became more and more difficult to use revenue growth at newly acquired facilities to offset declining growth at facilities that had been acquired previously, where revenue growth by adding beds and increasing occupancy rates had already largely been achieved.

36. Salary and benefits make up the largest component of the budget for PSI's hospitals, typically running at about 60% of the total budget, according to a former hospital CEO. PSI executives monitored staffing levels very closely, and when faced with revenue shortfalls or budgetary pressures, cutting staff was the first item on their agenda. In one case, a former PSI hospital executive said 40% to 50% of the staff of a facility acquired in 2006 had to be eliminated to comply with PSI's budgets and staffing ratios. Such reductions made it extremely difficult to comply with applicable licensing and regulatory requirements, and left the facility without sufficient staff to ensure the safety of patients.

37. PSI begins its annual budget process in August, when hospitals begin preparing their budgets for the coming year. As part of this process, each hospital is provided with financial targets by the corporation, including staff-to-patient ratios which invariably require hospitals to eliminate employees. According to a former division-level PSI employee, there were always expectations from corporate headquarters that the hospitals would improve financially from year to year, including by increasing revenues. The objective was for every hospital to increase annual revenues by 7% to 9% while holding spending increases to 3% to 5%, thus increasing overall profits by 10% to 12% annually. According to several former CEOs of PSI hospitals, these expectations continued even after hospitals were running at 90% or greater capacity. "There's a point where you can't have volume growth," said one former hospital executive.

38. PSI's corporate headquarters monitored facility staffing and census (*i.e.*, number of occupied beds) on a constant basis. As soon as the census began to drop, executives would push for

527027_1

Case 3:09-cv-00882   Document 109   Filed 06/15/10   Page 20 of 135 PageID #: 1432

cuts in staffing. This pressure increased during the Fall of 2007 when, according to one former PSI hospital executive, PSI's corporate headquarters began pushing for weekly reports on staffing. Around the same time, according to a former hospital CEO, PSI's division CEO showed up at one of its facilities in Kentucky demanding that the hospital cut five or six full-time employees from its staff. "We're not leaving here until we get enough staff cut," s/he recalled the division executive telling hospital administrators. This pressure continued during the Class Period. In April or May of 2008, for example, Jacobs attended a meeting at the Focus by the Sea facility in St. Simon's, Georgia, where facility managers directly informed Jacobs that the hospital needed more staff. Jacobs refused, and informed the facility managers that they had all the staff PSI could afford, and although PSI executives would "love to do more," they would not authorize the hiring of any additional staff.

39. To control staffing expenses, PSI instituted strict controls on the number of employees per occupied bed, or "EPOB," at each hospital. Corporate executives continually monitored EPOB ratios, and when the ratio began to climb above the target set for a facility, as it would when occupancy rates declined, they immediately put pressure on the hospitals to cut staff. One former hospital CEO recalled being under constant pressure to keep the EPOB ratio at the hospital under 2.0, and sometimes as low as 1.8, as compared with a more typical ratio of 2.0 to 2.2 at other hospitals. Whenever the EPOB ratio climbed above 2.0, s/he said corporate executives would immediately call and demand an explanation. Even at PSI hospitals which were permitted EPOB ratios above 2.0, CEOs similarly describe being under constant pressure to reduce staffing to achieve financial targets.

40. Since the late 1990s, the EPOB ratio has become increasingly insufficient to assure adequate patient care. Because most staff time in a psychiatric hospital is spent admitting and discharging patients, and because average patient stays have decreased while the staff-to-patient ratio

remained constant, the effect has been to create more work for the same number of employees. PSI staffing models have failed to take this into account, effectively leaving facilities understaffed.

41. PSI's myopic focus on the EPOB ratio has repeatedly jeopardized the safety of children, teens and other patients being treated at its facilities. Staff cuts required to comply with the EPOB ratio left fewer employees available to monitor patients, permitting unsupervised patients to assault, rape or sexually molest one another, or to act out on suicidal tendencies. These and other incidents frequently gave rise to regulatory violations that jeopardized the facility's license and revenues. In 2008, an adolescent girl was raped by a boy who went into her room in a unit at a PSI hospital in Texas that was only staffed half-time by a program director. The staff member on duty at the time of the assault was tired and not paying attention, leaving the victim unsupervised. "There was a lack of supervision, a lack of somebody staff could talk to about their concerns for patient care," said a worker at the facility at the time of the assault. The workers' account is corroborated by contemporaneous media accounts which describe several rapes at the facility, including one of a 13-year-old girl, and another of an adult woman who later told investigators that it occurred because PSI staff was "not paying attention" to patients at the facility.

42. Federal and many state laws and regulations establish both quantitative and qualitative staffing requirements for PSI's hospitals and residential treatment centers. For example, Centers for Medicare and Medicaid Services (CMS) regulations, which govern all facilities that, like PSI, seek reimbursement under Medicaid programs, require hospitals to "have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients **as needed**." This requires staffing to be based not just on numerical minimums set out in the regulations, but to also take into account the needs, or "acuity," of the patient population – *i.e.,* the level of care necessary based upon what mental problems patients are experiencing and exhibiting. Some patients require more intense, at times one-on-one, care than

527027_1
Case 3:09-cv-00882   Document 109   Filed 06/15/10   Page 22 of 135 PageID #: 1434

others, yet former PSI employees and government regulators have found that the Company's EPOB

ratio did not take this into account in calculating staffing levels.

- When Texas state investigators asked the Director of Clinical Services at a PSI hospital in that state to produce evidence that the facility had sufficient staff to meet patients needs, the Director was unable to do so, telling investigators that he was relying solely on a regulatory requirement that he have at least one RN on each nursing unit in making staffing decisions. The investigator confirmed this incident in an interview with UIC, which included it in its report on the Riveredge incidents.

- According to a former patient safety officer at a facility acquired by PSI in 2007, it was apparent from "Day One" after PSI took over that it had a much different view of staffing than the prior operator. PSI imposed a "very tight" ratio of staff to patients that did not take patient acuity, or the level of care they needed, into account, s/he said.

**C.    Numerous Assaults on Children Continue Even as Defendants Assure Investors and the Public of the Safety of Its Hospitals and the Sufficiency of Its Staff**

43.    Prior to and during the Class Period, defendants repeatedly assured investors that they

had comprehensive systems in place designed to detect potential problems before they occurred and

assure that PSI's hospitals and residential treatment centers were providing high-quality care in a

safe and secure environment, in compliance with regulatory and licensing requirements and

applicable treatment standards. In PSI's 2007 Report on Form 10-K, for example, the Company

claimed that:

> The services provided at each inpatient facility are ***continually assessed and monitored*** through an ongoing quality improvement program. The purpose of this program is to strive for the ***highest quality of care possible*** for individuals with behavioral health issues, and includes ***regular site visits*** to each inpatient facility in order to assess compliance with legal and regulatory standards, as well as adherence to our compliance program. ***Standardized performance measures based on a national outcomes measurement data base comparing our inpatient facilities' performance with national norms are also reported and reviewed and corrective steps are taken when necessary***.

44.    PSI said it employed compliance and risk management officers at every facility, who

ultimately reported to Kathy Bollmer, its corporate head of compliance who worked closely with

Jacobs and other PSI officers and also reported directly to PSI's Directors Bill Petrie and Ed

Wissing. The Company claimed to have an active regulatory monitoring and compliance program capable of "capturing real-time incidents that might be occurring" including minor incidents and suspected incidents. "[W]e capture much more than we actually have to report," Jacobs told investors on one conference call. By reason of these systems and programs, and their personal participation in creating them and working with compliance personnel, it may be inferred that PSI, Jacobs and the other defendants, board members and senior management of PSI had contemporaneous knowledge of incidents like those described below, where numerous children and adolescents were injured by the Company's failure to protect or appropriately treat them due to lack of staff, resources or failures to comply with regulatory and medical requirements.

45.     Prior to and during the Class Period, PSI claimed to be actively tracking seven "core measures" for psychiatric hospitals developed by the Joint Commission, an independent, non-profit accreditation agency, with input from PSI and other providers. PSI, which was one of the Pilot Providers in the program while it was under development, repeatedly assured investors that its facilities were performing well under those measures. At a December 5, 2008 JPMorgan conference, for example, Turner told investors to expect the data in early 2009: "we will even have more data to show that across these various core measures, core indicators; again, how we are doing relative to the industry and we are quite confident that is going to be viewed very favorably." In fact, as described below, when the data was released in 2009, it dramatically showed that PSI was out of compliance on six of the seven core measures, and the trend lines accompanying the reports strongly suggested that the problems had been even worse in 2008. *See* ¶¶74-75.

46.     From time to time prior to the Class Period, incidents of children and adolescents being injured by fights or sexual assaults at PSI's facilities surfaced in the media. Whenever this occurred, PSI orchestrated a carefully crafted public relations campaign in which it would express remorse for the incident while labeling it as an "unfortunate" reality associated with the treatment of

527027_1

patients with severe mental illnesses and attacking the media report as a sensationalized account of isolated incidents that had long since been corrected. Problems, where they were acknowledged at all, were blamed on the patients themselves, or on failings by low-level employees to follow Company policies and procedures. As UIC would later write in its report on Riveredge:

> If the modus operandi for managing crises within this organization is to ignore, deny or minimize quality of care problems, then rush in to retrofit a "corrective action" plan, this is probably not what DCFS would consider "acting in good faith" to protect its wards from harm. Nevertheless, that has been the response at Riveredge for years.

47.     Jacobs admitted on the call that he and other executives had advance notice of media investigations leading to negative media reports, including those by the *Tribune*, *ProPublica* and *Morning News* described below. On PSI's 4Q08 earnings call on February 26, 2009, Jacobs told investors the Company actively worked behind the scenes to alert government officials and other referral sources of the upcoming articles and convince them that the allegations were untrue or overblown so they would not stop sending patients to PSI facilities:

> [ANALYST:] Okay. And then can I just ask a question with regard to how you're educating your referral sources. You've obviously, some bad headlines which we would all like to see you avoid going forward, but in those markets where – that may have had some impact in your referral sources, perhaps, can you just talk to us about how your compliance team is educating referral sources with regard to your outcomes? If there's any different process there?

> [JACOBS:]     We know when someone's out there, doing a story, and we have – by the time the story is written, we kind of know where they're going to focus. Fortunately for us, they keep focusing on very old stories, very old incidents, so we do give state agencies joint commission, referral sources heads up ahead of time so they are not surprised or read it in the paper and I think our operations team in conjunction with Kathy Bolmer and the Compliance and Quality Department do a good job of reaching out to those sources and providing more detail surrounding the events and that the subsequent appropriate agency has reviewed those incidents that are occurring.

48.     After a series of assaults and allegations of sexual and physical abuse at PSI's Whisper Ridge residential treatment center in Charlottesville, for example, Jacobs told investors on an April 27, 2006 investor call that the incident was "isolated" and that a new CEO installed in

February was "making great progress there." The problems at Whisper Ridge were strikingly similar to and indicative of problems caused by understaffing of many other PSI facilities, including Riveredge, which came to light during and after the Class Period. In a letter sent to the Company on February 27, 2006, the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services found the 103-bed facility, acquired by PSI in April 2003, was in violation of numerous state laws concerning the care of patients and notified the Company of its intent to revoke the facilities license. The state found PSI had provided "***overall inadequate medical care due to the understaffing of care and nursing staff to address the needs of the number of residents***." The treatment center had been the scene of numerous assaults by patients on other patients and staff, repeated allegations of sexual abuse of patients by staff, and several suicide attempts arising from the facility's failure to monitor patients, follow drug administration protocols or complete medical assessments of patients upon admission. The state found "multiple violations constituting neglect" of children, and discovered documents showing "a system in place to hide medication errors" at the facility.

> **1. Defendants Falsely Downplay and Disparage the *Tribune's* Report of Children and Teens Placed in Harm's Way by Understaffing at Riveredge Hospital**

49. When the *Tribune* published its July 17, 2008 exposé describing numerous failures by Riveredge Hospital to supervise and protect adolescents under its care, and repeated instances of refusals and delays by hospital employees to report incidents of violence that erupted as a result, PSI engaged in a familiar pattern of downplaying the account. The CEO was replaced, the articles were disparaged as sensationalized accounts of isolated incidents long past, and investors and the public were assured that the new management of the hospital had eliminated the problems of the past.

50.    The 210-bed Riveredge Hospital is one of PSI's largest and oldest facilities, having been acquired in July 2002, just as the Company was embarking on its expansion spree. The *Tribune* began its description of conditions at the facility as follows:

> Illinois' largest psychiatric hospital left sexual predators unguarded despite allegations that at least 10 mentally disabled children were assaulted during the last three years. [¶] The youngest victim was an 8-year-old state ward admitted for evaluation after expressing suicidal thoughts. [¶] Administrators at west suburban Riveredge Hospital and government authorities failed to share basic information as the savage violence left some youth worse off than when they arrived, a Tribune investigation found. [¶] After the newspaper asked about the series of assault reports, the state Department of Children and Family Services last week stopped admitting wards to Riveredge – a punishment imposed on just three other psychiatric hospitals since 2004, records show. [¶] On Wednesday, agency officials announced that the Tribune's findings had prompted them to immediately impose changes, including new training for child-protection workers and better reporting of assault allegations.

51.    According to the *Tribune*, Illinois state Health Department surveyors cited the hospital 22 times in 2007 alone for deficiencies that threatened the safety or legal rights of patients. By comparison, during the same period the department cited a total of 31 such deficiencies at the dozen other private psychiatric hospitals or hospital units frequently serving DCFS wards. Riveredge had the highest rate of deficiencies per patient day, the *Tribune* found.

52.    The article and accompanying sidebars published in the *Tribune* documented numerous incidents of violence among unsupervised juveniles, including many resulting from the hospital's failure to heed or follow instructions to monitor or isolate dangerous patients admitted to the facility – a likely result of understaffing. The newspaper reported that it had "uncovered instances in which hospital administrators shooed away police." The incidents uncovered by the *Tribune's* investigation were horrific, and included the following:

- After a 19-year old reported being raped by another patient in the Hospital in 2007, records reviewed by the *Tribune* showed that, despite having found evidence of the attack – drops of blood in the bathroom where the attack was alleged to have occurred – the hospital didn't send the victim to a local emergency room, didn't report the allegations to local police, and didn't assign an aide to maintain the

required one-on-one observation on the attacker. The attacker struck the same victim again the next day, government records show.

- The newspaper recounted a similar 2006 incident in which a 12-year-old patient was raped by his 15-year old roommate, who was being treated for sexual aggression. "I told Riveredge over and over again, 'Do not put anybody in the room with this boy,'" the attacker's mother told the newspaper. The newspaper recounted a police report of the attack which similarly quoted the boy's mother as telling police that "she informed them when [her son] was admitted that he needed his own room . . . so just as much blame should be on the hospital [as on her son, the attacker] for creating the environment for the incident to occur."

- At 9:00 p.m. on December 31, 2006, local police responding to an anonymous 911 call from within the Hospital of a fight in progress were refused admittance by hospital employees. On New Year's Day, a woman reported her teenage son "had been battered in the melee." A hospital worker told the mother that a staff member had punched her boy in the eye, but no incident reports of the fight were available. Illinois Department of Public Health investigators were similarly stonewalled when they tried to look into the incident, reporting that "the hospital was unable to accurately identify the actual number of participants" in the melee.

- Riveredge similarly failed to promptly notify DCFS of a July 5, 2008 fight in the adolescent boys unit. Between 2005 and 2007, police and state surveyors investigated reports that eight young patients were injured in non-sexual assaults. Riveredge staff or contract employees were accused in four of those alleged attacks. The attacks included a March 19, 2007 incident reported by a clinical social worker, in which two Riveredge workers had battered a 16-year-old bipolar patient who resisted getting a shot.

- When police tried to investigate the July 5 melee, the hospital's human resources department was "unable to provide the names and addresses of the offenders or witnesses." When police tried to investigate another fight at the hospital, on October 25, 2007, a hospital employee refused to turn a video of the incident over the police, telling officers she needed permission of PSI's risk management specialist before she could do so.

- In at least four cases since 2006, the *Tribune* reported that government inspectors cited Riveredge for improperly sedating children with powerful psychotropic drugs. In 2006, Riveredge administered forced medication to a bipolar 12-year-old three times without notifying a guardian actively involved in his care, an Illinois Human Rights Authority report stated.

53.    In the weeks leading up to the publication of the *Tribune* articles, after Jacobs and other executives had already learned of the newspaper's investigation (*see* ¶47), the Company replaced Riveredge's CEO. The new CEO and other PSI executives downplayed the incidents,

telling reporters that "the company quickly corrected the deficiencies" and blaming the incidents on past problems or difficult patients. "We deal with a very acute population, and there are instances in all facilities where something will happen," Jeff Bergren, PSI's Midwest division president was quoted as saying in the article. "I can't speak knowledgeably about incidents from the past," new Riveredge CEO Carey Carlock was quoted as saying, "but the current team has a dedication to excellence." "There have been issues," added hospital spokesman John Van Mol, a Nashville public relations consultant, "but they've got new leadership and have beefed up psychiatric staff and are still making changes to try and get better."

54.     On a conference call with investors several weeks later, Jacobs reiterated these themes, claiming that PSI "take[s] care of very difficult patients," acknowledging that "unfortunate incidents do occur in this patient population" but assuring investors that the newspaper account reflected historical incidents that "were reported to the relevant agencies and appropriate corrective actions were taken in 2006 and 2007." "The quality is better there [now]," Jacobs claimed.

55.     In fact, the quality was not better – not at Riveredge, and not at PSI's other facilities. According to a follow-up article published by the *Tribune* on February 26, 2009, sexual assaults by unsupervised patients continued to occur at Riveredge in the weeks after the newspaper's original report. "In the months since," the *Tribune* wrote in its follow-up report, "details have emerged suggesting problems at Riveredge continued after the new facility manager took over in June." The follow-up article documented additional incidents like those described above, including a case in August 2008, where a hospital worker failed to intercede to stop or immediately report a sexual assault in progress against a 16-year-old autistic boy, and the discovery of a 2007 death of a patient due to alleged overmedication with clozapine which PSI had not reported on grounds that the patient died in an emergency room at a local hospital, an hour after she had collapsed at Riveredge.

### 2. Defendants Continue Misleading Investors by Falsely Downplaying and Minimizing Subsequent Accounts of Injuries Arising from Failures to Provide Sufficient Staff to Treat and Protect Patients at Other PSI Facilities

56. The incidents at Riveredge were reflective of conditions at other PSI hospitals and residential treatment centers, particularly those, like Riveredge, which had been acquired years earlier and were struggling under increasingly tight budgets necessary to sustain PSI's apparently remarkable – and misleading – track record of providing 7% to 9% same facility revenue growth every year. For example:

- After a five-year-old patient was sexually abused by a 12-year-old patient at the 88-bed Bryn Mar Hospital in North Carolina, acquired by PSI in June 2003, the North Carolina Department of Health and Human Services found in June 2007 that PSI had failed to protect patients after incidents of sexual abuse, lacked systems needed to identify the risks of sexual abuse, and – in 40% of the cases reviewed – failed to report sexual abuse promptly to authorities. Records supplied to investigators further showed that, PSI failed to provide sufficient monitoring of potential sexual abusers in 40% of the cases reviewed and failed to monitor patients with suicidal tendencies in 20% of the cases reviewed.

- In June 2007, the Texas Department of Health & Human Services concluded an investigation into a May 6, 2007 incident at Cypress Creek Hospital where a suicidal patient who was supposed to be monitored every 15 minutes had slit his wrist in the shower, passed out and remained unconscious for more than five hours while the shower flooded his room, then regained consciousness and walked to the nurses station where the self-inflicted injury was finally discovered. Records from the 96-bed hospital – acquired by PSI in September 2001 – showed no rounds were performed during the entire time the patient was unconscious. Upon review of records of care provided to another 15 patients at the hospital, the agency found that PSI had provided none of them with a safe setting for treatment.

- On September 17, 2007, the Carolina Department of Health & Human Services made a finding of immediate jeopardy against PSI's 108-bed Holly Hill Hospital, acquired by PSI in December 2001. The Department found numerous instances of providing drugs to the wrong patients and administering drugs without a doctor's order. Medication errors have frequently been linked to understaffing of nurses.

- California authorities have reported significant quality of care problems at the 72-bed Sierra Vista Hospital, acquired by PSI in July 2005, including medical errors and patient deaths. According to UIC, which "examined more than 500 pages of surveys at Sierra Vista," "Surveys conducted by the California Department of Health underscored repeated issues about understaffing, patient safety, medication

administration, poor supervision and staff training, and an array of serious quality of care violations."

57.     Following the *Tribune* report, other media organizations began investigating PSI's operations around the country, finding similar patterns of abuse and mistreatment of children and adolescents being treated at PSI hospitals and residential facilities.  On November 22, 2008, the *LA Times* and *ProPublica* – an independent, non-profit public interest newsroom based in New York – co-published an investigation that uncovered "a string of cases involving abuse and neglect at PSI facilities nationwide."  What *ProPublica* and the *LA Times* found was shocking.  ***"Poor patient supervision, understaffing and inadequate worker training have led to instances of chaos and brutality***," the article said, recounting numerous incidents across the country:

> Staffers at a Texas facility had to barricade themselves in an office and call in a SWAT team to bring unruly residents under control.  In North Carolina, inspectors found, a 12-year-old boy with a history of sexual aggression was put in a room with a 5-year-old and attempted to force the younger boy to perform oral sex. . . .  A nurse at another North Carolina facility gave a 7-year-old boy anti-seizure medication prescribed for an older patient, leaving him so drowsy that a doctor wrote in his chart that "he refuses to wake up."  Workers in Virginia waited almost an hour to call an ambulance for a 17-year-old girl who had suffered a seizure and was bleeding profusely, inspection records show.  The girl died later that day. . . .  A hospital in Texas was cited by state inspectors for concealing key facts about a patient abduction and a suicide.  Regulators in Virginia uncovered what they called an organized scheme to cover up violence, suicide attempts and medication errors at a Charlottesville facility for juveniles.[1]

58.     *ProPublica* found that "[s]ome of the PSI hospitals most under fire from authorities are those the chain has owned longest."  "Since 2005, the 10 hospitals PSI has owned longest have compiled almost twice as many patient-care deficiencies as 10 similar hospitals owned by its closest competitor, Universal Health Services Inc."  When it came to the most serious deficiencies – those impacting the ability to "provide care in a safe setting" – the difference was even more striking:

---

[1]     Internal paragraph breaks and bullet point markers omitted.

527027_1

PSI's California facilities were cited for those deficiencies 29 times between January 2005 and June 2008, compared with just six citations for Universal Health Services, Inc. ("UHS") in the same period. Other statistics told a similar story: There were four instances of PSI's California patients being placed in immediate jeopardy versus none for UHS; PSI had three patient deaths, UHS had none; PSI was warned seven times of possible Medicare termination and one hospital was terminated, UHS had three warnings and no terminations. "Among private psychiatric hospitals in California, [PSI-owned] – Sierra Vista [Hospital] had the single highest rate of state and federal deficiencies – about eight times the statewide average," *ProPublica* found, noting that the hospital had twice been fined for endangering patients – accounting for the only such penalties levied against psychiatric hospitals under a 2006 state law establishing the sanctions.

59. The primary reason for this string of problems was understaffing. As *ProPublica* described events following PSI's acquisition of one California facility:

> Psychiatric Solutions Inc. was on its way to becoming the nation's leading provider of private psychiatric care when it snapped up Sierra Vista Hospital in Sacramento in mid-2005. [¶] ***The company put its well-honed business formula into action: Staffing fell. Beds filled up. Profits soared***. [¶] It was a winning strategy for investors. But for some patients, federal records show, checking into Sierra Vista proved dangerous – at times deadly.

60. Former PSI employees contacted in connection with Lead Plaintiff's investigation have described similar cuts at other facilities acquired by PSI. For example:

- At one facility acquired in 2006, significant staff cuts were made the following year to meet aggressive budgetary goals even though the facility was out of compliance and had insufficient staff to ensure the safety of patients. Even where the hospital attempted to cut non-treatment staff – janitors, cafeteria workers and the like – the cuts still impacted patient treatment, because the work formerly done by those employees ended up being done by nurses, who then had insufficient time to devote to monitoring patients or other treatment-related tasks.

