## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **GARDEN CITY EMPLOYEES'** **RETIREMENT SYSTEM**, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No.: 3:09-cv-00882 |
| **CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND**, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | District Judge William J. Haynes, Jr. Magistrate Judge E. Clifton Knowles |
| Lead Plaintiff, | ) ) ) | |
| v. | ) ) | |
| **PSYCHIATRIC SOLUTIONS, INC.**, **JOEY A. JACOBS**, **BRENT TURNER**, and **JACK E. POLSON**, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT AND ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   THE REFORM ACT'S SAFE HARBOR PROVISION AND HEIGHTENED
     PLEADING STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  THE AMENDED COMPLAINT FAILS TO PLEAD ANY ACTIONABLE
     MISREPRESENTATION OR OMISSION. . . . . . . . . . . . . . . . . . . . . . . . . . . .5

     A.   The Forward-Looking Statements Are Protected
          by the Safe Harbor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          1.   The Statements Related to Reserves
               Are Not Actionable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               a.   The Safe Harbor Protects the Loss Reserve
                    Statements from Liability. . . . . . . . . . . . . . . . . . . . . . . . . . .7

               b.   The Loss Reserve Allegations Also Fail
                    as a Matter of Law For Lack of Particularity. . . . . . . . . . .9

          2.   The Safe Harbor Protects the Statements of
               Earnings Guidance from Liability. . . . . . . . . . . . . . . . . . . . . . . 10

          3.   The Safe Harbor Protects the Statements of
               Same-Facility Growth Expectations from Liability. . . . . . . . . . . .11

     B.   The Company's Accurate Statements of Past Earnings
          Are Not Actionable Because They Were Not False. . . . . . . . . . . . . . . . . 12

     C.   The Amended Complaint Fails to Allege that the Company's
          Statements of Substantial Compliance with the Law Were False,
          and PSI's Disclosures Were Adequate As A Matter of Law . . . . . . . . . . . 14

     D.   Statements of "High Quality Service" Are Not Actionable. . . . . . . . . . . .17

III. THE AMENDED COMPLAINT FAILS TO PLEAD
     SCIENTER ADEQUATELY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A.   The Allegations Concerning Patient Safety and Care
          Issues Do Not Give Rise to a Strong Inference of Scienter. . . . . . . . . . . . 20

B.     The Motive and Opportunity Allegations Do Not Give
Rise to a Strong Inference of Scienter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     1.     Corporate Position and Access to Information. . . . . . . . . . . . . . . . 22

     2.     Corporate Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     3.     Insider Stock Sales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.     The Hands-On Management Style Allegations Do
Not Give Rise to a Strong Inference of Scienter. . . . . . . . . . . . . . . . . . . . . 24

D.     The Allegations Concerning Pre-Class Period Whistleblower
Retaliation Do Not Give Rise to a Strong Inference of Scienter. . . . . . . . . 25

# INTRODUCTION

This putative securities class action is precisely the type the Private Securities Litigation Reform Act (the "Reform Act")[1] was designed to prevent. The Reform Act imposes daunting pleading standards that render motion to dismiss practice different from the rules applicable to other types of cases. Under the Reform Act, if the heightened pleading standards are not met, dismissal of the complaint is mandatory. The Amended Complaint manifestly fails to satisfy the Reform Act's exacting standards. Accordingly, Defendants' Motion to Dismiss should be granted.

***The Parties***. The corporate defendant, Psychiatric Solutions, Inc. ("PSI" or the "Company"), which is headquartered in Franklin, Tennessee, is a leading provider of inpatient behavioral health care services.[2] During 2008, PSI's subsidiaries operated between 90 and 95 behavioral health care facilities with more than 10,000 beds in 31 states, Puerto Rico, and the U.S. Virgin Islands.[3] In 2008 alone, it provided 2.7 million patient days of treatment.[4] The very nature of PSI's business – the operation of health care facilities – subjects it to "extensive regulation at the federal, state and local levels."[5] And, as is true with any company subject to extensive regulation, issues with regulatory bodies can be expected from time-to-time. The individual defendants are officers of PSI. Plaintiffs allege they were PSI shareholders.

***The Reform Act***. The Reform Act was "designed to curb perceived abuses of the §10(b) private action – 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'"[6] The Reform Act, in effect, accords to

---

[1] 15 U.S.C. §§ 78u-4, et seq.
[2] See PSI's 2007 Form 10-K at p. 3 (Exhibit A hereto).
[3] See id.; PSI's 2008 1Q Form 10-Q at p. 16 (Exhibit B hereto).
[4] See PSI's 2008 Form 10-K at p. 22 (Exhibit C hereto).
[5] See PSI's 2007 Form 10-K at p. 9.
[6] Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320 (2007).

District Courts a gatekeeping function. The heightened pleading requirements of the Reform Act were intentionally structured to facilitate a demanding review on a motion to dismiss "to stop this particularly harmful form of predatory litigation at the pleadings stage."[7] Thus, in a Reform Act case such as this, the "burden [is on the] plaintiff to acquire particularized knowledge of a party's scienter prior to obtaining discovery"[8] and to allege those particularized facts in the complaint. The Amended Complaint in this case abjectly flunks the Reform Act's pleading standards.

