UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) | Civil Action No. 3:09-cv-00882-WJH |
| Plaintiff, and | ) ) | CLASS ACTION |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | |
| Lead Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| PSYCHIATRIC SOLUTIONS, INC., et al., | ) ) | |
| Defendants. | ) ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...........................................................................................................1

II. ARGUMENT ................................................................................................................4

    A.    Defendants Were Engaged in a Fraudulent Course of Conduct that Misled Investors About the Reasons for the Success and Purported Sustainability of Their Rollup Scheme ...........................................................................................4

    B.    Defendants' Omissions of Material Facts About PSI's Operations Concealed Weaknesses in the Company's Rollup Scheme ...................................9

        1.    In Light of PSI's Undisclosed Understaffing and Patient Care Problems, Defendants' Claims About the High Quality of Its Care as Compared with Competitors Were Misleading .......................................9

        2.    Defendants' Statements About PSI's Compliance Similarly Omitted Material Facts Necessary to Make Them Not Misleading Under the Circumstances ..........................................................................12

        3.    Defendants' Continuing Misrepresentations and Omissions About Conditions at Riveredge Illustrate the Manner in Which They Misled Investors ....................................................................................16

        4.    Defendants' Deliberate Accounting Manipulations and Continuing Omissions Caused PSI's Financial Results to be Misleading ...................19

    C.    The Safe Harbor Does Not Bar Plaintiffs' Claims..................................................22

        1.    The Safe Harbor Does Not Apply to Statements Made in Connection with Rollup Transactions or in Financial Statements Purportedly Prepared in Compliance with GAAP ....................................22

        2.    Even if the Safe Harbor Could Apply, It Would Not Insulate Defendants' Statements Regarding PSI's Malpractice Reserves from Liability ...........................................................................................23

            a.    Allegations About Manipulation of Malpractice Reserves Are Sufficiently Particularized ......................................................24

            b.    The Malpractice Reserve Statements Are Not Forward-Looking .........................................................................................25

            c.    PSI's Malpractice Reserves Were Not Accompanied by Meaningful Cautionary Language .................................................26

3.      Under the Circumstances of This Case, PSI's Financial Guidance is Not Protected by the Safe Harbor ........................................................28

4.      The Safe Harbor Does Not Protect Defendant's Statements About Same-Facility Growth ...............................................................................30

D.      The Complaint Pleads a Strong Inference of Scienter ...........................................31

1.      The Pervasiveness of PSI's Misconduct Supports Scienter......................32

a.      Defendants Admissions Establish Their Contemporaneous Knowledge of PSI's Numerous Regulatory Violations and Quality of Care Problems..................................................................34

b.      Defendants Intense Focus on and Pressure to Control Staffing Costs Further Supports Scienter......................................37

2.      PSI's Concealment of Illegal Conduct Lends Further Support for Scienter .....................................................................................................38

3.      Defendants' Deliberate Manipulation of Accounting Reserves to Improve Financial Results Strengthens the Scienter Inference ................40

4.      Each of the Individual Defendants and Other PSI Insiders Earned Millions of Dollars by Perpetuating PSI's Fraudulent Rollup Scheme ......................................................................................................41

a.      PSI Insiders Sold Stock Ahead of Negative Publicity..................41

b.      Defendants Earned Excessive Bonuses by Propagating the Bonus Scheme..............................................................................43

c.      Defendants Were Using the Rollup Scheme to Engineer a Lucrative Buyout ........................................................................44

III.     CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

**Page**

## CASES

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 ...........................................................................................................42

*Baker v. MBNA Corp.*,
No. 05-272 (GMS), 2007 WL 2009673
(D. Del. July 6, 2007).............................................................................................................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................4, 32

*City of Monroe Employees Ret. Sys. v. Bridgestone*,
399 F.3d 651 (6th Cir. 2005) ....................................................................................... *passim*

*Fidel v. AK Steel Holding Corp.*,
No. C-1-00-320, No. 2002 U.S. Dist. LEXIS 18887
(S.D. Ohio Sept. 19, 2002)....................................................................................................26

*Freudenberg v. E*Trade Fin. Corp.*,
No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053
(S.D.N.Y. May 11, 2010).......................................................................................................27

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ....................................................................................... *passim*

*Hess v. Am. Physicians Capital, Inc.*,
No. 05:04-cv-31, 2005 U.S. Dist. LEXIS 1162 (W.D. Mich. Jan. 11, 2005) ..............................25

*In re Air Disaster at Lockerbie*,
144 F.R.D. 613 (E.D.N.Y. 1992) ...........................................................................................16

*In re Am. Italian Pasta Co. Sec. Litig.*,
No. 05-0725-CV-W-ODS, 2006 U.S. Dist. LEXIS 40548
(W.D. Mo. June 19, 2006) .....................................................................................................36

*In re America Service Group, Inc.*,
No. 3:06-0323, slip op. (M.D. Tenn. Mar. 31, 2009) ..................................................... *passim*

*In re Ancor Commc'ns*,
22 F. Supp. 2d 999 (D. Minn. 1998)......................................................................................36

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ...............................................................................................29

575554_1

*In re Axis Capital Holdings, Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................................16

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ......................................................................................40

*In re Cardinal Health, Inc. Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ..................................................................26, 36, 37

*In re Complete Mgmt. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................................................42, 43

*In re Comshare, Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) ..............................................................................................31

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................................................23

*In re DaimlerChrysler AG Sec. Litig.*,
   197 F. Supp. 2d 42 (D. Del. 2002) ......................................................................................16

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) ........................................................................................4, 36

*In re Direct Gen. Corp. Sec. Litig.*,
   398 F. Supp. 2d 888 (M.D. Tenn. 2005) ..............................................................................14

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004) ..........................................................................26, 27

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ..............................................................................................10

*In re Humana, Inc. Sec. Litig.*,
   3:08CV-00162-JHM, No. 2009 U.S. Dist. LEXIS 53535
   (W.D. Ky. June 15, 2009) ..............................................................................................26, 28

*In re Kindred Healthcare Inc.*
   299 F. Supp 2d 724, 738 (W.D. Ky. 2004) ..........................................................................25

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..........................................................................16, 40

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ................................................................................23

*In re Prudential Sec. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .......................................................................27

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ..........................................................................33, 39

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) ............................................................41

*In re Sofamor Danek Group, Inc.*,
123 F.3d 394 (6th Cir. 1997) ......................................................................14, 15

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000) .....................................................34, 37

*In re Unisys Corp. Sec. Litig.*,
No. 99-5333, 2000 U.S. Dist. LEXIS 13500
(E.D. Pa. Sept. 21, 2000) ..................................................................................43

*In re UNUMProvident Corp. Sec. Litig.*,
396 F. Supp. 2d 858 (E.D. Tenn. 2005) ...........................................14, 15, 21, 25

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) .....................................................................23

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ...........................................................................43

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...........................................................................44

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...........................................................................34

*Miller v. Champion Enters., Inc.*,
346 F.3d 660 (6th Cir. 2003) ...........................................................22, 27, 28, 29

*Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008) ..............................................................................35

*Morse v. McWhorter*,
200 F. Supp. 2d 853 (M.D. Tenn. 1998) ......................................................15, 33

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ..............................................................................4

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................36

*Plotkin v. IP Axess Inc., Etc.*,
    407 F.3d 690 (5th Cir. 2005) ..............................................................................44

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ...................................................................... *passim*

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    No. 94 Civ. 5587 (PKL) (RLE), 2002 U.S. Dist. LEXIS 23829
    (S.D.N.Y. Dec. 11, 2002) ....................................................................................45

*Saddle Rock Partners v. Hiatt*,
    No. 95-2326 GA, No. 95-2326 GA, 1996 U.S. Dist. LEXIS 20649
    (W.D. Tenn. Mar. 26, 1996) ...........................................................................39, 40

*Santa Fe Industries, Inc. v. Green*,
    430 U.S. 462 (1977).........................................................................................13, 14

*Sharenow v. Impac Mortg. Holdings, Inc.*,
    No. 09-55533, 2010 U.S. App. LEXIS 13279
    (9th Cir. Cal. June 29, 2010)...........................................................................33, 34

*Sipex Corp. Sec. Litig.*,
    No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854
    (N.D. Cal. Nov. 17, 2005)....................................................................................40

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010).......................................................................23, 29, 30

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)...................................................................................43

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ..................................................................40

*Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008).........................................................................................4, 5

*Tackett v. M&G Polymers, USA, LLC*,
    561 F.3d 478 (6th Cir. Ohio 2009) .......................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................4, 31, 32

*United States v. O'Hagan*,
521 U.S. 642 (1997) .................................................................................................. 4, 5, 6, 14

*Wright v. MetroHealth Med. Ctr.*,
58 F.3d 1130 (6th Cir. 1995) ................................................................................................ 4

*Zehman v. JDS Uniphase Corp.*,
376 F. Supp. 2d 956 (N.D. Cal. 2005) ................................................................................ 33

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78j(b) .................................................................................................................................. 1
§78t(a) .................................................................................................................................. 1
§78u-5(b)(1)(D) ............................................................................................................ 22, 23
§78u-5(b)(1)(D), (b)(2) ...................................................................................................... 22
§78u-5(i)(1)(A)-(D) ............................................................................................................ 26
§78u-5(b)(2) ........................................................................................................................ 23
§78u-5(c)(1) ........................................................................................................................ 22

Federal Rules of Civil Procedure
Rule 7(b) ............................................................................................................................. 10
12(b)(6) ......................................................................................................................... 4, 39

17 C.F.R.
§240.10b-5 ........................................................................................................................ 1, 5
§240.10b-5(a),(c) ................................................................................................................. 4
§240.10b-5(b) ....................................................................................................................... 9

575554_1

Lead Plaintiff Central States, Southeast and Southwest Areas Pension Fund, on behalf of itself and a proposed Class of persons who purchased the publicly traded securities of Psychiatric Solutions, Inc. ("PSI" or the "Company") between February 21, 2008 and February 25, 2009 (the "Class Period"), hereby responds as follows to Defendants' Motion to Dismiss the Consolidated Complaint ("Motion") (Dkt. 110) and Memorandum of Law in support thereof ("Mem.") (Dkt. 111).

## I. INTRODUCTION

Plaintiffs have alleged claims for securities fraud under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j, 78t, and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5 against PSI and its three top executives during the Class Period: CEO Joey A. Jacobs, Chief Accounting Officer Jack E. Polson, and Executive Vice President, Finance and Administration Brent Turner (collectively, "defendants"). Plaintiffs claim that defendants misled them by concealing the true reasons for the apparent success of PSI's rollup strategy, deceiving investors about the strength and sustainability of its business and concealing weaknesses that would have revealed that the rollup strategy was nearing the end of its life.

PSI acquires and operates psychiatric hospitals and residential treatment centers ("RTCs") for at-risk children and teens, as well as some adult patients, many of whom have struggled for years to control their violent, sexually aggressive and suicidal tendencies. ¶¶2, 27. For years, PSI had been expanding its business through acquisition – acquiring existing psychiatric hospitals and RTCs using borrowed funds, branding the facilities with the "Psychiatric Solutions" name, and rolling them up into its existing business. ¶¶2, 28-30, 32.[1] To convince investors of the success and sustainability of PSI's rollup strategy, defendants promised – and frequently delivered – continuous growth in revenues, profits and occupancy rates at acquired hospitals and RTCs. ¶¶3-4, 35, 98-99. Defendants

---

[1]	All ¶ references are to the Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint"). Dkt. 109. In quoting sources identified herein, emphasis is added and citations omitted unless otherwise noted.

also regularly touted the quality of care it provided to patients, asserting that its higher level of attention to patient needs had provided it with a strong competitive advantage. ¶¶34, 43-45, 109-110, 164-170. Defendants now attempt to discount their repeated assurances, telling the Court that those statements were just hollow "puffery" that no reasonable investor should have relied upon. Mem. at 17-19.

Unbeknownst to investors, PSI's hospitals and RTCs were operating at levels well below industry standards as a result of the Company's need to cut costs and reduce staff in order to report the consistent revenue and earnings growth defendants had led the market to expect. ¶¶5, 36-42. As a result of the enormous amount of debt incurred to fuel defendants' rollup scheme, the Company could not afford to staff its hospitals and RTCs at levels necessary to protect, monitor and treat the adolescent and pre-teen psychiatric patients entrusted to its care. ¶¶5, 41-42,61-62, 66. The pervasive and deliberate understaffing of PSI's facilities regularly put children at risk, resulting in frequent and alarming incidents of physical and sexual assaults, suicide attempts, and other cases of abuse and neglect of unmonitored patients. ¶¶6, 50-52, 55-58, 60, 64-65, 72. The majority of these incidents remained hidden from investors. ¶¶181, 200-213. Those that did come to light were downplayed or minimized by defendants, who falsely asserted that the injuries resulted from isolated or historic events that did not reflect wider problems in PSI's operations. ¶¶46-49, 53-54, 62-63, 127, 140, 151-152, 154.