- Within three months of the acquisition of another facility in 2007, the number of program directors (typically nurses) overseeing nine units was cut in half – from eight to four – and the number of mental health therapists was cut from three per unit to two. Most units housed 24 beds. In addition, the Company promoted unqualified

employees to management positions, and cut the facility's EPOB ratio significantly below its pre-acquisition level.

61.     *ProPublica* found that staffing ratios at PSI facilities in California were comparatively lower than other psychiatric facilities in the state, while its profits were correspondingly higher.  An analysis of data from the California Office of Statewide Health Planning and Development found that PSI hospitals had a profit margin of more than 25%, compared with an average of 6% for the state's other for-profit hospitals.  Meanwhile:

> PSI's California hospitals proportionally have fewer registered nurses than other private psychiatric facilities: about one for every four beds, compared with one for every two beds, according to the state data.  Overall, the PSI hospitals have about one-third fewer staffers per bed.

62.     PSI disputed *ProPublica's* data ("[w]e do not believe that we have fewer nurses per bed") and attempted to downplay the incidents it reported, claiming in a letter from Jacobs that *ProPublica* had "focus[ed] on just a relatively few incidents and paint[ed] an unfair picture" of PSI.  As with his attempts to undercut the earlier *Tribune* investigation, Jacobs portrayed the incidents reported by *ProPublica* as "unfortunate" occurrences that did not reflect PSI's current operations and claimed that any needed corrective measures "have long since been made."  According to *ProPublica*:

> Chad Thompson, who worked in the admissions office at Sierra Vista when PSI took over, has a different view.  He felt the chain put intense pressure on him to keep every bed full, with less emphasis on assuring that each patient got high-quality care.  [¶]  "It's a pattern of behavior driven totally by the almighty dollar," said Thompson, now the director of a nonprofit that provides therapy to the uninsured and chairman of Sacramento County's Mental Health Board, which advises the county Board of Supervisors.  [¶]  "It's not a client-centered approach.  It's a money-centered approach."

63.     In the weeks that followed the *ProPublica* investigation, defendants continued to attack the media articles.  "There's always going to be incidents that occur inside a psych hospital that you would rather wish had not occurred," defendant Turner told investors at a December 5, 2008 JPMorgan conference.  "But those are very, very, very much the exception and not the general rule."

527027_1

When questioning about the *ProPublica* article persisted, Turner deflected further inquiries from investors at the conference, telling them "I'm not here to talk about that."

64.     On January 12, 2009, the *Morning News* published an article describing the results of its investigation of PSI facilities in Texas, recounting numerous incidents of violence and abuse leading to injuries of patients housed at PSI's Laurel Ridge, The Oaks and San Marcos Treatment Centers. The incidents described by the *Morning News* were eerily reminiscent of those recounted at Riveredge by the *Tribune* and at Sierra Vista and other PSI facilities by *ProPublica* and the *LA Times*:

> [Texas government inspection and investigation] records say, "the facility failed to provide adequate numbers of qualified personnel" when a 13-year-old patient was injured while being restrained by a staff member. In another incident, a 14-year-old patient [was injured] in sexual activity with another patient. The investigator concluded that "the facility failed to direct, monitor and evaluate the care of patients." Center management also neglected to monitor patients sufficiently, an investigator found, when a 17-year-old patient with a "long history of violent and disruptive behavior" attacked another teenage patient. . . . [A] 13-year-old boy with Asperger's syndrome was ill for three days with acute respiratory problems and pancreatitis but did not see a doctor. . . . "The child . . . almost died," the investigator wrote. . . . On numerous occasions, investigators found, center administrators were aware of serious problems but did not act properly. In one case, a state finding said, "facility administration" knew of a sexual relationship between a staff member and a 16-year-old resident, but did not report it to licensing authorities. . . . In 2007, two suicide attempts by children were not reported to the state.[2]

65.     PSI, which operates 15 facilities in Texas, was fined $230,000 for violations by the state health department in 2007, nearly as much as all the other hospitals combined. The newspaper reported that PSI's San Marcos facility was cited for 52 violations after a single inspection in July 2007. At the Oaks Treatment Center in Austin, the *Morning News* reported in January 2009, and UIC confirmed during interviews with Texas officials, that staff had "made numerous requests of administration to increase staffing levels" prior to a 2007 incident in which overwhelmed staff had to

---

[2]     Internal paragraph separators and bullet point markers removed.

call in a police SWAT team to rescue them from out of control teenagers at the facility. "It always felt like they were putting out fires instead of making things fire-retardant," said a former clinical therapist who worked for PSI at The Oaks during that time. The worker said that, prior to the 2007 riot at the facility, s/he had repeatedly advised a supervisor and the facility's risk manager and written incidents about rising tensions at the facility due to trained staff having sex with patients and allowing patients to smoke marijuana and to have sex with one another, but nothing was done to respond to the reports.

66. Laurel Ridge had similarly been cited for inadequate staffing that allowed violent teenage patients to assault others, and state investigators found that a shortage in personnel had also led to the neglect of children at that facility, where the Texas Department of Family and Protective Services issued 92 citations in 36 site visit in 2007. UIC's investigation also turned up Texas inspection records documenting "inadequate staffing" at Laurel Ridge. A former nurse, there Loretta Ramos has sued the company, claiming she was fired after reporting "violations of law regarding unsafe staffing, failure to provide a safe environment of care and was a witness to the cover-up of the facts surrounding [a] patient's suicide." Others have as well. *See* §VII(E).

**D. PSI Stuns Investors by Missing Its 2008 Earnings by 20% and Reducing Its 2009 Guidance as a Direct Result of Lost Profits and Increased Expenses Arising from the Riveredge Investigation and Professional Liability Claims**

67. On February 25, 2009, PSI reported its 4Q08 and FY08 financial results, stunning investors by: (i) announcing a 20% miss in earnings as the result of lost business and investigative costs at Riveredge and a reversal of the reduction in professional liability reserves that had been used to boost earnings at the outset of the Class Period, and (ii) reducing the Company's 2009 earnings guidance by a staggering $0.14 per share at the midpoint of the range, reflecting the fact that PSI's roll up business model was broken. The release stated in part:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2008. Revenue increased 12.0% for the quarter to $445.9 million from $398.1 million for the fourth quarter of 2007. Income from continuing operations was $24.6 million, or $0.44 per diluted share, for the fourth quarter of 2008 compared with $23.2 million, or $0.42 per diluted share, for the fourth quarter of 2007.

For the year ended December 31, 2008, revenue rose 20.9% to $1.766 billion from $1.461 billion for 2007. Income from continuing operations increased 39.4% to $107.9 million from $77.4 million. Income from continuing operations per diluted share was $1.92 for 2008, up 38.1% from $1.39 for 2007. Results for 2007 included a loss on debt refinancing of $8.2 million, or $0.09 per diluted share after tax.

*The fourth quarter 2008 results included a negative impact of $0.05 per diluted share related to one of the Company's facilities in Chicago and $0.05 per diluted share related to an increase in the Company's reserves for professional and general liability coverage resulting from PSI's annual actuarial assessment of claims. Professional and general liability insurance expense increased during 2008 compared to 2007, primarily as a result of an increase in PSI's reserves for self-insured professional and general liability related to the revised assessment of certain claims at amounts higher than those originally anticipated and the actuarial implications of such revisions.*

Same-facility revenue for the fourth quarter increased 7.8% versus the fourth quarter of 2007 and increased 8.0% for full-year 2008 versus 2007. For the quarter, growth in same-facility revenue was driven by a 6.5% increase in same-facility net revenue per patient day and a 1.3% increase in same-facility patient days. Same-facility EBITDA margin was 18.7% for the fourth quarter of 2008 compared with 21.0% for the fourth quarter of 2007 and 20.8% for full-year 2008 versus 20.5% for the prior year. Consolidated adjusted EBITDA increased to $74.6 million for the fourth quarter of 2008 from $71.7 million for the fourth quarter of 2007 and full-year consolidated adjusted EBITDA was $312.9 million compared to $254.4 million for 2007. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on pages 7 and 8.

*PSI today adjusted its guidance for 2009 earnings from continuing operations per diluted share for 2009 to a range of $2.24 to $2.32, reflecting growth of 17% to 21% compared with 2008*. The Company's guidance does not include the impact from any future acquisitions.

68. The following day, February 26, 2009, PSI hosted its fourth quarter earnings call with investors and analysts, where it faced a barrage of angry criticism over the delayed disclosure of the financial impact of its regulatory problems and its resultant lower growth. At the outset of the call, Jacobs gave the following explanation for the earnings miss and reduced guidance:

- 32 -

[JACOBS:]   As discussed in our press release, the fourth quarter earnings per diluted share were impacted by one of the Company's facilities in Chicago and increase in the Company reserves for general and professional liability coverage. ***The Chicago facility suffered a decline in operations of $0.03 relating to an admissions hold. And professional fees of $0.02 relating to an investigation***. As a result of our annual actuarial review we determined that ***we needed to increase our self insured reserves for general and professional liability by $4.9 million or $0.05 per share***.

*          *          *

Our revised 2009 earnings guidance of $2.24 to $2.32 represents earnings growth of 17% to 21% before the effect of any future acquisitions. ***We are lowering our guidance to reflect the financial impact of the following three issues***. The current economic environment and the ***continued admissions hold at our Chicago facility*** resulted in lowering our revenues goals for 2009. ***Same store revenue growth is expected to be mid single digits for the year 2009, and lower single digits for the first quarter***. As we saw a softening in patient days that began in October.

Number two, ***our guidance reflects the trending of general and professional liability expense that we experienced in 2008***. And three, the impact of successfully amending our current revolving credit facility.

69.     Jacobs said that Riveredge alone was "probably costing us 50 to 70 basis points against the same store patient day comparison." He told investors that the administrative hold on new admissions was still in place, and would not be lifted until UIC completed its investigation and report of the incidents that had occurred there. "[W]e're just waiting on DCFS and they're kind of waiting on this report," he said. Jacobs claimed that UIC had been conducting a survey at Riveredge "since November," but everything else required by the State to lift the hold had been accomplished. "So let me see if I can characterize it," asked one analyst on the call. "What you're saying is that you've done everything the state has asked you to do and now you're just waiting for them to sort of make sure that you really have done those things with this outside survey and that's what's holding up the process?" Jacobs answer: "Correct." When the report came out, however, UIC revealed the problems had ***not*** been corrected, blasting PSI for a string of continuing violations at Riveredge and other facilities nationwide. *Infra*, §V(E). The administrative hold has never been lifted.

70. Jacobs claimed on the call that the "general softening" in the market and weakness in volume had been going on *since October*, and was a "general across the board" reduction in all but a few facilities. Although the softening began after the *Tribune* had reported the problems at Riveredge and around the time that *ProPublica* and the *LA Times* were winding up their investigation of PSI's California facilities, Jacobs laid blame for declining patients on Lehman Brothers: "It's just a general softening that occurred in October and that was I guess when banks started to fail, maybe Lehman Brothers closed or whatever and we just – the uneasiness, the layoffs in the market just caused a softening in the census, starting in October, across the board." Jacobs explanation stood in stark contrast to statements he made on PSI's 3Q08 conference call on October 30, 2008, when he told investors that PSI's census was expected to *increase* due to the financial crisis as more people struggled to cope with stress arising from lost jobs, underwater mortgages, and other financial problems: "The market demand for our high quality inpatient psychiatric care remains strong *and has historically intensified in difficult economic environments*."

71. On the February 26, 2009 conference call, an analyst challenged Jacobs to square his prior representations that PSI was largely insulated from the economic downturn with his current view that the downturn was responsible for PSI's lost business:

> [ANALYST:] I really want to sort of delve in a little bit more into this idea of you're seeing just overall weakness from the economy and people being more cautious. *Can you help me marry that idea with sort of the idea that we've previously had that you guys are really cushioned from a lot of the economic environment*, simply because you're not a first line treatment modality, you're the last line treatment modality. *A significant portion of your patients are a danger to themselves and/or the community, there really is no other choice but in patient hospitalization*. Where is sort of the point that gee a weak economy means I'm going to opt for X versus inpatient hospitalization and what is X?

> [JACOBS:] Well, hopefully X is not getting treatment. Could very well be that they're not getting treatment. X could be maybe a physician taking more of a risk about trying to do that patient through an outpatient effort.

527027_1

*     *     *

And hopefully these patients are not – hopefully, we would hope that they're not trying to get by with not care. And that – so, but it's just a softness and it's a small softness. We did 1.6% patient day growth in the fourth quarter. And that was 90 basis points affected by Riveredge which would have gotten the patient day growth roughly in the 2.5% range. So when you adjust for that 90 basis points, the fourth quarter was strong. We've had stronger quarters. ***The surprise to us in the fourth quarter was October. For some reason, we occasionally have a month like that, where it's supposed to be a stronger quarter and for – I mean stronger month and for some reason the month just wants to be soft and at that time last year in September and October, there was a lot of bad news going out in the economy***.

72.      Additionally, on February 26, 2009, *ProPublica* issued an investigative report entitled "Psychiatric Hospital Pledged Change, But Some Problems Persist" which reported that despite defendants' assurances in July 2008 that the deficiencies at Riveredge had been corrected and that the problems were behind them, the problems at the facility persisted into 2008. The article discussed two incidents that occurred at the facility in August 2008 where patients were sexually assaulted and the facility failed to properly document the attacks. The article revealed that the hospital had been cited again for failing to adequately monitor or protect patients, and noted repeated failures by the hospital to document or respond to incidents. In one case, the hospital's official incident report claimed that after an alleged sexual assault by a 14-year-old boy on his 16-year-old roommate, the boys were "immediately" separated, while the employee's own written statement admitted she had continued "going about her business before alerting a supervisor." Moreover, a hospital staffer who was responsible for observing the boys in their room every 10 minutes, wrote that they were each "in bed, asleep" at the time the assault was occurring.

73.      On news of the financial impact of PSI's regulatory and patient care issues and the continuation of the problems at Riveredge reported by *ProPublica*, PSI's stock dropped immediately by $9.79/share to close at $17.50 on February 26, 2009, a 1-day decline of 35% on volume of more than 17 million shares, more than 19 times the average 3-month daily volume. This was the lowest the Company's stock had traded at in over four years.

- 35 -

**E.** **After the Class Period, Evidence of the Extent of PSI's Misleading and Injurious Business Practices Continues to Come to Light**

74. Following the end of the Class Period, PSI published data on its website regarding its compliance with the core measures established by the Joint Commission. Rather than demonstrating the quality of care provided by PSI, as defendants had repeatedly represented it would, the data showed that at the outset of 2009 PSI's hospitals and treatment centers were operating well below the Joint Commission performance standards on six of the seven criteria:

| Core Measure | Standard | PSI |
|---|---|---|
| Admission Screening Completed within 72 Hours | 100% | 86.3% |
| Average Hours of Restraint Use per Facility | < 4 hrs. | 6.4 hrs. |
| Average Hours of Seclusion Use per Facility | < 4 hrs. | 6.2 hrs. |
| Percent of Patients with Appropriate Justification for Discharge on 2 or more antipsychotics | 100% | 26.8% |
| Percent of Patients with Continuing Care Plan Created on Discharge | 100% | 80.4% |
| Percent of Patients with Continuing Care Plan to Next Provider within 5 Days of Discharge | 100% | 64.0% |

75. Trend lines associated with the core measure data for 2009 strongly suggested that the problems had been even worse in 2008 as the following examples illustrate:

 

76. On March 30, 2009, UIC completed its 84-page report titled "Review of Riveredge Hospital" in which it strongly criticized the treatment provided by PSI at Riveredge and scores of other facilities across the county. UIC blasted the Company and its management for a lack of accountability and a failure to take responsibility for or move to correct systemic conditions that

caused or permitted the mistreatment of patients to occur.  The report was released to the public on Friday, April 3, 2009, precipitating a sustained two-day drop in PSI's stock price at the beginning of the following week, when its shares fell nearly 14% to close at $13.65, a drop of $2.17 since the report was released.

77.     After reviewing thousands of pages of internal documents, interviewing hospital patients, officials and medical staff and some regional and national executives from PSI, and reviewing state and federal investigative reports from Illinois and five other states, UIC and Illinois Department of Public Health ("IDPH") investigators reached a "***consistent set of findings***" of problems arising at PSI's hospitals, including repeated instances of inadequate documentation, "[q]uestionable or ***poor quality*** of individual therapeutic services," an "[u]nstructured, ***chaotic*** milieu" that was counterproductive to treatment, "[u]nit staff often ***poorly trained and supervised*** for their jobs," "[i]neffective monitoring creat[ing] ***serious risks for patient safety***," and improper discharge and discharge planning of patients.  These conditions had led to "sexual assaults; negligent supervision; physical harm to patients; a violent group outburst that required police intervention; and the death of a pregnant patient (not a DCFS ward), that has ***raised serious questions about the lack of reporting*** of the incident by Riveredge officials to Illinois authorities."

78.     The Riveredge report went on to find that the violations at Riveredge were reflective or problems throughout PSI's operations: "the UIC and IDPH reviewers were essentially identifying ***a pattern of quality of care and patient safety problems*** [at Riveredge that were] consistent with the separate investigations conducted in California, Texas, Virginia, North Carolina and Florida."  The report went on to state:

> ***When taken as a whole, the cumulative findings of UIC and IDPH reveal a longstanding pattern of egregious quality failures at this hospital, including recent and reoccurring clinical service issues that directly affect patient care and safety***.

*        *        *

527027_1

*There is compelling data about the tendency of this organization's leadership to avoid taking direct responsibility for longstanding and reoccurring clinical/administrative failures* – in effect, placing the onus for the chronic quality of care problems on the hospital staff "who do not perform their duties" and on mentally ill patients who "refuse to comply with the rules."

Such resistance to critical self-examination, and the organizational tendency to "blame downward and/or outward" when quality of care problems arise, are by no means limited to PSI/Riveredge officials. In fact, the brief review of similar problems in PSI facilities around the United States shows *a corporate culture operating from one crisis to the next – always primed to immediately spring into action to fix problems that were otherwise ignored until yet another crisis eventually forces attention to be paid*.

Moreover, the system-related accountability concerns for DCFS include the *unreliability of incident reporting* when adverse events occur at Riveredge. The UIC team was especially alarmed when it discovered several *efforts by PSI/Riveredge officials to avoid having to report sexual assaults of patients as "sentinel events," which would have required a "root cause analysis" to JCAHO – and that, in turn, would have focused unwanted outside attention on the hospital's problems*.

## VI. FRAUDULENT STATEMENTS, OMISSIONS AND COURSE OF BUSINESS BY DEFENDANTS DURING THE CLASS PERIOD

### A. FY07/4Q07 Earnings Release and Conference Call (February 20-21, 2008)

79.     On February 20, 2008, PSI issued a press release entitled "Psychiatric Solutions Reports a 27% Increase in Fourth Quarter Earnings to $0.42 per Diluted Share," to report its results of operations for the fourth quarter and full year results for 2007. The release was initially disseminated to the market via *Business Wire*, and thereafter disseminated further by other news organizations, financial analysts, websites, and other sources of information. The release was issued by PSI and approved by each of the Individual Defendants. Defendant Jacobs provided quotes that were included in the press release, and Defendant Turner was identified in the press release as the source to contact for further information about its contents.

80.     The February 20, 2008 press release included PSI's financial statements for 4Q07 and FY07, including the Company's reported operating expenses, same facility results, revenue and cost

data, and other financial metrics described below, and also included the following narrative statements:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2007. For the quarter, revenue increased 44.1% to a record $403.4 million compared to the fourth quarter of 2006. *Income from continuing operations increased 27.3% to $0.42 per diluted share from the fourth quarter of 2006*.

\* \* \*

Same-facility EBITDA margin expanded 200 basis points to 22.2% for the fourth quarter of 2007. Fourth quarter EBITDA margin for all facilities increased 70 basis points to 20.8%. Full year same-facility EBITDA margin increased 150 basis points to 21.5% and total facility EBITDA margin was 20.1%, an increase of 30 basis points compared to 2006.

"*PSI continued to produce outstanding profitable growth for the fourth quarter and full year 2007*," remarked Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "Demand for high quality inpatient psychiatric care continues to expand in this capacity constrained and very fragmented industry. *We are well positioned to achieve further significant profitable growth for 2008 and beyond through organic growth initiatives and acquisitions*.

"*We are targeting 7% to 9% same-facility revenue growth for 2008 once again. Work is already underway to add nearly 600 beds in existing and new facilities by the end of 2008, double our normal targeted pace of expansion, allowing us to treat patients that we do not have the capacity to treat today*.

"*We are highly confident that we will be able to acquire at least six inpatient facilities during 2008. The pipeline of potential acquisition opportunities remains strong, enhancing our ability to continue to build a platform for future growth*."

PSI is *increasing its 2008 earnings guidance range by $0.10 per diluted share to $1.93 to $1.97* to reflect the benefit of lower interest rates. As a result, growth in 2008 earnings per diluted share is expected to be 30% to 32% compared to 2007. In addition, PSI established its guidance for earnings from continuing operations for the first quarter of 2008 in a range of $0.42 to $0.43 per diluted share. The Company's guidance does not include the impact from any future acquisitions.

81. On February 21, 2008, PSI hosted a conference call to discuss the Company's FY07 and 4Q07 results with institutional investors and analysts. Each of the Individual Defendants participated in and spoke on the call, as did analysts representing 12 Wall Street firms. The call had been publicized by PSI in advance, and a live broadcast of the call was made available for at least 14

- 39 -

days after the call in the "Investors" section of the Company's website. Written transcripts of the call were also published and disseminated by Thomson Reuters Streetevents and by other sources. The contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities.

82.     At the outset of the call, defendant Jacobs made the following statement:

[JACOBS:]     Thanks for being with us this morning to review a strong fourth quarter performance for PSI and another great year. The **continuing strength of the PSI business model is evident in the 27% growth in earnings per diluted share for the fourth quarter and 30% growth in earnings for the year**. These results were at the top end of our guidance for each period and after we revised our annual guidance upward on two occasions after first establishing it in October 2006. In this respect we are also pleased today to be increasing our guidance for 2008 and as a result of the recent decline in interest rates.

Our **earnings growth was driven by 44% increase in our revenue for the fourth quarter and 45% for the year, both of which establish new records for the company**. Consistent with our historical performance we produced this growth primarily through the addition of beds to our operations, the great majority of which resulted from acquisitions of inpatient facilities.

We also benefited from **solid growth in same facility revenues** of 6.5% for the year. True to our business model, this growth generated additional operating leverage, which we complimented through ongoing initiatives to **improve productivity and efficiency in each facility**. As a result **we produced a new record for same facility EBITDA margin** of 200 basis points to 22.2% versus the fourth quarter of 2006. This performance was primarily accountable for the 49.1% growth in PSI's consolidated adjusted EBITDA for the quarter and its expansion as a percentage of revenue. **We remain confident about our prospects to drive facility revenue growth for 2008 in our historic range of 7% to 9%**.

**We are enhancing our ability to drive same facility performance for 2008, as well as aggregate organic growth through the planned addition of nearly 600 beds in existing and new facilities during the year. In addition, PSI is well positioned to continue its long-term acquisition strategy by acquiring at least six inpatient facilities during 2008**. We have a strong top line of candidates, a favorable pricing environment and the financial resources to accomplish our goals.

In summary, let me repeat that what you have heard before is **we consider our strong prospects for long-term profitable growth. Our confidence in our future rests on our ability to continue implementing a proven business model and growth strategy in an industry whose growth dynamics remain very favorable for**

***PSI. Simply put we are the clear leader in a highly fragmented capacity
constrained growth industry***. While we never take execution for granted, especially
in terms of providing the highest quality of care for our patients and their families,
we expect the PSI team to continue leveraging our strong momentum for future
growth.

83.     On February 28, 2008, PSI filed its Report on Form 10-K for the period ending

December 31, 2007 with the SEC.  The Report included PSI's financial statements for 4Q07 and

FY07, including the Company's reported earnings per share, operating expenses, same facility

results, revenue and patient data, and other financial metrics described below.  The Report was

signed by Jacobs and Polson, and also included certifications signed by Jacobs and Polson pursuant

to §§302 and 906 of the Sarbanes-Oxley Act of 2002.