*The Four Inactionable Misstatements Alleged in the Amended Complaint*. The initial iteration of the Complaint was thin in all respects. The Amended Complaint is bulky, to be sure, but it is similarly short on substance. It is larded with long quotes from newspaper articles and redundant and irrelevant passages from public filings. Its wordiness cannot disguise its shortcomings: "a complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail."[9]

Under the Reform Act, a plaintiffs' first task is to allege with the requisite detail a material misrepresentation of fact. Here, the Amended Complaint bases its claims on four categories of alleged misstatements. The four categories and the reasons they cannot, as a matter of law, survive this Motion to Dismiss are as follows.

| *Alleged Misstatement* | *Reason the Reform Act Requires Dismissal* |
| --- | --- |
| Statements about PSI's loss reserves, earnings guidance, and growth projections (see, e.g., Am. Compl., ¶¶ 86, 101, 102). | These are forward-looking statements that were accompanied by meaningful cautionary language. Under the Reform Act's Safe Harbor, these statements cannot form the basis for a viable claim. See infra at pp. 5 – 12. |
| Statements about PSI's historic staffing costs (see, e.g., Am. Compl., ¶ 96). | The Amended Complaint does not allege that the reported costs were false. See infra at pp. 12 – 14. |

---

[7] Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707, 713 (E.D. Va. 2003).
[8] In re Bisys Sec. Litig., 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007).
[9] Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 362 (5th Cir. 2004).

| Alleged Misstatement | Reason the Reform Act Requires Dismissal |
|---|---|
| Statements of substantial compliance with the law (see, e.g., Am. Compl., ¶ 111). | The allegations advanced are insufficiently detailed to support such a theory under Sixth Circuit law. See infra at pp. 14 – 17. |
| Statements that PSI provides "high quality" service (see, e.g., Am. Compl., ¶ 111). | These are generalized statements of corporate optimism that the Sixth Circuit has held are inactionable as a matter of law. See infra at pp. 17 - 19. |

Even if any of these four theories did allege an actionable misstatement, the Amended

Complaint would still fail as a matter of law because the allegations of scienter, i.e., allegations

that Defendants intended to deceive, manipulate, or defraud investors, are woefully insufficient.

See infra at pp. 19 – 25.

## ARGUMENT AND ANALYSIS

**I.   THE REFORM ACT'S SAFE HARBOR PROVISION AND HEIGHTENED PLEADING STANDARDS**

The essential elements of a claim under Section 10(b) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, are (1) a

misstatement or omission of material fact, (2) made with scienter, (3) in connection with the

purchase or sale of a security, (4) upon which the plaintiff reasonably relied, (5) causing

economic loss, and (6) a causal connection between the material misrepresentation and the loss,

known as loss causation. See PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004)

(citation and internal quotation marks omitted).  In alleging such a claim, a plaintiff must comply

with the Reform Act, which, as explained below, imposes heightened pleading standards in

securities fraud suits. Id.

As noted above, the Reform Act is expressly intended "to curb frivolous securities fraud

litigation, which unnecessarily increase[s] the cost of raising capital and chill[s] corporate

disclosure, [and is] often based on nothing more than a company's announcement of bad news,

not evidence of fraud." In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999) (quoting S. Rep. No. 104-98, reprinted in 1995 U.S.C.C.A.N. 679, 690). The Reform Act changes the pleading and dismissal rules in three relevant ways.

*First*, the Reform Act provides a statutory Safe Harbor provision that protects a forward-looking statement from liability where the statement is accompanied by meaningful cautionary language. Miller v. Champion Enters., Inc., 346 F.3d 660, 672 (6th Cir. 2003) (citing 15 U.S.C. § 78u-5(c)(1)(A)). Under the Safe Harbor, it is impossible for a forward-looking statement accompanied by meaningful cautionary language to form the basis for a Section 10(b) claim. Id.

*Second*, the Reform Act imposes a heightened pleading standard by requiring that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

*Third*, the Reform Act imposes a heightened pleading standard on allegations that a defendant acted with the requisite intent to deceive – i.e., scienter – by requiring that "the complaint shall, with respect to each act or omission alleged to violate [the laws of the securities exchanges], state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The United States Supreme Court established that the Reform Act "unequivocally raised the bar for pleading scienter." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).

In sum, "[i]f certain factors are not met in the complaint – factual particularity and the most plausible of competing inferences – 'the court ***shall***, on the motion of any defendant, dismiss the complaint.'" Miller, 346 F.3d at 673 (quoting 15 U.S.C. § 78u-4(b)(3)(A))

(emphasis added). Here, the Amended Complaint should be dismissed because it fails to plead an actionable misstatement or omission, as detailed in Section II, <u>infra</u>, or a strong inference of scienter, as detailed in Section III, <u>infra</u>, in accordance with the Reform Act's heightened pleading requirements.

## II. THE AMENDED COMPLAINT FAILS TO PLEAD ANY ACTIONABLE MISREPRESENTATION OR OMISSION

The Reform Act cannot be satisfied by a complaint that merely parrots allegations made in the press. <u>See, e.g.</u>, <u>In re Axis Capital Holdings, Ltd. Sec. Litig.</u>, 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006). Here, although the Amended Complaint "quotes verbatim from a series of press releases and other statements allegedly made by defendants during the Class Period, it fails to identify which portions of these statements (if any) were false or misleading. On this basis alone, plaintiff's Complaint must be dismissed." <u>Pollio v. MF Global, Ltd.</u>, 608 F. Supp. 2d 564, 570 (S.D.N.Y. 2009).

In addition, Defendants' alleged statements are not actionable under the securities laws. As noted above, the Amended Complaint attempts to state a claim based on four general categories of statements -- (A) forward-looking statements of loss reserves, earnings guidance, and growth expectations; (B) accurate statements of past earnings; (C) statements that the Company was generally in substantial compliance with the law; and (D) statements of corporate optimism that the Company provided high quality service. None of these statements are actionable under the securities laws for the reasons set forth below.

### A. The Forward-Looking Statements Are Protected by the Safe Harbor.

The Company's forward-looking statements regarding loss reserves, earnings guidance, and same-facility growth expectations (<u>see, e.g.</u>, Am. Compl., ¶¶ 85, 101, 102) are immunized from liability pursuant to the Safe Harbor of the Reform Act. <u>See</u> 15 U.S.C. § 78u-5(c)(1)(A)(i).

Because a "company's own assessment of its future potential [is] among the most valuable information shareholders and potential investors could have about a firm," Congress passed a statutory Safe Harbor as an integral part of the Reform Act. See S. Rep. No. 104-98, at 15-16 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694-95. The Safe Harbor was intended to quell corporate management's "[f]ear that inaccurate projections [would] trigger the filing of a securities fraud lawsuit." Id., 1995 U.S.C.C.A.N. 679, at 695.