On February 25, 2009, PSI stunned investors by announcing a sudden and (to investors) unexpected decline in PSI's FY08 earnings as a result of rising malpractice claims and regulatory expenses associated with an investigation by Illinois and federal authorities into patient injuries caused by understaffing at Chicago's Riveredge Hospital ("Riveredge") and other PSI facilities around the country. ¶¶9, 67-71. Though the Riveredge investigation had commenced following an administrative hold on new patient admissions imposed on the facility early in the Class Period,

defendants had urged investors to discount it, falsely claiming (as they did whenever such incidents occurred) that the hold had been imposed as the result of historical conditions that no longer existed, such that the investigation posed no material threat to the Company's operations. ¶¶7, 53-54.

In April 2009, the Illinois Department of Children and Family Services ("DCFS") issued a scathing report following a nine-month investigation of the Company, in which it found that the conditions that caused it to impose the administrative hold at Riveredge still existed there and at numerous other PSI facilities around the country. ¶¶11-12; *see also* ¶¶76-78. Describing a "pattern of quality of care and patient safety problems," resulting from "longstanding and recurring clinical/ administrative failures," the report strongly chastised PSI, concluding that "problems in PSI facilities around the United States shows a corporate culture operating from one crisis to the next." ¶11. These disclosures caused a further 8% decline in the value of PSI stock, demonstrating – along with the other earlier declines caused by the partial disclosures in the media – the importance to investors of defendants' regular assurances about the safety and quality of PSI's operations. ¶¶206-213. Thereafter, additional incidents arising from PSI's failure to correct conditions like those described in the Riveredge report continued to come to light. ¶¶13, 147.

Defendants' Motion studiously avoids any direct discussion of the factual circumstances that gave rise to this action. Instead, defendants selectively attack some of the alleged misstatements made in connection with their rollup scheme by making blanket assertions that the statements are inactionable. Defendants' "divide and conquer" strategy is ultimately unavailing because the categorical attacks in their Motion fail to address the majority of the false statements and alleged misconduct pled in the Complaint, much less to analyze – or even properly identify – the statements they contend are inactionable.

## II. ARGUMENT

Even under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the well-pled factual allegations of the Complaint must be taken as true, and the plaintiff receives the benefit of all plausible inferences. Fed. R. Civ. P. 12(b)(6); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-322 (2007); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680, 682 (6th Cir. 2004). A complaint need only be pled with "enough factual matter (taken as true) to suggest that the alleged conduct occurred." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage." Hence, even after *Tellabs* and *Twombly*, a motion to dismiss is still not the time to engage in fact finding or weigh the evidence for and against a plaintiff's claims.[2]  *See Helwig*, 251 F.3d at 553, 558.

### A. Defendants Were Engaged in a Fraudulent Course of Conduct that Misled Investors About the Reasons for the Success and Purported Sustainability of Their Rollup Scheme

The securities laws make it unlawful for any person to, *inter alia*, "employ any device scheme or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person [] in connection with the purchase or sale of any security." Rule 10b-5(a),(c). The Supreme Court has repeatedly reaffirmed that the securities laws reach misleading conduct as well as misleading statements, so long as there is some mechanism by which that conduct misled investors. *Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158-59 (2008); *United States v. O'Hagan*, 521 U.S. 642, 656 (1997). In *Stoneridge*, the

---

[2]       In assessing the complaint, the court need only assure itself that the allegations are based on reliable sources of information such as the plaintiff's personal knowledge, a witness in the position to know the matters attributed to him, a defendant's public statements or admissions, or documents reflecting the company's internal operations. *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000). If that requirement is met, the Court must presume the truth of the allegations. Fed. R. Civ. P. 12(b)(6); *City of Monroe Employees Ret. Sys. v. Bridgestone*, 399 F.3d 651, 665 (6th Cir. 2005); *see also Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130 (6th Cir. 1995) (issues of credibility cannot be determined on the pleadings).

Court recognized that "[c]onduct itself can be deceptive," but refused to impose liability on a third-party actor because there was no showing that its deceptive acts had been relied upon by investors. 552 U.S. at 159. In *O'Hagan*, the Court imposed liability on an attorney who had profited on inside information he misappropriated from his law firm, recognizing that a fraud "'can be practiced on one person, with resultant harm to another.'" 521 U.S. at 656.

Here, investors were presented with financial data purporting to show PSI's ability to profitability operate its acquired hospitals according to the highest standards of care, without being told that the data had been generated by longstanding practices designed to underfund and understaff those facilities in a manner that exposed patients to the risk of harm and the Company to substantially increased risks of regulatory sanctions, rising malpractice claims, negative publicity, and lost income. Had investors known about these conditions, they would have recognized that PSI's rollup scheme was unsustainable, because it could not simultaneously fund proper operations at its hospitals, service the debt incurred to acquire them, and profitably grow its business.

Defendants material omission of these facts from their public statements about PSI's rollup strategy and operations provides the link that was missing in *Stoneridge*. As in *O'Hagan*, defendants could have escaped liability (to investors) by candidly disclosing the understaffing and other conditions giving rise to the improper care at its facilities. *See* 521 U.S. at 655. Because, they failed to do so, their deceit in understaffing PSI's facilities harmed members of the investing public and is actionable under Rule 10b-5, even if it was originally practiced on the patients who were injured and the regulators who were deceived as a result of defendants' actions. *O'Hagan*, 521 U.S. at 656.

The Complaint includes detailed allegations that PSI's rollup strategy operated as a fraud or deceit upon investors. ¶¶3-6, 28-31, 35.[3] Although defendants rollup strategy outwardly appeared to be a success, in reality it only appeared to be so because defendants had repeatedly cut hospital budgets and staff in an effort to show the sustained revenue growth and profitability it was using to assure investors of the long-term viability of their business strategy. *E.g.*, ¶¶35-42, 96-100, 102-105. The staffing and budget cuts had the deepest impact at PSI's longest-held facilities, like Riveredge, where opportunities for increased profitability through revenue growth or improved operational efficiency had been exhausted. *E.g.*, ¶¶35, 58. It is no mere coincidence that it is those facilities where most of the problems arose. *Id.*

Rather than staffing its hospitals and RTCs based on an assessment of the needs of the patients being treated and housed there, as required by state and federal law (*e.g.*, ¶42), PSI relied upon a simplistic and arcane formula based on the number of employees per occupied bed ("EPOB"). ¶¶39-40. To meet quarterly expectations for PSI's financial performance, defendants regularly ordered staffing cuts at PSI's hospitals based solely on the facility's EPOB ratio, which was closely monitored by PSI's top executives. ¶¶36-41. As a result of these cuts, staffing at PSI's hospitals was significantly lower than at hospitals run by its competitors, and its incidence of patient injuries, quality of care problems and regulatory violations was correspondingly higher.[4] ¶¶58-59,

---

[3] The key to a debt-based "rollup" strategy like that perpetrated here is the ability to use the larger organization's marketing abilities and economies of scale to increase business and efficiency at acquired facilities. The problem with any rollup strategy is that, eventually, the business can grow too big – older facilities no longer have opportunities to increase earnings through improved marketing and efficiency because those improvements have already been made, and growth from new acquisitions is limited by the overall size of the existing business in comparison to the number of new facilities that can be acquired. To assure investors that PSI had not reached this point, defendants repeatedly pointed to the Company's purported ability to improve revenues and earnings on an annual basis, particularly in facilities it had owned for more than a year. *E.g.*, ¶¶80, 82, 113, 115, 121, 123, 136,138.

[4] For example, an analysis of data from the California Office of Statewide Health Planning by *ProPublica* and the *Los Angeles Times* found that PSI's hospitals in that state "proportionally have fewer registered nurses than other private psychiatric facilities: about one for every four beds, compared with one for every two beds . . . . Overall, the PSI hospitals have about one-third fewer staffers per bed." ¶61. Meanwhile, the 10 hospitals PSI had owned the longest in

61.  Former PSI workers have described repeated staffing cuts which left the facilities in which they worked with insufficient staff to monitor or protect patients.  *E.g.*, ¶¶60, 62, 65.

PSI's severe cuts in hospital budgets and staff put thousands of children at risk, resulting in numerous physical and sexual assaults and suicide attempts at PSI facilities across the nation.  ¶¶13, 50-52, 56-57, 60, 64-66, 72.  The Complaint is replete with allegations describing repeated incidents of harm arising from such conditions – hospitals leaving sexual predators and physically aggressive patients unguarded even after past incidents of rapes and assaults on other children and teenagers being treated there (¶¶50, 52, 56, 64, 72); hospitals that left suicidal children unsupervised then falsified records purporting to show the patients had been under regular observation when they attempted to kill themselves (¶¶13, 56, 72); hospitals that were using powerful psychotropic drugs to control patients with violent tendencies, simply because they lacked sufficient staff to properly monitor and observe the patients (¶¶13, 52, 57); hospitals with repeated instances of violence, including riots by unsupervised patients (¶¶57, 65-66); hospitals that repeatedly failed to report serious incidents of violence or patient injuries to the proper authorities, and failed to cooperate with police and other investigations into such incidents (¶¶52, 55, 57); and hospitals (including Riveredge) that failed to correct violations even after they were uncovered (¶¶13, 55, 72).

These allegations are strikingly similar, though of course not identical, to those at issue in *In re America Service Group, Inc.*, No. 3:06-0323, slip op. (M.D. Tenn. Mar. 31, 2009) ("*ASG*") recently upheld by this Court.  In *ASG*, plaintiffs alleged that defendants, following a difficult quarter that had investors questioning the company's ability to profitability operate its prison healthcare clinics, set about to reduce expenses by refusing to provide medical care to inmates,

_____

that state "have compiled about twice as many patient-care deficiencies as 10 similar hospitals owned by it closest competitor," and nearly five times as many citations arising from the most serious deficiencies of patient care.  ¶58.

575554_1

thereby increasing their profit margins while concealing the rising patient injuries, malpractice claims and increased regulatory oversight caused by their widespread failures to provide adequate medical treatment to inmates. Here, plaintiffs allege that defendants, following a similarly difficult quarter, accelerated their practice of cutting budgets and staffing at psychiatric hospitals and RTCs to improve similar financial metrics in order to create the similarly misleading appearance of the success of their enterprise, while similarly concealing the facility understaffing and other conditions that gave rise to repeated incidents of patient neglect and abuse that similarly threatened the profitability and sustainability of their business.[5] *See, e.g.*, ¶¶1-13.

Recognizing the factual similarity of this action to *ASG*, defendants' Motion simply ignores that case, mentioning it only in a footnote where they attempt, without success, to distinguish it on grounds that *ASG* involved a restatement at one of the company's subsidiaries and corporate housecleaning in which the perpetrators of the fraud were fired. Mem. at 7 n.10. Here, however, the Complaint alleges similar accounting manipulations that, although not as extensive as those in *ASG*, were similarly designed to improve financial metrics that defendants then used to convince investors of the strength of their business model. ¶¶85-95; *see e.g.*, *ASG*, slip op. 53-54, 64. Unlike *ASG*, the manipulations here were directed from corporate headquarters. ¶¶88, 91; *cf. ASG*, slip op. at 18-24. Moreover, while the *ASG* defendants admitted their fraud, restated corporate financial results and ultimately fired the wrongdoers, here the Complaint alleges that defendants continued perpetrating their wrongful conduct in order to position the Company for a buyout that they hoped would earn them hundreds of millions of dollars just months after the Class Period ended. ¶¶13-15, 189-197.

---

[5] There are other striking similarities as well. In *ASG*, defendants' fraud was first revealed by *The New York Times*, though, as a result of defendants continued efforts to downplay and deny the truth of those articles, the full impact of that revelation was not felt by investors until the company reported annual results that revealed the financial impact of defendants' misconduct. *ASG*, slip op. at 26-28, 97. Here, the fraud was similarly first revealed by negative media reports defendants sought to disparage and downplay, thereby delaying the full impact on investors until, again, the Company reported annual results that revealed the financial consequences of their actions. ¶¶200-213.

This hardly provides grounds for distinguishing that case from this one, or concluding that similar reasons do not exist to permit this case to proceed to discovery.

## B. Defendants' Omissions of Material Facts About PSI's Operations Concealed Weaknesses in the Company's Rollup Scheme

To state a claim for securities fraud under Rule 10b-5(b), "'a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" *PR Diamonds*, 364 F.3d at 681. The securities laws proscribe both affirmatively false statements and statements that are rendered misleading by the omission of facts that create an impression of a state of affairs that differs in a material way from the one that actually exists. *Helwig*, 251 F.3d at 560-561. Like *ASG*, this case primarily arises from omissions. Considering the allegations here therefore necessarily requires an analysis of both the statements and the context in which they were made. *Bridgestone*, 399 F.3d at 672.