84.     By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may

be strongly inferred that defendants knew or recklessly disregarded that the statements in the

February 20, 2008 press release and FY07 Report on Form 10-K and on the February 21, 2008

conference call would be, and were, misleading to and operated as a fraud upon investors in at least

the following respects:

- PSI's reported earnings per share for 4Q07 and FY07 and its published guidance for
  2008 were artificially inflated by defendants' deliberate reduction of the Company's
  professional liability and malpractice reserves and other manipulations of operating
  expenses that added $0.05 to reported earnings.  Given the extent of regulatory
  violations and patient safety and care issues that had arisen in 2007 and the resultant
  exposure to professional liability claims, and the other conditions at PSI's facilities
  which were likely to lead to at least a continuation if not an increase in the amount of
  those claims, there was no reasonable basis on which to reduce the reserve account at
  the outset of the Class Period.

- The financial results, metrics and guidance provided to investors failed to reflect the
  costs to operate PSI's facilities with sufficient staffing to protect and provide high
  quality treatment to patients in a safe therapeutic environment, or the actual and
  anticipated expenses incurred as a result of negligent treatment of and injuries to
  patients being treated at PSI's understaffed and underfunded facilities.

- Defendants' many claims about the strength and sustainability of PSI's business
  model, the reasons for and significance of the decline in same-facility revenues in
  4Q07, and the Company's ability to generate annual same-facility revenue growth of
  7% to 9% for the foreseeable future were all misleading under the circumstances

because defendants omitted to disclose facts sufficient for investors to understand that the Company's past results and future expectations of profitability were premised on a scheme to operate those facilities without sufficient staffing or funding to provide high quality care to patients in a safe therapeutic environment that complied with applicable regulatory, licensing and accreditation standards, requirements and conditions.

- Defendants misled investors about the nature and strength of the Company's compliance and quality assurance programs, and the nature and extent of patient safety and care problems or regulatory violations detected by those programs or existing at PSI's facilities.

### 1. Underreporting of Operating Expenses and Malpractice Reserves

85. PSI's reported financial results, as published in the February 20, 2008 earnings release, discussed on the February 21, 2008 conference call, and in the 2007 Report on Form 10-K were deliberately or recklessly misleading to investors. Despite the prevalence of patient care and safety problems leading to negligent or deliberate mistreatment of patients, and the likely increase in such incidents as a result of PSI's failures to staff facilities adequately or comply with monitoring and recordkeeping requirements, PSI reduced its reserves for malpractice claims at the outset of 2008. The reduction was made in violation of generally accepted accounting principles ("GAAP").

86. During the Class Period, PSI's other operating expenses were understated in its financial statements due primarily to the deliberate understatement of reserves for medical malpractice claims and other lawsuits arising from the treatment of patients at its facilities. During the Class Period the Company was at greater, not lesser, risk of malpractice and other claims due to the understaffing and underfunding of its treatment facilities and resultant problems described above. Nevertheless, at the outset of the Class Period, defendants caused PSI to *reduce* its professional and general liability reserves by $3.0 million, the biggest component of a $5 million reduction in other operating expenses that increased PSI's profits by $0.05 per share. At the conclusion of the Class Period defendants reversed this charge, adding $5 million to its 4Q08 malpractice reserves and other operating expenses, causing its reported earnings to decline by $0.05 per share. In a conference call

- 42 -

with investors, Jacobs admitted the account had been underfunded throughout 2008. Jacobs said the reserve balance should have been increased every quarter during the Class Period, admitting that the $0.05/share increase in expenses was "***a build-up that probably should have been allocated one-fourth across all the quarters***."

87.     PSI's FY07 and 4Q07 financial statements included with its February 20, 2008 earnings release and its 2007 Report on Form 10-K reflected the $5 million reduction in "other operating expenses" from the prior quarter. On February 20, 2008, a Credit Suisse analyst wrote: "We asked management for color on this line item and were not provided with a tangible explanation." When asked about the drop on PSI's February 21, 2008 investor conference call, Jacobs again refused to provide a tangible explanation for the change in the line item – which he said only includes "rent [leases], insurance, travel, repair and maintenance, recruitment and others":

> [JACOBS:]     [T]he fourth quarter; historically is a quarter where we do focus on expense management because between Thanksgiving and January first, we know our census is going to drop, and we are managing as much of those expense items as we can. And if that means postponing travel or some expenses that we can postpone, we will do that. So that is the reason you see the seasonality I think in the fourth quarter.

88.     The 2007 Report on Form 10-K included the following statements regarding the purported adequacy of PSI's reserves:

**Risk Management**

> We are subject to medical malpractice and other lawsuits due to the nature of the services we provide. At December 31, 2007, all of our operations have professional and general liability insurance in umbrella form for claims in excess of a $3.0 million self-insured retention with an insured excess limit of $50.0 million. ***The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors, and other actuarial assumptions calculated by an independent third-party actuary.*** This self-insurance reserve is discounted to its present value using a 5% discount rate. This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations. We have utilized our captive insurance company to manage the self-insured retention. While claims are monitored closely when estimating professional and general liability accruals, the complexity of the claims

and wide range of potential outcomes often hampers timely adjustments to the assumptions used in these estimates. ***The reserve for professional and general liability was approximately $15.1 million and $18.1 million as of December 31, 2007 and 2006, respectively. This decrease is primarily due to favorable developments in our professional and general liability experience.***

\*        \*        \*

**Professional and General Liability**

We are subject to medical malpractice and other lawsuits due to the nature of the services we provide. At December 31, 2007, all of our operations have professional and general liability insurance in umbrella form for claims in excess of $3.0 million with an insured limit of $50.0 million. ***The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial assumptions calculated by an independent third-party actuary***. This self-insurance reserve is discounted to its present value using a 5% discount rate.

89.     Following the improper reduction of the reserve account, each of PSI's 2008 Reports on Forms 10-Q issued during the Class Period also falsely claimed that reductions in other operating expenses had been achieved "primarily [as] the result of reductions in risk management costs as a percent of revenues":

- PSI's 1Q08 Report on Form 10-Q: "Same-facility other operating expenses for owned and leased inpatient facilities were $25.6 million in 2008, or 7.8% of revenue, compared to $26.1 million in 2007, or 8.6% of revenue. The decrease in same-facility other operating expenses for owned and leased inpatient facilities as a percentage of revenue is primarily the result of reductions in risk management costs as a percent of revenue."

- PSI's 2Q08 Report on Form 10-Q: "Same-facility other operating expenses for owned and leased inpatient facilities were $27.2 million in 2008, or 7.8% of revenue, compared to $28.0 million in 2007, or 8.6% of revenue. The decrease in same-facility other operating expenses for owned and leased inpatient facilities as a percentage of revenue is primarily the result of reductions in risk management costs as a percent of revenue."

- PSI's 3Q08 Report on Form 10-Q: "Same-facility other operating expenses for owned and leased inpatient facilities were $84.0 million in 2008, or 8.0% of revenue, compared to $82.7 million in 2007, or 8.5% of revenue. The decrease in same-facility other operating expenses for owned and leased inpatient facilities as a percentage of revenue is primarily the result of reductions in risk management costs as a percent of revenue."

- 44 -

90.     The foregoing statements were materially false and misleading to investors because risk management costs were not decreasing during the Class Period.  As a result of the numerous regulatory violations and incidents of negligent patient care described above, particularly those that occurred in 2007 and 2008, there was no reasonable basis upon which to believe that malpractice expenses were likely to decline in 2008, as to *reduce* PSI's malpractice reserve account on that basis. Jacobs has admitted, on a conference call where the other defendants had an opportunity to and did not correct him, that the reserve account was understated in every quarter of 2008, and that the increase in the reserve that was taken at the end of the Class Period should have been allocated ratably across all quarters of the year.

91.     When asked for more details about the increase in professional liability expenses during PSI's FY08/4Q08 conference call, Jacobs admitted that "the actual claim costs per claim is going to go up.  *And has gone up over time.*"  This prompted another analyst to ask Jacobs and Turner "*when it became known to you that you would have to take reserves*?"  In response, Turner and Jacobs admitted that they had known about the need to increase in reserve *since at least December* and that, in fact, the expenses had been *steadily rising all year* and should have been reflected as increased operating expenses in each the Company's quarterly financial reports issued during the Class Period:

> [TURNER:]    Darren, the timing of this is always done in the middle of the fourth quarter, so that we have good results and can study it for year-end.  We hadn't previously had any significant changes outside of our expectations from that.  This is the first year it happened there.  And so going forward, what we've done is put some – a monthly internal analysis in place to roll our experience forward.  And then quarterly, we'll be having our outside actuarial actually do a study before the end of each quarter.

> [ANALYST:] And when did you complete the actuarial review this go-round?

> [TURNER:]    Well, the final, *we got initial indications late in December, the final didn't come out until January*.  But these things are – they put out a

number of drafts and we go through that, so ***it was initiated the beginning of December*** and so it's a process.

[ANALYST:] I guess just a question with regard to your philosophy about preannouncing. It did seem like you had some information available by January, so maybe Joey, can you just share with us your thought process with regard to that and why you didn't want to get this information into the marketplace, this is probably the biggest miss you had since being a public Company. So I think your shareholders would like to hear that.

[JACOBS:] The review of the malpractice, the general and professional insurance reserves took the whole month of January and the audit committee and the review of the financial numbers were scheduled for mid February. I thought it would be – ***I thought it would be a disservice not to be able to put out one piece of information without being able to really talk about the whole quarter in its entirety during that and it was just $0.05, $4.9 million and so that was the decision and, it was somewhat of an unusual occurrence in that our history had not had those sort of adjustments and we wanted to take the time in January, maybe even the first couple weeks in February to review with the actuaries and make sure that we understood the details*** on what they were recommending to us and it coincided, it was within a few days of when we would be having this call.

\*         \*         \*

[ANALYST:] Just another follow-up to the question on professional and liability reserves. Joey, I think you mentioned that your guidance that you've been conservative in what you've assumed in there as it relates to your guidance. Is it fair to say, then, that your guidance doesn't assume any additional reserves being taken here over the rest of the year?

[JACOBS:] I would not see any unusual adjustments to the reserve over the year. Now, I can't guarantee that. We think we have built the reserves adequate enough and that we're going to be more timely with the review each quarter. ***That $0.05 that we took in – for the fourth quarter, quite frankly, that was probably a build-up, that probably should have been allocated one-fourth across all the quarters and so we'll be more real-time,*** adjustment I would assume if there was an adjustment would be smaller and quite frankly, it can go the other way. So it could be a positive.

92.     Jacobs' admission that PSI's reserves should have been increased in its prior quarterly financial statements demonstrates that PSI's Forms 10-K and 10-Q filed with the SEC during the Class Period violated GAAP. Basic accounting rules require that adequate reserves be established by a Company if it is probable a liability has been incurred at the date of the financial statements. GAAP rules require that PSI estimate an adequate professional and general liability reserve on its

balance sheet in both its annual and quarterly financial statements filed with the SEC. PSI in both its

2007 Form 10-K and its 2008 Form 10-Qs filed with the SEC failed to estimate an adequate

professional and general liability reserve given the numerous regulatory violations and incidents of

negligent patient care defendants were aware of during the Class Period. As a result, the Company

was required by GAAP to increase its "reserve" on the financial statements filed during the Class

Period to account for these additional claims, thereby increasing its expenses on the income

statement (which reduces its net income and EPS) and increasing its liabilities on the balance sheet.

Such "reserves" are required by Statement of Financial Accounting ("SFAS") No. 5, Accounting for

Contingencies. SFAS No. 5, ¶8 states the following:

> An estimated loss from a loss contingency shall be accrued by a charge to income if
> both of the following conditions are met: (a) Information available prior to issuance
> of the financial statements indicates that it is probable that an asset had been
> impaired or a liability had been incurred at the date of the financial statements. . . .
> (b) The amount of loss can be reasonable estimated.

93. The statements of the Individual Defendants' about the reserves during the conference

calls, as well as Jacobs' and Polson's signatures on PSI's financial statements and their Sarbanes-

Oxley certifications included with those statements, demonstrates that they were each directly aware

of, responsible for, and involved in the decision to lower the reserve at the outset of the Class Period.

The impact of that action on PSI's reported earnings for FY07 and FY08 further supports an

inference that each of the defendants were actually aware of the changes to the reserve account and

the reasons therefor at the time the changes were implemented. Defendants' knowledge of and

involvement in addressing the numerous regulatory violations and incidents of negligent patient care

described above, particularly including incidents that occurred during 2007 and 2008, further

demonstrate that defendants knew or recklessly disregarded circumstances demonstrating that PSI's

malpractice and other claims expenses would not decline in 2008 from the levels in 2007. Together,

these facts and the other allegations herein give rise to a strong inference that defendants knew or

recklessly disregarded that PSI's reported other operating expenses and the statements contained in PSI's SEC filings regarding the reasons for the reductions in those expenses would be, and were, materially misleading to investors.

94.     Defendants' scienter is further demonstrated by past instances where PSI improved operating results and earnings per share by manipulating its other operating expenses.  A former employee of a PSI hospital in Texas recalled "some accounting issues at the corporate level" in late 2005 that had helped the hospital stay on track for its 2006 profit goal.  As a result of the accounting change, the Company's costs for liability and malpractice insurance dropped and the hospital's share of those payments decreased proportionally, leading to an increase in the hospital's profit by more than $200,000.  Although the increased profit qualified the hospital's CEO for a bonus based on the hospital's 2005 financial results, PSI's division president initially refused to pay it, claiming the improvement came from accounting changes, and not from performance.  After the CEO pressed the issue, including by asking Polson in front of the division president why the change had been pushed down to facilities instead of being taken at the corporate level, he was terminated.

95.     PSI's financial statements bear out the witnesses' account, as they reflect a significant decrease in other operating expenses both as a total amount and as a percent of revenue in 4Q05 as compared to 3Q05, similar (though lesser in amount) to the reductions that took place in 4Q07 as compared with 3Q07.  The marked increase in other operating expenses as a percent of revenue and in total amount at the end of the Class Period further illustrate the extent to which PSI's malpractice reserves were understated during the Class Period:

| ($000s) | Q105 | Q205 | Q305 | Q405 | Q106 | Q206 | Q306 | Q406 |
|---|---|---|---|---|---|---|---|---|
| Revenue | 137406 | 142646 | 223572 | 224150 | 242312 | 248404 | 254814 | 280960 |
| Other Op. Expense | 17985 | 18957 | 26078 | 24485 | 27146 | 27244 | 26494 | 28560 |
| OOE as % of Rev. | 13.09% | 13.29% | 11.66% | 10.92% | 11.20% | 10.97% | 10.40% | 10.17% |

| ($000s) | Q107 | Q207 | Q307 | Q407 | Q108 | Q208 | Q308 | Q408 |
|---|---|---|---|---|---|---|---|---|
| Revenue | 322438 | 354126 | 402021 | 403367 | 423829 | 448270 | 448015 | 445863 |
| Other Op. Expense | 36411 | 39977 | 44264 | 39440 | 45345 | 47945 | 47192 | 52261 |
| OOE as % of Rev. | 11.29% | 11.29% | 11.01% | 9.78% | 10.70% | 10.70% | 10.53% | 11.72% |

> ### 2. Misleading Reports of Expenses and Financial Metrics that Understated the True Costs of Properly Staffing and Operating PSI's Hospitals and Residential Treatment Centers

96.     PSI's 4Q07/FY07 press release, conference call and financial statements included with its Report on Form 10-K, and the Company's subsequent earnings releases, conference calls and Reports on Forms 10-Q during the Class Period, misled investors because the costs of doing business reported therein, and certain financial and other metrics derived therefrom, did not accurately reflect, and materially understated, the costs of operating PSI's facilities with proper staffing levels necessary to protect and treat patients and to comply with regulatory and licensing requirements.

97.     Prior to and during the Class Period, defendants reported spending the following amounts on salaries, wages and employee benefits ($000s):

| Q107 | Q207 | Q307 | Q407 | Q108 | Q208 | Q308 | Q408 |
|---|---|---|---|---|---|---|---|
| $180999 | 195100 | 223902 | 224644 | 238651 | 246231 | 245578 | 240824 |

98.     During the Class Period, the financial statements included in PSI's quarterly earnings releases and Reports on Forms 10-Q regularly reported changes in same facility revenues, earnings and patient census statistics as compared with the same period in the prior year:

|  | **4Q07** | **FY07** | **1Q08** | **2Q08** | **3Q08** |
|---|---|---|---|---|---|
| Revenue | 5.3% | 6.5% | 7.7% | 7.8% | 8.7% |
| Admissions | 1.5% | 2.3% | 2.5% | 4.2% | 8.0% |
| Patient days | 0.6% | 1.4% | 2.4% | 2.7% | 3.7% |
| Avg. Length of Stay | (1.1%) | (0.6%) | 0.0% | (1.7%) | (4.0%) |
| Net revenue/patient/day | 4.6% | 5.0% | 5.1% | 5.1% | 4.8% |

99.     Defendants claimed these metrics proved the viability of PSI's roll-up acquisition scheme, even after the decline in same-facility revenues reported in 4Q07.  Defendants claimed that these results demonstrated that the Company could continue to grow revenues at psychiatric facilities after they were acquired, and had the ability to properly care for and protect increasing numbers of patients at its facilities.  Because, however, PSI's costs of doing business, in particular its salary, wage and benefit expenses, did not reflect expenditures at levels necessary to properly treat and protect PSI's patients, the same-facility metrics misled investors.  PSI's actual and potential profitability based upon its claimed growth in admissions and revenues was not as great as it seemed, because PSI lacked the ability to earn those profits while properly treating and protecting the larger volume of patients it claimed to have attracted to its facilities.

100.     Investors reasonably believed, based on defendants' actions and statements, that any reductions in operating expenses leading to greater profitability at acquired facilities had resulted primarily from economies of scale achieved by PSI's greater purchasing or negotiating power and operating experience, and thus would not jeopardize patient safety or treatment or materially increase the risks to PSI's operations.  Thus, investors reasonably believed that PSI's reported costs of doing business, and its reported growth and margins, reflected the true costs of operating its facilities in compliance with regulatory and licensing requirements and in a manner that did not jeopardize its patients.  In fact, PSI's reported costs, and the earnings  and margins derived therefrom, were misleading to investors because they materially understated the amounts necessary

527027_1
Case 3:09-cv-00882   Document 109   Filed 06/15/10   Page 54 of 135 PageID #: 1466

to operate the Company's facilities in a safe, legal manner, as defendants represented they were doing.

### 3. Misleading Guidance that Lacked a Reasonable Basis

101. The financial guidance provided in the February 20, 2008 earnings release and discussed on the February 21, 2008 conference call was also deliberately or recklessly misleading to investors. Defendants knew or recklessly disregarded that PSI's guidance was based on the underreporting of malpractice reserves reasonably expected to be incurred in connection with operations at the facilities acquired in its roll up scheme, as described in §VI(A)(1). The published guidance also lacked a reasonable basis because it was predicated on earnings expected to be derived by operating PSI's facilities without sufficient staffing or budgets necessary to provide PSI's patients with adequate care in a safe therapeutic environment, or to comply with applicable regulatory, licensing or accreditation standards and requirements. As a result, there was no reasonable basis for the guidance provided to investors.

### 4. Misleading Omissions About PSI's Business Model and Its Current and Future Ability to Improve Operations at Acquired Facilities and Generate Growth in Same Facility Revenues

102. Considered as a whole, defendants' representations in the FY07/4Q07 press release and conference call about the purported continuing strength of PSI's business model, including its ability to produce outstanding profitable growth and same facility revenue increases of 7% to 9% annually on a continuing basis, and the purported quality of its operations and ability to improve productivity and efficiency at acquired facilities while still providing high quality treatment to children, teens and other patients, were misleading to investors because defendants failed to disclose, and actively worked to conceal or recklessly ignored, conditions which created material and significant risks to the Company and the patients under its care. In particular, the foregoing statements were recklessly misleading in that:

- 51 -

- The statements omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate treatment or care to those patients, including proper around the clock monitoring of patients with suicidal tendencies or who otherwise presented a risk of harm to themselves or other patients or staff;

- Contrary to the contentions that PSI was providing "high quality" care and demonstrating "outstanding growth" while "improv[ing] productivity and efficiency" of acquired operations, many PSI hospitals and residential treatment centers were struggling under tight budgets that did not permit the facilities to be operated in compliance with regulatory requirements or in a manner that provided adequate – much less high quality – care to patients in a safe therapeutic environment;

- The Company was attempting to "double [its] normal targeted pace of expansion" not because of the purportedly "strong" "pipeline of potential acquisition opportunities" or marketplace demand but because the Company needed to accelerate its acquisitions to cover up its inability to continue squeezing growth out of facilities it had previously acquired; and

- The Company could not achieve 7% to 9% same facility revenue growth without the planned addition of 600 beds by facility expansion or acquisition, such that the planned additions were not "just . . . insurance," as claimed by Jacobs.

103.    During the FY07 conference call, several Wall Street analysts pressed Jacobs for more information on the reasons that PSI had reported same facility revenue growth of just 5.3% for 4Q07 and 6.5% for the full year – below forecast estimates of 7% to 9% growth – and why the Company was again forecasting that PSI would be able to achieve a 7% to 9% same facility growth rate for the coming year.  In response, ***Jacobs repeatedly claimed that the 2007 shortfall was due to "bad luck***," reassuring investors that the shortfall was not indicative of problems with or maturation of PSI's growth-by-acquisition strategy.  "That 7% to 9% was well within our grasp, and ***we just had some bad luck***," Jacobs said in response to one such question, later adding, in response to another: "But if you were just to take our bottom three facilities – not the bottom 10, just our bottom three facilities – and we focus on them and get them on the right track, we would have done well above 7% for last year.  So quite frankly, ***we can get above 7% in '08 just by doing what we did last year***

*and just working on these three facilities*." Jacobs then went on to claim that the additional 600 beds to be added in the year is "*just . . . insurance*," because the **problems were limited to "a small number of facilities that if we just fix, that 7% to 9% is there**."

104.    When asked about past "operational issues" at PSI facilities and what the Company was doing to correct them, Jacobs returned again to his "bad luck" theme to assure investors that the Company was doing everything it could to assure its facilities were providing high quality care in compliance with regulatory requirements:

> Well, we are about to see the positive changes.  We probably cost ourselves 100 basis points on the same-store numbers last year, and especially in the fourth quarter where we have deliberately taken patients days down.  Like 20 beds a unit – I mean 20 beds a facility and have renovated the facilities.  For example, the one in Austin, Texas comes to mind, the Oaks.  We have taken 20 beds off-line since July of last year and the last of those 20 beds come online in March.  So once again we have about three of those where we have been proactive in taking the census down and renovating them and bringing them back online and it probably cost us 100 basis points.
>
> **So maybe that is a little bad luck, too**, but it is the right thing to do versus as you know the Manatee Palms situation where we had to close the whole facility.  So we are doing more proactive there.  And then **Kathy Bolmer who is our Executive Vice President of compliance and quality, we have beefed up her staff and they are doing a much better job assisting our facilities on compliance and qualities issues, surveys being more proactive.  So we have done a lot there.  We've made it a primary focus as it should be for the local team at the facility**.  So we have done a lot of good work in the last 18 months in that area.  And so we will see the benefits of that this year; we will see the benefit – when the Oaks comes online in March, in April, 20 more patients a day will be at that facility.  And will that help the same-store numbers?  Absolutely.

105.    The foregoing statements were also deliberately or recklessly misleading to investors, because, as alleged previously, the problems in PSI's operations were not limited to "a small number of facilities," nor were the "operational issues" or the 4Q07 decline in same facility revenues simply the result of "bad luck."  Neither was the Company "doing a much better job assisting our facilities on compliance and qualities issues," nor was quality and compliance a "primary focus" at PSI's

527027_1

facilities. Moreover, PSI's problems at The Oaks and Manatee Palms were continuing to occur at

the time these statements were made, and similar problems had arisen at other facilities.