The Safe Harbor provides that "in any private action . . . that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, [the defendant] ***shall not be liable*** with respect to any forward-looking statement . . . [that] is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added).

As the Sixth Circuit held, "for forward-looking statements that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in [the Reform Act] makes the state of mind irrelevant." Miller, 346 F.3d at 672. "In other words, if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, ***a defendant's statement is protected regardless of the actual state of mind***." Id. (emphasis added).

As noted above, the Amended Complaint attempts to allege liability on three different categories of forward-looking statements – statements of loss reserves, statements of earnings guidance, and statements of same-facility growth expectations. All of the forward-looking statements alleged in the Amended Complaint were accompanied by meaningful cautionary language, and, thus, are not actionable and should be dismissed. Miller, 346 F.3d at 672.

## 1. The Statements Related to Reserves Are Not Actionable.

The first forward-looking statement on which the Amended Complaint attempts to premise liability is the Company's statements of loss reserves. <u>See, e.g.</u>, Am. Compl., ¶ 85. Loss reserves are an amount that a company establishes to cover future liability claims. <u>In re Kindred Healthcare, Inc. Sec. Litig.</u>, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004).

PSI self-insures a portion of its professional and general liability coverage for medical malpractice and other potential claims. <u>See</u> PSI's 2007 Form 10-K at p. 13 (Exhibit A hereto). PSI has a reserve for these claims. In early 2009, the Company announced that its reserve for 2008 had turned out to be too low to cover the claims the Company had received for that period. This development, in part, resulted in the Company missing earnings guidance for 2008 and lowering guidance for 2009. <u>See</u> PSI's Feb. 25, 2009 press release (Exhibit D hereto). The Amended Complaint's inadequate reserve theory should be dismissed because, <u>inter</u> <u>alia</u>, (a) statements related to reserves are considered forward-looking statements immunized from liability in the Sixth Circuit, and (b) fraud by hindsight allegations related to reserves without the requisite detail have long been rejected.

### a. The Safe Harbor Protects the Loss Reserve Statements from Liability.

As this Court has held, "[s]tatements about medical reserves are forward looking statements and are protected by the [Reform Act]." <u>In re Am. Serv. Group, Inc.</u>, No. 3:06-0323, 2009 WL 1348163, *37 (M.D. Tenn. Mar. 31, 2009).[10]  A company's statement of loss reserves is the quintessential forward-looking statement because "[t]he amount [a company] keeps in

---

[10]    This Court in <u>America Service Group</u> denied the motion to dismiss in other respects, but the allegations in that case are more egregious than the allegations here. For example, the complaint in <u>America Service Group</u> alleged that the company had a large restatement that covered five years of financial reports, the company fired senior executives, members of the audit committee resigned, and the company adopted sweeping internal reforms. None of those types of allegations are present here.

reserves to cover liability claims is necessarily a prediction about its future claims experience based on past claims history as well as current filings." Kindred Healthcare, 299 F. Supp. 2d at 738; see also Hess v. Am. Physicians Capital, Inc., No. 5:040CV031, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005) (holding that statements about loss reserves were forward-looking).

PSI's forward-looking statements of loss reserves are protected statements because they were accompanied by meaningful cautionary language. Miller, 346 F.3d at 672. Cautionary language is considered meaningful "when an investor has been warned of risks of a significance similar to that actually realized." In re Humana, Inc. Sec. Litig., No. 3:08CV-00162, 2009 WL 1767193 (W.D. Ky. June 23, 2009); see also Miller, 346 F.3d at 678.

Here, the Company's cautionary language specifically warned that the Company's estimated reserves could change –

> The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial assumptions calculated by an independent third-party actuary. … This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations.

See PSI's 2007 Form 10-K at p. 15 (Exhibit A hereto).

There can be no serious dispute that the cautionary language here was "meaningful" and not mere "boilerplate." Humana, 2009 WL 1767193, at *12. Of course, to be meaningful, the cautionary language need not be precisely on point with the issue that later arose. Miller, 346 F.3d at 678; Humana, 2009 WL 176193, at *12. But here the issue about which Plaintiffs complain – i.e., the need to increase loss reserves due to current and future occurrences – is exactly the risk described in the above-cited cautionary language. See Am. Compl., ¶ 86. Thus, as the Sixth Circuit held under similar circumstances, the cautionary language is meaningful as a matter of law. Miller, 346 F.3d at 678. Accordingly, the forward-looking statements of loss

reserves are subject to the Safe Harbor of the Reform Act and should be dismissed.  Id.

        **b.**      **The Loss Reserve Allegations Also Fail as a Matter of Law For Lack of Particularity.**

The Amended Complaint's claim premised on loss reserve statements fails for the additional reason that the claim is not alleged with sufficient particularity.  The Amended Complaint alleges that the increase in reserves should have been taken earlier, but "the mere fact that a company increased its reserves for doubtful accounts in one period does not, by itself, call into question the accuracy of the earlier period reserves."  Am. Serv. Group, 2009 WL 1348163, at *37; see also In re Huntington Bancshares Inc. Sec. Litig., 674 F. Supp. 2d 951, 964 (S.D. Ohio 2009).

Noticeably absent from the Amended Complaint is any allegation regarding:

- the specific point in time at which the Company should have increased its reserves;
- the specific amount by which the Company should have increased its reserves; or
- when any of the Individual Defendants knew that the reserve was too low.

This lack of detail is fatal under the Reform Act.  "***A court may dismiss a Complaint for failing to 'provide any particulars regarding the amount' at which the reserves should be set.***"  Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 588 (E.D. Va. 2006) (quoting Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 153-54 (3d Cir. 2004)).  To plead adequately that the failure to increase reserves is an actionable omission, the Amended Complaint must "allege the amount that should have been reserved at any particular time during the Class Period."  Id. at 588.  The Amended Complaint wholly fails to do so here.

Moreover, the fraud-by-hindsight pleading tactics by which the Amended Complaint attempts to allege the loss reserve claim have been rejected by the Sixth Circuit.  "[M]ere allegations that statements in one report should have been made in earlier reports do not make

out a claim of securities fraud." In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir.