### 1. In Light of PSI's Undisclosed Understaffing and Patient Care Problems, Defendants' Claims About the High Quality of Its Care as Compared with Competitors Were Misleading

The DCFS report on Riveredge leaves no doubt that the quality of care at PSI's hospitals was far below industry standards of care during the Class Period. *E.g.*, ¶¶11-13, 77. After reviewing thousands of pages of medical records and incident reports at PSI facilities in Illinois and five other states, government investigators reached a "consistent set of findings" about the "poor quality of individual therapeutic services," including staff that were "often poorly trained and supervised for their jobs" leading to "negligent supervision" that caused "serious risks for patient safety." ¶77.

Nevertheless, defendants seek dismissal of this action on grounds that their statements that PSI provides "high quality" services are inactionable puffery. Mem. at 3, 17-19. Defendants' Motion is based on a single paragraph in the Complaint, ¶111, in which plaintiffs allege various grounds for inferring that defendants knew or recklessly disregarded that certain statements in PSI's

2007 Report on Form 10-K (which are specifically alleged in ¶¶106-110) would be misleading to investors.  The first bullet point in ¶111 references statements in the Form 10-K that PSI "provides higher quality care than [its] competitors," maintains "24-hour skilled nursing observation" and provides "intensive, highly-coordinated treatment" to its patients.  ¶111.  It appears that it is only these three statements that defendants contend should be dismissed as inactionable puffery.[6]

Even a cursory look at these statements reveals that they are specific factual statements – not the "'generalized statements of corporate optimism'" defendants claim them to be.  *Cf. In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).  Unlike the statements generally proclaiming a commitment to quality that were at issue in *Ford*, the statements challenged here are specific, objectively-verifiable statements of fact.  *See Bridgestone*, 399 F.3d at 671-72.

For example, the assertion that PSI is able to provide "higher quality care than [its] competitors," ¶106, is not just a general boast about the quality of PSI's services, but a specific claim that the care provided by PSI is objectively better than that provided by its competitors.  Defendants repeatedly claimed that PSI's high quality care provided it with a significant competitive advantage.[7] ¶¶33-34, 70.  As measured by the ratio of nurses to staff or the incidence of regulatory violations, however, the quality of care provided by PSI was objectively *worse* than that provided by its competitors.  ¶¶58, 61, 65.  Moreover, during the Class Period, PSI's operations were significantly *below* industry standards of care on six of the seven "core measurements" established for psychiatric hospitals by the Joint Commission – standards which PSI itself helped to develop, actively tracked

---

[6]  To the extent defendants seek, through their convenient use of a "*see, e.g.*" signal prefacing their reference to ¶111, dismissal of other specific quality allegations on grounds of puffery, their Motion is improper because it fails to provide plaintiffs with fair notice of their contentions.  Fed. R. Civ. P. 7(b).  Plaintiffs cannot respond to arguments that have not been made.

[7]  *E.g.*, ¶34 (touting, in Report on Form 10-K, PSI's "reputation for the quality of our services" that "differentiate[s] ourselves from the competition"); ¶33 (touting Company's rigorous due diligence review and ability to improve operations and expand services at acquired facilities); ¶70 ("The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments.").

575554_1

and told investors would provide an objective measurement of the quality of service it provided. ¶¶45, 74-75, 151, 154. These allegations preclude dismissal. *Bridgestone*, 399 F.3d at 674.

The assertions that PSI's hospitals maintain "24-hour skilled nursing observation" and provides "intensive, highly-coordinated treatment" to its patients are also objectively verifiable.[8] *Id.* (statements of opinion or "puffery" are actionable where "the proposition at issue can be proven or disproven using standard tools of evidence"). The Complaint alleges that round the clock observation was ***not*** being provided at numerous PSI hospitals where nursing and other staff had been cut below the level necessary to provide that care. Inadequate observation has been blamed for numerous incidents where patients have been raped, beaten or attempted suicide at PSI facilities around the country which lack adequate staffing to provide 24-hour nursing supervision. ¶¶13, 41, 48, 52, 56-57, 60-61, 64-66, 147. These allegations also preclude dismissal.

Finally, as the Sixth Circuit has recognized, "[t]he context of statements is often telling," and a statement that may be "'innocuous 'puffery'" in one context can in another become an "'integral part of a representation of material fact [] used to emphasize and induce reliance upon such a representation.'" *Bridgestone*, 399 F.3d at 672. Such is the case here. The statements in PSI's 2007 Form 10-K Report defendants seek to dismiss as inactionable puffery were all part of a larger section of the report (*see* ¶¶106-110) intended to convince investors of the strength and reliability of the Company's regulatory compliance and quality assurance programs, which were critical to the success of its rollup scheme, as well as its ability to manage and mitigate the significant risk of lost business and financial penalties arising from regulatory actions, malpractice claims and adverse

---

[8]  Defendants repeatedly boasted of PSI's ability to care for the most difficult and challenging psychiatric patients, telling investors that some of its facilities had even been able to increase occupancy rates by attracting patients from neighboring states, where the intensive level of care purportedly provided by PSI was not available. ¶34. Hence, contentions about PSI's ability to provide this level of care went to a key competitive advantage purportedly achieved by the Company, and were highly material to investors.

575554_1

publicity.  *E.g.*, ¶¶9, 33-34, 43; *see also infra* §II(B)(2), (4).  Defendants regularly told investors about the purported strength of those programs, particularly when responding to and attempting to falsely downplay media reports about patients raped, beaten and injured at inadequately staffed PSI facilities, and resultant license suspensions or other regulatory actions that threatened to jeopardize its business.  *See infra* §II(B)(3).  Under these circumstances, there is no basis for declaring that no reasonable investor could have attached importance to defendants' claims about the quality of PSI's operations, or dismissing those claims as inactionable puffery.  *Bridgestone*, 399 F.3d at 671-74.

### 2. Defendants' Statements About PSI's Compliance Similarly Omitted Material Facts Necessary to Make Them Not Misleading Under the Circumstances

As with their puffery argument, defendants' Motion claims arising from defendants' contentions about PSI's regulatory compliance is based on a single statement in the Company's 2007 Report on Form 10-K asserting that PSI's facilities were "in substantial compliance with current applicable, federal, state, local and independent review body regulations and standards."  Mem. at 14; *see* ¶¶107, 111.  Defendants assert no argument for dismissing claims arising from the other alleged misstatements in the Form 10-K.[9]

Contrary to defendants' assertion (Mem. at 15) that plaintiffs have not sufficiently described how PSI's conduct violated applicable laws, regulations, licensing requirements and standards, the Complaint describes specific, repeated violations of requirements governing facility staffing, incident reporting and medical record-keeping requirements.  Investigators repeatedly concluded that patient injuries had been caused by PSI's failure to provide sufficient numbers of nurses and other

---

[9]      The Complaint also alleges claims based on  statements falsely describing PSI's regulatory compliance program and the actions regularly taken to identify and correct existing or potential regulatory violations (¶¶108, 110), misleading statements about PSI's ability to "optimize" staffing ratios at acquired facilities without negatively impacting patient care (¶109), and an express representation that management was "not aware of any material pending or threatened investigations involving allegations of potential wrongdoing" at PSI facilities (¶108).  *See* ¶111.  Neither does the Motion direct itself to any other misstatement about regulatory compliance alleged in the Complaint, including the many recklessly false statements defendants made in response to media reports about patient injuries at and regulatory actions directed against PSI facilities in Illinois, California, Texas, Florida, Virginia and elsewhere.  *E.g.*, ¶¶46-63, 151-154.

trained staff to monitor the numerous physically and sexually aggressive and suicidal patients the

Company had admitted in its zeal to increase occupancy rates and revenues at its facilities.[10] ¶¶13,

41, 48, 52, 56-57, 60-66, 132, 147.

For example, at Riveredge, PSI was cited 22 times in 2007 alone for deficiencies that

threatened the safety or legal rights of patients, as compared with 31 citations for the other 12

hospitals in the state subject to the same licensing requirements. ¶51. "Surveys conducted by the

California Department of Health underscored repeated issues about understaffing, patient safety,

medication administration, poor supervision and staff training, and an array of serious quality of care

violations." ¶56. PSI facilities in California were cited 29 times between January 2005 and

June 2008 for the most serious deficiencies of licensing standards, as compared with just six

citations for its biggest competitor in the same period. ¶58. PSI's facilities in Texas were fined

$230,000 for regulatory and licensing violations in Texas in 2007, nearly as much as all the other

hospitals combined. ¶65.

These allegations are a far cry from the "unadorned conclusion" or "'blanket

characterization'" of illegality described in the Motion.[11] Mem. at 15. Nor does this case present

mere claims of "mismanagement" of the type barred by *Santa Fe Industries, Inc. v. Green*, 430 U.S.

---

[10]     The Riveredge report leaves no doubt that PSI's reliance on the "EPOB" ratio to the exclusion of other factors violated applicable regulatory and licensing requirements. ¶42. PSI's overuse of medication to drug patients who could not be properly watched – *i.e.,* "chemical restraints" – has also been cited as violating applicable requirements. *E.g.*, ¶¶13, 52. PSI has repeatedly been cited for failing to timely report incidents of violence by or against patients, in violation of regulatory requirements. *E.g.*, ¶¶52, 55.

[11]     Defendants mistakenly contend that the Complaint's allegation of falsity is premised on "only two occurrences" – a fine and a subpoena issued to the Riveredge outside of Chicago. Mem. at 15. Defendants' effort to set up such a straw man argument if of no avail. Plaintiffs' claim is not so limited, nor is it premised on any alleged failure by PSI to disclose that its Riveredge facility had received a subpoena from the DOJ or that its license was suspended. Rather, this action is premised on defendants' active concealment of the conditions that led to those regulatory actions – conditions which existed not just at Riveredge, but at scores of PSI facilities nationwide during the Class Period.

462 (1977).[12]  *See ASG*, slip op. at 71.  Plaintiffs' "real beef" is not with "the Company's decisions with respect to staffing ratios," Mem. at 13, but with defendants' active concealment of the business practices that resulted from those (and other) decisions.  It is one thing to understaff hospitals and tell investors you are doing so to increase profitability.  *See O'Hagan*, 521 U.S. at 655.  It is quite another altogether to actively conceal the understaffing, especially where, as here, you are continually boasting to investors about the competitive advantages you have attained by virtue of your ability to run hospitals more efficiently while improving the quality of care.  *Id.*

Neither is this case akin to *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997).  In *Sofamor*, the allegedly concealed risks were described in detail in an FDA warning letter issued early in the Class Period that "any analyst could easily obtain . . . [and] make an independent judgment of its significance."  *Id.* at 402.  Here, by contrast, the vast majority of the misconduct was concealed, and the detailed government report of the investigation of PSI reflecting widespread problems in its operations was not publicly available until after the Class Period ended.  Moreover, in *Sofamor* the defendant acknowledged – both prior to and during the Class Period – participating in the practices that were the subject of the warning letter, along with the potential significant impact of future regulatory action by the FDA.  *Id* at 397, 402.  Here, defendants denied understaffing PSI's clinics or engaging in other practices which exposed patients to harm, and claimed that the regulatory action at Riveredge was immaterial.[13]  Under these circumstances, *Sofamor* presents no

---

[12]        *Santa Fe* involved a claim akin to one for breach of fiduciary duty, where defendants were not alleged to have made any misleading statements or omissions to minority investors about the underlying short form merger.  430 U.S. at 474.  Here, plaintiffs' Complaint is replete with allegations about the conditions that were concealed from investors, as described above.  Accordingly, *Santa Fe* does not bar plaintiffs' claims.  *E.g.*, *Helwig*, 251 F.3d at 559-61; *Bridgestone*, 399 F.3d at 669-70; *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 895-97 (M.D. Tenn. 2005); *In re UNUMProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 885-92 (E.D. Tenn. 2005).

[13]        There are other distinguishing circumstances as well.  In *Sofamor*, plaintiffs relied almost entirely on the historical sales and earnings reports to give rise to a duty of disclosure.  123 F.3d at 401.  Here, PSI's historic results are just one of many factors giving rise to the duty.  *Infra* §B(4).  In *Sofamor*, [t]he hard fact" was that no regulatory action

bar to maintenance of this action. *Helwig*, 251 F.3d at 560; *ASG*, slip op. at 68-69; *see also Morse v. McWhorter*, 200 F. Supp. 2d 853, 860-61 (M.D. Tenn. 1998) (although defendants had no duty to opine as to the legality of company's business practices, plaintiffs had adequately alleged an actionable misstatement or omission where they also alleged defendants failed to disclose fact of those practices); *In re UNUMProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 887 (E.D. Tenn. 2005) (finding *Sofamor* inapplicable where Complaint alleged defendants made misleading statements about claims reserve practices, and attributed improved performance to factors other than reserve manipulation).