### 5. Misleading Characterization of PSI's Compliance and Quality Assurance Programs and Results

106. The 2007 Report on Form 10-K included the following description of PSI's business:

> We are a leading provider of inpatient behavioral health care services in the United States. We operate 90 inpatient behavioral health care facilities with more than 10,000 beds in 31 states, Puerto Rico, and the U.S. Virgin Islands. We generated revenue of approximately $1.5 billion and $1.0 billion, respectively, for the years ended December 31, 2007 and 2006. *We believe that our primary focus on the provision of inpatient behavioral health care services allows us to operate more efficiently and provide higher quality care than our competitors.*

107. The 2007 Report on Form 10-K claimed that PSI's hospitals "provide the *most*

*intensive level of care*, including *24-hour skilled nursing observation* and care, daily interventions

and oversight by a psychiatrist and *intensive, highly coordinated treatment by a physician-led team*

*of mental health professionals*," assured investors that PSI was operating its facilities in compliance

with regulatory requirements and operating standards:

> **Regulation and Other Factors**
> *Licensure, Certification and Accreditation*
>
> Health care facilities are required to comply with extensive regulation at the federal, state and local levels. Under these laws and regulations, health care facilities must meet requirements for state licensure as well as additional qualifications to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, fire prevention, maintenance of adequate records, hospital use, rate-setting, and compliance with building codes and environmental protection laws. Facilities are subject to periodic inspection by governmental and other authorities to assure continued compliance with the various standards necessary for licensing and accreditation.
>
> All of the inpatient facilities operated by us are properly licensed under applicable state laws. Most of the inpatient facilities operated by us are certified under Medicare and/or Medicaid programs and accredited by The Joint Commission, a functional prerequisite to participation in the Medicare and Medicaid programs. Should any of our inpatient facilities lose its accreditation by The Joint Commission, or otherwise lose its certification under the Medicare and/or Medicaid program, that inpatient facility may be unable to receive reimbursement from the Medicare and/or

Medicaid programs. If a provider for who we provide contract management services is excluded from any federal health care program, no services furnished by that provider would be reimbursed by any federal health care program. If one of our facilities is excluded from a federal health care program, that facility would not be eligible for reimbursement by any federal health care program.

We believe that *the inpatient facilities we own and operate generally are in substantial compliance with current applicable federal, state, local and independent review body regulations and standards*. The requirements for licensure, certification and accreditation are subject to change and, in order to remain qualified, it may be necessary for us to affect changes in our inpatient facilities, equipment, personnel and services. Additionally, certain of the employed and contracted personnel working at our inpatient facilities are subject to state laws and regulations governing their particular area of professional practice. We assist our managed client hospitals in obtaining required approvals for new programs.

108. The 2007 Report on Form 10-K further claimed that PSI had extensive systems and controls in place to make sure that even minor and potential regulatory violations would not escape detection by senior management:

**Regulatory Compliance Program**.

*We are committed to ethical business practices and to operating in accordance with all applicable laws and regulations*. Our compliance program was established to ensure that all employees have a solid framework for business, legal, ethical, and employment practices. *Our compliance program establishes mechanisms to aid in the identification and correction of any actual or perceived violations of any of our policies or procedures or any other applicable rules or regulations*. We have appointed a Chief Compliance Officer as well as compliance coordinators at each inpatient facility. The Chief Compliance Officer heads our Compliance Committee, which consists of senior management personnel and two members of our board of directors. Employee training is a key component of the compliance program. All employees receive training during orientation and annually thereafter.

\*     \*     \*

In addition, *our management has spent, and may spend in the future, substantial time and effort on compliance measures*.

\*     \*     \*

We believe that *we are in substantial compliance with all applicable laws and regulations and are not aware of any material pending or threatened investigations involving allegations of potential wrongdoing*. While *no material regulatory inquiries have been made*, compliance with such laws and regulations can be subject to future government review and interpretation as well as significant regulatory

- 55 -

action including fines, penalties, and exclusion from the Medicare and Medicaid programs.

109.    The 2007 Report on Form 10-K also touted the Company's ability to improve financial results at acquired facilities through purported operating efficiencies while maintaining or improving the quality of treatment at those facilities:

> We strive to improve the operating results of new and existing inpatient behavioral health care operations by **providing the highest quality service**, expanding referral networks and marketing initiatives and **meeting increased demand for behavioral health care services by expanding our services and developing new services**.  We also attempt to **improve operating results by optimizing staffing ratios, controlling contract labor costs and reducing supply costs** through group purchasing.

The foregoing language was repeated in the Reports on Form 10-Q filed by PSI on May 6, 2008 (for 1Q08, the period ending March 31, 2008), August 6, 2008 (for 2Q08, the period ending June 30, 2008), and November 5, 2008 (for 3Q08, the period ending September 30, 2008).

110.    The 2007 Report on Form 10-K further assured investors about the rigorous review of PSI's operations designed to assure quality of treatment:

> The services provided at each inpatient facility are **continually assessed and monitored** through an ongoing quality improvement program.  The purpose of this program is to strive for the **highest quality of care possible** for individuals with behavioral health issues, and includes **regular site visits** to each inpatient facility in order to assess compliance with legal and regulatory standards, as well as adherence to our compliance program.  Standardized performance measures based on a national outcomes measurement data base comparing our inpatient facilities' performance with national norms are also reported and reviewed and **corrective steps are taken when necessary**.

111.    By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in the 2007 Report on Form 10-K would be, and were, misleading to and operated as a fraud upon investors, at least in the following material respects:

- Contrary to the claim that PSI "provide[d] higher quality care than [its] competitors" or the "highest quality service," including "24-hour skilled nursing observation" and "intensive, highly-coordinated treatment," PSI's facilities were staffed at levels far

- 56 -

below those necessary to provide such services, and well below the levels of its competitors, such that its incidence of regulatory violations and patient safety and quality of care problems was much higher than that of its competitors, as alleged above and as reported by *ProPublica*, the *LA Times* and other media outlets;

- Contrary to the claim that PSI's facilities were in substantial compliance with applicable federal, state, local and independent review body regulations and requirements –

  - PSI facilities were staffed below levels necessary to assure proper treatment of patients in a safe and secure therapeutic environment, or to monitor patients at risk for harming themselves and others, as described above;

  - PSI consistently failed to promptly report or accurately document incidents of actual or potential harm to patients, and actively delayed or concealed reporting of a significant number of events, as described above;

  - PSI was in violation of other regulatory requirements and standards pertaining to staffing levels and patient treatment, the condition of facilities, and medical record-keeping practices; and

  - Serious patient care deficiencies were still occurring at PSI hospitals in California and would continue to occur through at least June 2008, as was reported by *ProPublica* in November 2008.

- The Company was not spending substantial time and resources on its compliance programs, nor was regulatory compliance a top priority for PSI –

  - According to former PSI employees, the Company was serious about risk management only, as one employee put it, "until money was involved." A former CEO at two PSI hospitals echoed this sentiment, saying there was always a tension between training and budget – the Company wanted employees to be trained, s/he said, "but they didn't want to spend a month" doing it.

  - Several PSI hospital executives, when shown organizational charts for the Company's compliance department or asked who filled the compliance or regulatory positions like those described above, said that they had never heard those job titles being used in the organization and had no idea who, if anyone, filled those compliance-related roles.

- The statements that PSI was successful in improving results by "optimizing [its] staffing ratios, controlling contract labor costs and reducing supply costs" was materially misleading because it omitted to disclose that the reductions in staffing and expense were below the level at which PSI could operate its facilities in a safe manner or provide adequate – much less high quality – treatment to patients; and

- The claim that services at each facility are "continually assessed and monitored" and "corrective steps are taken when necessary" was materially false and misleading because, in reality, PSI took corrective actions only to avoid negative publicity, and only to the extent to create the appearance of action without making any meaningful changes in its practices or operations, as described in the UIC report on Riveredge and other sources detailed above.

**B.     1Q08 Earnings Release, Conference Call and Report on Form 10-Q (April 30 – May 1 and May 6, 2008)**

112.     On April 30, 2008, PSI issued a press release entitled "Psychiatric Solutions First Quarter Earnings Increase 39.4% to $0.46 per Diluted Share." The release was initially disseminated to the market via *Business Wire*, and thereafter disseminated further by other news organizations, financial analysts, websites and other sources of information. The release was issued by PSI and approved by each of the Individual Defendants. Defendant Jacobs provided quotes that were included in the press release, and defendant Turner was identified in the press release as the source to contact for further information about its contents.

113.     The April 30, 2008 press release included PSI's financial statements for 1Q08 including the Company's reported operating expenses, same facility results, revenue and patient data, and other financial metrics described in §VI(A)(2), and also included the following narrative statements:

> Psychiatric Solutions, Inc. ("PSI") today announced financial results for the first quarter ended March 31, 2008. Revenue increased 33.3% to a record $429.7 million for the quarter from $322.4 million for the first quarter of 2007. Income from continuing operations rose 39.4% to $0.46 per diluted share from the comparable prior-year quarter.
>
> ***Same-facility revenue grew 7.7% for the first quarter of 2008, reflecting same-facility growth in net revenue per patient day of 5.1% and growth in patient days of 2.4%. Same-facility EBITDA margin expanded 180 basis points to 21.9% and EBITDA margin for all facilities increased 80 basis points to 20.8% for the first quarter of 2008 from the first quarter of 2007***. Consolidated adjusted EBITDA grew 42.5% to a record $76.8 million, or 17.9% of revenue, for the first quarter of 2008 from the first quarter of 2007. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on page 6.

527027_1

Joey Jacobs, Chairman, President and Chief Executive Officer of PSI, remarked, "*PSI performed extremely well during the first quarter of 2008, enabling us to exceed earnings guidance for the quarter and to again raise our earnings guidance for the year*. Our *focus on execution* enabled us to *achieve our same-facility revenue and EBITDA targets and implement our plans for adding new beds*. With the March acquisition of five inpatient psychiatric facilities from United Medical Corporation, we also added more than 400 beds in a transaction expected to be accretive to our 2008 financial results.

"Market dynamics in the inpatient behavioral health industry remain favorable, supporting our ability to continue implementing our *proven business model*. We remain *confident of our prospects for driving further significant growth in our same-facility metrics*, while continuing to build our platform for future growth through the accretive acquisition of at least six inpatient facilities each year."

Based on its first quarter results and outlook for the remainder of the year, *PSI is increasing its guidance for earnings from continuing operations per diluted share for 2008 to a range of $2.00 to $2.03 from the previous range of $1.97 to $2.01. As a result, growth in 2008 earnings per diluted share is expected to be 34% to 36% compared to 2007*. The Company's guidance does not include the impact from any future acquisitions.

114.     On May 1, 2008, PSI hosted a conference call to discuss the Company's 1Q08 results with institutional investors and analysts. Each of the Individual Defendants participated in and spoke on the call, as did analysts representing nine Wall Street firms. The call had been publicized by PSI in advance, and a live broadcast of the call was made available for at least 14 days after the call in the "Investors" section of the Company's website. Written transcripts of the call were also published and disseminated by Thomson Reuters Streetevents and by other sources. The contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities.

115.     At the outset of the call, Jacobs made the following statement:

[JACOBS:]     We appreciate your being with us this morning to discuss an *outstanding performance by PSI* for the first quarter. As you can see from our earnings release, we once again produced very strong results. *Given the acute focus on our same facility revenue growth metric, I am pleased to report that we delivered 7.7% same-facility revenue growth, solidly within the range we target on an annual basis*.

I would also like to highlight very strong corporate wide growth. Total revenue increased 33%, consolidated adjusted EBITDA grew 43%, earnings from continuing operations increased 39%. And, once again, *we are raising our earnings guidance again for the year, and now expect to deliver earnings per share growth of 34% to 36% as compared to 2007*.

Our strong growth reflects the addition of the new inpatient beds, primarily through acquisition. Since the end of the first quarter of 2007, we acquired 20 inpatient psychiatric facilities with approximately 2000 beds in two transactions. We completed the acquisition of Horizon Health in May 2007, and purchased the five facilities from United Medical Corporation in March of this year. We also purchased two EAP companies during the first quarter of 2008.

We also continued to expand our bed count through the addition of beds to new and existing facilities. *These beds will help us meet increasing demand for high-quality inpatient psychiatric care*, while serving patients whom we cannot admit today. In the first quarter, we added approximately 80 beds, and we expect to add another 250 beds in the second quarter, of which more than 100 have already opened. As we had previously discussed, we are on track to add nearly 600 beds this year, and we continue to believe we will have all of those beds operational by late this year or very early next year.

As I mentioned earlier, we were very pleased with the 7.7% growth in PSI same-facility revenue for the first quarter, consistent with our annual target of 7% to 9% growth for 2008. We produced this growth in spite of the negative effect of Easter shifting into the first quarter this year compared with the second quarter last year. The increase in same-facility revenue resulted from a 2.4% increase in patient days and a 5.1% increase in revenue per day.

Our same-facility growth also continued to drive increased operating leverage. Our same-facility EBITDA margin increased 180 basis points to 21.9% for the quarter. *Considering this was the first full quarter in which the nine facilities acquired from ABS were included in our same-facility base, this growth demonstrates our ongoing progress in operating those facilities more effectively*.

We also produced an increase of 80 basis points to 20.8% in EBITDA margin for all of our facilities. This improvement contributed significantly to the 120 basis point increase in our margin for consolidated adjusted EBITDA, which totaled $77 million for the quarter, up 43% from the first quarter of 2007.

Looking forward, *we intend to continue executing PSI's proven business model*. Our pipeline of potential acquisitions remains healthy in a favorable pricing environment. And we have the financial capacity to carry out our plans. Steady growth in the industry demand also provides a solid foundation for the growth in our existing facilities and supports our development of new beds.

*With an anticipated 7% to 9% expansion in same-facility revenue annually, we expect to continue increasing our EBITDA margins over time. We remain*

***confident about our ability to continue to expand our same-facility EBITDA margin***.

In summary, ***we are well-positioned for future significant growth***. We enjoy positive industry conditions, a successful strategy and a highly experienced management team. As in the first quarter, the key to leveraging this momentum is primarily a matter of execution. And let me assure you that we are very focused on getting the job done.

116. On May 6, 2008, PSI issued its Report on Form 10-Q reflecting its results of operations and including its financial statements for the first quarter of 2008, the period ending March 31, 2008. The Report on Form 10-Q included the statements previously alleged regarding PSI's purported ability to improve operations while reducing costs and expanding revenues at acquired facilities and still providing high quality care to the children, teenagers and other patients being treated there, as alleged in ¶89. The Report included PSI's 1Q08 financial statements, including the Company's reported operating expenses, same facility results, revenue and patient data, and other financial metrics described at §VI(A)(2). The Report was signed by Jacobs and Polson, and also included certifications signed by Jacobs and Polson pursuant to the Sarbanes-Oxley Act, as alleged in §VII(G).

117. By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in the April 30, 2008 press release and on the May 1, 2008 conference call, and the financial information discussed there and in the 1Q08 Report on Form 10-Q, would be, and were, misleading to and operated as a fraud upon investors. Considered as a whole, defendants' representations about the purported continuing strength of PSI's performance and business model, its prospects for driving further growth, and its purported ability to provide "high quality" care to patients continued to mislead investors by presenting an overly-optimistic, one-sided picture of PSI's operating results, while failing to disclose, and actively concealing or recklessly ignoring, conditions which created

material and significant risks to the Company and the patients under its care. In particular, the foregoing statements were recklessly misleading in at least the following respects:

- The statements again omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate – much less "high quality" – treatment or care to those patients in a safe environment;

- The purportedly strong growth in same facility revenues and margins resulted not from PSI's "focus on execution" or its "successful strategy and [] highly experienced management team," but instead resulted from the deliberate understaffing and underfunding of psychiatric facilities below levels required to provide safe, high quality care to patients in compliance with regulatory licensing and accreditation standards and requirements, as previously alleged;

- At the time this release was issued, there continued to be ongoing undisclosed and uncorrected regulatory violations and quality of care and patient safety problems arising from understaffing of PSI healthcare facilities, including –

  - As of May 2008, serious patient care deficiencies were still occurring at PSI hospitals in California, as previously alleged.

- PSI's reported financial results, including its reported operating expenses, costs and margins did not reflect the true costs to operate its facilities in a manner that provided high quality treatment to patients in a safe therapeutic environment that complied with all regulatory, licensing and accreditation standards and requirements;

- PSI's reported financial results continued to under-reserve for medical malpractice and other professional liability claims in violation of GAAP, as previously alleged in §VI(A)(1); and

- The financial guidance provided in the April 30 earnings release and discussed on the May 1 conference call lacked a reasonable basis because it failed to account for malpractice and professional liability expenses that had been incurred and were reasonably expected to continue to be incurred at levels above the amounts reserved for such expenses, and because the guidance was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment.

### C.    2Q08 Earnings Release, Conference Call and Report on Form 10-Q (July 30-31 and August 6, 2008)

118.    On July 17, 2008, the *Tribune* published its report on the problems at Riveredge Hospital, as described in §V(C)(1).  On July 31, 2008, PSI filed a Report on Form 8-K with the SEC stating that the Company "has received a subpoena from the Department of Justice requesting certain information regarding Riveredge Hospital, one of the Company's inpatient psychiatric facilities in Chicago, Illinois.  The Company intends to provide the requested information to the Department of Justice."  The Company did not disclose when the subpoena had been received, nor did it attach a copy of the subpoena to its Report on Form 8-K, which was dated July 30, 2008.

119.    On July 30, 2008, PSI issued a press release reporting its financial results for 2Q08, which made no mention of the problems at Riveredge or the *Tribune's* report.  Rather, and as alleged below, the release again raised PSI's financial guidance for the year based on the purported strength of PSI's financial results while omitting to disclose material facts tending to undermine the significance of those results, including the fact that the reported results were based upon operations at facilities, including Riveredge, which were understaffed, underfunded and not being operated in compliance with regulatory and medical requirements.  Defendants' first comments to investors about the Riveredge issues and the *Tribune* report came during the 2Q08 investor conference call on July 31, 2008, during which they repeatedly downplayed the incident, falsely claiming it was based on historical incidents that did not reflect recent or current operations at Riveredge or other PSI facilities.  During the call, defendants repeatedly, and without any reasonable basis on which to do so, assured investors that the government investigation of that facility, including the new admission hold imposed by the Illinois DCFS, did not and would not have any material impact on the Company's operations.

120.    PSI's July 30, 2008, press release, titled "Psychiatric Solutions Reports Second Quarter Earnings of $0.52 per Diluted Share," was initially disseminated to the market via *Business*

*Wire*, and thereafter disseminated further by other news organizations, financial analysts, websites, and other sources of information. The release was issued by PSI and approved by each of the Individual Defendants. Defendant Jacobs provided quotes that were included in the press release, and defendant Turner was identified in the press release as the source to contact for further information about its contents.

121. The July 30, 2008, press release included PSI's financial statements for 2Q08, including the Company's reported operating expenses, same facility results, revenue and patient data, and other financial metrics described in §VI(A)(2), and also included the following narrative statements:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the second quarter ended June 30, 2008. ***Revenue was a record $451.0 million for the quarter, up 28.4% from $351.2 million for the second quarter of 2007.*** Income from continuing operations increased 40.5% to $0.52 per diluted share for the second quarter of 2008 from adjusted income from continuing operations of $0.37 per diluted share for the second quarter last year, which excluded a loss on debt refinancing of $0.09 per diluted share after tax. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on pages 6 and 7.

***Same-facility revenue increased 7.8% for the second quarter of 2008, driven by same-facility growth in net revenue per patient day of 5.1% and growth in patient days of 2.7%. Same-facility EBITDA margin expanded 170 basis points to 21.8% compared with the second quarter of 2007, and EBITDA margin for all facilities increased 130 basis points to 21.1%.*** Consolidated adjusted EBITDA grew 34.7% to a record $81.5 million, or 18.1% of revenue, for the second quarter of 2008 from the same quarter of 2007. Cash flow from continuing operations for the second quarter of 2008 was more than $41.5 million.

"PSI produced strong profitable growth for the second quarter of 2008," commented Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "Demand for high quality inpatient psychiatric care has continued to increase in our fragmented, capacity-constrained industry, driving substantial growth in our same-facility revenue. In addition, ***we have expanded PSI's capacity to meet increased demand through both accretive facility acquisitions and the addition of more than 300 beds to existing and new inpatient psychiatric facilities during the first half of 2008***. As expected, this volume growth and continuing initiatives to enhance productivity in each facility have generated significant operating leverage, expanding our profit margins.

"We expect to continue benefiting from strong industry growth trends in 2008 and beyond. In this environment, *we remain highly focused on executing a proven business model that has enabled us to build a long-term record of outstanding performance, while also becoming the leading provider in the inpatient psychiatric care industry. We are confident we have the opportunities, the resources and the expertise to further strengthen our leadership position and enhance stockholder value*."

Based on the Company's results for the second quarter and first half of 2008 and its outlook for the remainder of the year, *PSI today updated its guidance range for earnings from continuing operations per diluted share for 2008 to $2.02 to $2.03, reflecting growth of 36% compared to 2007*. The Company's guidance does not include the impact from any future acquisitions.

122.    On July 31, 2008, PSI hosted a conference call to discuss the Company's 2Q08 results with institutional investors and analysts. Each of the Individual Defendants participated in and spoke on the call, as did analysts representing 12 Wall Street firms. The call had been publicized by PSI in advance, and a live broadcast of the call was made available for at least 14 days after the call in the "Investors" section of the Company's website. Written transcripts of the call were also published and disseminated by Thomson Reuters Streetevents and by other sources. The contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities.

123.    At the outset of the call, Jacobs once again touted the improvement in existing facility revenues and margins, which he claimed resulted from the additional beds added to those facilities, while omitting to disclose the problems that had arisen at those facilities as a result of understaffing and underfunding, as previously alleged:

[JACOBS:]    I am very pleased to report that we had *another great quarter* at Psychiatric Solutions, which follows our strong first-quarter performance. Total revenues rose more than 28% for the second quarter, driving an increase in adjusted EBITDA of nearly 35% and growth in earnings per diluted share of more than 40%. Consistent with first-quarter growth and same-facility revenue of 7.7%, we produced a 7.8% increase in same-facility revenue for the second quarter.

We also *continued to expand our profit margins through greater operating leverage and enhanced productivities*. Our revenue growth was mainly driven by the addition of inpatient beds, including the impact from the Horizon Health

transaction, which brought approximately 1600 beds to PSI in June 2007. We also purchased five facilities with more than 400 beds from United Medical Corporation in the first quarter of 2008. And during the second quarter, added a third EAP acquisition to the two we completed in the first quarter.

Complementing the expansion of our beds through acquisition, *we have added and will continue to add hundreds of beds in new and existing facilities*. As of the end of the second quarter, we have completed more than 300 beds during 2008 and we expect to complete about 600 by year end. We remain on track with this plan and expect to have them all operational by late 2008 or early 2009.

*The addition of new beds to existing facilities over the past year contributed to our substantial same-facility revenue growth* for the second quarter. In some cases, these beds enabled us to serve patients who might otherwise have been turned away, and in other cases, the beds have enabled us to ramp up our initiatives in each individual facility to expand market share.

*Same-facility patient days for the second quarter improved 2.7% from the second quarter last year, which is our second consecutive quarterly improvement*, and revenue per patient day increased 5.1%, consistent with comparable quarter growth in this measure for the first quarter.

The additional same-facility revenue growth [furthered] operating leverage within our same-facility base, which we also enhanced *through ongoing programs to improve facility productivity and efficiency*. As a result, we have continued to expand our same-facility EBITDA margin, which increased 170 basis points to 21.8% for the second quarter from the same quarter last year.

We are *pleased with this margin expansion*, since the Horizon facilities were included in our same-facility base for the first time for the month of June. This improvement is *another indication of our ability first, to acquire facilities in attractive markets, and second, to integrate them quickly in a relatively seamless fashion*. As we make further progress, we continue to target long-term growth in our same-facility EBITDA margin of several hundred basis points.

The expansion of our same-facility margins drove 110 basis point increase in the EBITDA margin for all our facilities. PSI's consolidated adjusted EBITDA margin for the second quarter increased 34.7% to over $81 million, or 18.1% of total revenue.