1999).  In other words, the Complaint cannot "'seiz[e] upon disclosures made in later … reports

and alleg[e] that they should have been made in earlier ones.'"  Albert Fadem Trust v. Am. Elec.

Power Co., Inc., 334 F. Supp. 2d 985, 1017 (S.D. Ohio 2004) (quoting Denny v. Barber, 576

F.2d 465, 470 (2d Cir. 1978)) (internal quotation marks omitted).  This is a practice that the

"[c]ourts … have consistently rejected."  Id. at 1017.  Thus, the Amended Complaint's

inadequate reserve theory fails on its face, and should be dismissed.

> **2.** **The Safe Harbor Protects the Statements of Earnings Guidance from Liability.**

The second type of forward-looking statement on which the Amended Complaint

attempts to premise liability is statements of earnings guidance.  According to the Amended

Complaint, these statements are actionable because Defendants had no "reasonable basis" for

issuing the guidance.  See, e.g., Am. Compl., ¶ 101.  But, under the Sixth Circuit's holding in

Miller, Defendants' state of mind when issuing the earnings guidance is irrelevant.  Miller, 346

F.3d at 672.  The only inquiry for the Court is whether the statements of earnings guidance are

forward-looking statements accompanied by meaningful cautionary language.  Id.

Statements of earnings guidance or estimates are "classically forward-looking"

statements that are protected by the Safe Harbor when accompanied by meaningful cautionary

language.  Id. at 677.  The cautionary language that accompanied the Company's forward-

looking statements of earnings guidance was meaningful.  For example, the Company's 2007

Form 10-K stated that all forward-looking statements were "subject to a number of risks and

uncertainties" that "could cause actual results to differ from those forward-looking statements."

See PSI's 2007 Form 10-K at p. 18 (Exhibit A hereto).  The specific risks and uncertainties that

the Company identified included:

- ▪ "risks inherent to the health care industry, including the impact of unforeseen changes in regulation and exposure to claims and legal actions by patients and others";

- ▪ "our ability to comply with applicable licensure and accreditation requirements"; and

- ▪ "our ability to comply with extensive laws and government regulations related to billing, physician relationships, adequacy of medical care and licensure."

See id.

Again, cautionary language is considered meaningful "when an investor has been warned of risks of a significance similar to that actually realized." Humana, 2009 WL 1767193, at *12. Here, the cautionary language quoted above not only warns of risks of a similar significance to that realized, but warned of the very risks that plaintiffs contend materialized, namely, the impact of legal action that was taken by the government against Riveredge. See Am. Compl., ¶ 145.

Settled law is clear that PSI was not required to warn specifically that legal action could be taken against Riveredge. Miller, 346 F.3d at 678. It was sufficient for PSI to disclose of the general risk of legal action. Id. Thus, because the cautionary language that accompanied the forward-looking earnings guidance is meaningful as a matter of law, these statements are immunized from liability pursuant to the Safe Harbor of the Reform Act and should be dismissed from the Amended Complaint.

> **3.** **The Safe Harbor Protects the Statements of Same-Facility Growth Expectations from Liability.**

The third and final type of forward-looking statement on which the Amended Complaint attempts to premise liability is the Company's statements of same-facility growth expectations. See, e.g., Am. Compl., ¶ 102. Throughout the purported class period, PSI announced that it expected same-facility growth for 2008 to be in the range of 7% - 9%. See, e.g., PSI's Feb. 20, 2008 press release (Exhibit E hereto). These forward-looking statements of growth expectations were accompanied by the same cautionary language that accompanied PSI's statements of

earnings guidance. Id. As explained supra at Section II(A)(2), this cautionary language was meaningful, and, thus, the Company's statements of growth expectations are not actionable as a matter of law.

Moreover, the Company's statements of growth expectations could never be actionable because, even judged in 20/20 hindsight, they do not qualify as false. The law requires dismissal of a fraud claim premised on a "false" forecast where that forecast is met. See, e.g., In re Hutchinson Tech. Inc. Sec. Litig., 502 F. Supp. 2d 884, 898 (D. Minn. 2007) (dismissing claim premised on projections where the company's actual financial results were within or above the guidance figures), aff'd, 536 F.3d 952 (8th Cir. 2008); In re IAC/InterActiveCorp. Sec. Litig., 478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007); Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101, 107 (D. Mass. 2000).

Here, it is undisputed that PSI met the forecasted growth expectations. On February 25, 2009, PSI announced the same-facility growth for 2008 was 8%, which is squarely within the forecasted range. See PSI's Feb. 25, 2009 press release (Exhibit D hereto). Thus, the Amended Complaint's allegations premised on the accurate statements of same-facility growth expectations should be dismissed.

**B.   The Company's Accurate Statements of Past Earnings Are Not Actionable Because They Were Not False.**

The second of the four theories in the Amended Complaint is that the Company's statements of past earnings are actionable because "the costs of doing business reported therein … did not accurately reflect … the costs of operating PSI's facilities with proper staffing levels necessary to protect and treat patients and to comply with regulatory and licensing requirements." See Am. Compl., ¶ 96.

Conspicuously absent from the Amended Complaint, however, is any allegation that the reported staffing costs were inaccurate. Nor could the Amended Complaint include such allegations because PSI has never restated any portion of the reported staffing costs. Thus, the reported staffing costs were and are accurate historical statements of the costs PSI realized.

Contrary to the Amended Complaint's allegations, PSI's accurate factual recitation of past staffing costs is not actionable. As the Sixth Circuit held, "[i]t is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data. The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." In re Sofamor Danek Group, Inc., 123 F.3d 394, 401, n.3 (6th Cir. 1997).

This is true even in light of the Amended Complaint's allegation that the staffing costs would have been higher if PSI had properly staffed its hospitals. As one court held, "[a]bsent an allegation that [defendant] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability." In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 469-70 (S.D.N.Y. 2006) (emphasis added) (dismissing claim that accurate financial statements were false for failure to disclose that revenues were generated by improper activities).