Moreover, *Sofamor* has been limited by subsequent Sixth Circuit authority, including *Helwig*, which is nowhere cited in defendants' brief. 251 F.3d at 560-61. Recognizing that "the protections for soft information end where speech begins," the Sixth Circuit in *Helwig* distinguished from *Sofamor's* ambit cases, like this one, arising principally from a defendants' misleading omissions of facts that contradicted or tended to undermine their positive public statements:

> If – as defendants contend – the protection for soft information remains intact even after a company speaks on an emerging issue, the speaker could choose which contingencies to expose and which to conceal. On any subject falling short of reasonable certainty, then, a company could offer a patchwork of honesty and omission. This proposition is untenable, however, both as a matter of policy and precedent.

*Id*.

It bears reiterating here that plaintiffs' claim is not simply that they were misled about PSI's compliance with applicable regulatory requirements and licensing standards. Rather, it is (a) defendants' concealment of the conditions which led to the violations of those requirements, together with (b) their repeated assertions about the Company's commitment to regulatory

---

was ever commenced against the Company based on the alleged misconduct. 123 F.3d at 402. Here, the Company was subject to repeated regulatory sanctions for violating applicable requirements affecting patient care.

compliance and quality care and the nature and effectiveness of the systems, controls and procedures they had implemented to detect and correct even the smallest problems before they turned into big ones, and (c) their repeated efforts to falsely deny, downplay and distract investors from reports of patient injuries and regulatory violations when they came to light, that (d) misled investors about the manner in which PSI had achieved the purported success of its rollup strategy, and the nature and magnitude of the risks to the continued profitability and sustainability of their enterprise. *Supra* §II(A). The misrepresentations about Riveredge help illustrate the point.

### 3. Defendants' Continuing Misrepresentations and Omissions About Conditions at Riveredge Illustrate the Manner in Which They Misled Investors

On July 17, 2008, the *Chicago Tribune* published an exposé on a pattern of violence at Riveredge, including a series of horrific fights and physical and sexual assaults at the facility which had been concealed from regulators and police investigators, leading the state to place an administrative hold on new patient admissions – a severe sanction that had been imposed just three times in the preceding four years. ¶¶3, 50-52. As would later be revealed by subsequent regulatory actions and investigative reports by other media organizations including *ProPublica*, the *Los Angeles Times*, and the *Dallas Morning News*, the problems described by the *Chicago Tribune* were not limited to Riveredge Hospital, but were symptomatic of conditions at numerous other PSI facilities.[14] ¶56-66, 132-33, 147.

---

[14] As this Court has previously recognized, newspaper accounts are sufficient basis on which to plead, if not prove, facts giving rise to a claim for securities fraud. *ASG*, slip op. at 91; *accord In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 80 (D. Del. 2002); *In re Air Disaster at Lockerbie*, 144 F.R.D. 613, 617 (E.D.N.Y. 1992); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). *In re Axis Capital Holdings, Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006), on which defendants rely, does not even address this issue. Here, the accounts by the *Chicago Tribune*, the *Dallas Morning News*, the *Los Angeles Times* and *ProPublica* are each based on exhaustive and detailed review and analysis of hundreds of individual incident reports, interviews with regulators, patients and employees, and other sources of information. Moreover, the accounts by journalists at these newspapers have been corroborated by numerous other sources alleged in the Complaint.

Just prior to the publication of the *Chicago Tribune* articles, which Jacobs and other defendants knew were coming, PSI fired Riveredge's CEO so that he could plausibly deny knowledge or responsibility for the incidents. ¶¶47, 53. Jacobs and the other defendants and PSI executives then set about convincing investors that the *Chicago Tribune* report was sensationalized and inaccurate, that any problems at Riveredge were long past, that the conditions that gave rise to those incidents had been corrected, that the incidents themselves were largely unpreventable given the type of patients treated by PSI, and that the hospital and PSI's other facilities had been and were fully in compliance with all regulatory and licensing requirements.[15] *E.g.*, ¶¶53-54, 124-127.

Contrary to Jacobs' representations, additional incidents of sexual and physical assaults attributed to the hospital's failure to provide adequate staffing or oversight of patients continued to occur thereafter, both at Riveredge and at PSI's other facilities. *E.g.*, ¶¶55, 131-133, 146. Despite the perpetuation of these conditions, defendants continued to repeat their false assurances whenever the topic of Riveredge came up. On an October 31, 2008 conference call, for example, Jacobs told investors that he "fe[lt] very good about the quality of care at Riveredge, and it's been reevaluated by numerous people since the admissions hold" was imposed. ¶140. Contrary to these assurances, at a September 10, 2008 meeting of PSI's Medical Executive Committee, senior executives had been told that "the hospital was close to being placed in immediate jeopardy" as a result of a follow up CMS survey, leading to "a significant amount of concern for the hospital's reputation within the

---

[15] Jacobs asserted, for example, that the incidents described by the newspaper had been previously reported to regulators and corrective measures implemented. ¶124. As a matter of practice, Jacobs said, PSI "thoroughly report[s] incidents to relevant agencies as soon as possible." ¶124. "[W]e are in compliance with those states on reporting," Jacobs told investors. ¶126. "We know when to report, how to report." *Id.* In fact, as the investigation by UIC and IDPH at Riveredge and subsequent media investigations elsewhere later revealed, PSI had *not* properly reported the incidents at Riveredge, and repeatedly had failed to timely or accurately report incidents that had arisen at other hospitals. ¶¶11-12, 76-78. Less than a week after Jacobs claimed that the incidents at Riveredge had been promptly reported, investigators uncovered yet another example of an incident at Riveredge that had gone unreported – the 2007 death of a pregnant patient who had collapsed and died after being overmedicated with clozapine, a powerful antipsychotic drug, at the hospital. ¶¶55, 133.

575554_1
Case 3:09-cv-00882   Document 114   Filed 08/19/10   Page 25 of 58 PageID #: 1673

community and the quality of care provided to patients." ¶146. As UIC and IDPH would later conclude: "such data indicates that Riveredge officials are still failing – even in the face of a critical IDPH finding as well as other forms of outside scrutiny – to ensure the hospital operates at minimally adequate standards of care." ¶133.

Defendants similarly misled investors about the status and financial impact of the admissions hold at Riveredge. In July 2008, Jacobs told investors that, because the problems at Riveredge were minor and had already been corrected, "we don't expect a material adverse financial impact from the admissions hold." ¶124. On October 31, 2008, Jacobs told investors that he was "80%" certain that the hold would be lifted before the end of the year. By then, however, additional follow up surveys in September and October 2008 had found that the conditions at Riveredge that had resulted in the administrative hold remained uncorrected, PSI had been warned the facility was in jeopardy of losing its license, and DCFS had widened its probe to encompass PSI's other facilities. ¶¶133, 141, 146. As a result, Jacobs had no reasonable basis to make such a prediction. It was not until the end of the Class Period that investors would learn the extent to which the administrative hold had increased the Company's expenses and resulted in lost business that, combined with steadily increasing malpractice expenses, had caused a shocking decline in the Company's financial performance leading to an immediate 35% drop in the value of PSI's stock. ¶¶9, 67-73, 200-213.

Investors were lulled into believing Jacobs' false assurances about conditions at Riveredge and elsewhere by his repeated claims about the Company's quality control programs, which he said were designed to detect even the smallest regulatory and quality of care problems before they could arise. ¶¶162-170; *see also* ¶¶43-45, 108, 110, 124, 126. "PSI captures incidents that you don't report," Jacobs told investors during the Company's 2Q08 conference call following the *Tribune* report. "[W]e are looking for minor incidents. We want to fix those so those don't become major

incidents. So for PSI, we capture much more than we actually have to report, but we do diligently report anything that an agency needs to see." ¶¶126, 169.

In fact, as the Riveredge report reveals, the Company was not committed to fixing or reporting incidents before they became public, or to providing the resources necessary to assure compliance with applicable regulatory, licensing and quality of care standards. ¶¶11, 78. "There is **compelling data** about the tendency of this organization's leadership to avoid taking direct responsibility for **longstanding and reoccurring clinical/ administrative fmailures** – in effect, placing the onus for the chronic quality of care problems downward: first, onto the hospital staff 'who do not perform their duties'; [and] second, onto mentally ill patients who 'refuse to comply with the rules.' *Id.*

Tellingly, the Motion ignores nearly all of the foregoing allegations. Defendants make no argument for dismissing plaintiffs' securities fraud claims arising from their fraudulent statements and omissions about conditions at Riveredge, even though those claims are specifically and exhaustively described in the Complaint. *See* ¶¶7, 119, 124-128, 130-133, 138-141, 146, 152-153. Nor do defendants make any argument for dismissing plaintiffs' claims arising from a similar pattern of falsely denying and disparaging the results of subsequent investigations by the *Los Angeles Times, Pro Publica* and the *Dallas Morning News* revealing widespread understaffing of PSI facilities leading to patient injuries and deaths in California, Texas and elsewhere. ¶¶62-66, 151-154.

### 4. Defendants' Deliberate Accounting Manipulations and Continuing Omissions Caused PSI's Financial Results to be Misleading

Employing an artful sleight of hand, defendants also ask the Court to dismiss claims arising from PSI's "statements of past earnings" because plaintiffs do not allege "that the reported staffing costs were inaccurate." Mem. at 12-13. But plaintiffs' claims arising from the Company's reported financial results are not limited to the staffing costs reported therein, nor can those statements be

- 19 -

read in isolation from the other statements defendants made about the staffing and quality of care provided at PSI's hospitals. *E.g.*, *Bridgestone*, 399 F.3d at 672.

As a threshold matter, plaintiffs allege that PSI's reported financial results were deliberately inflated by understating the Company's operating expenses as the result of an unsupported reduction in the Company's malpractice reserves that was taken at the outset of the Class Period to make it easier for the Company to achieve its financial targets during the Class Period. ¶¶84-95. Defendants make no effort to substantively confront these allegations, other than their mistaken contention that claims arising from their deliberate manipulation of the reserve account are barred by the safe harbor or lack particularity. *See infra* §C(2).

Plaintiffs allegations about the staffing costs included in PSI's financial results provide an additional reason for refusing to dismiss this aspect of their claims on the pleadings. Plaintiffs claim is not just that PSI was spending less than required on staffing its facilities. The Complaint alleges that the staffing and budget cuts were integral to defendants rollup scheme, because without them the Company could not earn a profit, or report the results that would provide investors with a misleading appearance that their business strategy was successful and sustainable. *E.g.*, ¶¶35-40. The Complaint makes clear that plaintiffs' claims in this regard are premised on the manner in which defendants used the historic staffing costs reported by PSI, together with revenues and earnings derived therefrom and the financial metrics PSI regularly reported about changes in same-facility revenues, earnings, and hospital occupancy rates, to conceal weaknesses in their rollup scheme. ¶¶99-100; *see also* ¶¶117, 134, 146.

At the outset of the Class Period, for example, PSI reported its 4Q07 results, revealing a 20% decline in same facility revenues that led some Wall Street analysts to become concerned that PSI's rollup scheme was nearing the end of its life cycle. ¶¶4, 102. To quell these fears, Jacobs repeatedly – and falsely – claimed that the Company had just run into some "bad luck" caused by isolated

575554_1

regulatory problems at a few of its facilities, touted the "continued strength of the PSI business model" and its "strong prospects for long-term profitable growth," and assured investors that there were no current conditions to suggest that the Company could not continue reporting growth in revenues and earnings for the foreseeable future. ¶¶80, 82, 102-104. To further assure investors of the health of PSI's business and the strength of its operations, defendants lowered the Company's malpractice reserves and announced plans to double its historic rate of expansion. ¶¶4, 80, 88. Thereafter, defendants continued to use the financial results achieved through its practice of underfunding and understaffing hospitals to tout the purported success and sustainability of their rollup enterprise.[16] ¶¶82, 113-115, 121-123, 136-138.

Hence it is not just that PSI was not spending enough to treat and protect its patients – it is the **combination** of the reported financial results and metrics together with defendants' repeated assertions about the manner in which it was operating its hospitals and the competitive advantages it had attained as a result of the high quality treatment offered there, that misled investors. *Id.* Allegations such as this are sufficient to state a claim for securities fraud. *ASG*, slip op. at 67-72; *see also UNUMProvident*, 396 F. Supp. 2d at 887.[17]

---

[16]    *See, e.g.*, ¶82 ("The continuing strength of the PSI business model is evident in the 27% growth in earnings per diluted share for the fourth quarter and 30% growth in earnings for the year. . . . We also benefitted from solid growth in same facility revenues of 6.5% for the year. True to our business model, this growth generated additional operating leverage, which we complemented through ongoing initiatives to improve productivity and efficiency in each facility. As a result we produced a new record for same facility EBITDA margin."); *see also* ¶¶113-115 (statements following 1Q08 that financial results and metrics demonstrate, *inter alia*, PSI's "proven business model," and "ongoing progress in operating [newly acquired] facilities more effectively"); ¶¶121-123 (similar statements after 2Q08 results); ¶¶136-138 (statements after 3Q08 results).