\* \* \*

*PSI continues to be well-positioned* in an industry whose key growth dynamics remain intact in spite of the challenging economic environment. Among those dynamics, demand for inpatient psychiatric care continues to rise, as evidenced by the expansion of the industry's patient days and revenue per patient day, even in challenging economic conditions. In addition, capacity growth is limited and the industry remains highly fragmented. As a result of *our skill and expertise*, we have

527027_1

an ongoing opportunity to expand our capacity to meet this demand and expand our market share.

> *Our confidence in leveraging these opportunities lies in our proven business model*, which has produced a strong long-term record of profitable growth and increased stockholder value. With a *high quality management team* focused on the continued strong execution of this model, we expect to expand both through additional acquisitions and through the development of beds in existing and new facilities. *We are confident in our ability to drive enhanced profit margins through growth in same-facility revenues at our target rate of 7% to 9% annually*.

124.    In his opening remarks, Jacobs also sought to downplay the incidents at Riveredge

that had been reported two weeks earlier by the *Tribune*:

> [JACOBS:]    Before closing my remarks, I'll add that many of you are aware of a story that was published in a Chicago newspaper on July 17 about incidents that occurred in 2007 and 2006 at Riveredge Hospital. *This is not the first story about incidents at one of our facilities, and it won't be the last*. So I'd like to share my perspective.

> First, *these types of unfortunate incidents do occur in this patient population. Minimizing and eliminating these types of incidents is one of PSI's top priorities.   We take continuous improvement of quality, safety and risk management very seriously, and we have built a very effective infrastructure over the past several years*.

> As a matter of practice at all our facilities, *we thoroughly report incidents to relevant agencies as soon as possible and work directly with agencies to continuously improve safety and quality in a timely manner.   The incidents referenced in the newspaper story were reported to the relevant agencies* and appropriate corrective actions were taken in 2006 and 2007.

> Second, it is also important to understand that we operate in a highly regulated industry with nearly continuous oversight.  Our facilities are surveyed multiple times each year on average and less than 1% of these surveys result in serious deficiencies, *a testament to our diligent efforts to continuously improve risk management, safety and quality*.

> We are pleased with this track record in light of the fact that we are providing more than 2.7 million patient days of treatment annually.  Just before the story was published, the Department of Children and Family Services placed an admissions hold on Riveredge. *Riveredge is currently in discussions with DCFS and expects to conclude those discussions soon.  As a result, we don't expect a material adverse financial impact from the admissions hold*.

125.    When analysts pressed for more information about the Riveredge incidents during the

call, Jacobs continued his efforts to downplay their significance, repeatedly and falsely suggesting

that the *Tribune's* account was based on dated historical information.  In response to one analyst's question about the investigation of the incidents, Jacobs responded that "***We have taken action back in '06 and '07***.  But once again, if they want to come in and take a relook at it, that is okay with us."  He reiterated to another: "***the stories in the Chicago [Tribune], those were 2006 and 2007 incidents, and the quality is better there; the management team is better there***, and will continue to get better."  When another analyst asked for more color on the incidents, Jacobs responded:

> [JACOBS:]     [T]here's not a lot more I can talk about it.  It did create noise for us, and the article was visible enough that, quite frankly, we expected that all parties, whether it's the state of Indiana or a Joint Commission or the Department of DOJ, we expect them to take a look and review.  And if they find something that we can improve on, absolutely we will improve it.
>
> ***As I mentioned in the comments, these incidents actually occurred back previous years, and we've made considerable improvement there***.  And so we'll get through this, and as my comments mentioned, we have a weekly meetings with DCFS and we've got our fingers crossed here.  And if it was material, we would disclose that right now; we do not think it is.  They are working hard up there, taking care of their patients and working through the process

126.     During the call, Jacobs specifically denied that the Company was violating regulatory requirements by failing to report the incidents when they occurred, as claimed in the *Tribune* articles and later reported by *ProPublica*, the *LA Times* and other media organizations: "***[W]e are in compliance with those states on reporting.  We know when to report, how to report***.  And also PSI captures incidents that you don't report, that ***we are looking for minor incidents.  We want to fix those so those don't become major incidents***.  So for PSI, we capture much more than we actually have to report, but ***we do diligently report anything that an agency needs to see***."  Jacobs then went on to claim that, at Riveredge, "we think ***we have reported appropriately***, and the intent was absolutely to always report."

127.     When asked to comment on the "negative story on the company" that it had "grown so fast that you've lost span control and the quality issues are systemic because of the growth,"

Jacobs again claimed that the incidents at Riveredge were not indicative of any wider problem in the

Company's operations:

> [JACOBS:]  *Unfortunately, we take care of very difficult patients*.  I want them all not to have incidents, but some incidents will occur, and we do our level best to go back and put the resources back to correct it.  But as far as noise from the shorts or a negative newspaper article, as I mentioned earlier, we could have one today, or we could have one 30 days from now that somebody wants to write a story about us.

*       *       *

> Now, from the risk management side, when you take these incidents and put them through the actual oral process and through our risk management, *we have great results there.  So there is a disconnect between the sensationalism of an incident that might get put in the paper versus the actual reality*.

128.   Jacobs' repeated efforts to downplay the *Tribune* account and the problems at

Riveredge had its intended effect, as numerous analysts issued positive reports dismissing the events

in the article as old news based on isolated incidents not reflective of systemic problems in the

Company's operations, including the following representative examples:

- "The market, however, narrowly focused on the DoJ investigation news, which we believe will prove to have little-to-no operational impact.  Headline risk will likely always exist for this company given the nature of its patient population, and we believe the multiple well more than discounts this risk given the current growth prospects – LT EPS run-rate of 25+%.  We would be buyers here." (*JP Morgan*, July 31, 2008).

- "The company believes it reported the events, which occurred in 2006 and 2007, appropriately to authorities and has taken multiple steps since to improve the quality at the facility.  Admissions from the IL Department of Children and Family Services (DCFS) are still on hold.  Management expects the issue to be resolved in the near term and does not anticipate it having a material financial impact." (*Avondale Partners*, August 1, 2008).

- [I]n our discussions with the company, management highlighted the fact that the admission ban only affects those patients that would have been admitted by the DCFS, which is approximately 20% to 25% of total admissions.  The company is having weekly discussions with DCFS, which are expected to conclude in the near future, and does not anticipate that the admission ban will have a material adverse financial impact. (*Jefferies & Co.*, August 1, 2008).

129.    On August 6, 2008, PSI issued its Report on Form 10-Q reflecting its results of operations and including its financial statements for the second quarter of 2008, the period ending June 30, 2008.  The Report on Form 10-Q included the statements previously alleged regarding PSI's purported ability to improve operations while reducing costs and expanding revenues at acquired facilities and still providing high quality care to the children, teenagers and other patients being treated there in compliance with regulatory and licensing requirements, as alleged in ¶89.  The Report included PSI's 2Q08 financial statements, including the Company's reported operating expenses, same facility results, revenue and patient data and other financial metrics described at §VI(A)(2).  The Report was signed by Jacobs and Polson, and also included certifications signed by Jacobs and Polson pursuant to the Sarbanes-Oxley Act, as alleged in §VII(G).

130.    By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in the July 30, 2008 press release and on the July 31, 2008 conference call, and the financial information discussed there and in the 2Q08 Report on Form 10-Q, would be, and were, misleading to and operated as a fraud upon investors.  Considered as a whole, defendants' continuing representations about the purported strength of PSI's financial results and business model continued to mislead investors by concealing the extent to which those results had been achieved by underfunding and understaffing PSI's facilities in a manner that jeopardized patient safety and diminished the quality of care it provided.  In addition, the numerous statements described above which sought to discount, diminish and deny the reports about Riveredge Hospital in the *Tribune*, both as they pertained to that facility and to PSI's other operations, further misled investors by fraudulently assuring investors that the reports from Riveredge were isolated, historic occurrences that did not reflect current conditions there or at PSI's other facilities.

131.    As described in UIC's report on Riveredge Hospital and as alleged in detail in §V(E), the statements on the 2Q08 conference call regarding the conditions at that facility and the report in the *Tribune* failed to provide a truthful or accurate account of –

- the accuracy of the *Tribune's* report;

- the nature and significance of the conditions at Riveredge, when those conditions arose, or the existence of continuing violations;

- PSI's purported actions in reporting or correcting the conditions at Riveredge, and the timeliness and appropriateness of its response;

- the reasonably expected financial impact of the investigation or the regulatory hold placed on the hospital by DCFS; or

- the strength of the Company's compliance programs, and PSI's commitment to correcting conditions at Riveredge and elsewhere in its operations.

132.    At the time this release was issued, there ***continued*** to be ongoing undisclosed and uncorrected regulatory violations and quality of care and patient safety problems arising from understaffing at Riveredge and PSI's other healthcare facilities, including –

- at Sierra Vista Hospital in California, which was then receiving the most serious patient deficiency citations at about eight times the statewide average among private psychiatric hospitals in California, as was reported by the *LA Times* in November 2008; and

- at Riveredge, where the continuing failure to adequately monitor and ensure patient safety at Riveredge had led to additional incidents of a sexual assault and sexual activity in the hospital's common area dayroom in August 2008, as was reported by the UIC in March 2009.

133.    In addition, contrary to the contentions that PSI takes its reporting obligations seriously, had not failed to report patient injuries or abuse in a timely manner to proper authorities, and had already corrected the problems at Riveredge –

- As reflected in UIC's report on Riveredge, follow up surveys conducted in September and October 2008 found that the cited conditions at the hospital remained uncorrected months after the foregoing statements were made, leading UIC and IDPH to conclude that "such data indicates that Riveredge officials are still failing – even in the fact of a critical IDPH finding as well as other forms of outside scrutiny – to ensure the hospital operates at minimally adequate standards of care";

- Less than a week after the conference call, IDPH found that Riveredge had failed to notify the agency of the death of one of its patients in 2007 due to overmedication with Clozaril, as required by law; and

- UIC's Riveredge report includes a similar account of an affidavit and interview of a Texas investigator looking into the case of the teenager who was passed out for five hours in a shower after a suicide attempt at PSI's Cypress Creek facility, who indicated that "hospital administrators appeared to minimize or hide the reporting of this incident to state officials."

134.    In addition, the statements continued to deliberately or recklessly mislead investors in the same manner that defendants' earlier financial statements and claims about the strength of PSI's business model and the results derived therefrom had misled investors, including because –

- The financial guidance provided in the July 30, 2008 earnings release and discussed on the July 31, 2008 conference call lacked a reasonable basis because it failed to account for the actual and reasonably anticipated expenses and lost business arising from the Riveredge investigation or malpractice expense claims that had been and were continuing to be incurred, and because it was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment.

- The statements again omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate – much less "high quality" – treatment or care to those patients in a safe environment;

- The statements regarding PSI's ability to continue to improve revenues by adding hundreds of new beds to its facilities were misleading in that they omitted material facts about the Company's ability to earn profits from those beds while operating the facilities with sufficient staffing and budgets to provide high quality treatment to patients in a safe and secure therapeutic environment in compliance with applicable regulatory and licensing requirements and standards;

- Defendants failed to disclose that the same-facility improvements achieved "through ongoing programs to improve facility productivity and efficiency" were not made in compliance with applicable regulatory and licensing requirements and standards;

- The financial statements included in PSI's 2Q08 press release and conference call and Report on Form 10-Q continued to mislead investors because –

  - PSI's reported financial results, including its reported other operating expenses, costs and margins did not reflect the true costs to operate its

facilities in a manner that provided high quality treatment to patients in a safe therapeutic environment that complies with regulatory and licensing requirements; and

- PSI's reported financial results continued to under-reserve for medical malpractice and other professional liability claims in violation of GAAP, as alleged in §VI(A)(1).

**D.    3Q08 Earnings Release, Conference Call and Report on Form 10-Q (October 30-31 and November 5, 2008)**

135.    On October 30, 2008, PSI issued a press release, titled "Psychiatric Solutions Earnings Per Diluted Share Increases 37.8% on 8.7% Growth in Same-Facility Revenue," to describe its 3Q08 financial statements and results of operations.    The release was initially disseminated to the market via *Business Wire*, and thereafter disseminated further by other news organizations, financial analysts, websites, and other sources of information.    The release was issued by PSI and approved by each of the Individual Defendants.    Defendant Jacobs provided quotes that were included in the press release, and defendant Turner was identified in the press release as the source to contact for further information about its contents.

136.    The October 30, 2008 press release included PSI's financial statements for 3Q08, including the Company's reported operating expenses, same facility results, revenue and patient data, and other financial metrics described in §VI(A)(2), and also included the following narrative statements:

> Psychiatric Solutions, Inc. ("PSI") today announced financial results for the third quarter ended September 30, 2008.    Revenue was $448.0 million for the quarter, an increase of 13.0% from $396.4 million for the third quarter of 2007.    Income from continuing operations rose 39.1% to $28.6 million for the quarter from $20.6 million for the third quarter of 2007.    Income from continuing operations per diluted share increased 37.8% to $0.51 for the third quarter of 2008 from $0.37 for the third quarter of 2007.

> ***Same-facility revenue increased 8.7%*** for the third quarter of 2008 compared with the third quarter last year.    This increase reflected same-facility growth in net revenue per patient day of 4.8% and growth in patient days of 3.7%.    Same-facility EBITDA margin was 20.6% for the latest quarter, ***up 60 basis points*** from 20.0% for the third quarter of 2007, while the EBITDA margin for all facilities also ***increased***

527027_1

***60 basis points*** to 20.5%. PSI produced a comparable-quarter increase of 18.1% in consolidated adjusted EBITDA to $80.6 million, which increased as a percentage of revenue to 18.0% from 17.2%. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on pages 6 and 7.

"***PSI performed well*** for the third quarter, with ***strong same-facility revenue growth*** driving expanded profit margins," said Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "The ***addition of new beds throughout the year has contributed to the increasing rate of comparable-quarter growth in same-facility patient days for three consecutive quarters.***

"The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments. We plan to continue expanding our ability to serve this demand, both through the addition of new beds in our facilities and the ongoing execution of our proven acquisition strategy in a fragmented, capacity-constrained industry. ***We are well positioned to fund our anticipated growth over the next year through substantial cash flow from operations***, our existing cash and the availability under our credit facility."

Based on the Company's results for the third quarter and first nine months of 2008 and its outlook for the remainder of the year, PSI today ***affirmed its guidance*** for earnings from continuing operations per diluted share for 2008 in a range of $2.02 to $2.03, reflecting growth of 36% compared with 2007. In addition, PSI also today ***established its guidance for earnings per diluted share for 2009 in a range of $2.40 to $2.44, reflecting growth of 18% to 21%***.

137.     On October 31, 2008, PSI hosted a conference call to discuss the Company's 3Q08 results with institutional investors and analysts  Each of the Individual Defendants participated in and spoke on the call, as did analysts representing 16 Wall Street firms. The call had been publicized by PSI in advance, and a live broadcast of the call was made available for at least 14 days after the call in the "Investors" section of the Company's website. Written transcripts of the call were also published and disseminated by Thomson Reuters Streetevents and by other sources. The contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities.

138.     At the outset of the call, Jacobs again touted the purported quality of PSI's operations and the improvement in existing facility revenues and margins:

[JACOBS:]     ***PSI continued to perform very well for the third quarter***. We produced growth of 8.7% in same-facility revenue for the third quarter. The third

consecutive comparable quarter increase. This growth by 13% increase in revenue for the quarter, and also *margin improvement* that resulted in a 38% increase in earnings per diluted share.

As a result of this growth, *we are on track to achieve our earnings guidance for full year 2008. We are very pleased with our same-facility results*. Earlier this year we discussed our focus on expanding same-facility patient days. *For the third quarter patient days increased 3.7%, a rate which is now also increased over the third consecutive quarter. This improvement helped us produce our highest rate of same-facility revenue growth since the fourth quarter 2006*.

As expected, *the operating leverage created through this substantial growth resulted in higher profit margins. In addition we are continuing our initiatives to improve quality and efficiency in each facility*. As just one example, we are currently engaged in a process to standardize our automated dispensing machines for medication and to add these ADMs to facilities that don't currently have them.

ADMs have already proven their ability to enhance the quality of care, increase efficiency by automating the distribution, tracking management and security of medications. *They contribute to our greater patient safety* and reduced pharmacy costs. This initiative is *representative of our continuous efforts to identify and implement best practices within our facilities or within the industry that are relevant to all of our facilities*.

*Through our combined focus on growth and increased efficiency, both same-facility EBITDA to a percent of revenue, and the EBITDA margin for all facilities increased 60 basis points over the third quarter last year. In addition, consolidated adjusted EBITDA grew 18% quarter-over-quarter to [$80.6] million for the third quarter. This growth represented an 80 basis point increase as a percentage of revenue to 18% versus 17.2% for the third quarter last year*.

In an industry with steady growth in demand, *a significant portion of same-facility growth reflects the addition of new beds to existing facilities*. We are currently continuing to make progress on our plans to add nearly 600 beds to existing and new facilities during 2008. We continue to have many opportunities to expand our beds organically.

Complementing the impact of these beds on total revenue for the third quarter, we also benefited from the acquisition of five facilities with more than 400 beds from United Medical Corporation in the first quarter of 2008. Industry dynamics remain favorable for the continued success of *our proven facility acquisition strategy*. Through with each year we seek to buy at least six inpatient facilities that are leaders in their markets, and that have long-term growth potential.

The industry continues to be highly fragmented. A majority of the facilities that we operate and that we evaluate for purchase, are the sole providers in their markets. While new beds are coming onto the market primarily through additions to existing facilities, we expect the industry to remain capacity constrained. At the same time, demand has increased steadily for more than a decade; the long-term

perspectives for continued demand growth are strengthened by the recent passage of Mental Health Parity legislation which will become effective in the fall of 2009.

*Our scale and expertise positions PSI well to survive in this environment and to benefit from growth and demand*. Despite the condition of the credit markets, we also retain our financial ability to act. With our substantial cash flow from operations, $45 million of cash on hand on our balance sheet, and our existing revolver availability, we are positioned to fund our anticipated growth for 2009.

\*　　\*　　\*

Riveredge Hospital in Chicago which as we've discussed in our conference call last quarter, had an admissions hold placed on it by the Illinois Department of Family Services in July. During the third quarter, our same-facility patient day growth was negatively impacted by approximately 70 basis point due to the lower census levels resulting from this DCF admissions hold. *This hold is still in place; however we expect it to be lifted in the current quarter. The financial impact of the admissions hold in complying with the DOJ investigation cost us approximately 2% to 3% earnings per share hit in the third quarter*.

To conclude my remarks today I'll repeat what you've often heard me say. Our confidence in the long-term growth potential of PSI remains very strong. We are the leader in a growing capacity constrained industry. *Our business model and growth strategy have been continuously refined and successfully proven* over the six years that we have implemented (inaudible) as a public company. *As a result, our scale, our resources, our management depth, and capability have all increased enhancing our ability to execute*.

With continued strong execution we expect to expand through both additional facility acquisition and through the development of bed for existing and new facilities. We also *expect to drive enhance profit margins* through growth in same-facility revenue at our target rate of 7% to 9% annually.

139. During the call, Jacobs repeatedly told analysts that the impact of the investigation and DCFS hold at Riveredge was largely behind the Company, telling investors the investigation had reduced 3Q earnings by $0.02- $0.03 per share, and would impact 4Q earnings by another $0.01-$0.03 per share: "We have that coming back strong in '09." Jacobs told investors that legal expenses related to the investigation would decline significantly in the fourth quarter – "most if not all of those legal expenses are due to document production, and that's just a one-time event." Jacobs said those expenses were included in the Company's fourth quarter guidance, "but it's a lot less than we had occur in the third quarter."

140.    On the call, Jacobs again downplayed the seriousness of the incidents at Riveredge:

[JACOBS:]    Through our due diligence, through our looking back at Riveredge, *we think we've done a very good job there* whether it's a *couple of unfortunate incidents*, yes, but we take care of very sick kids there, and adults, and could things we do better, yes, and have we done them better, yes, and so – but looking back through the incidents that have occurred, *we feel good about the quality of care at Riveredge, and it's been reevaluated by numerous people since the admissions hold*.  We just basically have one more agency that needs to come through and approve it and lift the hold.

141.    Jacobs statement then prompted the following exchange:

[ANALYST]: A few questions.  First it sounds like your optimistic you're going to lift the admissions hold at Riveredge in the fourth quarter, and I know you've had some optimism that was going to be resolved sooner.  What's your level of confidence around that Joey?

[JACOBS]:    *I think its 80%.  I think it's 80%.  I think it's 80%*, it may be January 1, be the date.  But it could be next week.

142.    Jacobs further claimed that other facilities where PSI had previously had problems continued to perform well after corrective measures were put in place:

[ANALYST:]  All right, and then there were a few facilities that were having – I mean, besides Riveredge, that you guys talked about over the past year such as the Pines.  Just curious, did some of those sites ramp back up?

[JACOBS:]    Yes, in the third quarter, Adam, the Pines contributed about 30 basis points to the same store patient day growth.  They are now about 20 patients a day over what they were this time last year, and ramping up, and Wes Mason is doing a fantastic job for us there.  Also I was going to mention at the end, but I'll go ahead and mention it now, our Manatee Palms facility has comeback very strong for us, and it's doing a great job and Dave [Guyman] unfortunately for his death, but Dave and Manatee Palms just received the Trauma Award from the University of South Florida for being the best in Florida.  And it's just a terrific story about where we took a facility that had some issues, and now we've turned it into the best.  So those things are happening, and Riveredge hold, we expect to get it lifted in the fourth quarter, and so we're doing well, and whenever we find an issue that we need to address, we're addressing it.

143.    On November 5, 2008, PSI issued its Report on Form 10-Q reflecting its results of

operations and including its financial statements for the third quarter of 2008, the period ending

September 30, 2008.  The Report on Form 10-Q included the statements previously alleged

regarding PSI's purported ability to improve operations while reducing costs and expanding revenues at acquired facilities and still providing high quality care to the children, teenagers and other patients being treated there, as alleged in ¶89 above. The Report included PSI's 3Q08 financial statements, including the Company's reported operating expenses, same facility results, revenue and patient data, and other financial metrics described at §VI(A)(2). The Report was signed by Jacobs and Polson, and also included certifications signed by Jacobs and Polson pursuant to the Sarbanes-Oxley Act, as alleged in §VII(G) above.

144. By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in the October 30, 2008 press release and on the October 31, 2008 conference call, and the financial information discussed there and in the 3Q08 Report on Form 10-Q, would be, and were, misleading to and operated as a fraud upon investors. Once again, defendants' representations about the quality of care provided to PSI's patients and the purported strength and sustainability of PSI's financial results and business model, considered as a whole, continued to mislead investors by concealing the extent to which those results had been achieved by underfunding and understaffing PSI's facilities in a manner that jeopardized patient safety and diminished the quality of care it provided.

145. The statement that PSI was "on track to achieve [its] earnings guidance for full year 2008" and PSI's establishment of guidance for 2009 lacked a reasonable basis because the published guidance failed to account for the actual and reasonably anticipated expenses and lost business arising from the Riveredge investigation or the administrative hold imposed by DCFS, malpractice expense claims that had been and were continuing to be incurred, or a decline in patient occupancy that defendants claimed had begun to occur in October 2008. The guidance was also misleading and lacked a reasonable basis because it was predicated on operating PSI's facilities in a manner that

failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment.