The Amended Complaint's real beef is not with the Company's reported costs, but with the Company's decisions with respect to staffing ratios. The Supreme Court's Santa Fe doctrine, however, prevents the Amended Complaint from asserting a securities fraud claim that is premised on alleged corporate mismanagement. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977). As the Santa Fe Court held, allegations of internal corporate mismanagement

"without any deception, misrepresentation, or nondisclosure" are simply not cognizable under the federal securities laws. Id. at 476, 479.

Here, the Amended Complaint fails to allege any "deception, misrepresentation, or nondisclosure" because the only statements to which the Amended Complaint attempts to link its allegations of inadequate staffing levels are *accurate* statements of staffing costs. "Because the [Amended Complaint does] not allege the historical inaccuracy of [PSI's reported staffing costs], such statements are not misrepresentations" and are not actionable under the securities laws. In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004). Accordingly, the Amended Complaint's allegations of inadequate staffing should be dismissed.

### C. The Amended Complaint Fails to Allege that the Company's Statements of Substantial Compliance with the Law Were False, and PSI's Disclosures Were Adequate As A Matter of Law.

The third of four theories alleged in the Amended Complaint relates to the Company's statement that it "believe[d] that the inpatient facilities [it] own[s] and operate[s] generally are in substantial compliance with current applicable federal, state, local, and independent review body regulations and standards." See PSI's 2007 Form 10-K at p. 9 (Exhibit A hereto). According to the Amended Complaint, this statement is allegedly misleading because PSI failed to disclose (a) violations of unspecified laws and regulations or (b) the full extent of the issues at Riveredge Hospital, one of PSI's 95 facilities. See Am. Compl., ¶ 111. As explained below, neither allegation has any merit.

The Amended Complaint's allegation that PSI should have disclosed that it was operating in violation of the law is "fatally flawed" because "the complaint fails to allege facts which would establish such an illegal scheme." In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006). "In cases alleging securities fraud based on the failure to

disclose the existence of an underlying illegal scheme, the basis for the illegality must be pled with particularity." In re Mirant Corp. Sec. Litig., No. 1:02-cv-1467-RWS, 2009 WL 48188, *17 (N.D. Ga. Jan. 7, 2009).

The Amended Complaint attempts to meet this strict pleading requirement with the unadorned conclusion that PSI was "in violation of ... regulatory requirements." See Am. Compl., ¶ 111. This pleading tactic simply does not suffice under the Reform Act. As one court held, the Amended Complaint's "blanket characterization of [PSI's business activities] as illegal does not make them so, nor does alleging their non-disclosure necessarily state a valid … Exchange Act violation." Mirant Corp., 2009 WL 48188, at *18.

To survive a motion to dismiss, the Amended Complaint must plead specific facts detailing how PSI's alleged activities "would actually violate state or federal . . . laws." Axis Capital, 456 F. Supp. 2d at 585 (dismissing complaint for failure to explain how the alleged illegal activities violated any laws). But the Amended Complaint wholly fails to do so. In fact, the Amended Complaint alleges only two occurrences during the purported class period that are even related to PSI's substantial compliance with the law.

First, the Amended Complaint cites to an article that reports PSI was fined at *one* of its 95 facilities in connection with an incident that occurred during *one* of the 2.7 million patient days that PSI's facilities treated patients in 2008. See Am. Compl., ¶ 8. But one fine at one facility related to one patient day out of 2.7 million does not render false PSI's statement that it was "generally in substantial compliance" with the law.

Second, the Amended Complaint alleges that PSI received a subpoena from the Department of Justice ("DOJ") related to Riveredge, one of its 95 facilities. As an initial matter, receipt of a subpoena from the DOJ does not equate to a violation of any law, rule, or regulation.

See <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1245 (11th Cir. 2008). And, in 2008, there

was no finding of wrongdoing by the DOJ, nor has there been any finding of wrongdoing to date.

Moreover, PSI met its disclosure obligations with respect to the DOJ subpoena by

disclosing on July 31, 2008 in a Form 8-K filed with the Securities and Exchange Commission

("SEC") that the Company had received a subpoena from the DOJ related to the Riveredge

Hospital. <u>See</u> PSI's Form 8-K filed on July 31, 2008 (Exhibit F hereto). Further, the Company

repeatedly disclosed in its filings with the SEC that (a) the extensive regulation of the industry

puts PSI at risk that it may be subject to government investigations and (b) PSI could be found to

be in violation of applicable laws and regulations. For example, PSI's 2007 Form 10-K filed

with the SEC on February 29, 2008 included the following risk disclosures:

- "Significant media and public attention has focused in recent years on the hospital industry. … It is possible that governmental entities could initiate investigations of, or litigation against, inpatient facilities owned, leased, or managed by us in the future and that such matters could result in significant penalties as well as adverse publicity." <u>See</u> PSI's 2007 Form 10-K at p. 12 (Exhibit A hereto).

- "***Other companies within the health care industry continue to be the subject of federal and state investigations, which increases the risk that we may become the subject to investigations in the future.***" <u>Id.</u> at p. 15.

- "The OIG and the U.S. Department of Justice have, from time to time, undertaken national enforcement initiatives that focus on specific billing practices or other suspected areas of abuse. … Any investigations of us or our executives or managers could result in significant liabilities or penalties as well as adverse publicity." <u>Id.</u>

- "While we believe we are in substantial compliance with all applicable laws, we do not always have the benefit of significant regulatory or judicial interpretation of these laws and regulations. In the future, different interpretations or enforcement of these laws and regulations could subject our current or past practices to allegations of impropriety or illegality or could require us to make changes in our inpatient facilities, equipment, personnel, services, capital expenditure programs and operating expenses. A determination that we have violated these laws or the public announcement that we are being investigated for possible violations of these laws, could have a material adverse effect on our business, financial condition, results of operations or prospects and our business reputation could suffer significantly." <u>Id.</u> at p. 14.