[17]    The facts of *UNUMProvident* are instructive: "Here, Glickenhaus has alleged Defendants conceived, instituted, and oversaw a claims handling strategy which was, at best, unethical and then both failed to credit this conduct as the cause of the company's success and knowingly failed to reflect the potential liabilities in the company's financial disclosures. Therefore, even assuming Defendants' alleged claims practices themselves constitute mere mismanagement, Glickenhaus has adequately alleged Defendants knowingly failed to account for the potential repercussions of those practices in its statements regarding the company's finances." *UNUMProvident* at, 396 F. Supp. 2d at 885-86.

## C. The Safe Harbor Does Not Bar Plaintiffs' Claims

The safe harbor offers protection only for those forward looking statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1). Statements that are not forward looking, as well as forward-looking statements made with actual knowledge of falsity that are unaccompanied by meaningful cautionary language, are not protected by the safe harbor. *Id*; *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). In addition, statements made in connection with a rollup transaction or which appear in a financial statement prepared in accordance with Generally Accepted Accounting Principles ("GAAP") are specifically excluded from the safe harbor. 15 U.S.C. §78u-5(b)(1)(D), (b)(2). Despite these limitations and exclusions, defendants contend that the safe harbor bars broad swaths of this action.[18] Mem. at 5-14.

### 1. The Safe Harbor Does Not Apply to Statements Made in Connection with Rollup Transactions or in Financial Statements Purportedly Prepared in Compliance with GAAP

The safe harbor "shall not apply to a forward looking statement – that is made with respect to the business or operations of the issuer, if the issuer . . . makes the forward-looking statement in connection with a rollup transaction." 15 U.S.C. §78u-5(b)(1)(D). Though the Complaint specifically pleads at ¶229(c) that the safe harbor is rendered inapplicable by this exclusion, the Motion ignores it. There can be no dispute that PSI was operating a rollup business. ¶¶2-3, 28-34, 80, 82, 121, 136; *see also* ¶28 (analyst calling PSI "among the more successful health care service roll-ups in recent memory"). Plainly, defendants statements about "loss reserves, earnings guidance and growth expectations" were intended to communicate to investors the growth and earnings they

---

[18]     As with other parts of their Motion, defendants' safe harbor argument is unsupported by any specific identification or discussion of the actual statements they ask the Court to dismiss on this ground. Instead, defendants lump various statements into broad groups ("forward-looking statements of loss reserves, earnings guidance, and growth expectations") and then – with a wave of the pen – claim that a few line of an SEC filing immunize their falsehood. Mem. at 5. A proper analysis requires an evaluation of the actual statement made.

could expect from PSI's rollup transactions. Mem. at 5. By its plain language, therefore, the statute precludes defendants from relying on the safe harbor to immunize these statements from liability. 15 U.S.C. 78u-5(b)(1)(D).

The safe harbor also expressly excludes from its protections any forward looking statements included in financial statements prepared in accordance with GAAP.[19] 15 U.S.C. §78u-5(b)(2). Though this exclusion is also specifically pled in the Complaint (¶229(d)), it is similarly ignored by the Motion. PSI's reserves for malpractice claims were reflected on the "other operating expense" line of the Company's financial statements included with its reports on Forms 10-K and 10-Q issued during the Class Period, and discussed in the Notes to those financial statements. ¶¶83, 86, 88-89, 116, 129, 143. Because those financial statements were purportedly prepared in accordance with GAAP, the safe harbor is unavailable to immunize defendants' misleading statements about PSI's loss reserves from liability.

2. **Even if the Safe Harbor Could Apply, It Would Not Insulate Defendants' Statements Regarding PSI's Malpractice Reserves from Liability**

PSI regularly reported and discussed the amount of money it had set aside to cover liabilities associated with medical malpractice and other lawsuits arising from negligent patient care at its facilities. ¶88. At the outset of the Class Period, defendants deliberately reduced the reserve account by $3 million to make it easier for the Company to meet financial expectations for its performance. ¶86. PSI's 2007 Report on Form 10-K falsely stated that the reserve account had been decreased due to "favorable developments in our professional and general liability experience." ¶88. At the time the reserve was reduced, the Company was at greater risk of malpractice claims due to

---

[19]     *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1007 (N.D. Cal. 2008) ("to the extent that any of the challenged statements were made in Forms 8-K or 10-K filed with the SEC, safe harbor does not apply") *accord*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 767-68 (2d Cir. 2010); *Baker v. MBNA Corp.*, No. 05-272 (GMS), 2007 WL 2009673 at *5 (D. Del. July 6, 2007); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 236 (S.D.N.Y. 2006); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1171 (N.D. Ill. 2004).

the number of injuries that were resulting from the widespread understaffing of its facilities.  ¶¶85-86, 90, 93-94.  The $3 million reduction in the reserve account was part of a larger $5 million reduction in other operating expenses during 4Q07 that increased the Company's earnings per share by $0.05.  ¶¶86-87.  Defendants obscured the reasons for the reduction in PSI's operating expenses.  ¶87.  This was not the first time that PSI had manipulated its operating expenses in an attempt to meet forecast guidance for its performance.  ¶¶94-95.

PSI's malpractice claims expenses steadily increased every quarter during the Class Period.  ¶91.  Despite this, PSI failed, in violation of GAAP, to increase its reserve account in any financial statement accompanying the reports it filed on Forms 10-Q during the Class Period.  ¶89, 92.  At the end of the Class Period, PSI increased its malpractice reserves by $5 million, reducing reported earnings by $0.05 per share.  ¶68.  Defendant Jacobs has admitted that PSI should have increased the reserve account earlier in the Class Period.  ¶¶91-92.

Without directly addressing the content of these allegations, defendants contend that claims arising from defendants' deliberate manipulation of PSI's reserve account must be dismissed under the safe harbor.  Mem. at 7-8.  Recognizing the futility of this argument, defendants also contend the allegations should be dismissed for lack of particularity.  Mem. at 9-10.  Neither contention has merit.

### a.    Allegations About Manipulation of Malpractice Reserves Are Sufficiently Particularized

Defendants' contention that the malpractice reserve allegations lack particularity is easily dispatched because their Motion ignores that this claim is based on the deliberate, and fraudulent, *reduction* in the reserve account at the outset of the Class Period.  This is not, as defendants attempt to describe it, a claim based on "the mere fact" that an increase in loss reserves was taken at the end

- 24 -

of the Class Period.[20]  The fraud here was in reducing the reserve account in the first place, lying about the reasons for doing so, and failing to correct the reduction in subsequent financial statements despite defendants' acknowledgment that the Company should have done so.  ¶¶85-93.

Hence, contrary to the Motion, the Complaint adequately specifies **when** the Company should have increased its reserves (at the outset of the Class Period, because the reserves should never have been reduced in the first place); the **amount** by which the reserve should have been increased (at least $3 million, the amount by which it was artificially reduced in PSI's 4Q07 financial statements); and **why** defendants knew the reserve was too low (because PSI's malpractice claims were not, in fact, decreasing, and there was therefore no basis for the reduction other than an attempt to improve reported performance).  ¶¶85-95.  The Complaint further specifies that the $3 million reduction should have been restored ratably during the Class Period, as defendant Jacobs **admitted** it should have: "That $0.05 [EPS hit as a result of the increase in malpractice reserves] that we took in – for the fourth quarter [of 2008], quite frankly, that was probably a build-up, that probably **should have been allocated one-fourth across all the quarters**."  ¶91.  These allegations are sufficiently particular.  *E.g.*, *UNUMProvident*, 396 F. Supp. 2d at 887-88.

### b.   The Malpractice Reserve Statements Are Not Forward-Looking

Plaintiffs' claims do not arise solely from the reported **amount** of the reserves, but also concern misleading statements defendants made **about** those reserves, including false reasons they gave for the reduction of loss reserves at the outset of the Class Period.  ¶¶87-89.  For example, in its

---

[20]     Neither *ASG*, *In re Kindred Healthcare Inc*. nor *Hess v. Am. Physicians Capital, Inc*., arose from a **reduction** in a reserve account, but instead arose solely from an end-of-period increase in reserves.  Mem. at 7-8; *see ASG*, slip op at 59 (analyzing "*ASG's* statements about its future exposure and its subsequent increase in reserves"); *Kindred*, 299 F. Supp 2d 724, 738 (W.D. Ky. 2004) (analyzing "statements [] made that *Kindred's* current reserves and liability coverage were adequate"); *Hess*, No. 05:04-cv-31, 2005 U.S. Dist. LEXIS 1162 (W.D. Mich. Jan. 11, 2005) (same).  Nor did any of these cases allege an admission by a defendant that the reserve account should have been increased in an earlier period than it was.

2007 Form 10-K, the Company attributed the reduction in reserves "primarily due to favorable developments in our professional and general liability experience." ¶88. In each of PSI's Reports on Form 10-Q issued during the Class Period, the Company reported that it had decreased its reserves, as reflected in the other operating expenses line item on its financial statement, "primarily [as] the result of reductions in risk management costs as a percent of revenue." ¶89. In fact, there had been no favorable developments or reductions in risk management costs. *E.g.*, ¶¶85-86, 91. These false statements of historical fact are not forward looking, and therefore not subject to safe harbor protection.[21] 15 U.S.C. §78u-5(i)(1)(A)-(D).

**c.      PSI's Malpractice Reserves Were Not Accompanied by Meaningful Cautionary Language**

Even where a statement is forward-looking and within the scope of the safe harbor, the statute provides no protection unless the statement is identified as a forward looking statement and accompanied by ***meaningful*** cautionary language. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749-50 (S.D. Ohio 2006); *see, e.g.*, *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004) ("vague and insipid cautionary language is insufficient to afford the statements protection under PSLRA's safe harbor provision").

Defendants' Motion is based on cautionary language which purports to warn investors that PSI's accrual for malpractice claims "could be significantly affected should current and future occurrences differ from historical claim trends and expectations." Mem. at 8. Defendants appear to contend that, by warning investors that "current" occurrences might differ, they were essentially warning investors that current conditions were markedly different from what one would surmise

---

[21]      *See e.g. Fidel v. AK Steel Holding Corp.*, No. C-1-00-320, No. 2002 U.S. Dist. LEXIS 18887, at *58-*59 (S.D. Ohio Sept. 19, 2002) (statement that a proposed merger was "in the best interest of . . . stockholders" "plainly relate[] to past or current, rather than future, performance"); *In re Humana, Inc. Sec. Litig.*, 3:08CV-00162-JHM, No. 2009 U.S. Dist. LEXIS 53535, at *31 (W.D. Ky. June 15, 2009) (statement "Our rigorous benefit expense trend analysis and forecasting includes regular interaction of many disciplines within our organization, this increases the reliability of our commercial pricing and profit planning" held not forward-looking).

575554_1

based on the amount of the reserve. Not only is this a nonsensical (or at least deeply cynical) interpretation, it is one which takes defendants wholly out of the statute, for it admits that the misrepresentation is one about current, rather than future, occurrences. "As a matter of policy and precedent," however, such false cautionary language cannot immunize defendants' misconduct. *Helwig*, 251 F.3d at 560-61; *Miller*, 346 F.3d at 681.

The cited cautionary language fails for another reason as well – a warning that an event might occur in the future is never sufficient where the event has already occurred.[22]  Here, the Complaint alleges, based on defendants own description of events, that malpractice claims were "steadily rising" throughout 2008 with the result that the reserve account "should have been allocated" ratably across all four quarters during the Class Period. ¶¶91-92. Hence, the warning that the reserve "*could be* significantly affected" was insufficient because the reserve already *was* affected at the time those warnings were issued.

Finally, "[c]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Helwig*, 251 F.3d at 559. "[G]eneral" cautionary language which "fails to disclose the 'actual risks' known by the Company" is insufficient. *First Energy*, 316 F. Supp. 2d at 596.  The cited warnings here fail to meet these requirements. Defendants make the absurdly simple argument that they warned that reserves might need to be raised, and – lo and behold – they were raised, as if that ends the argument without any need to discuss the *reasons* for the increase in reserves or whether they had warned investors of the events that had led them to raise the reserves. Defendants offer no substantive analysis of their

---

[22]       *Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053, at *56 (S.D.N.Y. May 11, 2010) ("general statements that loan losses and securities impairments 'could be affected by market risks and were subject to change,'" was insufficient to insulate defendants from liability for knowing misstatements and omissions about inadequate loan loss reserves); *see also In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

cautionary language, nor does the cautionary language itself purport to identify the "important factors" that could cause malpractice claims to rise significantly above historic levels, as required to invoke the safe harbor.[23]  *E.g.*, *Helwig*, 251 F.2d at 559.  Hence, the warnings are inadequate.