146. The statements did not provide a truthful or accurate account of the current conditions at Riveredge, the nature of the incidents or their causes, the quality of care being provided at the hospital, or the nature and progress of the state of Illinois' investigation, because –

- There was no basis for claim that the Company expected the DCFS hold at Riveredge to be lifted in 4Q08, or that there was an 80% likelihood that this would occur, because, as reflected in the UIC report on Riveredge –

    - at the time this statement was made, PSI knew that UIC's investigation had expanded to include facilities other than Riveredge and was therefore unlikely to be completed before the end of the year; and

    - PSI had been informed that "the hospital was close to being placed in immediate jeopardy" as the result of a CMS survey of the facility, and there was "a significant amount of concern for the hospital's reputation within the community and the quality of care provided to patients" at a September 10, 2008 meeting of PSI's Medical Executive Committee, according to minutes of that meeting;

- The statements understated the actual and reasonably expected financial impact of the investigation and the regulatory hold placed on Riveredge by DCFS;

- The statements did not provide a truthful or accurate account of conditions at other PSI facilities, including The Pines and Manatee Palms, because they failed to disclose the continuing violations at those facilities or the pressure and influence exerted by PSI to dissuade politicians from imposing fines or sanctions at The Pines, as described below;

- The statements again omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate – much less "high quality" – treatment or care to those patients in a safe environment;

- The statements regarding revenues derived from the addition of new beds omitted to disclose material facts about the Company's failure to sufficiently staff and fund its facilities in order to provide high quality treatment to patients in a safe and secure therapeutic environment in compliance with applicable regulatory and licensing requirements and standards;

- 79 -

- As with its prior financial statements, the financial statements included in PSI's 3Q08 press release, conference call and 10-Q Report continued to mislead investors because –

  - PSI's reported financial results, including its reported operating expenses, costs and margins did not reflect the true costs to operate its facilities in a manner that provided high quality treatment to patients in a safe therapeutic environment that complied with regulatory and licensing requirements; and

  - PSI's reported financial results continued to under-reserve for medical malpractice and other professional liability claims in violation of GAAP, as alleged in §VI(A)(1) below.

147. The statements made false claims about PSI's purported improvements in patient safety and the status of PSI as a purported industry leader in providing high quality, safe treatment to patients. At the time this release was issued, there continued to be ongoing undisclosed and uncorrected regulatory violations and quality of care and patient safety problems arising from understaffing of PSI's other healthcare facilities, including –

- Serious incidents occurring at West Hills Hospital in Reno investigated by Nevada state regulators but not disclosed until June 2009.

- According to a May 22, 2009 article in *The Philadelphia Inquirer*, Pennsylvania state records showed that Friends Hospital had been placed under a provisional license during the second half of 2008, after officials found evidence of medication errors and inadequate treatment plans. PSI made no public announcement of or acknowledgment of the action. Inadequate patient oversight at PSI's Friends Hospital in Philadelphia, in one instance resulting in a suicide, remained pervasive during 2008 as a result of conditions which would ultimately lead to a finding of deficient care by state regulators and the termination of the facility's CEO and chief medical officer in 2009.

- Deficient patient care was still occurring at PSI's Streamwood Behavioral Health facility in Illinois throughout 2008, as was evidenced by the conclusions reached by Illinois DCFS in 2009 that the hospital was relying on excessive rates of chemical restraints due to severe understaffing.

- An unannounced recertification survey by IDPH at Riveredge in October 2008 revealed continued deficient patient care, including the failure to properly develop treatment plans and documentation procedures.

148.     PSI has made substantial efforts to conceal such violations, including by influencing regulators to withhold sanctions or penalties that could bring such incidents to light. According to a February 21, 2010 article in the *Richmond Times-Dispatch* ("*Times-Dispatch*"), following a series of incidents in which PSI failed to report and actively attempted to conceal suicide attempts and other incidents at The Pines, State officials in the spring of 2009 were moving to downgrade its license to provisional status – the most serious sanctions short of shutting down the facility, and one that was likely to result in lost admissions and negative publicity. Citing e-mails and other documents obtained through a Freedom of Information Act request, the newspaper reported that the action was quashed by the state's Mental Health Commissioner, Dr. James S. Reinhardt, who subsequently left his post to become a consultant to PSI.

149.     According to the *Times-Dispatch*, not long before Reinhardt quashed the provisional license, Virginia's Secretary of Health and Human Services had taken PSI officials on a tour of a state-operated center in Staunton, Virginia for treatment of children and adolescents that state officials wanted to close. A few days later, PSI told the state that it "wanted to operate a psychiatric hospital of exactly the same size for young people in Staunton." Shortly thereafter, in May 2010, the state's director of licensing met with Reinhardt, and wrote the following e-mail quoted in the article: "Met with Commissioner this morning. It was clear he was not going to approve this provisional." Six weeks later, PSI signed a non-public memorandum of agreement agreeing to increase staff at The Pines and to provide information about serious incidents to social service officials and responding fire and rescue crews, as already required by law, effectively concealing the violations from public scrutiny. It was not until 2009, when the state downgraded The Pines' license to provisional status due to a continuation of the problems, that the public and investors learned of the safety and treatment problems at the facility.

527027_1
Case 3:09-cv-00882   Document 109   Filed 06/15/10   Page 85 of 135 PageID #: 1497

### E. December 5, 2008 and January 12, 2009 JPMorgan Conferences

150.    On November 22 and 23, 2008, the *LA Times* and *ProPublica* co-published the results of their in-depth investigation of PSI's California operations, concluding that a pattern of "[p]oor patient supervision, understaffing and inadequate worker training have led to instances of chaos and brutality" at PSI facilities across the country. §V(C)(2). In California alone the newspapers found that PSI facilities had about one-third fewer staffers per bed than other private psychiatric facilities, and one-half the number of registered nurses – average one RN for every four beds versus one RN for every two beds at its competitors.

151.    Thereafter, defendants continued to deny that PSI's facilities were understaffed or its workers poorly trained, and to dismiss the *ProPublica/LA Times* investigation as an unfounded and overly sensational account, just as they had disparaged the *Tribune* account months earlier. At a December 5, 2008 JP Morgan Small-Midcap Conference transcribed by Thomson Streetevents, for example, Turner said the following during PSI's presentation to investors:

> [TURNER:]    PSI has always been a growth story. We have always been excited to talk about our growth but of late it is important to qualify and talk a little bit more about the quality. [¶] If you know what happens in a psych hospital, it's tragic. It is very important that these folks are treated and stabilized. We do a great job of treating patients inside of our psychiatric hospitals. But we are not perfect. [¶] *There's always going to be incidences that occur inside a psych hospital that you would rather wish had not occurred. But those are very, very, very much the exception and not the general rule. But unfortunately when something like that happens, we tend to hear about it, read about it, have people talk about it and all of a sudden people think that is the norm. What we try to do here on this slide is just give you the perspective that it is absolutely not the norm.* [¶] We care about the patients that we treat. We've got 23,000 employees and they come to these hospitals to care for our patients because they have that compassion and we try to give them the adequate training to make sure that we're doing it correctly.
>
> You can see we are surveyed by multiple regulatory agencies and *less than 1% of our surveys have historically resulted in any kind of a serious deficiency or sanction*. We have accreditation, licensing, certification and accreditation from joint commission, federal and state agencies that have unilateral – any time they want to come into our facility 24 hours day, they can come in unannounced and *we welcome that because we know what we are doing inside of those facilities*.

Lastly, there are clinical metrics that we capture inside of PSI. But unfortunately, that doesn't mean anything to the outside world because you have no baseline. If we tell you we have X amount here, what does that mean? You just hear X. [¶] There is something going on in the industry called – through the joint commission called core measures. These core measures are something that all inpatient providers had to begin collecting and reporting beginning October of 2008. [¶] So it is our goal once we get through – at the end of the year that these core measure data, they are measured quarterly, that we will even have more data to show that across these various core measures, core indicators; again, how we are doing relative to the industry and *we are quite confident that is going to be viewed very favorably because quite frankly we have participated, we helped develop some of these*. [¶] *We were inside the pilot projects again endorsing. We want measurements because right now there is not a whole lot we can say on these areas other than we do our best. So the [core measure] being an important data point for folks going forward* and we certainly expect to see those in 2009.

152. When asked specifically about Riveredge at the December 5, 2008 conference, Turner made the following statements:

[TURNER:] The admissions hold at River Edge is really directly from the Department of Children and Family Services. They are the party that has the admission hold. We are still under the same – *there is no change since our last update on the earnings call there*. That is still in place.

[AUDIENCE MEMBER]: Any sense for the timing on that?

[TURNER:] Joey mentioned (inaudible) this quarter and I don't have anything updating from that.

153. By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may be strongly inferred that Turner knew or recklessly disregarded that his statements at the December 5, 2008 investor conference would be, and were, misleading to and operated as a fraud upon investors. In particular, the foregoing statements were recklessly misleading in that –

- The incidents at Riveredge were not "very very very much the exception," as UIC concluded in its investigative report of the incident at Riveredge;

- There was no basis for the claims that PSI was operating its facilities in a manner that would be "viewed very favorably" once the core measure data was released, because that data showed that PSI's facilities as a whole were operating far below the benchmarks established in those measures, as alleged in ¶¶74-75;

- There was no basis for again claiming that the Company expected the DCFS hold at Riveredge to be lifted in 4Q08, or that there was no change to its prior statements

527027_1

that this was the case, because defendants knew by the time this statement was made that UIC and the agency were still conducting the survey at the hospital, and the investigation had expanded to the extent that it was not reasonable to expect that it would be concluded or the hold would be lifted within the next 26 days after this statement was made.

154. On January 13, 2009 – one day after the *Morning News* published its exposé of conditions at PSI facilities in Texas – Turner and Jacobs participated in another JPMorgan investor conference, this one focusing on healthcare companies, and again assured investors of the safety of patients under PSI's care and the quality of its treatment. Jacobs again touted the purported quality of the Company's operations at the conference, telling investors to expect data on PSI's core measure compliance that would prove his point:

> All of our facilities go through various agencies, accreditation bodies. ***Very pleased on our recent joint commission scores. Very, very pleased with what we're scoring on their surveys***.

> We do capture clinical data inside the Company. ***We will be putting out core measurements that joint commission has determined for industry. They will be going on our website in February. So you will be able to track PSI and its quality initiatives as it compares to the core measurements***.

155. Following Jacobs' remarks, Turner made the following statements, falsely assuring investors of the financial condition of the Company and the continuation of its prior growth trajectory:

> [TURNER:] [R]evenue growth has been outstanding for our Company as we have been able to deliver the topline organic growth complemented by the acquisition activity. You can see 67% compound annual growth rate over the last five years.

> We were at about $1.320 billion of revenues for the first nine months. That annualizes to probably about $1.7 billion for the full year and then you can see our growth for the third quarter, our most recently reported quarter, we were up 13% in revenue over the prior year third quarter.

> Our ability to expand our operating margins or our EBITDA margins are paramount to our operations and you can see that reflected here. Annual EBITDA growth on a compound annual basis up 84% as compared to the 67% that we saw on the topline growth and similarly EBITDA for the third quarter up 18% on a 13% revenue growth; so very strong growth there.

- 84 -

And then lastly from the earning side, EPS compound annual growth rate of 47% over the last five years. ***Most recent quarter $0.51 over $0.37 Q3 '07 was 38% growth and currently we have our 2008 guidance of $2.02 to $2.03 and then also 2009 guidance $2.40 to $2.44 a share***.

156.    By virtue of the facts alleged in §§V, VII, and the other facts set forth below, it may be strongly inferred that Jacobs and Turner knew or recklessly disregarded that their statements at the January 13, 2009 investor conference call would be, and were, misleading to and operated as a fraud upon investors. In particular, the foregoing statements were recklessly misleading in that –

- The core measure data showed that, at the time these statements were made, PSI's facilities were operating well below the levels set by the core measures, as set forth in ¶¶74-75.

- The statement reiterating PSI's guidance for 2008 and 2009 lacked a reasonable basis because the republished guidance failed to account for the actual and reasonably anticipated expenses and lost business arising from the Riveredge investigation or the administrative hold imposed by DCFS, malpractice expense claims that had been and were continuing to be incurred, or the decline in patient occupancy that defendants claimed had begun to occur in October 2008, as previously alleged.

## VII.    ADDITIONAL EVIDENCE IN SUPPORT OF A STRONG INFERENCE OF SCIENTER

157.    Each defendant knew or recklessly disregarded that the statements alleged above would be, and were, materially false and misleading to investors, including because the material adverse facts specified herein had not been disclosed to or were being actively concealed from the market, and that defendants' positive representations during the Class Period were thus materially false and misleading.

158.    The following allegations, previously pled, support a strong inference of scienter:

- The nature, number and extent of the regulatory violations and patient safety and quality of care issues at PSI's existing facilities, as described in UIC's reports on Riveredge and Streamwood, and in the accounts by the *Tribune*, *ProPublica* and the *LA Times*, the *Morning News*, and the other media reports;

- Defendants' contemporaneous claims about the nature and extent of their systems and controls designed to monitor and detect regulatory noncompliance and quality of care problems before they occurred, including their role in establishing and overseeing "mechanisms to aid in the identification and correction of any actual or

perceived violations of any of our policies or procedures or any other applicable rules and regulations;" and

- Defendants' statements about their commitment to and personal involvement in maintaining and enhancing compliance and quality.

These allegations lend strong support for an inference that PSI executives, including Jacobs, Turner and Polson, knew, or were reckless in not knowing, that there was a pervasive pattern of inadequate patient care, sexual and physical assaults on patients, improper reporting and medical recordkeeping resulting from the Company's failure to maintain budgets and staffing at levels customary in the industry or necessary to adequately treat, monitor and protect the children, teenagers and other patients being treated at PSI's facilities.

159. Defendants' responsibility for and control over financial reporting, including their regular participation in preparing, authorizing, and filing PSI's financial statements and other periodic reports with the SEC, and authorizing or making statements about PSI's financial results in periodic press releases and on conference calls, demonstrates that each of the defendants knew or recklessly disregarded that the information contained therein would be, and was, materially misleading to investors, including information about PSI's malpractice and other professional liability reserves, and information about PSI's earnings per share, revenues, expenses, same-facility margins and other metrics regularly reported by PSI.

160. Additional facts supporting a strong inference of scienter include the following, as specified in more detail below: (a) defendants' disregard of the most current factual information before making statements, including divergence between internal reports and external statements relating to patient incidents and staffing ratios at PSI's inpatient facilities; (b) the deliberate concealment of illegal activity in connection with the scheme to defraud; (c) the self-interested motivation of defendants in the form of saving their salaries and jobs; (d) insider trading at suspicious times and in unusual amounts; (e) the positions of the defendants in the Company, and the

- 86 -

control exerted over PSI's business practices and operations by a relatively small number of people operating out of its Franklin, Tennessee headquarters; (f) defendants' motivation to conceal patient incidents at PSI facilities to gain regulatory approval for numerous acquisitions and to continue to profit from Medicare and Medicaid revenue; (g) UIC's detailed report based on an extensive investigation into PSI's Riveredge facility showing defendants' knowledge or unacceptable ignorance of major threats to patient safety and resulting incidents; and (h) closeness in time between fraudulent statements and the later disclosure of inconsistent information.

161.     These facts, collectively and holistically, give rise to a strong inference that, in engaging in the acts and omissions complained of herein, each defendant was acting with scienter within the meaning of the federal securities laws.

###     A.     Active Monitoring of Patient Safety, Treatment and Regulatory Compliance Issues

162.     Prior to and during the Class Period, PSI and Company executives, including CEO Jacobs, regularly claimed to be gathering, reviewing, analyzing, and acting upon specific, detailed information regarding the care provided to children, adolescents and other patients being treated at the Company's inpatient psychiatric facilities, including information regarding actual, perceived or potential violations of Company policies and procedures and regulatory and legal requirements, as well as other factors that could harm patients or increase the risks to the Company's operations arising from incidents of negligent or deliberate harm to patients.  Defendants' own descriptions of their active involvement in monitoring the types of events and incidents occurring at Riveredge, Sierra Vista, The Oaks, Intermountain Hospital, Streamwood Behavioral Health, Friends Hospital and other PSI facilities lend additional support for a strong inference that they knew, or were at least reckless in not knowing, that the statements alleged herein were misleading to investors.

163.     Jacobs' responsibility for regulatory compliance, patient safety and quality of care issues is demonstrated in part by the Letter to Stockholders he prepared and signed that is attached to

527027_1

PSI's 2008 Annual Report, filed with the SEC on April 23, 2009, two months after the end of the Class Period. In the letter, Jacobs admitted: "*As the individual charged with leading PSI, I take full responsibility when the patient care we provide falls short of expectations*. I deeply regret and apologize for any action or inaction by anyone at PSI that compromises patient care or results in harm to a patient."

164.    Defendants repeatedly conveyed the message in PSI's SEC filings during the Class Period that the Company was constantly working to improve the quality of care for the benefit of patients, including making assessments of staffing levels: "*We strive to improve the operating results of our inpatient behavioral health care operations by providing the highest quality service . . . . We also attempt to improve operating results by optimizing staffing ratios*."

165.    As described above, defendants also held themselves out as knowledgeable about the compliance of each inpatient facility with all applicable laws and regulations:

> *The services provided at each inpatient facility are continually assessed and monitored through an ongoing quality improvement program . . . . [which] includes regular site visits to each inpatient facility in order to assess compliance with legal and regulatory standards, as well as adherence to our compliance program . . . [C]orrective steps are taken when necessary*.

166.    Former employees of PSI confirmed that facility site visits were conducted on a monthly basis by Division-level officers, including CEOs or Clinical Services Directors, who reported to PSI's most senior executives, and on an annual basis by PSI's Vice President of Environmental Safety and Compliance who reported to Executive Vice President of Quality and Compliance.

167.    Jacobs similarly described the Company's compliance program during PSI's 2Q08 earnings conference call with analysts and investors where, as described above, he spent considerable time seeking to quell investor concerns over the quality of PSI's operations following the negative *Tribune* report about Riveredge. During that call, Jacobs told investors:

- 88 -

[JACOBS:]     We also have a risk management process improvement person *at each facility*, and that is where we began *gathering data for the corporation*, both to our risk management department, which has, I think, about 10 employees, and to our quality compliance department, which has about 25 employees.

And *we are capturing real-time incidents that might be occurring,* and especially, if we internally classify it as a grave incident, that it is real-time to us and that *we immediately began a root-cause analysis* to is there a way we can approve the facility and improve the process there.   And then *the compliance quality department reports back to the Board of Directors – there are two board members, Dr. Bill Petrie and Ed Wissing – that get to see the value lines call, the incidents, what we are doing, how we are doing*.

And there is *multiple indicators that we track real-tim*e.   For example, medication errors, we track that real-time.  And so – and that is something we really built over the past three years, and we will continually be putting more resources to that.   And *unfortunately, the story dealt with past years where we've made processes improvements*.

\*          \*          \*

*[W]e constantly are improving the safety, looking at ways to improve the safety, quality, meeting standards and regulations*.

168.     Defendants also told investors in PSI's SEC filings that the Company had established "ValuesLine," a hotline that had executive oversight through which any employee could promptly report actual or suspected violations of the laws or Company policy.  Defendants told the market that the information received would go directly to the Company's Executive Vice President, Quality and Compliance.

169.     During PSI's 2Q08 earnings conference call with analysts and investors, Jacobs further assured investors that PSI had systems in place designed to prevent even minor or potential compliance issues from escaping detection: "*PSI captures incidents that you don't report, that we are looking for minor incidents. We want to fix those so those don't become major incidents.  So for PSI, we capture much more than we actually have to report*."  Jacobs told investors during the call that he was "so much *personally involved* in getting resources" for compliance, including five new compliance employees he had just hired to  "give us more in insurance that we're picking up on

all the indicators and that we're implementing corrections as soon as possible to the facilities." Jacobs said those employees were about to "embark on a new [compliance] initiative and we're going to just see how that works. ***And so it's top of mind for me***."

170. During PSI's 1Q09 earnings conference call with analysts and investors on April 29, 2009, Jacobs admitted that the Company needed to be more attentive to warning signs at its facilities – an acknowledgment that directly contradicts defendants' Class Period statements that the Company ***was*** then focusing on minor and potential incidents and that compliance was "top of mind" for Jacobs and other executives. The admission was prompted by a question from an analyst:

> [ANALYST:] [Y]ou've had some incidents of certain facilities that have very much been in the press. But if you look at those facilities now in hindsight, are there certain maybe warning signs or early warning signs that you have now learned that hopefully you can use to look at other facilities that you have in your portfolio and maybe send in an early action team or something like that? How does that work overall?

> [JACOBS:] Absolutely, we are more sensitive to early indicators, absolutely. ***Absolutely we are more aware, we are more sensitive to early indicators. We are more sensitive to making sure we have the resources in place for them . . . . So we are more sensitive to the front end and to early indications*** of something that might be occurring.

**B. Experience in the Industry and Knowledge of Regulatory Requirements**

171. Jacobs' extensive experience in the healthcare field further supports the inference that he understood the significance of the incidents of patient mistreatment or lack of supervision at Riveredge and elsewhere as described above, and recognized, or was at least reckless in failing to recognize, the significant and material risks those incidents presented to PSI's operations and the patients under its care.

172. Leading up to and during the Class Period, defendants consistently touted the Company would be able to continue to increase profitability in part due to its competitive strength of having "experienced management team," which included the Individual Defendants. Defendants

assured investors in PSI's SEC filings: "***Our senior management team has extensive experience in the health care industry***. Joey A. Jacobs, our Chairman, President and Chief Executive Officer, has over 30 years of experience in various capacities in the health care industry."

173.    Other senior PSI executives, including Turner and Polson, also had sufficient experience in the industry to recognize the significance of the incidents described above, such that they, too, may be presumed to be reckless in continuing to tout, or to permit PSI to tout, the purported quality of the staffing and treatment provided by PSI and its regulatory compliance while these conditions remained hidden from investors. Defendants assured investors in PSI's SEC filings:

> ***Our senior management operates as a cohesive, complementary group and has extensive operating knowledge of our industry and understanding of the regulatory environment in which we operate***. Our senior managers employ conservative fiscal policies and have a successful track record in both operating our core business and integrating acquired assets.

174.    Similarly, defendants touted in PSI's "Corporate Profile" – available on the Company's website – that PSI's business operations benefit from a "[v]eteran management team and experienced Board of Directors." PSI's Corporate Profile states: "***PSI has purposefully built a veteran management team with in-depth health care expertise to support its ability to manage substantial growth***. The average health care industry experience of the Company's top eight officers is over 19 years. The strength of this team is complemented by the Company's Board of Directors, which is composed of experienced health care industry executives, as well as senior executives of venture capital firms and financial services companies that have financed our growth."

## C.    Hands on Management

175.    Several former PSI employees who had direct contact with Jacobs during the budgeting process and in other contexts have described him as one of the most "hands-on" CEOs they have ever worked for. Jacobs was "unequivocally the most hands-on CEO" and "the most involved [I have worked with]," particularly when it came to financial issues, said one. "Some

(CEO's) manage through delegation, less so Joey." Jacobs "was pretty informed, from what I could see" said another. "He was pretty close to everything . . . if you had something that surfaced, he'd pick up the phone and ask questions."

176. Several former employees recall getting weekly e-mails from Jacobs summarizing the Ten Worst hospitals in terms of patient capacity, comparing their performance to budgeted patient capacity targets. The e-mails were distributed to division presidents, hospital CEOs, and other executives. "There was peer pressure to make sure you weren't in the worst 10," said one e-mail recipient. I "didn't want to be on it," said another, who recalled that Jacobs displayed the variance on "a big 38-inch screen" in his office. The census numbers were "driving decision-making," s/he said.

### D.     Regular Meetings Attended by and Reports Received by Management

177. PSI executives, including Jacobs, Turner and Polson, were each kept apprised of financial and incident metrics at each facility through the following recurring reports and meetings during the Class Period:

(a)     *Monthly Operational Reviews and Meetings:*  Each facility prepared a Monthly Operational Review ("MOR"), which was compiled into a Division MOR. The facility and Division MORs contained key operating and financial statistics. Once the Division MOR was prepared, Division Presidents and Division CFOs traveled to corporate headquarters in Tennessee meet with Company executives and discuss Division MORs, including Jacobs, Polson, COO Terrance Bridges or Ron Fincher, CFO of Operations Dave Tropower, and occasionally EVP of Finance and Administration Turner.

(b)     *Monthly Executive Reviews:*  Each Division President participated in a monthly executive review of their division's financial performance at PSI's corporate headquarters,

which included meeting with Jacobs, Polson, Chief Operating Officer Bill Rutherford and other PSI executives.