These disclosures satisfied PSI's disclosure obligations. Contrary to the Amended Complaint's allegations, PSI was not obligated to disclose that it was in violation of any law because the "[f]ederal securities laws do not require a company to accuse itself of wrongdoing." Iron Workers, 432 F. Supp. 2d at 587. "Consistent with the principle that a corporation has no duty to accuse itself of wrongdoing, where there exists a good faith dispute as to facts or an alleged legal violation, the law only requires disclosure of the dispute." In re United Am. Healthcare Corp. Sec. Litig., No. 2:05-CV-72112, 2007 WL 313491, *12 (E.D. Mich. Jan. 30, 2007). This is because companies simply "have no duty to opine about the legality of their own actions." Ind. St. Dist. Council v. Omnicare, Inc., 583 F.3d 935, 945 (6th Cir. 2009).

The Sixth Circuit has rejected allegations similar to those here. See Sofamor Danek, 123 F.3d 394. In Sofamor Danek, the defendants received a warning letter from the government, and plaintiff alleged that defendants should have disclosed the company was not in compliance with the law. Id. at 402. The Sixth Circuit held, however, that the company satisfied its disclosure obligations by disclosing (a) receipt of the government's warning letter and (b) specific risk warnings that the government might obtain an injunction against the company. Id.

PSI likewise met its disclosure obligations by disclosing (a) receipt of the DOJ subpoena and (b) specific risk warnings that the DOJ or other government entities might investigate PSI from time-to-time. Accordingly, the Amended Complaint's allegations premised on PSI's statement of substantial compliance with the law should be dismissed because PSI complied with its disclosure obligations. See, e.g., Sofamor, 123 F.3d at 402; Mirant Corp., 2009 WL 48188; Axis Capital, 456 F. Supp. 2d 576.

D.     Statements of "High Quality Service" Are Not Actionable.

The fourth and final theory alleged in the Amended Complaint is that PSI's statements

that its services were "high quality" were allegedly misleading because of inadequate staffing levels and quality of care problems at PSI's facilities.  See, e.g., Am. Compl., ¶ 111.  As an initial and dispositive matter, these statements are not actionable because there are *no* allegations in the Amended Complaint that Defendants believed PSI's services were anything other than "high quality."

Even if the Amended Complaint had included such allegations, which it does not, these statements would not be actionable because these are the types of statements courts have held qualify as immaterial statements of "mere puffing" or "corporate optimism."  Ford, 381 F.3d at 570.  The Sixth Circuit defines "puffing" statements as "generalized statements of optimism that are not capable of objective verification."  Ford, 381 F.3d at 570.  Such statements are not actionable because they are immaterial.  Id.  As the Sixth Circuit explained, "[a]ll public companies praise their products and their objectives.  Courts everywhere have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace."  Id.

PSI's statements of "high quality" services fit squarely within the Sixth Circuit's definition of puffery.  They are "generalized statements of optimism that are not capable of objective verification."  Id.

In fact, in Ford, the Sixth Circuit was faced with indistinguishable statements by Ford that Ford had "its best quality ever" and that "quality comes first."  Id.  Plaintiffs in the Ford case alleged that these statements of "quality" should be actionable given Ford's problems with Explorer rollover incidents.  Id.  The Sixth Circuit disagreed and held that Ford's statements related to "quality" were not actionable because they were mere puffing.  Id.

The same is true here.  PSI's statements of "high quality" are strikingly similar to Ford's statements of "best quality."  Id.  Accordingly, the Amended Complaint's allegations related to PSI's "high quality" statements should be dismissed because the statements are those of corporate optimism that are not actionable under the federal securities laws.  Id.

## III.    THE AMENDED COMPLAINT FAILS TO PLEAD SCIENTER ADEQUATELY

The Reform Act requires that the Amended Complaint allege particular facts giving rise to a "strong inference" that the Defendants acted with scienter – i.e., the intention to deceive, manipulate, or defraud.  See Tellabs, 551 U.S. at 313.  As the Supreme Court held, the Reform Act's "'strong inference' standard 'unequivocally raise[d] the bar for pleading scienter." Tellabs, 551 U.S. at 321 – 22.

Under the heightened standard, "an inference of scienter must be more than merely plausible or reasonable – it must be ***cogent and at least as compelling as any opposing inference*** of nonfraudulent intent."  Id. at 314 (emphasis added).  As Tellabs teaches, the inquiry into whether a strong inference of scienter has been pled is "inherently comparative" and requires a court to "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  Id. at 324.  The Amended Complaint must allege "particularized facts" giving rise to a strong inference of scienter to survive dismissal.  See Ley v. Visteon Corp., 543 F.3d 801, 809 (6th Cir. 2008) (affirming dismissal based on similarly weak allegations of scienter).

The Amended Complaint attempts to meet this burden with conclusory allegations that (A) the Company has regulatory violations and patient care issues that it did not disclose; (B) the Individual Defendants had motive and opportunity to mislead investors for personal gain; (C) the CEO was a "hands on" manager; and (D) whistleblowers retaliated against the Company

sometime in the past.

As explained below, these allegations are insufficient as a matter of law to give rise to a strong inference of scienter. See Konkol v. Diebold, Inc., 590 F.3d 390, 397-403 (6th Cir. 2009); Ley, 543 F.3d at 809.

A.  **The Allegations Concerning Patient Safety and Care Issues Do Not Give Rise to a Strong Inference of Scienter.**

The Amended Complaint alleges that Defendants must have known that their statement that PSI was "generally in substantial compliance with the law" was false because there was a "pervasive pattern of inadequate patient care," as evidenced by the "nature, number and extent of the regulatory violations and patient safety and quality of care issues at PSI's existing facilities" described in various media reports recited in the Amended Complaint. See Am. Compl., ¶ 158.

But to stave off dismissal, the Amended Complaint must allege particularized facts "that the defendants knew of [the illegal operations] *at the time* they stated the belief that the company was in compliance with the law." Kushner v. Beverly Enters, Inc., 317 F.3d 820, 831 (8th Cir. 2003).  Thus, the Amended Complaint must allege particularized facts that Defendants knew about violations of the law during the purported class period when the statements of compliance were made.  The Amended Complaint wholly fails to meet this burden.