### 3. Under the Circumstances of This Case, PSI's Financial Guidance is Not Protected by the Safe Harbor

Although financial guidance is ordinarily within the ambit of the safe harbor, the Complaint here alleges sufficient grounds – in addition to the fact that the guidance concerns rollup transactions – for concluding that the statute provides no protection here.  First, the guidance PSI issued during the Class Period was based in part on the deliberately understated malpractice reserves.  ¶67; *see also* ¶¶9, 80, 113, 138.  As defendants had no reasonable basis for the reduction in the reserve account, they had no reasonable basis to believe that the financial results premised on reduced spending on malpractice claims were attainable.  Second, defendants have admitted that by the time PSI reaffirmed its guidance on October 30, 2008 (¶136), if not earlier, they were aware of weakening volume and general softness in the market that was negatively impacting the Company's financial results.  ¶145; *see also* ¶70 (describing "a softening in the census, starting in October, across the board"); ¶71 ("the surprise to us in the fourth quarter was October").  These allegations are sufficient to meet the actual knowledge requirement.  *See, e.g.*, *Helwig*, 251 F.3d at 558.

In addition, by October, the Company was already subject to increasing expenses associated with the Riveredge investigation – another factor which it later admitted had caused PSI to miss its forecast guidance.  ¶¶67-68, 145-146.  Though defendants claimed they warned investors that results

---

[23]    Neither *Miller* nor *Humana* present circumstances similar to this case, because both involved comprehensive cautionary language which – unlike that employed by PSI – actually addressed the specific **factors** that could cause results to materially differ.  For instance, in *Miller*, the defendant corporation warned that "housing stocks in general have underperformed the markets in 1999" and that "in certain regions we see too many retail locations, suggesting an oversupply of retail inventory of homes in that region."  346 at 677-78.  In *Humana*, the court quoted a page of specific and detailed risk factors.  2009 U.S. Dist. LEXIS 53535, at *13-*14; *Miller* F.3d at 677-78.  Moreover, neither *Miller* nor *Humana* address risks like those present here which had already materialized when the warnings were given.

could differ due to general "risks inherent to the health care industry" or PSI's "ability to comply with licensure and accreditation requirements" and "laws and government regulations," none of these warnings were sufficiently specific or certain to alert investors of the significant impact associated with Riveredge. The other warnings quoted in defendants' brief are similarly vague and insufficient, as they warn only of "possible" investigations resulting from actions taken against "other companies" or media reports "on the hospital industry." *See* Mem. at 16. Such warnings of potential future actions say nothing about the risks of on-going investigations, like that arising from conditions at Riveredge. *Helwig*, 251 F.3d at 559; *Slayton* 604 F.3d at 772. In fact, when they reaffirmed PSI's guidance at the end of October, defendants told investors that the costs associated with the Riveredge investigation were already largely ***behind*** the Company, and that the guidance they gave included all the reasonably expected additional expenses they expected PSI to incur as a result of the investigation. ¶¶138-139. Under these circumstances the risk warnings were insufficient. *See, e.g.*, *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

Finally, defendants, citing *Miller*, incorrectly assert that "settled law" immunizes their failure to warn of a known specific litigation risk. While *Miller* states that a corporation "is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk" the requisite level of detail in a risk disclosure is a fact specific inquiry. *See Helwig*, 251 F.3d at 554, 562-63. *Miller* does not arise from or analyze any cautionary language relating to the risk of litigation, much less hold that, in circumstances like the case at bar, risks attendant to on-going regulatory actions do not have to be specifically disclosed. *Slayton* offers a much closer factual parallel. There, the Second Circuit held that the corporate defendant "knew of the major and specific risk . . . yet did not warn of it." *Slayton*, 604 F.3d at 770. The court in *Slayton* pointed to the generalized risk disclosure (like those present here) and noted that as the risk evolved, the cautionary

language stayed the same.[24] "The consistency of the defendants' language over time despite the new information they received . . . belies any contention that the cautionary language was 'tailored to the specific future projection.'" *Id.* at 773.

### 4. The Safe Harbor Does Not Protect Defendant's Statements About Same-Facility Growth

Defendants next claim that "statements of same-facility growth expectations" are forward-looking statements immunized by the safe harbor. Though defendants base their Motion on ¶102 of the Complaint, that paragraph is not just about same facility forecasts. To the contrary, as that paragraph makes abundantly clear, plaintiffs' claim is based on the overall manner in which defendants misled investors about the Company's rollup scheme. While PSI's same facility forecasts ***and results*** (which, of course, are not forward looking) were an important part of defendants' scheme to conceal the true nature of their rollup activities, that data was far from the only part. *See* ¶102; *see also* ¶¶84, 103-105.

Defendants fail to discuss or analyze either ¶102 or the specific statements referenced therein about the purported strength of PSI's business model, as alleged in ¶¶80, 82. Defendants assertion that claims arising in part from same facility forecasts must be dismissed because the Company purportedly met its same facility forecasts is legally and factually irrelevant to the foregoing allegations. It is the practices which were concealed from investors that caused their losses, in the form of rising malpractice claims, lost business, and increased regulatory and compliance expenses that caused the Company's financial performance to suffer and its stock price to decline. ¶¶200-213. In the face of these dire consequences, and the numerous injuries to patients

---

[24]     Significantly, although the Riveredge investigation developed and expanded throughout the Class Period, PSI's risk warnings never changed. Compare 2007 Forms 10-K at 18, 1Q08 10-Q at 15; 2Q08 10-Q at 18; 3Q08 10-Q at 18. In fact, defendants' brief cites to warnings in their 2007 10-K, which make reference to "unforeseen . . . legal actions by patients and others" and the Company's "ability to comply with . . . regulations related to . . . licensure." Mem. at 11, citing 2007 Form 10-K. Clearly, the legal actions at Riveredge were not unforeseen at the time defendants gave the false guidance alleged in the Complaint.

575554_1

that occurred as a result of defendants deliberate understaffing and underfunding of PSI's hospitals, the Company's claim that it managed through these practices to squeak out an improvement in same facility results is a Pyrrhic victory indeed, and one which provides no basis to dismiss this case before discovery.

### D. The Complaint Pleads a Strong Inference of Scienter

To establish scienter at this stage, plaintiffs must plead facts sufficient to raise a "strong inference" that each of the defendants was reckless to the falsity of the alleged statements at the time they were made. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* In considering whether plaintiffs have pled facts sufficient to raise a strong inference of recklessness, courts must consider the totality of circumstances pled in the complaint. *Tellabs*, 551 U.S. at 321-22; *accord PR Diamonds*, 364 F.3d at 428. A complaint will survive "if a reasonable person would deem the inference of scienter cogent and ***at least as*** compelling as any opposing inference one could draw from the facts alleged." *Id.* 23-24. "This necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept." *Helwig*, 251 F.3d at 551. The Court cannot, as defendants attempt here, treat each paragraph of the Complaint as independent of the others in order to isolate individual allegations and explain why each on its own is inadequate. *Tellabs*, 551 U.S. at 321-22.

When the allegations at issue here are considered collectively and holistically with the other allegations in the Complaint in the manner required by *Tellabs*, there is no question but that the

inferences of scienter arising therefrom are sufficiently strong to permit this case to proceed to discovery.[25]

### 1.  The Pervasiveness of PSI's Misconduct Supports Scienter

It is inconceivable that Defendants were unaware of the widespread patient safety and quality of care issues described in the Complaint.  ¶11.  The number and nature of these violations of regulatory and licensing standards governing facility staffing, medical record-keeping and incident reporting, repeated at numerous PSI facilities nationwide, and the recurring instances of similar harm to patients that resulted from these practices, alone negates any inference that defendants were unaware of the conditions that Plaintiffs allege were concealed from investors.  The extent of this misconduct is also sufficient to support the inference that these violations resulted from corporate policies, procedures and a culture of indifference.  The nature and extent of these violations would make any competing inference that the violations are isolated, unrelated occurrences much less cogent and compelling, such that it cannot be credited at this stage.  *Tellabs*, 551 U.S. at 323-24; *Twombly*, 550 U.S. at 556.  Indeed, any attempt to reach such an inference would be negated by the findings of the government and media investigations into PSI's practices, all of which are extensively described in the Complaint and corroborated by plaintiffs' own investigation.[26]  ¶¶7-8,

---

[25]     The Complaint contains numerous interlocking and detailed allegations that cumulatively support a strong inference of scienter, including allegations describing: (i) that defendants had contemporaneous knowledge contradicting or undermining their statements about conditions at Riveredge and the adequacy of PSI's malpractice reserves to investors (*e.g.*, *supra* §§II(B)(3),(c)(2)); (ii) the pervasiveness of the hidden conditions at PSI's facilities; (iii) defendants' assertions that they were actively monitoring those conditions, along with the business conditions that required them to do so; (iv) the active concealment of fraudulent activities; and (v) the millions in dollars defendants earned as the result of well-timed stock sales and bonuses based on the Company's financial performance, as well as the hundreds of millions more they stood to earn by propping up the rollup scheme long enough for PSI to position itself as an attractive acquisition target.  *See* ¶¶157-161.  These allegations are among the "fixed constellations of facts" that the Sixth Circuit has found probative of securities fraud.  *Helwig*, 251 F.3d at 551-52.  The *Helwig* list is a starting point, not a mechanical checklist.  *Id.*  ("[W]e cannot disregard any set of facts as insufficient as a matter of law. . . . Other cases will allege different facts with possibly different results.").

[26]     The joint findings of DCFS and UIC following the investigation of PSI's practices in Illinois, California, Texas, Florida, Virginia, North Carolina and elsewhere drive home this point.  ¶¶11, 76-77.  The DCFS findings, corroborated by numerous specific examples pled in the Complaint of quality of care and patient safety problems that arose before,

11-13, 50-52, 55-66, 72, 76-78. Detailed allegations like these describing a failure to disclose such improper business practices are actionable. *ASG*, slip op. at 72; *Morse v. McWhorter*, 200 F. Supp. 2d 853, 861 (M.D. Tenn. 1998), *vacated on o.g.* 290 F.3d 795 (6th Cir. 2000).

Seeking to dodge these allegations, defendants incorrectly contend that the incidents "mostly occurred well before the class period and, thus, have no bearing on Defendants' scienter during the class period." Mem. at 21. Initially, defendants are incorrect that the incidents mostly predate the Class Period, as the Complaint specifically details many incidents that occurred in 2008 and later years. ¶¶13, 41, 52, 147. More fundamentally, the incidents which occurred before the Class Period arose from the widespread understaffing of PSI hospitals that plaintiffs allege remained concealed, and continued to exist, during the Class Period. *E.g.*, ¶¶77-78, 131-133, 146. Given the continuing nature of the alleged misconduct (indeed, plaintiffs allege it had been continuing for several years prior to the Class Period as an integral part of defendants' rollup scheme), the conditions that existed before and after the Class Period are plainly probative of the conditions that existed (and were concealed) during the Class Period, and, by extension, defendants' knowledge of those conditions. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period data can "confirm what a defendant should have known during the class period"); *Zehman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (pre-class period events contribute to the creation of an inference of scienter). *Impac* does not support the *per se* rule advanced by defendants that pre-Class Period misconduct is irrelevant. *Sharenow v. Impac Mortg. Holdings, Inc*., No. 09-55533, 2010 U.S. App. LEXIS 13279 (9th Cir. Cal. June 29, 2010). There, unlike here, the plaintiff had failed to

---

during and after the Class Period, provide a cogent and compelling basis for the Court to find that the requisite strong inference of scienter has been adequately pled here.

tie pre-Class Period accounting violations to any misconduct that occurred during the Class Period. *Id.* at *5.

### a. Defendants Admissions Establish Their Contemporaneous Knowledge of PSI's Numerous Regulatory Violations and Quality of Care Problems

Defendants' repeated assertions that they were directly and closely involved in monitoring quality and compliance issues at each of PSI's hospitals and RTCs, together with the number and nature of violations at those facilities, as described above, further demonstrates that a strong inference of scienter has been pled here. *PR Diamonds*, 364 F.3d at 688 (noting strong inference arising in *Telxon*, where company "touted the Individual Defendants' careful monitoring of the very areas in which Intrenet committed accounting violations"; *ASG*, slip op. at 83-84; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs II*") (finding it "exceedingly unlikely" the defendant CEO was unaware of problems facing the company's key product).