(c) *Budget Documents*:  PSI's budget process began in August, when each hospital forecast its results for the rest of the year and built a budget for the coming year based on corporate goals established to increase revenues and profits.  In late August or early September the budgets were sent to division CFOs and presidents for review.  In mid-September, the budgets were sent to corporate headquarters for review, with comments channeled back down through the divisions to the hospitals.  Budgets were changed to follow corporate direction, and resubmitted by mid-October, then consolidated and finalized by senior management to present to the Board of Directors by mid-November or early December.

(d) *Hospital Operations Reports*: Hospital Operations Reports were sent to division managers on a monthly basis and included monthly statistics reflecting all incident reports at the facility during the previous month, as well as other hospital specific data including revenue, expenses, admissions, discharges, staffing levels, in-house education and marketing.

(e) *Monthly Risk Management Reports:*  Risk Management Reports from individual facilities were sent to each Division Quality Control Manager, then summarized and forwarded to Division Presidents and Kathy Bolmer, PSI's EVP of Quality and Compliance, who reported directly to Jacobs.

(f) *Monthly Risk Management Meetings Conducted by PSI's COO Rutherford:* Division Presidents all attended a monthly risk management meeting run by COO Rutherford.  PSI's EVP of Quality and Compliance, Kathy Bolmer, who reported directly to Jacobs, also attended the meetings, and the head of risk management, Dulce Mooney, participated by phone from Miami.  At each meeting, Division Presidents received a 12 to 20 page printout listing outstanding "major clinical events" separated by division.  The events included the most serious, "sentinel events," and

527027_1

also those involving inappropriate relationships between patients and staff and significant medical errors.

(g)     *Monthly Risk Management Conference Calls Conducted by PSI's corporate Risk Management Department*: PSI's corporate Risk Management Department also coordinated a conference call with all PSI hospital Risk Managers once a month to discuss incidents and risk issues at each facility.

(h)     *Incident Reports*: Facility CEOs received incident reports every day and reported them either as part of a monthly statistical analysis or in detail to PSI executives, depending on the nature of the incident. Severe incidents, or "sentinel events," were reported immediately to upper management, and a detailed "root cause analysis" report of the incident was prepared. Less severe incidents were reported to PSI's corporate headquarters quarterly on a statistical basis based on a "dashboard" that included all incidents and was compiled by the hospital's Risk Manager. These statistical reports reflected the facility's "seclusion rate," which referred to the number of patients who had to be removed from the hospital's general population for a time, as well as incidents involving the use of chemical restraints. In 2007 or 2008 PSI implemented a web-based software system for filing incident reports to replace the previous methods of fax or email. The reason for this new system was because PSI's corporate executives wanted to know about incidents as close to real-time as possible. This information was reviewed at least monthly by PSI's Risk Management Department in Miami and PSI's EVP of Quality and Compliance, Kathy Bolmer.

## E.     Whistleblower Retaliation

178.    In January of 2007, Leslie Smith ("Smith"), former Masters Level Therapist providing mental health services to juvenile males at PSI's Gulf Coast Youth Academy ("GCYA") during 2006, filed a complaint under Florida's whistleblower act for retaliation after she was terminated from that facility. Smith claimed she was fired after reporting sexual abuse by one youth

- 94 -

on another, the excessive use of force on a youth by GCYA staff, refusing to execute reporting guidelines concerning abuse, reporting Medicaid fraud, and reporting the falsification of documents. Smith additionally charged that the CEO of GCYA hired two employees who had been dishonorably discharged from the military. One employee, who was hired as Assistant Program Director, was discharged for sexual harassment and misconduct. This individual was promoted to GCYA Program Director after Smith was terminated by GCYA. Additionally, employees, including senior staff members, at PSI's Intermountain Hospital in Boise, Idaho, were fired or suspended during 2006 for reporting to their superiors that the facility was understaffed and employees were unable to control the young patients in the residential treatment unit, leading to a riot in the main unit where the police had to be called to quell the violence.

179.   A former interim executive at Manatee Palms, who had filled similar roles at a number of other PSI facilities between 2005 and 2007, suddenly found s/he was out of work after s/he aired concerns about the way the facility was staffed and the way patients were being treated there in early 2007. The employee said s/he felt like she had been "blackballed" by the Company, and when s/he later asked PSI if they had any more work assignments for him/her, s/he was told that "they won't use you anymore." Neither did the Company do anything in response to his/her complaints while at Manatee: "No one would listen to me," s/he said.

180.   In February 2008, Kimberly Gilyard, a former Charge Nurse for six years at PSI's Laurel Ridge Hospital in San Antonio, Texas, filed a lawsuit, in part under the Texas Health and Safety Code and the Texas Occupations Code, claiming she was retaliated against leading up to her retaliatory termination in October 2006 for reporting abuse and neglect of patients, inadequate staffing that put patient care at risk, and for exposing cover-ups by management related to patient injury.

## F.    Deliberate Concealment of Illegal Activity

181.    As set forth above, and as was detailed in the UIC report and investigative articles published by *Tribune*, *ProPublica*, *Morning News*, *LA Times*, and other sources, Company employees repeatedly failed to timely, completely or accurately report patient incidents at PSI's inpatient facilities and actively concealed such problems that should have been reported to state regulators and disclosed to investors.

## G.    Jacobs' and Polson's Sarbanes-Oxley Certifications

182.    In PSI's 2007 Report on Form 10-K and each of its 2008 Reports on Form 10-Q issued during the Class Period, defendants Jacobs and Polson made the following certifications required by the Sarbanes-Oxley Act of 2002:

I, Joey A. Jacobs [Jack E. Polson], certify that:

1.    I have reviewed this annual report on Form 10-K [10-Q] of Psychiatric Solutions, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

183.    The certifications made by Jacobs and Polson during the Class Period lend further support for an inference that these defendants knew about, or deliberately disregarded, information about (i) changes in PSI's professional and general liability expenses; (ii) staffing ratios and expenses at PSI's facilities, and their impact on reported margins and earnings; and (iii) material changes arising from negligent patient treatment or other injuries or regulatory violations at PSI facilities, including injuries and violations arising from PSI's failure to fund or staff PSI's hospitals and residential treatment facilities in a manner necessary to meet regulatory requirements and assure adequate treatment and care of patients in a safe and controlled environment.

- 97 -

### H. Bonuses and Other Incentive Compensation

184. Although the Individual Defendants knew, or recklessly disregarded, the true conditions at PSI's inpatient facilities, they were motivated to keep the truth a secret so as to avoid losing their jobs – and lucrative performance-based executive compensation.

#### 1. Class Period Compensation

185. According to PSI's SEC filings, the Company's Executive Compensation Program included base salary, performance-based cash bonuses and equity-based incentive compensation in the form of stock options and shares of restricted stock. In making executive compensation decisions, the Compensation Committee of PSI's Board of Directors relied on the input and recommendations of the Company's CEO and President, Jacobs. The details of the components of PSI's Executive Compensation Program during the Class Period are as follows:

(a) **Base Salary**: Base salaries were dependant, in part, upon the overall "financial performance" of the Company, including the performance of PSI's inpatient facilities, which generated more than 90% of PSI's total revenue. For 2008 and 2009, the Individual Defendants' base salaries increased based upon PSI's position as "the top performing company in [its] peer group" over the past three years. In setting Jacobs' base salary for 2009, the Compensation Committee made an even higher percentage of his compensation dependant on the Company's financial performance. As such, Jacobs' base salary for 2009 remained the same, but his potential maximum cash bonus award increased significantly. On December 18, 2009, the Compensation Committee approved salary increases for the Individual Defendants largely based on PSI's 2009 financial performance. Jacobs' 2010 base salary increased to $1,545,000; Polson's increased to $500,000; and Turner's increased to $500,000.

(b) **Cash Bonuses**: Cash Bonuses were based on "established performance objectives." Defendants were motivated to conceal the problems at and risks associated with PSI's

inpatient facilities because the "financial components of the cash bonus plans [were] Adjusted

EBITDA and Adjusted EPS." In PSI's Proxy Statement filed with the SEC on April 10, 2008,

Defendants made clear how crucial financial performance was in determining whether the Individual

Defendants received a cash bonus:

> "*The Compensation Committee believes that Adjusted EBITDA and Adjusted EPS are the appropriate financial measures for the cash bonus plans* because they are important measures of our performance and the performance of our management, they drive our success and growth and they are key criteria by which management plans and monitors our business."

Jacobs also had the power to influence the cash bonuses paid to the other Individual Defendants

because he *recommended to the Compensation Committee the target bonus amounts for Polson*

*and Turner*. For 2008 and 2009, Jacobs, Polson and Turner were eligible to receive maximum cash

bonus awards totaling up to 150%/200%, 100% and 100% of their base salaries, respectively. For

2009, they were awarded cash bonuses based 60% upon targets relating to the Company's actual

versus budgeted EBITDA, 20% upon targets related to adjusted EPS, and 20% based upon other

criteria selected by PSI's CEO – Jacobs – and the Compensation Committee.

      (c)    **Stock Option and Restricted Stock Grants**: Jacobs, as CEO, also proposed

equity awards for all eligible employees, excluding himself but including Polson and Turner, to the

Compensation Committee.

      (i)    For 2008, the grant of stock options and restricted stock – PSI's

"Equity-Based Compensation" program – were a "key component to the compensation of [PSI's]

executive officers." The grants of stock options and restricted stock made under the Equity

Compensation Plans were largely based on PSI's overall financial performance. Pursuant to the

Company's 2008 Long-Term Equity Compensation Plan (the "2008 Plan"), no stock options would

be granted for 2008 if certain performance targets were not achieved. Also under the 2008 Plan, the

Individual Defendants would have received no equity awards for 2008 if PSI's adjusted EPS for 2008 did not exceed its adjusted EPS for 2007 by at least 20%.

(ii)     Similarly, pursuant to PSI's 2009 Long-Term Equity Compensation Plan, the Individual Defendants were awarded stock options and/or restricted stock based upon the Company's financial performance in 2008.  No equity awards would have been granted if the Company's adjusted EPS for 2009 did not exceed the adjusted EPS for 2008 by at least 14%. According to PSI's Proxy Statement filed with the SEC on April 9, 2009, Defendants "believe that *[PSI is] the only company in [its] peer group that conditions the grant of all equity awards to existing employees on an increase in adjusted EPS from the prior year to the current year.  Under [PSI's] Equity Compensation Plans, [PSI] must achieve a specified level of EPS growth for existing employees to earn the right to receive any equity awards*."

(iii)     Under PSI's the 2010 Long-Term Equity Compensation Plan, the Company's adjusted EPS for 2010 must exceed the Company's budgeted EPS for 2010 to avoid forfeiture of all shares of restricted common stock.

(d)     Defendants were also motivated to conceal the problems at PSI's inpatient facilities to avoid losing other executive "perquisites compensation," including the payment of premiums for long-term disability and care insurance and a deferred compensation plan.

186.     The Individual Defendants' executive compensation for 2008, 2009 and 2010, which was largely dependant upon PSI's financial results for 2007, 2008 and 2009, was as follows:

| Name and Principal Position | Year | Salary | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| **Joey A. Jacobs** Chairman of the Board, President and Chief Executive Officer | 2009 | $1,557,692 | $4,200,000 | - - | $1,198,000 | $11,311 | $6,967,003 |
| | 2008 | 1,490,384 | 847,000 | 261,000 | 1,108,000 | 11,360 | 3,717,744 |
| | 2007 | 1,236,250 | 2,900,000 | 1,439,000 | 1,535,250 | 11,923 | 7,122,423 |
| **Jack E. Polson** Executive Vice President, Chief Accounting Officer | 2009 | 476,692 | 1,260,000 | - - | 244,937 | 11,224 | 1,992,853 |
| | 2008 | 438,462 | 423,500 | 104,400 | 216,686 | 11,255 | 1,194,303 |
| | 2007 | 397,740 | 870,000 | 539,625 | 265,200 | 11,602 | 2,084,167 |
| **Brent Turner** Executive Vice President, Finance and Administration | 2009 | 476,692 | 1,260,000 | - - | ** 319,937 | 11,175 | 2,067,804 |
| | 2008 | 438,462 | 423,500 | 104,400 | 216,686 | 11,211 | 1,194,259 |
| | 2007 | 397,740 | 870,000 | 539,625 | 265,200 | 11,611 | 2,084,176 |

**  Includes a $75,000 discretionary bonus awarded to Mr. Turner outside of his 2009 cash bonus plan in recognition of his additional responsibilities as a division president.

## 2.  PSI's Bonus Plan for Facility CEOs Encouraged the Minimization of Staffing

187.    Former PSI employees have said that the CEO of each PSI facility would receive a letter from corporate executives after the first half of each year, outlining an annual bonus plan for facility CEOs.  The most significant factor on which bonuses were based was whether the CEO's facility met its budget and profit goals.  The bonus program at times also included specific, local targets relating to issues such as accreditation, however these factors were given little weight.  If a facility CEO did not meet the profit target set forth in the budget controlled by PSI executives, no other metric mattered.

188.    Several former PSI employees agreed that earnings were far and away the most important component of the budget calculations.  While budget plans might include components related to safety or compliance, they said that in practice increasing revenue and meeting or exceeding earnings targets was all that really mattered.  "I think hitting a margin for a CEO bonus is

ridiculous," said one former PSI hospital CEO. "It incentivizes you to be really frugal," s/he said, which can lead to staff or other cuts that threaten patient safety.

> **3. Defendants Continued to Seek Improper and Inflated Compensation and Stock Awards After the Class Period Ended, and Actively Sought to Shield Their Actions From Investors**

189. Further evidence of defendants' scienter during the Class Period is found in their actions after the Class Period, when they awarded themselves extraordinary stock-based compensation awards while they were secretly negotiating a sale of the Company, knowing that the coming sale announcement would drive PSI's stock price higher, increasing the value of the spring-loaded grants by millions of dollars. Defendants' continuing efforts to secretly line their own pockets at the expense of investors provides additional strong evidence of their intent and motivation to defraud investors during the Class Period.

190. In February 2010, the Compensation Committee of the Company's Board of Directors awarded to PSI's top executives tens of millions in options and restricted stock grants (the "Grants"), while secretly negotiating a potential merger with third-parties. Indeed, while touting the Grants as an incentive plan designed to retain key employees, PSI's Board of Directors failed to disclose that PSI was looking to sell the Company. The Grants force any potential buyer to bear ***an additional $30 million in expenses*** to acquire the Company, thereby lowering the price the purchaser would pay to shareholders.

191. Following the March 10, 2010 announcement of the potential sale of the Company to third parties – which caused PSI's stock price to jump more than 20% to nearly $30 per share – the DOJ launched an investigation of PSI, particularly concerning the issuance of the Grants. PSI failed to disclose that the DOJ investigation was related to the Grants until May 10, 2010, just days before the Company's annual meeting of the shareholders at which the compensation grants were to be approved. No mention of the link between the DOJ investigation and the Grants had been made in

527027_1

the Company's Definitive 14A Proxy Statement, seeking approval of the Grants, which was filed

with the SEC on April 10, 2010. On May 17, 2010 – the day before the shareholder meeting – the

Company announced a proposed merger of the Company with UHS for $33.75 per share, leaving

shareholders with insufficient time to evaluate the Grants, the DOJ investigation, and the merger, or

understand the interplay and relationship among the events.

192.    The additional $30 million acquisition expense created by the Grants is compounded

by certain amendments to employment agreements between the Company and its executives. On

April 15, 2010, the Compensation Committee approved an amendment to the Company's

employment agreement with Jacobs (the "Jacobs Employment Agreement"), which, among other

things, modifies the compensation and benefits payable to Jacobs in the event the Company

experiences a "change in control," as defined therein.

193.    The Jacobs Employment Agreement was amended to provide that upon Jacobs'

voluntary or involuntary separation from service with the Company, other than as a result of his

death or disability, within 12 months following a change in control, he will be entitled to a lump sum

payment equal to the sum of: (i) Jacobs' earned but unpaid base salary through the termination date;

(ii) three times (3x) the sum of Jacobs' base salary plus an amount equal to the higher of (A) the

highest annual amount of bonus compensation paid to or earned by Jacobs with respect to the three

fiscal years prior to the fiscal year in which the change in control occurs and (B) 100% of the bonus

compensation amount that would be payable to Jacobs, assuming that both the Company and Jacobs

satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to

the applicable agreement, policy, plan, program or arrangement and communicated to Jacobs for the

fiscal year in which the change in control occurs; and (iii) Jacobs' accrued but unused paid time off

or sick pay and unreimbursed business expenses.

527027_1

194.     Based on the Grants, Jacobs can receive a lump sum payment that includes not only three times his annual salary, but also an amount at least as great as his last bonus upon consummation of any change in control transaction.  This could mean millions more dollars in shareholder value that would be segregated for Jacobs alone.  And because the Jacobs Employment Agreement allows Jacobs to voluntarily quit after a change in control and still collect the entirety of his severance payments, he effectively holds a multi-million dollar option over any prospective buyer, another cost bore by the Class.

195.     Similarly, on April 15, 2010, the Compensation Committee also approved change of control agreements for each of the company's top executives, which provide in relevant part:

> The compensation and benefits payable under the CIC Agreement include a lump sum payment equal to the sum of: (i) the earned but unpaid base pay due to the Covered Executive; (ii) two times (2x) the sum of the Covered Executive's base pay plus incentive pay in an amount equal to ***the higher of (A) the highest annual amount of incentive pay paid to or earned by the Covered Executive with respect to any of the three fiscal years prior to the fiscal year in which the change in control occurs and (B) 100% of the incentive pay amount that would be payable to the Covered Executive***, assuming that both the Company and the Covered Executive satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to the Covered Executive for the fiscal year in which the change in control occurs; (iii) the Covered Executive's accrued but unused paid time off or sick pay and unreimbursed business expenses; (iv) any other compensation or benefits payable to the Covered Executive in accordance with the terms of the Company's existing plans and programs; and (v) a pro-rata portion of the incentive pay amount that would be payable to the Covered Executive, assuming both the Company and the Covered Executive satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to the Covered Executive for the fiscal year in which the separation date occurs.  ***Additionally, the Covered Executive will be entitled to (a) full vesting of stock options and restricted stock or other equity-based awards that have not otherwise become vested***, (b) the provision of certain health and welfare benefits for 24 months following the termination and (c) reimbursement of up to $25,000 for outplacement counseling expenses and related benefits for 12 months following the termination.

196.     Thus, PSI's top executives will be entitled to a lump sum payment that includes not only double their base salaries, but also an amount roughly equivalent in value to the outsized equity rewards received in the Grants.

197.     Defendants' combined beneficial ownership is currently valued at approximately $130 million in merger consideration.  In addition, they will all cash out their outstanding restricted stock and unvested options that arc not currently beneficially owned as defined by the SEC, and will enjoy immediate and complete vesting upon consummation of the merger.  All told, severance and equity payments to the Individual Defendants resulting from the merger will be over $200 million - more than 10% of the Company's total market capitalization.

### I.     Insider Trading

198.     The Individual Defendants were highly motivated to keep PSI's stock price inflated throughout the Class Period, including during 10b5-1 trading plan windows.  According to SEC Forms 4 filed by PSI insiders, the Individual Defendants and members of the Company's Board of Directors made PSI stock sales that were suspicious in both timing and amount, as follows:

(a)     **Polson**: On May 28 and 29, 2008, following defendants' false statements regarding PSI's 1Q08 earnings, Polson disposed of 50,000 shares of PSI stock at near Class Period highs of $37.02 and $37.21 per share, reaping over $1.85 million in proceeds.  Polson sold off 42% of his stock in the Company, not according to any pre-established plan or pattern.  Polson has not sold a single share of PSI stock since the Class Period ended.

(b)     **Turner**: On July 9 and September 19, 2008, just days before the *Tribune* published its investigative report exposing patient mistreatment at Riveredge – which defendants knew about before it was published (¶47) – Turner sold 95,800 shares at an average price of $40.03 per share, a price higher than any closing price of PSI stock during the Class Period.  This constituted a sale of 55% of Turner's holdings.  Although these sales were purportedly made

527027_1

pursuant to a 10b5-1 trading plan adopted by Turner in September 2005, both PSI's Insider Trading Policy and its Code of Conduct prohibited any sale of stock by an insider when in possession to material, nonpublic information that is unavailable to investors. Furthermore, the fact that Turner sold 100% of his Class Period stock holdings on just two days runs contrary to the policy behind permitting trading plans under Rule 10b5-1. During the year since defendants were forced to reveal the truth and the artificial inflation was let out of PSI's stock price at the end of the Class Period, Defendant Turner has not sold a single share of PSI stock.

(c)     **Director and Insider Mark Clein**: On August 12 and November 4, 2008, just days after defendants' false statements regarding PSI's 2Q08 and 3Q08 earnings, insider and PSI Director Mark Clein ("Clein") sold 18,000 shares of PSI stock for $628,210. These sales constituted more than 63% of his holdings, and were not made pursuant to any established plan or pattern. In contrast, in the year preceding the Class Period – a comparable time frame – Clein only sold 10,000 shares for $360,000. Furthermore, since the end of the Class Period, Clein has not sold a single share of PSI stock.

(d)     **Director and Insider Christopher Grant**: On July 9, 2008, just days before the *Tribune* published its investigative report exposing patient mistreatment at Riveredge, insider and PSI Director Christopher Grant ("Grant") sold 100% of his 2,000 shares of Company stock for $80,000. Although these sales were purportedly made pursuant to a 10b5-1 trading plan adopted by Grant in September 2005, both PSI's Insider Trading Policy and its Code of Conduct prohibit any sale of stock by an insider when in possession of material, nonpublic information that is unavailable to investors. Furthermore, the fact that insider Grant sold 100% of his Class Period stock holdings on a single day runs contrary to the policy behind permitting trading plans under Rule 10b5-1. Since the end of the Class Period, Grant has not sold a single share of PSI stock.

(e)    **Director and Insider Edward Wissing**: On January 2, 2009, PSI Director

Edward Wissing ("Wissing") sold 100% of his 7,000 shares of Company stock for $192,220 ahead

of the *Morning News* report of problems in PSI's Texas facilities.  Although these sales were

purportedly made pursuant to a 10b5-1 trading plan adopted by Wissing in September 2005, both

PSI's Insider Trading Policy and Code of Conduct prohibited any sale of stock by an insider when in

possession of material, nonpublic information that is unavailable to investors.  Furthermore, the fact

that Insider Wissing sold 100% of his Class Period stock holdings on a single day runs contrary to

the policy behind permitting trading plans under Rule 10b5-1, which was designed to establish a

regular pattern of trade.  Since the end of the Class Period, Wissing has not sold a single share of PSI

stock.

199.    During the Class Period, sales of PSI stock by the Individual Defendants and insiders

Clein, Grant, and Wissing (the "Insiders") were predominately made between late May 2008 and

early November 2008, while defendants were vociferously denying the accuracy of and attempting

to downplay published and anticipated negative media reports accurately describing conditions at

PSI's facilities.  A significant percentage of the Individual Defendants' and Insiders' Class Period

sales occurred between July 9, 2008 and September 19, 2008 – just over a two month period.

**VIII.    ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS
          CAUSATION & DAMAGES**

200.    Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory

of reliance.  The market price of PSI securities, including common stock regularly traded on the

NASDAQ market, was artificially inflated by the false and misleading statements complained of

herein, including PSI's misleading statements about the quality of care provided at its psychiatric

hospitals and other facilities, its compliance with regulatory requirements and industry standards of

care, the costs of providing its services and the operating margins and growth that could be achieved

from its operations, the past, present and anticipated future success of its roll-up acquisition strategy,

the risks to its business and operations, the adequacy of its reserves, the completeness and accuracy of its published financial results and guidance, and the other matters complained of herein. Defendants false statements inflated the price of PSI securities both before and during the Class Period.

201. The Class Period inflation in PSI's stock price was eliminated when the financial conditions, business risks, and other information concealed by defendants' scheme was revealed to the market. The information did not reach the market all at once, but through several partial disclosures which each partially corrected the market price of PSI's securities. The partial disclosures on which plaintiffs' damage theory is based include stock price declines accompanying and resulting from: (i) negative media reports by the *Tribune*, *ProPublica, LA Times*, and *Morning News*; (ii) analyst downgrades based on information about PSI's staffing and operations uncovered by the media; and (iii) the significant earnings miss and reduced guidance announced at the end of the Class Period as the result of financial impacts arising from PSI's failure to properly staff or operate its facilities. Following the Class Period, investors who continued to hold the PSI securities they purchased during the Class Period suffered additional injury as the result of price declines accompanying further disclosures of PSI's business practices, including additional reports of patient injuries and regulatory problems arising from PSI's failure to properly staff or operate its hospitals and residential treatment centers.