As a preliminary matter, allegations of potential regulatory problems cannot render false a generalized statement regarding substantial compliance with law.  Beyond that, the Amended Complaint is deficient because it lacks any detailed allegations that PSI was not in substantial compliance with the law during the purported class period.

Furthermore, to satisfy the scienter standard, the Amended Complaint would need to plead detailed facts regarding knowledge that Defendants possessed of violations that would render the statement of substantial compliance false. See Kushner, 317 F.3d at 831.  No such

allegations are presented in the Amended Complaint. The patient care incidents referenced in the *Chicago Tribune*, *ProPublica*, *LA Times*, and *Dallas Morning News* articles published during the class period mostly occurred well before the class period and, thus, have no bearing on Defendants' scienter during the class period. <u>See, e.g.</u>, <u>Sharenow v. Impac Mortgage Holdings, Inc.</u>, No. 09-55533, 2010 WL 2640195, at *1 (9th Cir. Jun. 29, 2010) (holding conduct prior to class period had no bearing on scienter during the relevant time period).

Indeed, the news articles referenced in the Amended Complaint that were published during the class period mention ***only one purported incident at one facility that occurred during 2008***. A single incident at one of 95 facilities and on one patient day out of 2.7 million does not give rise to a strong inference that Defendants knew PSI was not in "substantial compliance with the law." <u>See</u> PSI's 2008 Form 10-K at p. 22 (Exhibit C hereto). And it certainly does not imply Defendants knew the statement about substantial compliance was false when made.

In fact, as alleged in the Amended Complaint, PSI's "facilities are surveyed multiple times each year on average and less than 1% of those surveys result in serious deficiencies." <u>See</u> Am. Compl., ¶ 124. Thus, the more "cogent" and "compelling" inference is that Defendants believed PSI was in substantial compliance with the law at the time they represented as much. <u>Tellabs</u>, 551 U.S. at 314.

### B. The Motive and Opportunity Allegations Do Not Give Rise to a Strong Inference of Scienter.

The Amended Complaint also relies on "motive and opportunity" allegations in a failed attempt to give rise to an inference of scienter. In the Sixth Circuit, the "bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter." <u>PR Diamonds, Inc. v. Chandler</u>, 364 F.3d 671, 689 (6th Cir. 2004) (quoting <u>In re Comshare Sec. Litig.</u>, 183 F.3d 542, 551 (6th Cir. 1999)) (internal quotation marks omitted). As

demonstrated below, the motive and opportunity allegations on which the Amended Complaint relies, namely corporate position and access to information, corporate compensation, and stock sales, fail to give rise to a strong inference of scienter.

### 1.    Corporate Position and Access to Information

The Amended Complaint alleges that, because the Individual Defendants had "responsibility for and control over financial reporting," attended meetings, and received certain reports, they knew that their statements to the market were false or misleading. See Am. Compl., ¶¶ 159, 177.  It is well-established, however, that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the company and alleged access to information." PR Diamonds, 364 F.3d at 688.  Otherwise, "every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud." In re Criimi Mae, Inc. Sec. Litig., 94 F. Supp. 2d 652, 661 (D. Md. 2000).

Here, the Amended Complaint alleges the same generalized facts of corporate position and access to unspecified information that have been repeatedly held insufficient to give rise to an inference of scienter.  As the Sixth Circuit held, "[g]eneralized facts alleging that the Defendants had access to … financial information, in short, do not support a strong inference that the Defendants knew of or recklessly disregarded the falsity of … [their] statements." Konkol, 590 F.3d at 397.

### 2.    Corporate Compensation

The Amended Complaint's allegations about the Individual Defendants' compensation are similarly insufficient to plead scienter.  See Am. Compl., ¶¶ 184-197.  An executive's desire to increase his compensation simply does not comprise a motive for fraud.  See PR Diamonds, 364 F.3d at 690.  Indeed, if an executive's compensation was considered indicia of fraud, then

there would be a "strong inference that most executives commit securities fraud" since nearly every executive works for pay." Kindred Healthcare, 299 F. Supp. 2d at 741.

### 3. Insider Stock Sales

The insider trading allegations in the Amended Complaint likewise do not give rise to an inference of scienter because the Amended Complaint does not – and cannot – plead that Defendant Jacobs, the Chairman of the Board and Chief Executive Officer, sold any stock during the class period. "Courts have found that where some defendants did not profit from the alleged fraud, any inference of scienter is negated as to all defendants." In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 686 (D. Md. 2002).

The Amended Complaint's allegations of insider stock sales by Defendants Polson and Turner are also insufficient to raise a strong inference of scienter. See Am. Compl., ¶ 198(a)-(b). For insider sales to be relevant to the scienter calculus, the Amended Complaint must allege that "the stock sales were in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed insider information." Beaver County Ret. Bd. v. LCA-Vision, Inc., No. 1:07-CV-750, 2009 WL 806714, at *23 (S.D. Ohio Mar. 25, 2009) (citation and internal quotation marks omitted); see also Ashland Inc. v. Oppenheimer & Co., Inc., 689 F. Supp. 2d 874, 886 (E.D. Ky. 2010).

As to Mr. Turner's sales, the Amended Complaint alleges that his sales were pursuant to a 10b5-1 trading plan. See Am. Compl., ¶ 198(b). "'A 10b5-1 plan is an agreement which allows corporate insiders to set a schedule by which to sell shares over time.'" Elam v. Neidorff, 544 F.3d 921, 928 n.3 (8th Cir. 2008). "Stock sales pursuant to Rule 10b-5 trading plans 'can raise an inference that the sales were prescheduled and not suspicious.'" Elam, 544 F.3d at 928. Here, Mr. Turner adopted the 10b5-1 plan, and, thus, set the time at which his shares would be

sold, in September 2005 – well over two years before the purported class period began. Accordingly, there can be no allegation that Mr. Turner timed his sales during the class period to benefit from undisclosed insider information.