Defendants' own statements and conduct establish, beyond doubt at this stage, that they had direct personal knowledge of and involvement in the activities which were concealed from investors, and either knew, or were reckless in not knowing, about the understaffing of PSI's hospitals, the resulting harm to patients, and the other conditions that were concealed from investors. ¶¶162-170. Jacobs went out of his way to assure investors that he was directly and "personally involved" in, and ultimately responsible for, quality and compliance issues. ¶¶163, 167, 169. Jacobs told investors that he had personally overseen the hiring of new employees to help the Company maintain compliance. ¶169. "[I]t's top of mind for me," he said. *Id.* The Company repeatedly boasted about the nature and extent of its compliance and quality monitoring programs, telling investors they "capture[d] incidents that you don't report, that we are looking for minor incidents . . . to fix those so those don't become major incidents." ¶169. Jacobs acknowledgment that he had advance

575554_1

knowledge of specific incidents of quality and compliance deficiencies before they came to light, including media reports like those published in the *Chicago Tribune*, *ProPublica*, *Los Angeles Times* and *Dallas Morning News*, and regularly commenced damage control measures even before those incidents were publicly revealed.  ¶¶47, 53.  Allegations such as these provide strong evidence for finding scienter adequately pled at this stage of the proceedings.[27]

In addition, PSI told investors it regularly monitored standardized performance measures which, as revealed after the Class Period, showed that PSI's facilities were operating well below national standards of care.  ¶¶43, 45, 74-75.  PSI's Report on Form 10-K told investors that Company management had spent "substantial time and effort on compliance measures," and would continue to do so.  ¶108.  PSI's executive vice president, quality and compliance, Kathy Bollmer ("Bollmer") oversaw a staff of 35 employees responsible for risk management and quality compliance.  ¶¶44, 167.  Bollmer reported directly to CEO Jacobs as well as two members of the Board of Directors, Bill Petrie and Ed Wissing, who were responsible for reviewing incident and whistleblower reports affecting compliance and quality issues.  ¶¶44, 167.  The Company, Jacobs said, tracked "multiple indicators" of quality and compliance in "real-time," even minor incidents and "real-time incidents that ***might*** be occurring."  ¶¶167, 169.

The Company's regulatory filings reinforced these statements, telling investors that "services provided at each inpatient facility are continually assessed and monitored through an ongoing quality improvement program" and that PSI's "compliance program establishes mechanisms to aid in the identification and correction of any ***actual or perceived*** violations of any of our policies or procedures or any other applicable rules and regulations."  ¶¶108, 110.  Defendants also claimed to

---

[27] *E.g.*, *Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91-92 (1st Cir. 2008) (executive defendant who acted as "point person" on important company product "would presumably have been aware of the status of the company's 'ongoing monitoring'" of the product).

575554_1

have extensive experience in the healthcare industry and knowledge about regulatory and facility licensing requirements, standards and conditions. ¶¶22-24, 108, 171-174. The Complaint includes detailed allegations of specific meetings attended and reports received by defendants and other senior executives, which bolster and corroborate the allegations that they recklessly disregarded conditions at PSI's facilities. ¶177. Jacobs "was pretty close to everything," said one former PSI employee who worked directly with the CEO. Jacobs, former employees said, did not manage by delegation – "If you had something that surfaced, he'd pick up the phone and ask questions." ¶175. Defendants' regular receipt of information, when considered in combination with the other scienter allegations, plainly adds additional support for a strong inference of recklessness.[28]

The Sarbanes-Oxley" certifications signed by Jacobs and Polson establishes that they were aware of the rising malpractice expenses and declining staffing levels and budgets, the increasing costs of the regulatory investigations at Riveredge and elsewhere, and other Class Period "red flags" thereby also lending additional support to a strong inference of scienter. *E.g.*, *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2006 U.S. Dist. LEXIS 40548, at *21-*22 (W.D. Mo. June 19, 2006); *see also ASG*, slip op. at 66 (SOX certifications, accompanied by allegations showing involvement in concealed conditions and participation in regular meetings, held sufficient).

---

[28] *E.g.*, *Cardinal Health*, 426 F. Supp. 2d at 724 ("Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations or omissions pertain to 'central, day-to-day operational matters.'"); *In re Ancor Commc'ns*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("'Facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.'"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (finding it "reasonable to infer that the [defendant company's] executives' detail-oriented management style," including the CEO's statement that he "'love[d] getting involved in every detail of the business,'" caused defendants to become aware of the alleged fraud); *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (unlike "[g]eneral allegations of defendants 'hands-on' management style, . . . specific admissions by top executives that they are involved in every detail of the company" support a strong inference of scienter); *cf. PR Diamonds*, 364 F.3d at 687-88 (declining to infer scienter from corporate responsibilities where "it [could] not be said that the alleged misrepresentations or omissions pertained to central, day-to-day operational matters").

575554_1

### b.    Defendants Intense Focus on and Pressure to Control Staffing Costs Further Supports Scienter

The Complaint alleges how defendants were under enormous pressure to control staffing costs to meet forecast financial results in order to prevent weaknesses in PSI's rollup scheme from being revealed, and therefore exerted great influence over staffing levels at each of PSI's hospitals and RTCs.  ¶¶29-42.  The critical importance of staffing expenditures to the Company's financial success, along with defendants' active and involved management of the operation of each of PSI's inpatient facilities and Jacobs' unusually powerful position as both CEO **and** Chairman of the Company's Board of Directors (¶22) lends further support for a strong inference of scienter.[29]

Following the Company's 4Q07 financial results, when weakening growth and declining same-facility results threatened to reveal weaknesses in PSI's rollup scheme, the pressure on defendants intensified, providing them with an even stronger incentive at the outset of the Class Period to engage in and conceal the understaffing, compliance and quality issues which would have revealed the significant difficulties the Company was having in managing and profitably operating the extraordinary number of facilities it had acquired in recent years.  ¶¶4, 102.

These are not "generic" allegations, as defendants suggest.  The allegations here are detailed and specific, and are based on numerous corroborating sources of information, including information obtained from former PSI employees who witnessed first hand how defendants exerted control over staffing levels and other critical aspects of the Company's operations.  Corporate executives dictated staffing cuts necessary to achieve financial targets, and constantly monitored facility occupancy rates so they could order staff to be cut as soon as occupancy rates fell.  ¶¶37-38.  Whenever new facilities

---

[29]    *ASG*, slip op. at 89; *see also PR Diamonds*, 364 F.3d at 688 (unusual pressures to make public statements reflecting positive performance support strong inference of scienter); *In re Cardinal Health*, 426 F. Supp. 2d at 726-27 (pressure to demonstrate revenue growth to showcase purported success of change to new business model raises a strong inference of scienter); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028 (N.D. Ohio 2000) (pressure to reduce reported costs to satisfy investor expectations provides motive for fraud).

were acquired, PSI immediately and drastically cut staffing levels, impacting the hospital's ability to care for patients. ¶¶41, 42, 59-60, 62. The longer PSI owned a facility, the more pressure it put on hospitals to make even more dramatic staffing cuts. ¶¶35-39, 56, 58. This pressure to cut staff intensified even while the Company was demanding that hospitals increase occupancy rates in order to generate the increased revenues needed to fuel the rollup scheme. ¶¶36-37.

Facility occupancy (or "census") rates drove PSI's decision making. ¶176. Jacobs prominently displayed a 38-inch TV screen in his office, which he used to constantly monitor the Company's "Ten Worst" hospitals – as determined by comparing their projected to actual occupancy rates. *Id*. Jacobs sent weekly emails to hospital administrators, division presidents and other senior executives listing the Ten Worst hospitals – putting enormous pressure on facilities to increase occupancy to stay off that list, whether or not there were sufficient staff available to handle the increased patient load. ¶176. Numerous hospital executives have reported being under constant pressure from corporate headquarters to reduce staffing to meet financial targets. ¶¶39, 56.

Both Turner and Polson oversaw PSI's annual budget process, which focused extensive attention to staffing levels and budgets for each hospital and RTC. ¶¶23-24, 36-37. During the annual budgeting process, PSI's corporate headquarters established staff-to-patient ratios at each hospital which consistently required staffing levels to be reduced year-after-year in order to meet the Company's profit and revenue targets. ¶37. PSI's corporate headquarters closely monitored facility staffing throughout the year, immediately ordering hospital executives to cut staff whenever the number of occupied beds decreased, regardless of the needs of the patients still housed there. ¶¶38-39. These allegations, too, lend support for scienter. *Supra*, notes 28-30.

### 2. PSI's Concealment of Illegal Conduct Lends Further Support for Scienter

The Complaint describes recurring failures by PSI to comply with regulatory reporting requirements, including repeated instances in which PSI sought to conceal patient deaths or injuries

caused by the Company's failure to provide adequate numbers of staff in its hospitals or other regulatory and licensing deficiencies in its operations. *E.g.*, ¶¶11, 52, 55, 77. The Complaint also describes how defendants have been able to avoid the imposition of regulatory sanctions by well-timed deals with local politicians. ¶¶148-149. In addition, the Complaint recounts several instances in which the Company is alleged to have retaliated against whistleblowers who brought concerns with facility understaffing and patient mistreatment to light. ¶¶178-180.

Defendants deliberately ignore the allegations about their recurring failures to comply with regulatory reporting requirements in their scienter analysis, focusing only on the allegations of whistleblower retaliation, which they contend "have no bearing on the [] scienter calculus" because two of the whistleblower claims arose prior to the Class Period, and, apparently, because two of the claims were dismissed in other proceedings. Mem. at 25. Defendants are incorrect. Pre-class period events are relevant, *e.g.*, *Scholastic Corp.*, 252 F.3d at 72, and, it should go without saying that the Court cannot reach the merits of the whistleblower actions at this stage, regardless of the outcome of another proceeding.[30] *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. Ohio 2009) ("Rule 12(b)(6), besides some minor exceptions, does not permit courts to consider evidence extrinsic to the pleadings."); *Saddle Rock Partners v. Hiatt*, No. 95-2326 GA, No. 95-2326 GA, 1996 U.S. Dist. LEXIS 20649, at *23 (W.D. Tenn. Mar. 26, 1996) ("Defendants' contention introduces a factual question beyond the complaint, inappropriate for consideration upon a motion to dismiss.").

---

[30] The summary materials in Exhibit G to the Motion are not properly considered at this stage. *Tackett*, 561 F.3d at 487. Even if such materials could be considered, nothing in the scant record submitted by defendants would permit the Court to discern the basis for dismissal of the whistleblower action, much less to conclude that the underlying facts about understaffing and patient injuries could not be proved. To the contrary, it appears from the materials submitted that the actions were dismissed because, *inter alia*, the employees failed to exhaust administrative remedies, timely move to amend, or meet statutory conditions precedent to their claims.

3. **Defendants' Deliberate Manipulation of Accounting Reserves to Improve Financial Results Strengthens the Scienter Inference**

At the outset of the Class Period, defendants deliberately lowered PSI's malpractice reserves without any basis to do so, simply because they wanted to make it easier for the Company to meet its financial targets during the Class Period. ¶¶85-95; *supra* §II(C)(2). By doing so, defendants were able to conceal the true extent of risks to PSI's operations arising from the Company's understaffing of its hospitals and RTCs, thereby perpetuating its misleading rollup scheme and rendering statements about the quality of care provided and the regulatory and licensing compliance of its facilities false by omission. *Id.* These allegations provide additional support for finding a strong inference of scienter has been pled. *E.g.*, *Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *4 (N.D. Cal. Nov. 17, 2005) ("Many decades of experience teach that sham transactions like the one alleged are not done for the fun of it – they are done to cook the books."); *McKesson*, 126 F. Supp. 2d at 1272-73 ("books do not cook themselves"). The strength of these inferences is increased by the well-pled allegations in ¶¶94-95 that defendants had used similar accounting manipulations in the past to similarly inflate earnings.[31] ¶¶94-95. *See also In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574 (D.N.J. 2001) (scienter established where defendants repeatedly inflated financial results in order to meet earnings targets they had established); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1190 (D. Nev. 2009) (repetitive GAAP violations "lend to an overall inference of scienter.").