### A. Applicability of Presumption of Reliance: Fraud on the Market Doctrine

202. At all relevant times, the market for PSI's common stock was an efficient market for the following reasons, among others:

(a) PSI's stock met the requirements for listing, and was listed and actively traded on the Nasdaq market, a highly efficient and automated market;

(b)     During the Class Period, the average trading volume of the PSI common stock traded on the NASDAQ market was approximately 1.03 million shares per day;

(c)     As a regulated issuer, PSI filed periodic public reports with the SEC and Nasdaq;

(d)     PSI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services;

(e)     During the Class Period, PSI was followed by securities analysts employed by major brokerage firms including Lehman Brothers, Barclay Capital, William Blair, Merrill Lynch, JP Morgan, Deutsche Bank, Robert W. Baird & Co., Inc., Avondale Partners, Citigroup, Credit Suisse, Raymond James & Associates, Piper Jaffray, Banc of America, Stanford Group and others. Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated by defendants about PSI. These reports were distributed to the sales force and certain customers of their respective brokerage firms;

(f)     PSI had substantial institutional ownership during the Class Period. Each of these institutions regularly analyzed and reported on the publicly-available information about PSI and its operations; and

203.    Through the foregoing mechanisms, the information publicly disseminated by defendants about PSI and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of their transactions in PSI stock, the information disseminated by defendants, including the false and misleading statements described

- 109 -

above, became incorporated into and were reflected by the market price of PSI's publicly-traded securities.

204. As a result of the foregoing, the market for PSI's common stock promptly digested current information regarding PSI from all publicly-available sources and reflected such information in PSI's stock price. Under these circumstances, all purchasers of PSI's common stock during the Class Period suffered similar injury through their purchase of PSI's common stock at artificially inflated prices and its subsequent decline in value, and a presumption of reliance applies.

**B.     Plaintiffs Suffered Damages When PSI's Stock Price Dropped as Information Concealed by Defendants' Fraud Scheme Leaked into the Market**

205. The business conditions and risks concealed from investors by defendants' scheme to defraud reached the market through a series of partial disclosures. Though each of the disclosures was incomplete, each revealed some of the business conditions concealed by defendants' fraud scheme and the concealed materialization of risks to its operations, leading to price declines that partially corrected PSI's stock price by reducing the extent to which it had been inflated by defendants' fraud scheme, thereby injuring plaintiffs and other members of the Class who had purchased PSI securities during the Class Period at prices that had been artificially inflated by the fraudulent course of business and misleading statements and omissions alleged herein.

206. The disclosures which corrected the market price to eliminate fraud-induced inflation include at least those identified in the chart below, which identifies each corrective event, the price decline resulting from the event, and, for purposes of comparison, the percentage change in the Nasdaq Healthcare Index (HCX) during the same time period.[3]

---

[3]     The list of corrective events identified herein is necessarily preliminary, and based upon plaintiffs' analysis and investigation to date. Upon further investigation and discovery and

527027_1

| Date | Corrective Event | PSI | | HCX |
|------|------------------|-----|-----|-----|
| | | $ | % | % |
| 8/12/08 | Deutsche Bank downgrade | ($1.36) | (3.5%) | (0.3%) |
| 11/24/08 | *LA Times/ProPublica* report | ($1.14) | (4.3%) | 3.1% |
| 1/12/09 | *Morning News* report | ($1.17) | (4.6%) | (1.3%) |
| 2/26/09 | 4Q08/FY08 results, and additional *ProPublica* report | ($9.79) | (35.9%) | (5.1%) |
| 4/6/09 | UIC Riveredge report released | ($1.22) | (7.7%) | 0.6% |

207.    On August 12, 2008, following issuance of the *Tribune* report and the Company's

2Q08 conference call, Deutsche Bank downgraded its rating on PSI shares to Hold, citing the risk of

erosion in the Company's profit margins as the Company added staffing to address recent regulatory

violations described by the *Tribune*.  After noting that PSI's recent increases in profits had resulted

primarily from reductions in operating expenses, particularly salary, wage and benefit expenses, the

analyst went on to explain the reasons for the downgrade, including the following:

> [W]e are mindful that ***a more generous and better trained staffing model may be
> required to eliminate PSYS's incident frequency and in an effort to foster better
> risk management.  PSYS is under tremendous pressure by state regulators,
> investigative journalists and its own industry peers to ensure that its risk
> management infrastructure and processes are in better synch with its recent
> growth trajectory.  It is worth pointing out that PSYS's revenue base has
> essentially doubled every two years since 2002, while its corporate risk
> management infrastructure did not expand materially until 2006***, according to our
> discussions with senior management.  Put simply, we believe PSYS is now devoting
> the adequate corporate resources to this important area, but it is still in "catch-up
> mode," in our view.

208.    On this news, PSI's stock declined 3.5% on August 12, a one-day drop of $1.36 on

increased volume of more than 1.3 million shares.  The heightened trading activity continued on

August 13 when PSI's stock declined by an additional 1.9%, or $0.71/share, as the market continued

to digest and react to the downgrade.  The stock drop halted on August 14, 2008 when another

analyst, the Stanford Group Company, issued a report advising investors that, based on a series of

---

additional analysis plaintiffs may alter or amend its theory of damages, including by identifying
additional corrective events that caused or contributed to the damages claimed in this action.

527027_1

meetings it held with defendant Turner, it was "increasingly confident" about the Company and believed that "concerns by the bears on this stock are misplaced." According to the analyst, Turner claimed that the Company was "adequately staffed to handle its patient volumes," that the Riveredge facility was "operating normally" and was hopeful that the DCFS hold would be lifted in the short term. Based on information provided by Turner and the Company, the analyst concluded that the Company was not at risk of increased salary expenses and was in fact spending more than its competitors on salary expense per patient day.

209.    On November 23, 2008 the *LA Times* and *ProPublica* co-published the results of their in-depth investigation of PSI's California operations, as described in §V(C)(2). The articles caused an immediate decline in PSI's stock price, which fell 4.3% ($1.14) on November 24 on volume of nearly 2 million shares. On the same day, the Nasdaq Healthcare Index rose 3.1%, resulting in a near 7.5% decline in PSI shares that day as compared with the industry in which it operates. PSI stock also declined significantly on November 20, 2008, falling $3.64 on heightened volume of over 2 million shares, a one-day decline of 12.2% that – given defendants' acknowledgment of having advance notice of the publication of the articles – may have resulted from early leakage of the information to be reported by *ProPublica* into the market.

210.    On January 12, 2009, PSI's stock price declined $1.17 as the result of the publication of the articles in the *Morning News* described in §V(C)(2). The articles caused an immediate decline in PSI's stock price, which fell 4.6% ($1.17) on volume of 1.2 million shares.

211.    Following each of the negative newspaper articles described above, defendants, as previously alleged, sought to deny and downplay the media reports, thereby falsely reassuring investors that the conditions described therein did not reflect current conditions at PSI facilities, that the facilities were adequately staffed and operated in compliance with regulatory and licensing requirements and standards, and that the Company's procedures and controls were adequate to

- 112 -

prevent such incidents from recurring. As a result of these false and misleading reassurances, the decline of PSI's stock price following the newspaper reports was not as great as it would have been had the true conditions inside PSI's facilities been know to the market. In the wake of these fraudulent reassurances, some fraud-created inflation was reintroduced back into the price of PSI's securities.

212.     On February 26, 2009, PSI's stock price declined $9.79, or 35.9%, on extraordinary volume of 17.5 million shares following PSI's announcement that it had failed to achieve its FY08 earnings targets due to rising malpractice expenses and the costs of compliance at Riveredge, and on a further *ProPublica* article describing continuing violations at Riveredge. Over the course of the next week, PSI's shares continued to trend downward, suffering additional declines of $3.79 (22.4%) on volume of 6.2 million shares on March 2, 2009, $1.30 (8.7%) on volume of 1.5 million shares on March 5, 2009, and $0.74 (5.4%) on volume of 2.3 million shares on March 6, 2009. At the end of this period, PSI's stock was trading at just $12.86/share – a decline of nearly 52%, as compared with a decline of less than 5% in the Nasdaq Healthcare Index over the same period.

213.     On April 6, 2009, PSI's stock price declined $1.22 – a one-day drop of 7.7% – on volume of more than 1.8 million shares following release of UIC's report on the Riveredge investigation. The market decline resulting from the report continued the following day, April 7, 2009, when PSI's stock price declined an additional $0.95 (6.5%) on volume of nearly 2.3 million shares. These declines resulted in further injury to Class members who retained the shares they had purchased during the Class Period as of the date of the price declines.

## IX.     ADDITIONAL CONTROL PERSON ALLEGATIONS

214.     Defendants Jacobs, Polson and Turner acted as controlling persons of PSI within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and awareness of the Company's operations and intimate knowledge of the false

statements and omissions made by PSI and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by plaintiffs to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215. According to PSI's Corporate Governance Standards, PSI's business is conducted by its officers and employees under the direction of the Company's CEO, Jacobs. As CEO, Jacobs is charged with overseeing and directing the day-to-day business of PSI. Jacobs is subject only to the oversight of PSI's Board of Directors – of which Jacobs is also Chairman. PSI's Corporate Governance Standards acknowledge the "current debate" regarding one individual serving as both CEO and Chairman – yet PSI has refused to institute a policy prohibiting the same individual from simultaneously occupying both positions.

216. During the Class Period, Polson and Turner reported directly to Jacobs and were the top executives overseeing the operations of their departments. Jacobs was also the direct supervisor of Kathy Bolmer, PSI's Executive Vice President, Quality and Compliance, who exercised constant oversight over the regulatory compliance and risk management at each of PSI's inpatient psychiatric facilities. Furthermore, Jacobs had direct authority over each of PSI's 11 Divisions, each of which was comprised of approximately ten facilities, a number specifically set by defendants as the appropriate quantity of facilities for efficient and effective oversight.

217. Each of the defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised the same. Specifically, they had authority over the budget for each of PSI's inpatient facilities – which accounted for over 90% of total Company revenue during the Class Period – which included setting the maximum expenditure on staffing and thus controlling staff-to-patient ratios for each hospital. Furthermore, defendants continuously tracked all patient incident reports on an immediate, monthly or quarterly basis, depending on the severity of the event, and through Monthly Risk Management Reports and Monthly Hospital Operations Reports prepared by each facility and consolidated by Division Presidents and CEOs. Defendants also tracked key operating and financial statistics for each hospital, similarly compiled on a Division basis, via Monthly Operation Review reports and monthly meetings discussing the contents of these reports.

218. As set forth above, the defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## X. CLASS ACTION ALLEGATIONS

219. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired PSI securities during the Class Period (the "Class"). Excluded from the Class are: (i) PSI, its parents, subsidiaries, and any other entity owned or controlled by PSI; (ii) the Individual Defendants; (iii) all other executive officers and directors of PSI or any of its parents, subsidiaries or other entities owned or controlled by PSI; (iv) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and step-relations of similar degree; and (v) all predecessors and successors in interest or assigns of any of the foregoing.

527027_1
Case 3:09-cv-00882   Document 109   Filed 06/15/10   Page 119 of 135 PageID #: 1531

220.     The members of the Class are so numerous that joinder of all members is impracticable.  PSI has more than 55 million shares of stock outstanding, owned by hundreds if not thousands of persons.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

221.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)     whether the 1934 Act was violated by defendants;

    (b)     whether defendants omitted and/or misrepresented material facts;

    (c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)     whether defendants acted with scienter;

    (e)     whether defendants' fraudulent misrepresentations and omissions affected the market price for PSI securities.

    (f)     the extent of damage sustained by Class members and the appropriate measure of damages.

222.     Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

223.     Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

224.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

225.    Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

226.    By engaging in the acts, practices and omissions previously alleged, each of the defendants violated §10(b) of the Exchange Act and Rule 10b-5 by:

      (a)    employing devices, schemes and artifices to defraud;

      (b)    making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    engaging in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of PSI common stock during the Class Period.

227.    During the Class Period defendants made, disseminated and/or approved each of the statements specified in §VI above.

228.    Each of the statements specified in §VI above were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

229.    The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

      (a)    the statements were not forward-looking, or identified as such when made;

- 117 -

(b)     the statements were not accompanied by meaningful cautionary language that sufficiently identified the specific, important factors that could cause actual results to differ materially from those in the statement;

(c)     the statements were made in connection with a rollup transaction;

(d)     the statements were included in a financial statement prepared in accordance with generally accepted accounting principles; or

(e)     the statements were made by defendants with actual knowledge that the statement was false or misleading.

230.    Defendants made, disseminated or approved the statements specified in §VI above while knowing or recklessly disregarding that the statements were false or misleading, or omitted to disclose facts necessary to prevent the statements from misleading investors in light of the circumstances under which they were made.

231.    Plaintiffs purchased shares of PSI common stock in reliance upon the truth and accuracy of the statements specified in §VI above and the other information that was publicly-reported by defendants about PSI and its operations, and without knowledge of the facts, transactions, circumstances and conditions fraudulently misrepresented to or concealed from the market during the Class Period, as specified above.

232.    Plaintiffs and the Class have suffered damages in that they:

(a)     paid artificially inflated prices for publicly-issued shares of PSI securities;

(b)     purchased their PSI securities on an open, developed and efficient public market; and

(c)     incurred economic losses when the price of those securities declined as the direct and proximate  result of the public dissemination of information that was inconsistent with defendants' prior public statements or otherwise alerted the market to the facts, transactions,

circumstances and conditions concealed by defendants' misrepresentations and omissions, or the economic consequences thereof.

233.    Plaintiffs and the Class would not have purchased PSI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions specified above.

## COUNT II
### For Violation of §20(a) of the 1934 Act
### Against All Defendants

234.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235.    Defendants and/or persons under their control violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiffs and the other members of the Class.

236.    By virtue of their positions as controlling persons, defendants are each liable pursuant to §20(a) of the Exchange Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

237.    Each of the defendants acted as a controlling person of some or all of their co-defendants, as set forth in the chart below, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws:

| Defendant | controlled Defendants | by virtue of |
|---|---|---|
| Jacobs | PSI, Polson and Turner | his position of power and control and his responsibilities as PSI's CEO and Chairman; his power to hire and fire and his supervisory authority over Polson, Turner and other members of PSI's senior management, division management, and hospital management; his day-to-day involvement in and control over PSI's operations, including those relating to financial reporting, regulatory compliance, patient safety, and quality of care; his ability to control the contents of PSI's press releases, SEC filings and other public statements during the Class Period. |

| Defendant | controlled Defendants | by virtue of |
|-----------|----------------------|--------------|
| Polson & Turner | PSI | their ability to control the contents of PSI's press releases, SEC filings and other public statements during the Class Period; their supervisory authority over other members of PSI's senior, division-level and hospital management, and their day-to-day involvement in and control over PSI's operations. |
| PSI | Jacobs, Polson and Turner | its power to hire, fire, supervise and otherwise control the actions of its employees, including the Individual Defendants, and the salaries, bonuses, incentive compensation and other employment consideration and arrangements provided to the Individual Defendants. |

238. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the content of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of and contractual rights with PSI, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged above.

## XII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing in an amount to be proven at trial, including interest;

- 120 -

C.     Awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

DATED:  June 15, 2010                         ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                      DENNIS J. HERMAN
                                                      DANIEL J. PFEFFERBAUM


                                                  _____
                                                            s/ DENNIS J. HERMAN
                                                            DENNIS J. HERMAN

                                                      100 Pine Street, Suite 2600
                                                      San Francisco, CA  94111
                                                      Telephone:  415/288-4545
                                                      415/288-4534 (fax)

                                                      ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                      DARREN J. ROBBINS
                                                      TOR GRONBORG
                                                      JULIE A. KEARNS
                                                      655 West Broadway, Suite 1900
                                                      San Diego, CA  92101-3301
                                                      Telephone:  619/231-1058
                                                      619/231-7423 (fax)

                                                      Lead Counsel for Plaintiff

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT, #2672
DOUGLAS S. JOHNSTON, JR., #5782
TIMOTHY L. MILES, #21605
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

Liasion Counsel

# EXHIBIT 1

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.  (a)  Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Rubin, et al. v. MF Global, Ltd., et al.*, No. 08-cv-02233-VM (S.D.N.Y.)
*Kuriakose v. Federal Home Loan Mortgage Company, et al.*, No. 1:08-cv-07281-JFK (S.D.N.Y.)

(b)  Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)  Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Pappas v. Countrywide Financial Corp., et al.*, No. 07-cv-05295-MRP(MANx) (C.D. Cal.)
*Eastwood Enterprises, LLC v. Farha, et al.*, No. 8:07-CV-01940-SCB-MSS (M.D. Fla.)
*In re Schering-Plough Corp. Litig.*, No. 2:08-397(DMC) (D.N.J.)
*In re Bank of America Corp. Sec. Deriv and ERISA Litig.*, No. 1:09-md-02058-DC (S.D.N.Y.)

PSYCHIATRIC SOLUTIONS

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of Nov. , 2009.

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND

By: _J . J. Conlon_____

Its: _DEPUTY CHIEF LEGAL OFFICER__

- 2 -

PSYCHIATRIC SOLUTIONS

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 02/22/2008 | 3,680 | $29.02 |
| 02/22/2008 | 17,970 | $28.53 |
| 02/25/2008 | 9,270 | $28.89 |
| 04/02/2008 | 22,715 | $31.74 |
| 04/11/2008 | 1,250 | $31.44 |
| 04/11/2008 | 2,010 | $31.09 |
| 04/11/2008 | 4,790 | $31.22 |
| 04/14/2008 | 3,750 | $31.53 |
| 04/14/2008 | 4,010 | $31.50 |
| 04/23/2008 | 5,455 | $34.12 |
| 06/09/2008 | 60 | $35.81 |
| 06/09/2008 | 540 | $35.66 |
| 06/09/2008 | 1,680 | $35.93 |
| 06/09/2008 | 3,150 | $36.24 |
| 06/23/2008 | 10,890 | $39.05 |
| 06/23/2008 | 19,400 | $39.07 |
| 06/24/2008 | 11,800 | $39.00 |
| 07/01/2008 | 5,180 | $38.24 |
| 07/01/2008 | 7,100 | $38.20 |
| 07/02/2008 | 4,400 | $39.17 |
| 07/03/2008 | 945 | $38.21 |
| 07/14/2008 | 5,601 | $38.20 |
| 07/22/2008 | 2,191 | $35.90 |
| 08/11/2008 | 1,800 | $39.36 |
| 08/26/2008 | 4,260 | $36.99 |
| 08/27/2008 | 1,500 | $37.91 |
| 09/03/2008 | 2,900 | $38.40 |
| 09/03/2008 | 3,100 | $38.43 |
| 09/10/2008 | 4,440 | $38.20 |
| 10/09/2008 | 1,362 | $32.78 |
| 10/10/2008 | 1,318 | $30.97 |
| 11/11/2008 | 5,054 | $31.41 |
| 11/14/2008 | 3,720 | $31.69 |
| 11/20/2008 | 2,424 | $27.14 |
| 12/03/2008 | 430 | $24.83 |
| 01/15/2009 | 2,300 | $25.04 |
| 01/16/2009 | 6,500 | $25.71 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 05/01/2008 | 41,900 | $37.95 |
| 07/17/2008 | 11,900 | $35.65 |
| 07/31/2008 | 6,220 | $35.37 |
| 08/11/2008 | 3,582 | $39.27 |
| 09/02/2008 | 651 | $38.49 |
| 09/02/2008 | 714 | $38.93 |
| 09/02/2008 | 1,123 | $38.44 |
| 09/03/2008 | 1,537 | $38.43 |
| 09/08/2008 | 3,600 | $37.90 |
| 09/08/2008 | 6,260 | $37.88 |
| 09/09/2008 | 7,630 | $37.98 |
| 09/10/2008 | 6,450 | $38.14 |
| 09/16/2008 | 6,040 | $36.96 |
| 09/18/2008 | 13,770 | $38.20 |
| 10/14/2008 | 9,860 | $31.55 |
| 10/29/2008 | 11,600 | $31.99 |
| 11/04/2008 | 5,000 | $33.20 |
| 11/25/2008 | 26,000 | $25.01 |
| 11/26/2008 | 12,831 | $25.51 |
| 12/02/2008 | 96,531 | $24.75 |

*Opening position of 168,184 shares.

# CERTIFICATE OF SERVICE

I hereby certify that on this the 15th day of June, 2010, the foregoing Consolidated Complaint for Violation of the Federal Securities Laws was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Todd R. David
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
todd.david@alston.com

Jessica Perry Corley
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
jessica.corley@alston.com

Lisa R. Bugni
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
lisa.bugni@alston.com

W. Travis Parham
Waller Lansden Dortch & Davis, LLC
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
615/244-6380
615/244-6804(Fax)
travis.parham@wallerlaw.com

Waverly D. Crenshaw
Waller Lansden Dortch & Davis, LLC
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
615/244-6380
615/244-6804(Fax)
wcrenshaw@wallerlaw.com

Michael T. Harmon
Waller Lansden Dortch & Davis, LLC
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
615/244-6380
615/244-6804(Fax)
michael.harmon@wallerlaw.com

Daniel E. Bacine
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
215/963-0600
215/963-0838(Fax)
dbacine@barrack.com

Mark R. Rosen
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
215/963-0600
215/963-0838(Fax)
mrosen@barrack.com

Douglas S. Johnston, Jr.
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
djohnston@barrettjohnston.com

George Edward Barrett
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
gbarrett@barrettjohnston.com

Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
tmiles@barrettjohnston.com

Wade B. Cowan
Davies Humphreys Horton & Reese PLC
150 Second Avenue North, Suite 225
Nashville, TN 37201
615/256-8125
615/242-7853(Fax)
wcowan@dhhrplc.com

Stephen R. Basser
Barrack, Rodos & Bacine
600 West Broadway, Suite 900
San Diego, CA 92101
619/230-0800
619/230-1874(Fax)
sbasser@barrack.com

Samuel M. Ward
Barrack, Rodos & Bacine
600 West Broadway, Suite 900
San Diego, CA 92101
619/230-0800
619/230-1874(Fax)
sward@barrack.com

Darren J. Robbins
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
darrenr@rgrdlaw.com

Tor Gronborg
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
torg@rgrdlaw.com

Tricia L. McCormick
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
triciam@rgrdlaw.com

Julie A. Kearns
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
jkearns@rgrdlaw.com

Catherine J. Kowalewski
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
katek@rgrdlaw.com

James M. Hughes
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843/216-9000
843/216-9450(Fax)
jhughes@motleyrice.com

William S. Norton
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843/216-9000
843/216-9450(Fax)
bnorton@motleyrice.com

Robert J. Dyer, III
Dyer & Berens LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
Telephone: 303/861-1764
303/395-0393 (fax)
bob@dyerberens.com

Thomas C. Michaud
Vanoverbeke Michaud &
Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

David C. Walton
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
davew@rgrdlaw.com

William H. Narwold
Motley Rice LLC
20 Church Street, 17th Floor
Hartford, CT 06103
860/882-1676
860/882-1682 (Fax)
bnarwold@motleyrice.com

Jeffrey A Berens
Dyer & Berens LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
Telephone: 303/861-1764
303/395-0393 (fax)
jeff@dyerberens.com

Gregg S. Levin
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843/216-9000
843/216-9450(Fax)
glevin@motleyrice.com

Michael J. Vanoverbeke
Vanoverbeke Michaud &
Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com

James Gerard Stranch, III
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)
jstranch@branstetterlaw.com

James Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)
gstranch@branstetterlaw.com

Jane Branstetter Stranch
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)
jbs@branstetterlaw.com

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on June 15, 2010.

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS HERMAN


s/ DENNIS J. HERMAN
DENNIS J. HERMAN

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
DennisH@rgrdlaw.com