As to both Messrs. Turner and Polson, "plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." Konkol, 590 F.3d at 399. A complaint like the Amended Complaint that merely provides "the names of the insiders who sold stock, the quantities of stock sold and the prices at which the sales occurred, and the dates of the sales is insufficient." Beaver County Ret. Bd., 2009 WL 806714, at *23.

The Amended Complaint attempts to bolster the insider trading allegations by alleging insider sales of individuals who are not defendants. See Am. Compl., ¶ 198(c) – (d). Sales by unnamed defendants, however, are irrelevant where, as here, the Amended Complaint does not allege any facts suggesting that the named defendants intended their manipulation of the company's stock to assist their colleagues. In re PetSmart, Inc., Sec. Litig., 61 F. Supp. 2d 982, 1001 (D. Ariz. 1999).

### C. The Hands-On Management Style Allegations Do Not Give Rise to a Strong Inference of Scienter.

The generic allegations in the Amended Complaint concerning Mr. Jacobs's "hands on" management also do not give rise to a strong inference of scienter. See Am. Compl., ¶¶ 175-176. According to certain undisclosed former employees of the Company, Mr. Jacobs was a "hands-on CEO" that put pressure on the Company's facilities not to be among the bottom ten hospitals in terms of patient capacity. Id., ¶ 176. "These are little more than statements of broad operational plans or goals . . . [that] do not show knowledge or reckless disregard" of the alleged misstatements in the Amended Complaint. PR Diamonds, 364 F.3d at 689.

The Amended Complaint's allegations concerning the supposed hands-on management style must also be discounted because they are supported only by statements of confidential witnesses. "When confidential sources are used to support 'vague and conclusory' allegations, the allegations are not 'accorded much weight.'" Konkol, 590 F.3d at 399 (quoting Ley, 543 F.3d at 811). The allegations concerning Mr. Jacobs's management style are the type of "[b]are-bones statements [ ] from confidential witnesses that are properly discounted." Id.

**D.    The Allegations Concerning Pre-Class Period Whistleblower Retaliation Do Not Give Rise to a Strong Inference of Scienter.**

The Amended Complaint also attempts to allege a strong inference of scienter with purported instances of "whistleblower retaliation." See Am. Compl., ¶¶ 178-180. But not one of the former employees who allegedly "retaliated" was employed by PSI during or near the alleged class period.[11] Thus, any conduct against which these employees were retaliating has no bearing on Defendants' state of mind during the class period. See Sharenow, 2010 WL 2640195, at *1.

Moreover, there are no allegations in the Amended Complaint that any of the Defendants was aware of any of the purported whistleblowers' allegations or that such allegations represented "red flags" of which Defendants should have been aware. See In re Nat'l Century Fin. Enters., Inc. Inv. Litig., 580 F. Supp. 2d 630, 643 (S.D. Ohio 2008) (complaint failed to allege scienter where there were no allegations defendant knew or should have been aware of the red flags). Because each of the alleged whistleblowers was employed at the hospital level at one of the Company's *ninety* facilities, there can be no inference, much less the requisite compelling inference, that Defendants knew of these isolated retaliation claims. The whistleblower retaliation allegations, therefore, have no bearing on the Court's scienter calculus.[12]

---

[11]    Two of the three alleged whistleblowers' claims have been rejected in court. See Exhibit G hereto.

[12]    Based on the foregoing, the Amended Complaint fails to state a claim against any Defendant for a primary violation of Section 10(b). The Section 20(a) claim should, accordingly, also be dismissed. Ley, 543 F.3d at 818.

Respectfully submitted, this 15th day of July, 2010.

s/ Lisa R. Bugni
Todd R. David
Jessica P. Corley
Lisa R. Bugni
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel. (404) 881-7000
todd.david@alston.com
jessica.corley@alston.com
lisa.bugni@alston.com

W. Travis Parham
Waverly D. Crenshaw
Michael T. Harmon
WALLER LANSDEN DORTCH
& DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
Tel. (615) 244-6380
travis.parham@wallerlaw.com
waverly.crenshaw@wallerlaw.com
michael.harmon@wallerlaw.com

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 15, 2010, a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Catherine J. Kowalewski
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
Email: katek@csgrr.com

Darren J. Robbins
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
Email: e_file_sd@rgrdlaw.com

David C. Walton
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
Fax: (619) 231-7423
Email: davew@csgrr.com

Julie A. Kearns
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
Fax: (619) 231-7423
Email: jkearns@rgrdlaw.com

Daniel J. Pfefferbaum
Robbins Geller Rudman & Dowd LLP
100 Pine Street
Suite 2600
San Francisco, CA 94111
(415) 288-4545
Fax: (415) 288-4534
Email: dpfefferbaum@rgrdlaw.com

Dennis J. Herman
Robbins Geller Rudman & Dowd LLP
100 Pine Street
Suite 2600
San Francisco, CA 94111
(415) 288-4545
Fax: (415) 288-4534
Email: dherman@rgrdlaw.com

Tor Gronborg
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
Fax: (619) 231-7423
Email: torg@rgrdlaw.com

Tricia L. McCormick
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
Fax: (619) 231-7423
Email: triciam@csgrr.com

Douglas S. Johnston , Jr.
Barrett, Johnston & Parsley
217 Second Avenue, N

Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, N

Nashville, TN 37201
(615) 244-2202
Email: djohnston@barrettjohnston.com

George Edward Barrett
Barrett, Johnston & Parsley
217 Second Avenue, N
Nashville, TN 37201
(615) 244-2202
Email: gbarrett@barrettjohnston.com


Thomas C. Michaud
Vanoverbeke, Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
(313) 578-1200
Fax: (313) 578-1201
Email: tmichaud@vmtlaw.com


Nashville, TN 37201
(615) 244-2202
Email: tmiles@barrettjohnston.com

Michael J. Vanoverbeke
Vanoverbeke, Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
(313) 578-1200
Fax: (313) 578-1201
Email: mvanoverbeke@vmtlaw.com


This 15th day of July, 2010.

s/ Lisa R. Bugni
Lisa R. Bugni