---

[31]  The Complaint specifically describes, based on information obtained from a former PSI employee that is corroborated by data in the Company's prior financial statements, how PSI had similarly manipulated its accounting for malpractice reserves at the end of 2005 in order to improve financial results. ¶¶94-95. The witness was clearly in a position to know and recall this incident, because s/he stood to gain a substantial bonus which the Company refused to pay based on the fact that the profit which entitled the witness to the bonus had come from accounting changes rather than performance. *Id.*

575554_1

Defendants ignore these allegations in their scienter analysis, apparently under the mistaken belief that their accounting misconduct is shielded by the safe harbor. *Supra* §§II(C)(2). Even if defendants' misplaced safe harbor arguments were accepted, however, these allegations would still assist plaintiffs in establishing the requisite strong showing of recklessness required to show scienter for other aspects of their fraudulent scheme to conceal the circumstances that had led to the apparent success of their rollup scheme. Those allegations demonstrate, ***at a minimum***, that defendants were at least reckless in reducing PSI's malpractice reserves at the outset of the Class Period, and that they had actual knowledge (or recklessly disregarded) that the incidence of malpractice claims was rising throughout the Class Period. ¶¶85-95. As a result, they also recklessly disregarded that the many statements they made about the quality of the care being provided by the Company and the risks of malpractice claims would be, and were, misleading to investors under the circumstances in which they were made. *ASG*, slip op. at 84, 89 (finding allegations of accounting manipulations and GAAP violations probative of scienter).

**4.     Each of the Individual Defendants and Other PSI Insiders Earned Millions of Dollars by Perpetuating PSI's Fraudulent Rollup Scheme**

In the Sixth Circuit, defendants' motive to artificially inflate the Company's stock price in order to increase their personal wealth is indicative of scienter. *Helwig*, 251 F.3d at 552; *Bridgestone*, 399 F.3d at 684.

**a.     PSI Insiders Sold Stock Ahead of Negative Publicity**

Insider selling at a suspicious time or in an unusual amount supports a strong inference of scienter. *Helwig*, 251 F.3d at 552; *see also In re SmarTalk Teleservices, Inc. Sec. Litig*., 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (defendants' sale of 40%, 27%, 11%, and 37% of their holdings support a strong inference of scienter). Here, Polson, Turner and other Company insiders made Class Period sales of PSI stock that were suspicious in both timing and amount, including because

the sales came just ahead of negative media reports about the Company which defendants admitted insiders knew were coming before they were published. ¶¶47, 198-199.

- Edward Wissing – one of two PSI Directors specifically tasked with monitoring compliance issues – sold 100% of the shares he owned for $192,000 on January 2, 2009, just days before the *Dallas Morning News* published its exposé about conditions at PSI's facilities in Texas. ¶¶64, 167, 198(e)

- Two corporate insiders – Defendant Turner and Director Grant – made significant sales on July 9, 2008, just eight days before the *Chicago Tribune* published its exposé about conditions at Riveredge. ¶¶7, 47, 198(b)(d). Grant sold 100% of his holdings for $80,000, while Turner sold 15% of his holdings for more than $1 million. *Id.* Before the end of the Class Period, Turner would sell more than 70,000 additional shares, bringing his total Class Period proceeds to $3.8 million on the liquidation of 55% of his PSI stock. ¶198(b).

- Director Mark Clein, liquidated nearly 64% of his holdings during the Class Period, receiving proceeds of $628,210. ¶198(c). Clein sold 57% of those shares (36% of his total holdings) for nearly $400,000 on November 4, 2008, just weeks before *Pro Publica* and the *Los Angeles Times* published the results of their investigation into PSI's misleading and injurious business practices. ¶¶47, 57-62, 198(c).

- In May 2008, over a period of just two days and shortly after defendants issued PSI's misleading 1Q08 financial results, Polson sold 42% of his holdings at near Class Period high prices and reaped over $1.85 million in proceeds. ¶198(a).

Considered collectively and in combination with the other facts pled, these insider sales "are sufficiently widespread and substantial to qualify as probative evidence of scienter." *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001).

Defendants contend that most of these sales should be disregarded by the Court because they were purportedly made pursuant to an approved insider trading plan. Mem. at 23-24. As a threshold matter, without knowing the details of the trading plan – including whether it was adopted at a time when the insiders were in possession of material inside information, what control insiders could exert over the timing or amount of purchases pursuant to the plan, and whether the Class Period sales even comported with the plan – it is impossible to determine whether that plan diminishes or bolsters the inferences of scienter. *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1184-85 (S.D. Cal. 2009 (despite the existence of 10b5-1 trading plans, "defendants unloading stock near in time to

- 42 -

when the market would inevitably learn of the alleged [adverse disclosure] does support an inference that defendants timed their sales to benefit from stock prices before the information leaked to the market"). Accordingly, defendants' assertion raises factual arguments that cannot be resolved at this stage. *See Helwig*, 251 F.3d at 558 (whether an "explanation" offered by defendants for making insider sales during the class period " is accurate is not an issue [the court] can decide on the pleadings").

Defendants are also incorrect in contending (Mem. at 24) that suspicious sales of PSI shares by non-defendant Company insiders cannot be used to support a strong inference of scienter. *Complete Mgmt.*, 153 F. Supp. 2d at 328; *see also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999). Also incorrect is defendants' assertion that the purported lack of sales by Jacobs can negate an inference of scienter against Polson and Turner. *See In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2000 U.S. Dist. LEXIS 13500, at *20 (E.D. Pa. Sept. 21, 2000) (absence of insider sales by main speaking defendant "does not weigh against an inference of [other defendants'] fraudulent intent"). Defendants also erroneously contend that a "meaningful trading history" is insufficiently pled here. The Complaint identifies the amount of stock each defendant sold, the amount they owned, and the reasons why the timing of their trades is suspicious. This is sufficient to establish a basis for the Court to include the allegations of these stock sales in its scienter analysis. *Konkol v. Diebold, Inc.*, 590 F.3d 390, 399-400 (6th Cir. 2009).

### b. Defendants Earned Excessive Bonuses by Propagating the Bonus Scheme

The "self-interested motivation of defendants in the form of saving their salaries" can also assist in establishing a strong inference of scienter. *ASG*, slip op. at 77; *see also Helwig*, 251 F.3d at 552. The Complaint alleges that defendants were motivated to conceal significant patient safety issues to avoid a reduction in capacity – and thus Company earnings – because their executive compensation was directly tied to PSI's financial performance. ¶¶184-186. For example, the

- 43 -

Individual Defendants' base salaries were increased for 2008 and 2009 based on the Company's position as "the top performing company in [its] peer group." ¶185(a). Defendants cash bonuses were based on adjusted EBIDTA and EPS results that could not be met without cutting staff below reasonable levels. ¶¶35-42, 57-62, 185(b). In addition, the Complaint alleges that PSI established a bonus program that put inordinate weight on hospital and RTC CEOs to increase revenues by adding beds and services even where they lacked sufficient budgets or staff to treat the additional patients. ¶¶187-188. The Complaint describes how those bonuses could be manipulated by the use of accounting gimmickry like the deliberate reduction in malpractice reserves made by defendants at the outset of the Class Period. ¶94. Together, these allegations further support scienter because they demonstrate that defendants and other executives at all levels in the organization were collectively incentivized to perpetrate – and help the Company conceal – the adverse conditions that existed in PSI's facilities throughout the Class Period.

### c. Defendants Were Using the Rollup Scheme to Engineer a Lucrative Buyout

Shortly after the Class Period, defendants sought to obtain large amounts of cash by positioning PSI to be acquired before their rollup scheme collapsed under the weight of its prior acquisitions.[32] ¶¶14-15, 189-197. These allegations, ignored by the Motion, lend additional support for scienter. *See Lormand v. US Unwired, Inc*., 565 F.3d 228, 254 (5th Cir. 2009) (post-class period events indicative of class period scienter); *Plotkin v. IP Axess Inc*., *Etc.*, 407 F.3d 690, 698-99 (5th Cir. 2005) ("later-emerging facts can . . . provide warrant for inferences about an earlier situation");

---

[32]    Just months after the Class Period, defendants arranged for the receipt of spring-loaded stock options worth millions of dollars while secretly negotiating a potential merger of the Company that defendants knew would – and did – drastically boost PSI's stock price and thus increase the value of the grants they received. ¶¶189, 191. The Individual Defendants received severance and equity benefits under the merger that are valued *in excess of $200 million* – further demonstrating their direct financial motivation to participate in the scheme to perpetuate PSI's unsustainable rollup scheme in the hopes they could position the Company as an attractive acquisition target before the scheme collapsed. ¶189.

575554_1

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL) (RLE), 2002 U.S. Dist. LEXIS 23829, at *6-*7 (S.D.N.Y. Dec. 11, 2002) ("later occurring evidence" can be relevant to scienter.).

## III.    CONCLUSION

For the foregoing reasons, defendants' Motion should be DENIED, in its entirety.  In the event the Court finds the Complaint deficient in any particular, plaintiffs request leave to amend to cure any defect found by the Court.

DATED:  August 19, 2010                     ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                              DENNIS J. HERMAN
                                              DANIEL J. PFEFFERBAUM


                                                 s/ Dennis J. Herman
                                              DENNIS J. HERMAN

                                       100 Pine Street, Suite 2600
                                       San Francisco, CA  94111
                                       Telephone:  415/288-4545
                                       415/288-4534 (fax)

                                       ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                       DARREN J. ROBBINS
                                       TOR GRONBORG
                                       JULIE A. KEARNS
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101-3301
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       Lead Counsel for Plaintiff

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT, #2672
DOUGLAS S. JOHNSTON, JR., #5782
TIMOTHY L. MILES, #21605
217 Second Avenue, North
Nashville, TN  37201-1601
Telephone:  615/244-2202
615/252-3798 (fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

Liaison Counsel

575554_1

# CERTIFICATE OF SERVICE

I hereby certify that on this the 19th day of August, 2010, the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Todd R. David
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
todd.david@alston.com

Jessica Perry Corley
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
jessica.corley@alston.com

Lisa R. Bugni
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404/881-7000
404/881-7777(Fax)
lisa.bugni@alston.com

W. Travis Parham
Waller Lansden Dortch & Davis, LLC
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
615/244-6380
615/244-6804(Fax)
travis.parham@wallerlaw.com

Waverly D. Crenshaw
Waller Lansden Dortch & Davis, LLC
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
615/244-6380
615/244-6804(Fax)
wcrenshaw@wallerlaw.com

Michael T. Harmon
Waller Lansden Dortch & Davis, LLC
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
615/244-6380
615/244-6804(Fax)
michael.harmon@wallerlaw.com

Daniel E. Bacine
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
215/963-0600
215/963-0838(Fax)
dbacine@barrack.com

Mark R. Rosen
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
215/963-0600
215/963-0838(Fax)
mrosen@barrack.com

Douglas S. Johnston, Jr.
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
djohnston@barrettjohnston.com

Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
tmiles@barrettjohnston.com

Stephen R. Basser
Barrack, Rodos & Bacine
600 West Broadway, Suite 900
San Diego, CA 92101
619/230-0800
619/230-1874(Fax)
sbasser@barrack.com

Darren J. Robbins
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
darrenr@rgrdlaw.com

Tricia L. McCormick
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
triciam@rgrdlaw.com

George Edward Barrett
Barrett, Johnston & Parsley
217 Second Avenue North
Nashville, TN 37201
615/244-2202
615/252-3798(Fax)
gbarrett@barrettjohnston.com

Wade B. Cowan
Davies Humphreys Horton & Reese PLC
150 Second Avenue North, Suite 225
Nashville, TN 37201
615/256-8125
615/242-7853(Fax)
wcowan@dhhrplc.com

Samuel M. Ward
Barrack, Rodos & Bacine
600 West Broadway, Suite 900
San Diego, CA 92101
619/230-0800
619/230-1874(Fax)
sward@barrack.com

Tor Gronborg
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
torg@rgrdlaw.com

Julie A. Kearns
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
jkearns@rgrdlaw.com

Catherine J. Kowalewski
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
katek@rgrdlaw.com

James M. Hughes
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843/216-9000
843/216-9450(Fax)
jhughes@motleyrice.com

William S. Norton
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843/216-9000
843/216-9450(Fax)
bnorton@motleyrice.com

Robert J. Dyer, III
Dyer & Berens LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
Telephone: 303/861-1764
303/395-0393 (fax)
bob@dyerberens.com

Thomas C. Michaud
Vanoverbeke Michaud &
Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

David C. Walton
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)
davew@rgrdlaw.com

William H. Narwold
Motley Rice LLC
20 Church Street, 17th Floor
Hartford, CT 06103
860/882-1676
860/882-1682 (Fax)
bnarwold@motleyrice.com

Jeffrey A Berens
Dyer & Berens LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
Telephone: 303/861-1764
303/395-0393 (fax)
jeff@dyerberens.com

Gregg S. Levin
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843/216-9000
843/216-9450(Fax)
glevin@motleyrice.com

Michael J. Vanoverbeke
Vanoverbeke Michaud &
Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
mvanoverbeke@vmtlaw.com

James Gerard Stranch, III
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)
jstranch@branstetterlaw.com

James Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)
gstranch@branstetterlaw.com

Jane Branstetter Stranch
Branstetter, Stranch & Jennings, PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)
jbs@branstetterlaw.com

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on August 19, 2010.

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS HERMAN

s/ Dennis J. Herman
DENNIS J. HERMAN

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
DennisH@rgrdlaw.com