# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

GARDEN CITY EMPLOYEES'
RETIREMENT SYSTEM, Individually and
on Behalf of All Others Similarly Situated,

     Plaintiff,

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,
Individually and on Behalf of All Others
Similarly Situated,

     Lead Plaintiff,

v.

PSYCHIATRIC SOLUTIONS, INC.,
JOEY A. JACOBS, BRENT TURNER, and
JACK E. POLSON,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:09-00882
JUDGE HAYNES

## M E M O R A N D U M

I. Introduction ......................................................................................... 1

II. Analysis of the Motion for Class Certification ...................................3

    A. Analysis of the Amended Complaint ......................................3

        1. The Parties ...................................................................3

        2. PSI's Business Practices ..............................................4

        3. State Enforcement Actions against PSI ...................... 10

        4. Media Reports on PSI's Practices ............................. 12

        5. PSI's Responses to Published Reports ...................... 17

        6. Defendants' Statements on PSI's Finances .............. 24

        7. Defendants' Alleged False or Misleading Statements ............................. 38

    B. The Parties' Class Certification Proof .................................. 45

III. Conclusions of Law ...................................................... 47

    A. Rule 23 (a) Requirements .................................................. 49

        1.Numerosity .............................................................. 49

        2. Commonality............................................................50

        3. Typicality ................................................................53

        4. Adequacy of Class Representative .............................54

    B. Rule 23(b)(3) Requirements ...............................................57

IV. Conclusion ....................................................................58

# I. Introduction

Plaintiffs, Garden City Employees' Retirement System ("Garden City") and Central States, Southeast and Southwest Areas Pension Fund, filed this action under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of themselves and a class of shareholders against the Defendants: Psychiatric Solutions, Inc. ("PSI"), Joey A. Jacobs, Brent Turner, and Jack E. Polson. In earlier proceedings, the Court appointed Central States, Southeast and Southwest Areas Pension Fund ("Central States") as the Lead Plaintiff in this action. Central States then filed an amended complaint (Docket Entry No. 109). Plaintiffs assert jurisdiction under 15 U.S.C. § 78aa of the Securities Exchange Act.

In sum, Plaintiffs allege that from February 21, 2008 through February 25, 2009 when Plaintiffs purchased or held PSI stock, these Defendants engaged in and/or materially assisted in a scheme and course of business to inflate artificially the value of PSI stock. Defendants allegedly did so by running the business in a manner which operated as a fraud or deceit upon investors and other members of the public. Plaintiffs specifically allege that the Defendants concealed PSI's increasing financial difficulties in increasing revenue and profits due to staffing PSI facilities at levels below those necessary for patient safety and PSI's stated quality of care at PSI facilities. Plaintiffs allege that the Defendants repeatedly minimized the significance of published reports of patient safety incidents at PSI institutions to hide PSI's actual financial problems and to prevent steep stock price declines until February 25, 2009, when PSI reported its fiscal year 2008 and fourth quarter 2008 financial results. Plaintiffs allege that the Defendants' fraud ultimately led to a collapse of PSI's stock price, damaging the Plaintiffs.

1

Before the Court is the Plaintiffs' motion for class certifications (Docket Entry No. 147),

The Plaintiffs' proposed class is defined as follows:

> All persons who purchased or otherwise acquired PSI securities between February 21, 2008 and Febryary 25, 2009, inclusve (the "Class Period"). Excluded from the Class are:(i) PSI, its parents, subsidiaries, and any other entity owned or controlled by PSI; (ii) Joey A. Jacobs, Jack E. Polson and Brent Turner (the "Individual Defendants"); (iii) all other executives officers and directors of PSI or any of its parents, subsidiaries or other entities owned or controlled by PSI; (iv) all immediate family members of the foregoing including grandparents, parents, spouses, siblings, children, grandchildren and step-relations of similar degree; and (v) all predecessors and successors in interest or assigns of any of the foregoing.

Plaintiffs contend, in essence, that Plaintiffs' claims are representative of a class of investors who are too numerous for joinder; that Plaintiffs claims are typical of the claims of members of the class; that common questions of fact and law exist on Plaintiffs' claims and class members' claims and that as experienced counsel, Plaintiffs are an adequate representative for the class.

In opposition, Defendants assert, in sum, that Plaintiffs are not proper representatives of the purported class because the Lead Plaintiff did not suffer losses that are necessary to assert common and typical claims necessary for class certification; that Lead Plaintiff Central States is not an adequate class representative due to its limited resources and lack of control of this litigation; and that subclasses are appropriate based upon published reports of Defendants' business practices at different times.

In its response, Lead Plaintiff Central states asserts: that it has suffered actual losses to posses claims typical of the class; that as a matter of law, the issue of its actual loss is not relevant to class certification; and that Defendants' loss calculations are flawed for failures to include

transaction costs.

## II. Analysis of the Motion for Class Certification

For its analysis of the Plaintiffs' motion for class certification, the Court adopts potions of its analysis of the Plaintiffs' complaint that is set forth below. The court deems particularly probative on the class certification issue, the amended complaint's quotations of the Defendants and governmental findings on the Defefendants' methods of operating their businessThereafter the court sets forth the parties' other facts on class certification.

### A. Analysis of the Amended Complaint

#### 1. The Parties

According to Plaintiffs' amended complaint, Plaintiffs, Garden City Employees' Retirement System ("Garden City") and Central States, Southeast and Southwest Areas Pension Fund are benefit funds that purchased PSI stock in providing pension services and benefits to more than 360,000 participants in those Plans. (Docket Entry No. 109, Amended Complaint at ¶¶ 19, 20). The proposed class in this action includes persons who purchased the publicly traded securities of PSI between February 21, 2008 through February 25, 2009. Id. at ¶ 1.

PSI is a publicly traded company based in Franklin, Tennessee, and provides inpatient behavioral healthcare services at 95 hospitals and residential treatment facilities. Id. at ¶ 2. The majority of PSI's patients in these facilities are children and adolescents who have been placed under protective care after incidents of abuse or neglect by their former caregivers. Id. PSI's common stock is traded on the NASDAQ market under the ticker symbol "PSYS." Id. at ¶ 21. During the Class Period, there were more than 55 million shares of PSI common stock issued and outstanding. Id.

3

Defendant, Joey A. Jacobs, co-founded PSI in 1988, and has served as executive chairman of PSI's board of directors and as PSI's president and chief executive officer since April 1997. Id. at ¶ 22. As chief executive officer, Jacobs oversees and directs PSI's day-to-day business. Id. During the Class Period, Jacobs signed PSI's Securities and Exchange Commission ("SEC") filings and Sarbanes-Oxley certifications. Id.

Since August 2002, Defendant Jack E. Polson has served as PSI's chief accounting officer. Id. at ¶ 23. Prior to that position, Polson served as PSI's controller beginning in June 1997. Id. As chief accounting officer, Polson participates in monthly executive review meetings with each of PSI's division's presidents. Id. During these meetings, Jacobs, Polson and other PSI executives discussed detailed financial reports for each PSI division and inpatient facility. Id. With Defendant Brent Turner and Jacobs, Polson sets PSI's facilities' budgets, including capital allocated to staffing. Id. During the Class Period, Polson signed SEC filings and Sarbanes-Oxley certifications. Id.

Since August 2005, Defendant Brent Turner has served as PSI's executive vice president for finance and administration. Id. at ¶ 24. In this position, Turner works with Jacobs and Polson to set PSI's facilities' budgets, including capital allocated to staffing. Id. Beginning in February 2003, Turner served as PSI's vice president, treasurer and had responsibility for investor relations. Id.

## 2. PSI's Business Practices

According to the amended complaint, in 1999 PSI decided to expand its services to inpatient hospitals and centers. Id. at ¶ 28. In 2002, PSI merged with the PMR Corporation and acquired five hospitals. Id. Between 2002 and 2007, PSI acquired more than 90 hospitals and

4

centers averaging 17 such acquisitions per year.  Id. at ¶¶ 28, 29, 41. PSI financed these

acquisitions with $620 million in guaranteed notes, a line of credit and secured loans from

lenders. Id. at ¶ 30.  By the end of 2007, PSI's various debts exceeded $650 million with interest

rates between 6.4% and 7.1% interest.  Id.  Plaintiffs allege that by May 2007, PSI had a

maximum leverage ratio of 5.5x PSI's adjusted EBITDA (Earnings Before Interest Taxes

Depreciation and Amortization).  Id.  In December 2007, a Credit Suisse analyst cited PSI as

"among the more successful health care service rollups in recent memory."  Id. at ¶ 28.

Defendants allegedly stated that PSI could leverage its debt through 7% to 9% growth

from existing facilities on an annual basis.  Id. at ¶ 31.  Between 2002 and 2008, PSI repeatedly

told investors to expect and stated that PSI had delivered a growth in "same facility" revenues of

7% to 9% per year.  Id. at ¶ 2.  Plaintiffs alleged that to do so, Defendants essentially were

purchasing earnings by using debt to buy facilities to increase PSI's annual revenue.  Id. at ¶ 31.

Investors raised questions about PSI's "rollup strategy" based upon acquisitions and the viability

of this strategy.  Id.  In March 2008, after PSI's acquisition of five facilities in the first quarter of

2008, a Credit Suisse market analyst wrote that PSI "historically … has overpaid for assets, in an

attempt to drive the income statement, yet disregarding the balance sheet."  Id.

PSI's 2007 10-K Report, issued on February 28, 2008, assured investors of PSI's

continuing viability and explained PSI's plans to continue growth by acquisition of existing

psychiatric hospitals and residential treatment centers:

**Our Growth Strategy**

We have experienced significant growth in our operations as measured by the
number of our facilities, admissions, patient days, revenue and net income. We
intend to continue successfully growing our business and increasing our

5

profitability **by improving the performance of our inpatient facilities and through strategic acquisitions**. The principal elements of our growth strategy are to:

• Continue to Drive Same-Facility Growth – We increased our samefacility revenue by approximately 6.5% for the year ended December 31, 2007 compared to the year ended December 31, 2006. Samefacility revenue also increased by approximately 9.0%, 8.0%, and 9.0% for the years ended December 31, 2006, 2005, and 2004, respectively, compared to the immediately preceding years. Samefacility revenue refers to the comparison of the inpatient facilities we owned during a prior period with the comparable period in the subsequent period, adjusted for closures and combinations for comparability purposes. We intend to continue to increase our samefacility growth by increasing our admissions and patient days and obtaining annual reimbursement rate increases. We plan to accomplish these goals by:

> • expanding bed capacity at our facilities to meet demand;

> • expanding our services and developing new services to take advantage of increased demand in select markets where we operate;

> • building and expanding relationships that enhance our presence in local and regional markets;

> • developing formal marketing initiatives and expanding referral networks; and

> • continuing to provide high quality service.

• Grow Through Strategic Acquisitions – Our industry is highly fragmented and we plan to selectively pursue the acquisition of additional inpatient behavioral health care facilities. There are approximately 500 freestanding acute and residential treatment facilities in the United States and the top two providers operate approximately one-third of these facilities. We believe there are a number of acquisition candidates available at attractive valuations, and we have a number of potential acquisitions that are in various stages of development and consideration. We believe our focus on inpatient behavioral health care provides us with a strategic

6

advantage when assessing a potential acquisition. We employ a disciplined acquisition strategy that is based on defined criteria, including quality of service, return on invested capital and strategic benefits.

• Enhance Operating Efficiencies – **Our management team has extensive experience in the operation of multi-facility health care services companies. We intend to focus on improving our profitability by optimizing staffing ratios, controlling contract labor costs and reducing supply costs through group purchasing. We believe that our focus on efficient operations increases our profitability and will attract qualified behavioral health care professionals and patients.**

Id. at ¶ 32 (emphasis added).

PSI's 2007 10-K Report cited PSI's "[d]emonstrated ability to identify and integrate acquisitions" as a competitive strength, and its rigorous due diligence review, disciplined acquisition strategy, and comprehensive post-acquisition strategic plans to improve revenues and the quality of patient care:

We attribute part of our success in integrating acquired inpatient facilities to our rigorous due diligence review of these facilities prior to completing the acquisitions as well as our ability to retain key employees at the acquired facilities. We employ a disciplined acquisition strategy that is based on defined criteria including quality of service, return on invested capital and strategic benefits. **We also have a comprehensive post-acquisition strategic plan to facilitate the integration of acquired facilities that includes improving facility operations, retaining and recruiting psychiatrists and expanding the breadth of services offered by the facilities.**

Id. at ¶ 33 (emphasis added).

As to delivery of its services, PSI's 2007 10-K Report filed with the SEC stated that PSI's hospitals "provide the most intensive level of care, including 24-hour skilled nursing observation and care, **daily interventions and oversight by a psychiatrist and intensive, highly coordinated treatment by a physician-led team of mental health professionals.**" Id. at ¶ 107

7

(emphasis added). This 2007 10-K Report also informed investors that PSI could manage this growth without sacrificing "our reputation for the quality of our services" or jeopardizing its "recruitment of first rate medical staff," both of which allowed PSI to "differentiate ourselves from our competition." Id. at ¶ 34. As to the quality of PSI's treatment facilities, the report cited the "[t]wenty-four hour observation and care" at its residential treatment centers and PSI's ability to "provide services to patients with multiple issues and specialized needs" that resulted in numerous out-of-state referrals of patients to PSI's facilities. Id.

This 2007 report assured investors that PSI was operating its facilities in compliance with regulatory requirements and operating standards:

**Regulation and Other Factors**
**Licensure, Certification and Accreditation**

Health care facilities are required to comply with extensive regulation at the federal, state and local levels. Under these laws and regulations, health care facilities must meet requirements for state licensure as well as additional qualifications to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, fire prevention, maintenance of adequate records, hospital use, rate-setting, and compliance with building codes and environmental protection laws. Facilities are subject to periodic inspection by governmental and other authorities to assure continued compliance with the various standards necessary for licensing and accreditation.

All of the inpatient facilities operated by us are properly licensed under applicable state laws. Most of the inpatient facilities operated by us are certified under Medicare and/or Medicaid programs and accredited by The Joint Commission, a functional prerequisite to participation in the Medicare and Medicaid programs. Should any of our inpatient facilities lose its accreditation by The Joint Commission, or otherwise lose its certification under the Medicare and/or Medicaid program, that inpatient facility may be unable to receive reimbursement from the Medicare and/or Medicaid programs. If a provider for who we provide contract management services is excluded from any federal health care program, no services furnished by that provider would be reimbursed by any federal health care program. If one of our facilities is excluded from a federal health care program,

8

that facility would not be eligible for reimbursement by any federal health care program.

> **We believe that the inpatient facilities we own and operate generally are in substantial compliance with current applicable federal, state, local and independent review body regulations and standards**. The requirements for licensure, certification and accreditation are subject to change and, in order to remain qualified, it may be necessary for us to affect changes in our inpatient facilities, equipment, personnel and services. Additionally, certain of the employed and contracted personnel working at our inpatient facilities are subject to state laws and regulations governing their particular area of professional practice. We assist our managed client hospitals in obtaining required approvals for new programs.

Id. at ¶ 107 (emphasis added).

The 2007 Report on Form 10-K further asserted that PSI had an extensive control system in effect to ensure the "identification and connection of any actual or perceived violations." Id. at ¶ 108. The 2007 Form 10-K Report further assured investors that PSI's operations were "continually assessed and monitored" to assure "the highest quality of care." Id. at ¶ 110.

> We strive to improve the operating results of new and existing inpatient behavioral health care operations by providing the highest quality service, expanding referral networks and marketing initiatives and meeting increased demand for behavioral health care services by expanding our services and developing new services. **We also attempt to improve operating results by optimizing staffing ratios, controlling contract labor costs and reducing supply costs through group purchasing**.
>
> \* \* \*
>
> **The services provided at each inpatient facility are continually assessed and monitored through an ongoing quality improvement program**. The purpose of this program is to strive for the highest quality of care possible for individuals with behavioral health issues, and includes regular site visits to each inpatient facility in order to assess compliance with legal and regulatory standards, as well as adherence to our compliance program. Standardized performance measures based on a national outcomes measurement data base comparing our inpatient facilities' performance with national norms are also reported and reviewed and corrective steps are taken when necessary.

9

Id. at ¶¶ 109, 110 (emphasis added).

According to Plaintiffs, to meet PSI's financial expectations, Defendants, in fact, began cutting staffing levels at numerous PSI facilities to meet PSI's budget and staffing ratios. Id. at ¶¶ 35-37. Plaintiffs allege such reductions caused insufficient staff to ensure patient safety and allegedly rendered compliance with applicable licensing and regulatory requirements extremely difficult. Id. Plaintiffs allege that PSI's corporate headquarters pressured its facilities' management for frequent cuts in staffing, id. at ¶¶ 38-39, that left fewer employees to monitor patients, and allowed the assaults, rapes or sexual molestations of unsupervised patients or suicidal acts by patients. Id. at ¶ 41. These incidents gave rise to regulatory violations that jeopardized PSI's facility's license and revenues. Id. at ¶¶ 40-41. According to Plaintiffs, PSI's focus on increasing patient-employee ratios jeopardized the safety of children, teenagers and other patients at its facilities, as reflected by the following allegations. Id.

### 3. State Enforcement Actions against PSI

In a February 27, 2006 letter, the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services informed PSI of its findings that PSI's 103-bed facility in Virginia, acquired by PSI in April 2003, was in violation of numerous state laws concerning patient care. Id. at ¶ 48. The Virginia agency found PSI had provided "overall inadequate medical care due to the understaffing of care and nursing staff to address the needs of the number of residents." Id. This letter notified PSI of Virginia's officials' intent to revoke the facility's license. Plaintiffs allege that PSI has made substantial efforts to conceal such violations, including by influencing regulators to withhold sanctions or penalties that could bring such incidents to light. Id. at ¶ 148.

10

Plaintiffs' amended complaint sets forth other state enforcement actions against PSI facilities in several states:

> After a five-year-old patient was sexually abused by a 12-year-old patient at the 88-bed Bryn Mar Hospital in North Carolina, acquired by PSI in June 2003, the North Carolina Department of Health and Human Services found in June 2007 that **PSI had failed to protect patients after incidents of sexual abuse, lacked systems needed to identify the risks of sexual abuse, and – in 40% of the cases reviewed – failed to report sexual abuse promptly to authorities.** Records supplied to investigators further showed that, **PSI failed to provide sufficient monitoring of potential sexual abusers in 40% of the cases reviewed and failed to monitor patients with suicidal tendencies in 20% of the cases reviewed.**
>
> In June 2007, the Texas Department of Health & Human Services concluded an investigation into a May 6, 2007 incident at [PSI's] Cypress Creek Hospital where a suicidal patient who was supposed to be monitored every 15 minutes had slit his wrist in the shower, passed out and remained unconscious for more than five hours while the shower flooded his room, then regained consciousness and walked to the nurses station where the self-inflicted injury was finally discovered. **Records from the 96-bed hospital – acquired by PSI in September 2001 – showed no rounds were performed during the entire time the patient was unconscious. Upon review of records of care provided to another 15 patients at the hospital, the agency found that PSI had provided none of them with a safe setting for treatment.**
>
> On September 17, 2007, the Carolina Department of Health & Human Services made a finding of immediate jeopardy against PSI's 108-bed Holly Hill Hospital, acquired by PSI in December 2001. **The Department found numerous instances of providing drugs to the wrong patients and administering drugs without a doctor's order. Medication errors have frequently been linked to understaffing of nurses.**
>
> California authorities have reported significant quality of care problems at the 72-bed Sierra Vista Hospital, acquired by PSI in July 2005, including medical errors and patient deaths. According to UIC, which "examined more than 500 pages of surveys at Sierra Vista," **"Surveys conducted by the California Department of Health underscored repeated issues about understaffing, patient safety, medication administration, poor supervision and staff training, and an array of serious quality of care violations."**

Id. at ¶ 56 (emphasis added).  PSI's California facilities were cited for deficiencies of abuse and

11

mistreatment of patients 29 times between January 2005 and June 2008, compared with just six

citations for Universal Health Services, Inc. ("UHS"), a PSI competitor, in the same period. Id. at

¶ 58. The alleged primary reason for this state regulatory finding was understaffing at PSI

facilities. Id. at ¶ 59.

On April 13, 2009, the Illinois Department of Children and Family Services issued the

report of the department of psychiatry at the University of Illinois at Chicago ("UIC") and Illinois

Department of Public Health ("IDPH") investigators that made a "consistent set of findings" of

problems arising at PSI's Riveredge hospital. Id. at ¶¶ 11, 77. This report cited a "**pattern of**

**quality care and patient safety problems**" at PSI facilities. Id. at ¶ 78 (emphasis in original).

The Illinois report found repeated instances of inadequate documentation, "[q]uestionable or poor

quality of individual therapeutic services," an "[u]nstructured, chaotic milieu" that was

counterproductive to treatment, "[u]nit staff often poorly trained and supervised for their jobs,"

"[i]neffective monitoring creat[ing] serious risks for patient safety," and improper discharge and

discharge planning of patients. Id. at ¶ 77. These conditions caused "sexual assaults; negligent

supervision; physical harm to patients; a violent group outburst that required police intervention;

and the death of a pregnant patient (not a DCFS ward), that has raised serious questions about the

lack of reporting of the incident by Riveredge officials to Illinois authorities." Id.

### 4. Media Reports on PSI's Practices

On July 17, 2008, Chicago Tribune reported on numerous abuses at PSI's Riveredge

Hospital:

> Illinois' largest psychiatric hospital left sexual predators unguarded despite
> allegations that at least 10 mentally disabled children were assaulted during the last
> three years. The youngest victim was an 8-year-old state ward admitted for

12

evaluation after expressing suicidal thoughts. Administrators at west suburban Riveredge Hospital and government authorities failed to share basic information as the savage violence left some youth worse off than when they arrived, a Tribune investigation found. **After the newspaper asked about the series of assault reports, the state Department of Children and Family Services last week stopped admitting wards to Riveredge – a punishment imposed on just three other psychiatric hospitals since 2004, records show.** On Wednesday, agency officials announced that the Tribune's findings had prompted them to immediately impose changes, including new training for child-protection workers and better reporting of assault allegations.

<u>Id.</u> at ¶¶ 49-50 (emphasis added).

Plaintiffs' amended complaint summarizes the specific disclosures from this article that are set forth below for the time period from 2005 to 2007:

After a 19-year old reported being raped by another patient in the Hospital in 2007, records reviewed by the Tribune showed that, despite having found evidence of the attack – drops of blood in the bathroom where the attack was alleged to have occurred – the hospital didn't send the victim to a local emergency room, didn't report the allegations to local police, and didn't assign an aide to maintain the required one-on-one observation on the attacker. The attacker struck the same victim again the next day, government records show.

The newspaper recounted a similar 2006 incident in which a 12-year-old patient was raped by his 15-year old roommate, who was being treated for sexual aggression. "I told Riveredge over and over again, 'Do not put anybody in the room with this boy,'" the attacker's mother told the newspaper. The newspaper recounted a police report of the attack which similarly quoted the boy's mother as telling police that "she informed them when [her son] was admitted that he needed his own room . . . so just as much blame should be on the hospital [as on her son, the attacker] for creating the environment for the incident to occur."

At 9:00 p.m. on December 31, 2006, local police responding to an anonymous 911 call from within the Hospital of a fight in progress were refused admittance by hospital employees. On New Year's Day, a woman reported her teenage son "had been battered in the melee." A hospital worker told the mother that a staff member had punched her boy in the eye, but no incident reports of the fight were available. Illinois Department of Public Health investigators were similarly stonewalled when they tried to look into the incident, reporting that "the hospital was unable to accurately identify the actual number of participants" in the melee.

13

Riveredge similarly failed to promptly notify DCFS of a July 5, 2008 fight in the adolescent boys unit. **Between 2005 and 2007, police and state surveyors investigated reports that eight young patients were injured in non-sexual assaults. Riveredge staff or contract employees were accused in four of those alleged attacks.** The attacks included a March 19, 2007 incident reported by a clinical social worker, in which two Riveredge workers had battered a 16-year-old bipolar patient who resisted getting a shot.

**When police tried to investigate the July 5 melee, the hospital's human resources department was "unable to provide the names and addresses of the offenders or witnesses." When police tried to investigate another fight at the hospital, on October 25, 2007, a hospital employee refused to turn a video of the incident over the police, telling officers she needed permission of PSI's risk management specialist before she could do so.**

**In at least four cases since 2006, the Tribune reported that government inspectors cited Riveredge for improperly sedating children with powerful psychotropic drugs.** In 2006, Riveredge administered forced medication to a bipolar 12-year-old three times without notifying a guardian actively involved in his care, an Illinois Human Rights Authority report stated.

Id. at ¶ 52 (emphasis added). In a follow-up article on February 26, 2009, the Chicago Tribune reported that sexual assaults by unsupervised patients continued at Riveredge weeks after the newspaper's original report. Id. at ¶ 55. According to Plaintiffs, Riveredge incidents were reflective of conditions at other PSI hospitals and residential treatment centers that PSI acquired years earlier because Defendants were struggling under increasingly tight budgets necessary to sustain PSI's apparently misleading and stated track record of providing 7% to 9% same facility revenue growth every year. Id. at ¶ 56.

After the Tribune' s initial report, other media organizations investigated PSI's operations around the country, finding similar patterns of abuse and mistreatment of children and adolescents being treated at PSI hospitals and residential facilities. On November 22, 2008, the LA Times and ProPublica, an independent, non-profit public interest media, co-published their investigation

about "a string of cases involving abuse and neglect at PSI facilities nationwide." Id. at ¶ 57.

ProPublica found that "[s]ome of the PSI hospitals most under fire from authorities are those the

chain has owned longest. . . . **Since 2005, the 10 hospitals PSI has owned longest have compiled**

**almost twice as many patient-care deficiencies as 10 similar hospitals owned by its closest**

**competitor, Universal Health Services Inc.**" Id. at ¶ 58 (emphasis added).

On January 12, 2009, the Dallas Morning News published the results of its investigation of

PSI facilities in Texas, recounting numerous incidents of violence, abuse, and injuries of patients

at PSI's Laurel Ridge, The Oaks and San Marcos Treatment Centers in Texas.

> **[Texas government inspection and investigation] records say, "the facility**
> **failed to provide adequate numbers of qualified personnel"** when a 13-year-old
> patient was injured while being restrained by a staff member. In another incident, a
> 14-year-old patient [was injured] in sexual activity with another patient. The
> investigator concluded that **"the facility failed to direct, monitor and evaluate**
> **the care of patients." Center management also neglected to monitor patients**
> **sufficiently,** an investigator found, when a 17-year-old patient with a "long history
> of violent and disruptive behavior" attacked another teenage patient. . . . [A] 13-
> year-old boy with Asperger's syndrome was ill for three days with acute respiratory
> problems and pancreatitis but did not see a doctor. . . . "The child . . . almost died,"
> the investigator wrote. . . . **On numerous occasions, investigators found, center**
> **administrators were aware of serious problems but did not act properly.** In
> one case, a state finding said, "facility administration" knew of a sexual
> relationship between a staff member and a 16-year-old resident, but did not report
> it to licensing authorities. . . . In 2007, two suicide attempts by children were not
> reported to the state.

Id. at 64 (emphasis added).

PSI's San Marcos' facility received 52 citations after one inspection and in 2007, the

Laurel Ridge facility received 92 citations after 36 inspections resulting in a state finding of

"inadequate staffing." Id. at ¶¶ 65, 66. According to the Morning News report, PSI's facility staff

"**made numerous requests of the administration to increase staffing levels.**" Id. at ¶ 65

15

(emphasis added).  After calling in a Swat Team for one incident, a PSI clinical therapist is reported to have stated: "It is always felt like they were putting out fires instead of making things fire-retardant."  Id.  PSI operates 15 facilities in Texas and was fined $230,000 for violations by the state health department in 2007, nearly as much as all other Texas hospitals combined.  Id. at ¶ 65.  The Morning News article also described incidents reported by the Tribune and by ProPublica and the LA Times about other PSI facilities.  Id. at ¶ 64.

According to a February 21, 2010 article in the Richmond Times-Dispatch, following a series of incidents in which PSI failed to report and actively attempted to conceal patients' suicide attempts and other patient incidents at PSI's The Pines facility.  Id. at ¶ 148.  In the spring of 2009, Virginia officials took steps to downgrade PSI's license to provisional status – the most serious sanction short of shutting down the facility, and one that was likely to result in lost admissions and negative publicity.  Id.  Citing e-mails and other documents obtained through a Freedom of Information Act request, the newspaper reported that the action was quashed by the state's Mental Health Commissioner, Dr. James S. Reinhardt, who subsequently left his post to become a PSI consultant.  Id.

Plaintiffs allege that as reflected in the state enforcement actions and the Tribune, ProPublica, LA Times, Morning News, and Richmond Times-Dispatch articles and other sources, PSI employees repeatedly failed to report timely, completely or accurately, patient incidents at PSI's inpatient facilities and actively concealed such problems that should have been reported to state regulators.  Id. at ¶ 181. Thus, Plaintiffs assert that PSI had continuing issues with regulatory compliance and abuse incidents in PSI facilities that were not disclosed to investors.  Id. at ¶¶ 43-46.

16

### 5. PSI's Responses to Published Reports

As to awareness of media reports generally, Jacobs admitted that he and other PSI executives had advance notice of media investigations that were later published.

> [ANALYST:] Okay. And then can I just ask a question with regard to how you're educating your referral sources. You've obviously, some bad headlines which we would all like to see you avoid going forward, but in those markets where – that may have had some impact in your referral sources, perhaps, can you just talk to us about how your compliance team is educating referral sources with regard to your outcomes? If there's any different process there?

> [JACOBS:] **We know when someone's out there, doing a story, and we have – by the time the story is written, we kind of know where they're going to focus. Fortunately for us, they keep focusing on very old stories, very old incidents, so we do give state agencies joint commission, referral sources heads up ahead of time so they are not surprised or read it in the paper** and I think our operations team in conjunction with Kathy Bolmer and the Compliance and Quality Department do a good job of reaching out to those sources and providing more detail surrounding the events and that the subsequent appropriate agency has reviewed those incidents that are occurring.

Id. at ¶ 47 (emphasis added).

As an example, Plaintiffs allege that after a report about a series of assaults and allegations of sexual and physical abuse at PSI's Whisper Ridge residential treatment center in Charlottesville, Virginia, Jacobs told investors during an April 27, 2006 investor call that the incident was "isolated" and that a new chief executive officer installed in February was "making great progress there." Id. at ¶ 48. According to Plaintiffs' amended complaint, the problems at Whisper Ridge were strikingly similar to and indicative of problems caused by understaffing at other PSI facilities, including Riveredge, that were disclosed during and after the Class Period. Id.

In its July 30, 2008 press release on its financial results for the second quarter

2008, PSI did not mention any problems at Riveredge or the Tribune's report. Id. at ¶ 119.

This press release raised PSI's financial guidance for the year based on the purported

strength of PSI's financial results. Id. at ¶ 119. Yet, on July 31, 2008, during the second

quarter 2008 investor conference call, Jacobs first commented to investors about the

Riveredge issues and the Tribune report. Id. Jacobs allegedly downplayed the Tribune

report of two weeks earlier as involving historical incidents that did not reflect current

operations at Riveredge or other PSI facilities. In his concluding remarks, Jacobs stated:

> [JACOBS:] Before closing my remarks, **I'll add that many of you are aware of a story that was published in a Chicago newspaper on July 17 about incidents that occurred in 2007 and 2006 at Riveredge Hospital. This is not the first story about incidents at one of our facilities, and it won't be the last**. So I'd like to share my perspective.

> First, **these types of unfortunate incidents do occur in this patient population. Minimizing and eliminating these types of incidents is one of PSI's top priorities. We take continuous improvement of quality, safety and risk management very seriously, and we have built a very effective infrastructure over the past several years**.

> As a matter of practice at all our facilities, **we thoroughly report incidents to relevant agencies as soon as possible and work directly with agencies to continuously improve safety and quality in a timely manner. The incidents referenced in the newspaper story were reported to the relevant agencies** and appropriate corrective actions were taken in 2006 and 2007.

> Second, it is also important to understand that we operate in a highly regulated industry with nearly continuous oversight. **Our facilities are surveyed multiple times each year on average and less than 1% of these surveys result in serious deficiencies, a testament to our diligent efforts to continuously improve risk management, safety and quality**.

> We are pleased with this track record in light of the fact that we are providing more than 2.7 million patient days of treatment annually. Just before the story was published, the Department of Children and Family Services placed an admissions hold on Riveredge. **Riveredge is currently in discussions with DCFS and expects to conclude those discussions soon. As a result, we don't expect a**

**material adverse financial impact from the admissions hold**.

Id. at ¶ 124 (emphasis added).

Plaintiffs allege that when analysts pressed for more information about the Riveredge incidents during the 2008 conference call, Jacobs continued to discount their significance and repeatedly and falsely suggested that the Tribune's report was based on dated historical information. Id. at ¶ 125. In response to one analyst's question, Jacobs responded that **"We have taken action back in '06 and '07**. But once again, if they want to come in and take a relook at it, that is okay with us." Id. (emphasis in original). During that call, Jacobs reiterated to another investor, **"the stories in the Chicago [Tribune], those were 2006 and 2007 incidents, and the quality is better there; the management team is better there**, and will continue to get better." Id. (emphasis in original).

During this 2008 conference call, Jacobs specifically denied that PSI was violating regulatory requirements by failing to report the incidents as they occurred, as reported in the Tribune articles and later ProPublica, LA Times and other media reports:

> **[W]e are in compliance with those states on reporting. We know when to report, how to report**. And also PSI captures incidents that you don't report, that **we are looking for minor incidents. We want to fix those so those don't become major incidents**. So for PSI, we capture much more than we actually have to report, but **we do diligently report anything that an agency needs to see**. . . .[W]e think **we have reported appropriately**, and the intent was absolutely to always report.

Id. at ¶ 126 (emphasis in original).

When asked to comment on the "negative story on the company" that PSI had "grown so fast that you've lost span control and the quality issues are systemic because of the growth," Jacobs attributed the problems to PSI's patients:

19

[JACOBS:] **Unfortunately, we take care of very difficult patients**. I want them all not to have incidents, but some incidents will occur, and we do our level best to go back and put the resources back to correct it. But as far as noise from the shorts or a negative newspaper article, as I mentioned earlier, we could have one today, or we could have one 30 days from now that somebody wants to write a story about us.

* * *

Now, from the risk management side, when you take these incidents and put them through the actual oral process and through our risk management, **we have great results there. So there is a disconnect between the sensationalism of an incident that might get put in the paper versus the actual reality**.

Id. at ¶ 127 (emphasis and asterisks in original).  Plaintiffs allege that during this conference call, Defendants repeatedly assured investors that the government investigation of that facility, including the new admission hold imposed by the Illinois agency, did not and would not have any material impact on PSI's operations.  Id. at ¶¶ 128, 152, 153.

On July 31, 2008, PSI filed its Form 8-K Report with the SEC stating that PSI "has received a subpoena from the Department of Justice requesting certain information regarding Riveredge Hospital, one of PSI's inpatient psychiatric facilities in Chicago, Illinois.  PSI stated its intention to provide the requested information to the Department of Justice," but did not disclose when the subpoena had been received, nor did PSI attach a copy of the July 30, 2008 subpoena to its Form 8-K Report.  Id. at ¶ 118.

Plaintiffs allege that based upon Jacobs' responses to the Tribune account of the Riveredge problems, numerous market analysts issued positive reports dismissing the events in the article as old news and isolated incidents that are not reflective of any systemic problems in PSI's operations.  Id. at ¶ 128.  Plaintiffs cite the following as representative examples of these analysts' assessments:

20

• "The market, however, narrowly focused on the DoJ investigation news, which we believe will prove to have little-to-no operational impact. Headline risk will likely always exist for this company given the nature of its patient population, and we believe the multiple well more than discounts this risk given the current growth prospects – LT EPS run-rate of 25+%. We would be buyers here." (JP Morgan, July 31, 2008).

• "The company believes it reported the events, which occurred in 2006 and 2007, appropriately to authorities and has taken multiple steps since to improve the quality at the facility. Admissions from the IL Department of Children and Family Services (DCFS) are still on hold. Management expects the issue to be resolved in the near term and does not anticipate it having a material financial impact." (Avondale Partners, August 1, 2008).

• [I]n our discussions with the company, management highlighted the fact that the admission ban only affects those patients that would have been admitted by the DCFS, which is approximately 20% to 25% of total admissions. The company is having weekly discussions with DCFS, which are expected to conclude in the near future, and does not anticipate that the admission ban will have a material adverse financial impact. (Jefferies & Co., August 1, 2008).

Id. at ¶ 128.

Plaintiffs allege, however, that ongoing undisclosed and uncorrected regulatory violations occurred at other PSI institutions involving quality of patient care and safety and understaffing at PSI's other healthcare facilities.  Plaintiffs cite:

• at Sierra Vista Hospital in California, which was then receiving the most serious patient deficiency citations at about eight times the statewide average among private psychiatric hospitals in California, as was **reported by the LA Times in November 2008**; and

• at Riveredge, where the continuing failure to adequately monitor and ensure patient safety at Riveredge had led to additional incidents of a sexual assault and sexual activity in the hospital's common area dayroom in August 2008, as was **reported by the UIC in March 2009**.

Id. at ¶ 132 (emphasis added).

After the ProPublica-LA Times November 2008 report, PSI responded that, "We do not

21

believe that we have fewer nurses per bed." Id. at ¶ 62. In a letter, Jacobs downplayed the reported incidents that ProPublica had "focus[ed] on just a relatively few incidents and paint[ed] an unfair picture" of PSI. Id. at ¶ 62. Plaintiffs allege that as with his earlier response to the Tribune investigation, Jacobs described ProPublica-LA Times's reported incidents as "unfortunate" occurrences and were not reflective of PSI's current operations and stated that any remedial measures "have long since been made." Id.

As to Jacobs's statements about PSI reporting obligations seriously and a timely correction of patient injuries or abuse at Riveredge, Plaintiffs allege that:

> • As reflected in UIC's report on Riveredge, **follow up surveys conducted in September and October 2008 found that the cited conditions at the hospital remained uncorrected months after the foregoing statements were made, leading UIC and IDPH to conclude that "such data indicates that Riveredge officials are still failing – even in the fact of a critical IDPH finding as well as other forms of outside scrutiny – to ensure the hospital operates at minimally adequate standards of care"**;
>
> • **Less than a week after the conference call, IDPH found that Riveredge had failed to notify the agency of the death of one of its patients in 2007** due to overmedication with Clozaril, as required by law; and
>
> • UIC's Riveredge report includes a similar account of an affidavit and interview of a **Texas investigator looking into the case of the teenager who was passed out for five hours in a shower after a suicide attempt at PSI's Cypress Creek facility, who indicated that "hospital administrators appeared to minimize or hide the reporting of this incident to state officials."**

Id. at ¶ 133 (emphasis added).

Defendant Turner told investors at a December 5, 2008 conference call: "There's always going to be incidents that occur inside a psych hospital that you would rather wish had not occurred. . . ." Id. at ¶ 151. When questioned further about the ProPublica article, Plaintiffs allege Turner deflected, stating, "I'm not here to talk about that." Id. at ¶ 63. Thereafter, Plaintiffs allege

22

Defendants continued to deny that PSI's facilities were understaffed or its workers poorly trained, and dismissed the ProPublica/LA Times investigation as an unfounded and overly sensational account, as Defendants had earlier with the Tribune. Id. at ¶ 151.

On January 13, 2009 – one day after the Morning News exposé of PSI's facilities in Texas, Turner and Jacobs participated in a JPMorgan investor conference on healthcare companies and assured investors of the safety of patients under PSI's care and the quality of its treatment. Id. at ¶ 154. Jacobs stated that he was "very pleased on our recent joint commission scores. Very, very pleased with what we are scoring on their surveys." Id. Jacobs told investors to expect data on PSI's core measure compliance that would support his claims about quality. Id.

After Jacobs' remarks, Plaintiffs allege Turner falsely assured investors of PSI's financial condition and the continuation of its prior growth trajectory. Id. at ¶ 155.

> **...Our compliance program establishes mechanisms to aid in the identification and correction of any actual or perceived violations of any of our policies or procedures or any other applicable rules and regulations**. We have appointed a Chief Compliance Officer as well as compliance coordinators at each inpatient facility. The Chief Compliance Officer heads our Compliance Committee, which consists of senior management personnel and two members of our board of directors. Employee training is a key component of the compliance program. All employees receive training during orientation and annually thereafter.
>
> * * *
>
> In addition, **our management has spent, and may spend in the future, substantial time and effort on compliance measures**....

Id. at ¶ 108 (emphasis in original).

Following the end of the Class Period, PSI published data on its website regarding its compliance with the Joint Commission's core remedial measures. Id. at ¶ 74. Plaintiffs cite graphic statistical data revealing that at the outset of 2009, PSI's hospitals and treatment centers

23

"were operating well below the Joint Commission performance standards on six of the seven criteria." Id. at ¶ 74. Plaintiffs allege that a trend line analysis shows that in 2008, PSI's core measures worsened. Id. at ¶ 75. On March 30, 2009, Illinois's 84-page report entitled "Review of Riveredge Hospital," strongly criticized PSI's patient treatment at Riveredge citing PSI's management's lack of accountability and failure to take responsibility and to correct systemic conditions that caused or permitted patient mistreatment. Id. On Friday, April 3, 2009, the date UIC's report was published, PSI's stock sustained a two-day drop the following week, when its shares closed at $13.65, a drop of 14%. Id. at ¶ 76.

### 6. Defendants' Statements on PSI's Finances

On February 28, 2008, PSI filed its Form 10-K Report for the period ending December 31, 2007 with the SEC. Id. at ¶ 83. This Report included PSI's financial statements for the fiscal year 2007 and the fourth quarter of 2007, including PSI's reported earnings per share, operating expenses, same facility results, revenue and patient data, and other financial metrics described below. Id. Plaintiffs allege that in its published guidance for 2008, Defendants artificially inflated its reported earnings per share for the fiscal year 2007 and the fourth quarter of 2007 by deliberately reducing of PSI's professional liability and malpractice reserves and manipulating PSI's operating expenses that added $0.05 to reported earnings. Id. at ¶ 84. PSI's language on PSI's estimated reserves was as follows:

> The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial assumptions calculated by an independent third-party actuary....This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations.

(Docket Entry No. 111-1 at p. 15). Jacobs and Polson signed this report with certifications under §§ 302 and 906 of the Sarbanes-Oxley Act of 2002. Id. at ¶ 83.

In a February 20, 2008 press release entitled "Psychiatric Solutions Reports a 27% Increase in Fourth Quarter Earnings to $0.42 per Diluted Share," PSI and the Individual Defendants reported PSI's financial results for 2007 that were disseminated to the market via Business Wire, and thereafter by other news organizations, financial analysts, and websites. Id. at ¶ 79. Defendant Jacobs is quoted in this press release, and Defendant Turner is identified as the contact source for further information about the release's contents. Id. Plaintiffs' amended complaint set forth specific statements in this release as actionable:

> Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2007. For the quarter, revenue increased 44.1% to a record $403.4 million compared to the fourth quarter of 2006. **Income from continuing operations increased 27.3% to $0.42 per diluted share from the fourth quarter of 2006.**
>
> * * *
>
> Same-facility EBITDA margin expanded 200 basis points to 22.2% for the fourth quarter of 2007. Fourth quarter EBITDA margin for all facilities increased 70 basis points to 20.8%. Full year same-facility EBITDA margin increased 150 basis points to 21.5% and total facility EBITDA margin was 20.1%, an increase of 30 basis points compared to 2006.
>
> **"PSI continued to produce outstanding profitable growth for the fourth quarter and full year 2007,"** remarked Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "Demand for high quality inpatient psychiatric care continues to expand in this capacity constrained and very fragmented industry. **We are well positioned to achieve further significant profitable growth for 2008 and beyond through organic growth initiatives and acquisitions.**
>
> **"We are targeting 7% to 9% same-facility revenue growth for 2008 once again. Work is already underway to add nearly 600 beds in existing and new facilities by the end of 2008, double our normal targeted pace of expansion, allowing us to treat patients that we do not have the capacity to treat today.**

25

> "We are highly confident that we will be able to acquire at least six inpatient facilities during 2008. The pipeline of potential acquisition opportunities remains strong, enhancing our ability to continue to build a platform for future growth."
>
> PSI is **increasing its 2008 earnings guidance range by $0.10 per diluted share to $1.93 to $1.97** to reflect the benefit of lower interest rates. As a result, growth in 2008 earnings per diluted share is expected to be 30% to 32% compared to 2007. In addition, PSI established its guidance for earnings from continuing operations for the first quarter of 2008 in a range of $0.42 to $0.43 per diluted share. The Company's guidance does not include the impact from any future acquisitions.

Id. at ¶ 80 (emphasis in original).

On February 21, 2008, PSI hosted a conference call to discuss PSI's 2007 financial results with institutional investors and analysts from twelve Wall Street firms. Id. at ¶ 81. Each of the Individual Defendants participated in this conference call that was recorded and thereafter made available on PSI's website. Written transcripts of the conference call were also published and disseminated by Thomson Reuters Streetevents and other sources. Id. Plaintiffs cited Defendant Jacobs's statements during this conference as actionable:

> [JACOBS:] Thanks for being with us this morning to review a strong fourth quarter performance for PSI and another great year. The **continuing strength of the PSI business model is evident in the 27% growth in earnings per diluted share for the fourth quarter and 30% growth in earnings for the year**. These results were at the top end of our guidance for each period and after we revised our annual guidance upward on two occasions after first establishing it in October 2006. In this respect we are also pleased today to be increasing our guidance for 2008 and as a result of the recent decline in interest rates.
>
> Our **earnings growth was driven by 44% increase in our revenue for the fourth quarter and 45% for the year, both of which establish new records for the company**. Consistent with our historical performance we produced this growth primarily through the addition of beds to our operations, the great majority of which resulted from acquisitions of inpatient facilities.
>
> **We also benefited from solid growth in same facility revenues of 6.5% for the year. True to our business model, this growth generated additional operating**

26

leverage, which we complimented through ongoing initiatives to improve productivity and efficiency in each facility. **As a result we produced a new record for same facility EBITDA margin of 200 basis points to 22.2% versus the fourth quarter of 2006. This performance was primarily accountable for the 49.1% growth in PSI's consolidated adjusted EBITDA for the quarter and its expansion as a percentage of revenue. We remain confident about our prospects to drive facility revenue growth for 2008 in our historic range of 7% to 9%.**

**We are enhancing our ability to drive same facility performance for 2008, as well as aggregate organic growth through the planned addition of nearly 600 beds in existing and new facilities during the year. In addition, PSI is well positioned to continue its long-term acquisition strategy by acquiring at least six inpatient facilities during 2008**. We have a strong top line of candidates, a favorable pricing environment and the financial resources to accomplish our goals.

In summary, let me repeat that what you have heard before is **we consider our strong prospects for long-term profitable growth. Our confidence in our future rests on our ability to continue implementing a proven business model and growth strategy in an industry whose growth dynamics remain very favorable for PSI. Simply put we are the clear leader in a highly fragmented capacity constrained growth industry**. While we never take execution for granted, especially in terms of providing the highest quality of care for our patients and their families, we expect the PSI team to continue leveraging our strong momentum for future growth.

Id. at ¶ 82 (emphasis added).

During the 2008 conference call, several Wall Street analysts questioned Jacobs for more information on PSI's same facility revenue growth of 5.3% for the fourth quarter 2007 and 6.5% for the full year and PSI's forecast estimates of 7% to 9% growth. Id. at ¶ 103. Jacobs responded that the 2007 shortfall was due to "bad luck," and was not indicative of problems with or maturation of PSI's acquisition strategy: "That 7% to 9% was well within our grasp, and we just had some bad luck." Id. at ¶ 103. Jacobs also stated: "But if you were just to take our bottom three facilities – not the bottom 10, just our bottom three facilities – and we focus on them and get them on the right track, we would have done well above 7% for last year. So quite frankly, **we can**

get above 7% in '08 just by doing what we did last year and just working on these three facilities." Id. (emphasis in original). Defendant Jacobs also cited the additional 600 beds to be acquired the next year as "just . . . insurance," because PSI's "problems were limited to a small number of facilities that if we just fix, that 7% to 9% is there." Id. at ¶ 103 (emphasis in original).

In a February 2008 conference call with investors, Jacobs admitted the account had been underfunded throughout 2008, explaining that the reserve balance should have been increased every quarter during the Class Period, but admitted that the $0.05/share increase in expenses was "a build-up that probably should have been allocated one-fourth across all the quarters." Id. at ¶ 86. During the 2008 conference call, Jacobs admitted that "the actual claim costs per claim is going to go up. And has gone up over time." In response to an investor's question, "when it became known to you that you would have to take reserves?," Turner and Jacobs admitted that their awareness of the need to increase in reserve since at least December and that increased operating expenses should have been reflected in each of PSI's quarterly financial reports issued during the Class Period. Id. at ¶ 91.

On April 30, 2008, PSI issued a press release that was approved by each of the Individual Defendants, entitled "Psychiatric Solutions First Quarter Earnings Increase 39.4% to $0.46 per Diluted Share," through Business Wire and thereafter other news organizations, financial analysts, websites and other sources of information distributed this release. Id. at ¶ 112. Defendant Jacobs is again quoted in this press release that identifies Defendant Turner as the contact source for further information. Id. at ¶ 112.

During a May 1, 2008 conference call with nine Wall Street firms on PSI's first quarter

28

2008 results with institutional investors and analysts, all Individual Defendants participated and the contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities. Id. at ¶ 114. At the outset of the call, Jacobs made the following statement:

> [JACOBS:] We appreciate your being with us this morning to discuss an **outstanding performance by PSI for the first quarter**. As you can see from our earnings release, we once again produced very strong results. **Given the acute focus on our same facility revenue growth metric, I am pleased to report that we delivered 7.7% same-facility revenue growth, solidly within the range we target on an annual basis**.
>
> I would also like to highlight very strong corporate wide growth. Total revenue increased 33%, consolidated adjusted EBITDA grew 43%, earnings from continuing operations increased 39%. And, once again, **we are raising our earnings guidance again for the year, and now expect to deliver earnings per share growth of 34% to 36% as compared to 2007**.
>
> Our strong growth reflects the addition of the new inpatient beds, primarily through acquisition. Since the end of the first quarter of 2007, we acquired 20 inpatient psychiatric facilities with approximately 2000 beds in two transactions. We completed the acquisition of Horizon Health in May 2007, and purchased the five facilities from United Medical Corporation in March of this year. We also purchased two EAP companies during the first quarter of 2008.
>
> We also continued to expand our bed count through the addition of beds to new and existing facilities. **These beds will help us meet increasing demand for high-quality inpatient psychiatric care**, while serving patients whom we cannot admit today. In the first quarter, we added approximately 80 beds, and we expect to add another 250 beds in the second quarter, of which more than 100 have already opened. As we had previously discussed, we are on track to add nearly 600 beds this year, and we continue to believe we will have all of those beds operational by late this year or very early next year.
>
> As I mentioned earlier, we were very pleased with the 7.7% growth in PSI same-facility revenue for the first quarter, consistent with our annual target of 7% to 9% growth for 2008. We produced this growth in spite of the negative effect of Easter shifting into the first quarter this year compared with the second quarter last year. The increase in same-facility revenue resulted from a 2.4% increase in patient days and a 5.1% increase in revenue per day.

29

Our same-facility growth also continued to drive increased operating leverage. Our same-facility EBITDA margin increased 180 basis points to 21.9% for the quarter. **Considering this was the first full quarter in which the nine facilities acquired from ABS were included in our same-facility base, this growth demonstrates our ongoing progress in operating those facilities more effectively.**

We also produced an increase of 80 basis points to 20.8% in EBITDA margin for all of our facilities. This improvement contributed significantly to the 120 basis point increase in our margin for consolidated adjusted EBITDA, which totaled $77 million for the quarter, up 43% from the first quarter of 2007.

Looking forward, **we intend to continue executing PSI's proven business model**. Our pipeline of potential acquisitions remains healthy in a favorable pricing environment. And we have the financial capacity to carry out our plans. Steady growth in the industry demand also provides a solid foundation for the growth in our existing facilities and supports our development of new beds.

**With an anticipated 7% to 9% expansion in same-facility revenue annually, we expect to continue increasing our EBITDA margins over time. We remain confident about our ability to continue to expand our same-facility EBITDA margin.**

In summary, **we are well-positioned for future significant growth**. We enjoy positive industry conditions, a successful strategy and a highly experienced management team. As in the first quarter, the key to leveraging this momentum is primarily a matter of execution. And let me assure you that we are very focused on getting the job done.

Id. at ¶ 115 (emphasis in original). A broadcast of the call remained available for at least 14 days thereafter on PSI's website.

On May 6, 2008, PSI issued its Form 10-Q Report on its financial results for the first quarter of 2008, citing PSI's ability to improve operations, reduce costs and to expand revenues at its facilities while providing high quality care to PSI's patients. Jacobs and Polson signed this Report and certified this report under the Sarbanes-Oxley Act. Id. at ¶ 116.

During a July 31, 2008, PSI conference call on PSI's second quarter 2008 results with institutional investors and analysts representing 12 Wall Street firms, Jacobs cited the

30

improvement in PSI's existing facility revenues and margins from the additional beds at those facilities, but Plaintiffs allege Jacobs omitted that PSI facilities were understaffed and underfunded as revealed by problems at PSI facilities. Id. at ¶¶ 122, 123.

In a October 30, 2008 press release entitled "Psychiatric Solutions Earnings Per Diluted Share Increases 37.8% on 8.7% Growth in Same-Facility Revenue," the Defendants describe PSI's third quarter 2008 financial results that included the following narrative statements:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the third quarter ended September 30, 2008. Revenue was $448.0 million for the quarter, an increase of 13.0% from $396.4 million for the third quarter of 2007. Income from continuing operations rose 39.1% to $28.6 million for the quarter from $20.6 million for the third quarter of 2007. Income from continuing operations per diluted share increased 37.8% to $0.51 for the third quarter of 2008 from $0.37 for the third quarter of 2007.

**Same-facility revenue increased 8.7%** for the third quarter of 2008 compared with the third quarter last year. This increase reflected same-facility growth in net revenue per patient day of 4.8% and growth in patient days of 3.7%. Same-facility EBITDA margin was 20.6% for the latest quarter, **up 60 basis points** from 20.0% for the third quarter of 2007, while the EBITDA margin for all facilities also **increased 60 basis points** to 20.5%. PSI produced a comparable-quarter increase of 18.1% in consolidated adjusted EBITDA to $80.6 million, which increased as a percentage of revenue to 18.0% from 17.2%. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on pages 6 and 7. "**PSI performed well** for the third quarter, with **strong same-facility revenue growth** driving expanded profit margins," said Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "The **addition of new beds throughout the year has contributed to the increasing rate of comparable-quarter growth in same-facility patient days for three consecutive quarters.**

"The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments. We plan to continue expanding our ability to serve this demand, both through the addition of new beds in our facilities and the ongoing execution of our proven acquisition strategy in a fragmented, capacity-constrained industry. **We are well positioned to fund our anticipated growth over the next year through substantial cash flow from operations**, our existing cash and the availability under our credit facility."

31

Based on the Company's results for the third quarter and first nine months of 2008 and its outlook for the remainder of the year, PSI today **affirmed its guidance** for earnings from continuing operations per diluted share for 2008 in a range of $2.02 to $2.03, reflecting growth of 36% compared with 2007. In addition, PSI also today **established its guidance for earnings per diluted share for 2009 in a range of $2.40 to $2.44, reflecting growth of 18% to 21%.**

Id. at ¶ 136.

During an October 31, 2008 conference call on PSI's third quarter 2008 results with institutional investors and analysts representing 16 Wall Street firms, the Individual Defendants participated, and Jacobs again touted the purported quality of PSI's operations and the improvement in existing facility revenues and margins:

> [JACOBS:] **PSI continued to perform very well for the third quarter**. We produced growth of 8.7% in same-facility revenue for the third quarter. The third consecutive comparable quarter increase. This growth by 13% increase in revenue for the quarter, and also **margin improvement** that resulted in a 38% increase in earnings per diluted share.
>
> As a result of this growth, **we are on track to achieve our earnings guidance for full year 2008. We are very pleased with our same-facility results**. Earlier this year we discussed our focus on expanding same-facility patient days. **For the third quarter patient days increased 3.7%, a rate which is now also increased over the third consecutive quarter. This improvement helped us produce our highest rate of same-facility revenue growth since the fourth quarter 2006.**
>
> As expected, **the operating leverage created through this substantial growth resulted in higher profit margins. In addition we are continuing our initiatives to improve quality and efficiency in each facility**. As just one example, we are currently engaged in a process to standardize our automated dispensing machines for medication and to add these ADMs to facilities that don't currently have them. ADMs have already proven their ability to enhance the quality of care, increase efficiency by automating the distribution, tracking management and security of medications. **They contribute to our greater patient safety** and reduced pharmacy costs. This initiative is **representative of our continuous efforts to identify and implement best practices within our facilities or within the industry that are relevant to all of our facilities.**
>
> **Through our combined focus on growth and increased efficiency, both same-**

Case 3:09-cv-00882   Document 180   Filed 03/29/12   Page 34 of 60 PageID #: 4360

**facility EBITDA to a percent of revenue, and the EBITDA margin for all facilities increased 60 basis points over the third quarter last year. In addition, consolidated adjusted EBITDA grew 18% quarter-over-quarter to [$80.6] million for the third quarter. This growth represented an 80 basis point increase as a percentage of revenue to 18% versus 17.2% for the third quarter last year.**

In an industry with steady growth in demand, **a significant portion of samefacility growth reflects the addition of new beds to existing facilities**.

\* \* \*

Riveredge Hospital in Chicago which as we've discussed in our conference call last quarter, had an admissions hold placed on it by the Illinois Department of Family Services in July. During the third quarter, our same-facility patient day growth was negatively impacted by approximately 70 basis point due to the lower census levels resulting from this DCF admissions hold. **This hold is still in place; however we expect it to be lifted in the current quarter. The financial impact of the admissions hold in complying with the DOJ investigation cost us approximately 2% to 3% earnings per share hit in the third quarter**.

To conclude my remarks today I'll repeat what you've often heard me say. Our confidence in the long-term growth potential of PSI remains very strong. We are the leader in a growing capacity constrained industry. **Our business model and growth strategy have been continuously refined and successfully proven** over the six years that we have implemented (inaudible) as a public company. **As a result, our scale, our resources, our management depth, and capability have all increased enhancing our ability to execute**.

With continued strong execution we expect to expand through both additional facility acquisition and through the development of bed for existing and new facilities. We also **expect to drive enhance profit margins** through growth in samefacility revenue at our target rate of 7% to 9% annually.

Id. at ¶¶ 137, 138 (emphasis in original).

During this call, as to the impact of the investigation and Illinois's hold on Riveredge admissions, Jacobs repeatedly told analysts that the problem was largely behind PSI, but had caused a reduction of third quarter earnings by $0.02- $0.03 per share and would impact fourth quarter earnings by another $0.01-$0.03 per share. Jacobs told investors that "We have that

33

coming back strong in '09" with legal expenses related to the investigation declining significantly in the fourth quarter. Id. at ¶ 139. Jacobs explained: "most if not all of those legal expenses are due to document production, and that's just a one-time event." Id. Jacobs said those expenses were included in the Company's fourth quarter guidance, "but it's a lot less than we had occur in the third quarter." Id. Jacobs also stated, "[W]e feel good about the quality of care at Riveredge, and it's been reevaluated by numerous people since the admissions hold." Id. at ¶ 140. Plaintiffs cite a colloquy with an analyst that reveals the following:

> [ANALYST]: A few questions. First it sounds like your optimistic you're going to lift the admissions hold at Riveredge in the fourth quarter, and I know you've had some optimism that was going to be resolved sooner. What's your level of confidence around that Joey?

> [JACOBS]: **I think its 80%. I think it's 80%. I think it's 80%,** it may be January 1, be the date. But it could be next week.

Id. at ¶ 141. Jacobs described other PSI facilities with problems as continuing to perform well after implementing corrective measures. Id. at ¶ 142.

At a December 5, 2008 JP Morgan Small-Midcap Conference transcribed by Thomson Streetevents, Defendant Turner told investors:

> [TURNER:] PSI has always been a growth story. We have always been excited to talk about our growth but of late it is important to qualify and talk a little bit more about the quality. If you know what happens in a psych hospital, it's tragic. It is very important that these folks are treated and stabilized. We do a great job of treating patients inside of our psychiatric hospitals. But we are not perfect. **There's always going to be incidences that occur inside a psych hospital that you would rather wish had not occurred. But those are very, very, very much the exception and not the general rule. But unfortunately when something like that happens, we tend to hear about it, read about it, have people talk about it and all of a sudden people think that is the norm. What we try to do here on this slide is just give you the perspective that it is absolutely not the norm.**

\* \* \*

34

You can see we are surveyed by multiple regulatory agencies and **less than 1% of our surveys have historically resulted in any kind of a serious deficiency or sanction**. We have accreditation, licensing, certification and accreditation from joint commission, federal and state agencies that have unilateral – any time they want to come into our facility 24 hours day, they can come in unannounced and **we welcome that because we know what we are doing inside of those facilities**.

Id. at ¶ 151.

When asked about Riveredge at the December 5, 2008 conference, Turner responded:

[TURNER:] The admissions hold at River Edge is really directly from the Department of Children and Family Services. They are the party that has the admission hold. We are still under the same – **there is no change since our last update on the earnings call there**. That is still in place.

[AUDIENCE MEMBER]: Any sense for the timing on that?

[TURNER:] Joey mentioned (inaudible) this quarter and I don't have anything updating from that.

Id. at ¶ 152.

Plaintiffs allege that PSI's February 25, 2009 release of its fourth quarter 2008 financial results revealed: (1) a 20% miss in earnings as the result of lost business and investigative costs at Riveredge and a reversal of the reduction in professional liability reserves that boosted earnings in February 2008, and (2) a reduction of PSI's 2009 earnings guidance by $0.14 per share at the midpoint of the range. Id. at ¶ 67. Plaintiffs allege that these facts reflect that PSI's acquisition business model was broken. Id.

During a February 26, 2009 conference call with investors, Jacobs told investors PSI was actively working behind the scenes to alert government officials and other referral sources of the upcoming articles allegedly in an effort to convince investors that the allegations were untrue or overblown so governmental entities would not stop sending patients to PSI facilities. Id. at ¶ 47.

35

In this conference call with investors and analysts elicited angry criticism over PSI's delayed disclosure of the impact of regulatory problems, and Jacobs responded:

> [JACOBS:] As discussed in our press release, the fourth quarter earnings per diluted share were impacted by one of the Company's facilities in Chicago and increase in the Company reserves for general and professional liability coverage. The Chicago facility suffered a decline in operations of $0.03 relating to an admissions hold. And professional fees of $0.02 relating to an investigation. As a result of our annual actuarial review we determined that we needed to increase our self insured reserves for general and professional liability by $4.9 million or $0.05 per share.
>
> *   *   *
>
> Our revised 2009 earnings guidance of $2.24 to $2.32 represents earnings growth of 17% to 21% before the effect of any future acquisitions. We are lowering our guidance to reflect the financial impact of the following three issues. The current economic environment and the continued admissions hold at our Chicago facility resulted in lowering our revenues goals for 2009. Same store revenue growth is expected to be mid single digits for the year 2009, and lower single digits for the first quarter. As we saw a softening in patient days that began in October.
>
> Number two, our guidance reflects the trending of general and professional liability expense that we experienced in 2008. And three, the impact of successfully amending our current revolving credit facility.

Id. at ¶ 68.

Jacobs described Riveredge alone as "probably costing us 50 to 70 basis points against the same store patient day comparison." Id. at ¶ 69. Jacobs informed investors of an administrative hold on new admissions until UIC completed its investigation and report of the incidents there, but stated that the State requirements to lift the hold had been accomplished. Id. One analyst stated: "What you're saying is that you've done everything the state has asked you to do and now you're just waiting for them to sort of make sure that you really have done those things with this outside survey and that's what's holding up the process?," to which Jacobs answered, "Correct."

36

Id. Plaintiffs allege that UIC's final report disclosed that PSI's problems had **not** been corrected when Jacobs made that statement, however, citing PSI for a string of continuing violations at Riveredge and other facilities nationwide. Id. Moreover, Plaintiffs allege this administrative hold has never been lifted. Id.

During this conference call, Jacobs described a "general softening" in this market and since October that was a "general across the board" reduction in all but a few PSI facilities. Id. at ¶ 70. Plaintiffs allege that notwithstanding PSI facilities' problems in Illinois and California, Jacobs attributed blame for PSI's declining patients on Lehman Brothers: "It's just a general softening that occurred in October and that was I guess when banks started to fail, maybe Lehman Brothers closed or whatever and we just – the uneasiness, the layoffs in the market just caused a softening in the census, starting in October, across the board." Id.

On October 30, 2008, during PSI's third quarter 2008 conference call, Jacobs told investors that PSI expected an increase due to the financial crisis because more people struggled to cope with stress arising from lost jobs, mortgages, and other financial problems: "The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments." Id. When pressed about this issue by an analyst, Jacobs responded:

> The surprise to us in the fourth quarter was October. For some reason, we
> occasionally have a month like that, where it's supposed to be a stronger quarter
> and for – I mean stronger month and for some reason the month just wants to be
> soft and at that time last year in September and October, there was a lot of bad
> news going out in the economy.

Id. at ¶ 71.

After ProPublica published reports of PSI's regulatory and patient care issues at Riveredge

37

on February 26, 2009, PSI's stock dropped immediately by $9.79 per share to close at $17.50 on February 26, 2009, a 1-day decline of 35% on volume of more than 17 million shares, more than 19 times the average 3-month daily volume. This stock price was PSI's lowest in trading over four years. Id. at ¶¶ 72-73.

### 7. Defendants' Alleged False or Misleading Statements

Plaintiffs' claims for Defendants' misrepresentations include statements from the 2007 reports, press releases and conference calls about the quality of PSI's operations, and the representations of productivity and efficiency at PSI facilities with "higher quality care" for patients, as materially misleading to investors. Id. at ¶ 106  Plaintiffs allege that these facts strongly infer that Defendants knew or recklessly disregarded that the statements in the 2007 Report on Form 10-K and other press releases would be, and were, misleading to and operated as a fraud upon investors, at least in the following material respects:

> • Contrary to the claim that PSI "provide[d] higher quality care than [its] competitors" or the "highest quality service," including "24-hour skilled nursing observation" and "intensive, highly-coordinated treatment," PSI's facilities were staffed at levels far below those necessary to provide such services, and well below the levels of its competitors, such that its incidence of regulatory violations and patient safety and quality of care problems was much higher than that of its competitors, as alleged above and as reported by ProPublica, the LA Times and other media outlets;

> • Contrary to the claim that PSI's facilities were in substantial compliance with applicable federal, state, local and independent review body regulations and requirements –

>> • PSI facilities were staffed below levels necessary to assure proper treatment of patients in a safe and secure therapeutic environment, or to monitor patients at risk for harming themselves and others, as described above;

>> • PSI consistently failed to promptly report or accurately document

38

incidents of actual or potential harm to patients, and actively delayed or concealed reporting of a significant number of events, as described above;

• PSI was in violation of other regulatory requirements and standards pertaining to staffing levels and patient treatment, the condition of facilities, and medical record-keeping practices; and

• Serious patient care deficiencies were still occurring at PSI hospitals in California and would continue to occur through at least June 2008, as was reported by ProPublica in November 2008.

• The Company was not spending substantial time and resources on its compliance programs, nor was regulatory compliance a top priority for PSI –

• According to former PSI employees, the Company was serious about risk management only, as one employee put it, "until money was involved." A former CEO at two PSI hospitals echoed this sentiment, saying there was always a tension between training and budget – the Company wanted employees to be trained, s/he said, "but they didn't want to spend a month" doing it.

• Several PSI hospital executives, when shown organizational charts for the Company's compliance department or asked who filled the compliance or regulatory positions like those described above, said that they had never heard those job titles being used in the organization and had no idea who, if anyone, filled those compliance-related roles.

• The statements that PSI was successful in improving results by "optimizing [its] staffing ratios, controlling contract labor costs and reducing supply costs" was materially misleading because it omitted to disclose that the reductions in staffing and expense were below the level at which PSI could operate its facilities in a safe manner or provide adequate – much less high quality – treatment to patients; and

• The claim that services at each facility are "continually assessed and monitored" and "corrective steps are taken when necessary" was materially false and misleading because, in reality, PSI took corrective actions only to avoid negative publicity, and only to the extent to create the appearance of action without making any meaningful changes in its practices or operations, as described in

39

the UIC report on Riveredge and other sources detailed above.

Id. at ¶ 111.

In summary, Plaintiffs allege numerous statements in 2007 were deliberately or recklessly misleading to investors because PSI's problems were not limited to "a small number of facilities," nor were the published reports only "operational issues" or "bad luck," because PSI had problems at multiple Texas facilities and other PSI facilities in other states at the time of these statements. Id. at ¶ 105. Prior to and during the Class Period, Plaintiffs allege as false and misleading Defendants' assurances of their comprehensive monitoring systems to detect potential problems before their occurrence and their high-quality patient care in a safe and secure environment and in compliance with regulatory and licensing requirements. Id. at ¶ 43.

As to Defendants' statements about the condition of PSI's finances, Plaintiffs cite the following statements:

> • Contrary to the contentions that PSI was providing "high quality" care and demonstrating "outstanding growth" while "improv[ing] productivity and efficiency" of acquired operations, many PSI hospitals and residential treatment centers were struggling under tight budgets that did not permit the facilities to be operated in compliance with regulatory requirements or in a manner that provided adequate – much less high quality – care to patients in a safe therapeutic environment;

> • The Company was attempting to "double [its] normal targeted pace of expansion" not because of the purportedly "strong" "pipeline of potential acquisition opportunities" or marketplace demand but because the Company needed to accelerate its acquisitions to cover up its inability to continue squeezing growth out of facilities it had previously acquired; and

> • The Company could not achieve 7% to 9% same facility revenue growth without the planned addition of 600 beds by facility expansion or acquisition, such that the planned additions were not "just . . . insurance," as claimed by Jacobs.

Id. at ¶ 102.

40

Plaintiffs' allege as actionable the following statements about PSI's reported operating expenses, same facility results, revenue and patient data, in the first quarter of 2008:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the first quarter ended March 31, 2008. Revenue increased 33.3% to a record $429.7 million for the quarter from $322.4 million for the first quarter of 2007. Income from continuing operations rose 39.4% to $0.46 per diluted share from the comparable prior-year quarter.

**Same-facility revenue grew 7.7% for the first quarter of 2008, reflecting same-facility growth in net revenue per patient day of 5.1% and growth in patient days of 2.4%. Same-facility EBITDA margin expanded 180 basis points to 21.9% and EBITDA margin for all facilities increased 80 basis points to 20.8% for the first quarter of 2008 from the first quarter of 2007.** Consolidated adjusted EBITDA grew 42.5% to a record $76.8 million, or 17.9% of revenue, for the first quarter of 2008 from the first quarter of 2007. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on page 6.

**Joey Jacobs, Chairman, President and Chief Executive Officer of PSI, remarked, "PSI performed extremely well during the first quarter of 2008, enabling us to exceed earnings guidance for the quarter and to again raise our earnings guidance for the year. Our focus on execution enabled us to achieve our samefacility revenue and EBITDA targets and implement our plans for adding new beds**. With the March acquisition of five inpatient psychiatric facilities from United Medical Corporation, we also added more than 400 beds in a transaction expected to be accretive to our 2008 financial results.

**"Market dynamics in the inpatient behavioral health industry remain favorable, supporting our ability to continue implementing our proven business model. We remain confident of our prospects for driving further significant growth in our same-facility metrics,** while continuing to build our platform for future growth through the accretive acquisition of at least six inpatient facilities each year."

Based on its first quarter results and outlook for the remainder of the year, **PSI is increasing its guidance for earnings from continuing operations per diluted share for 2008 to a range of $2.00 to $2.03 from the previous range of $1.97 to $2.01. As a result, growth in 2008 earnings per diluted share is expected to be 34% to 36% compared to 2007**. The Company's guidance does not include the impact from any future acquisitions.

41

Id. at ¶ 113 (emphasis in original).

Given the regulatory violations and patient safety and care issues for incidents in 2007 and earlier, Plaintiffs allege PSI had increased exposure to professional liability claims at PSI's facilities. Id. at ¶ 85. Thus, Plaintiffs allege that Defendants lacked a reasonable basis to reduce PSI's reserve account at the outset of the Class Period and, in doing so, violated generally accepted accounting principles ("GAAP"). Id. Plaintiffs specifically cite Defendants' underreporting of PSI's actual operating expenses and malpractice reserves despite the prevalence of patient care and safety problems and likely increase of patient claims in 2008 as constituting misleading statements to investors at the outset of the Class Period. Id. at ¶¶ 85-95. Thus, Plaintiffs allege the Defendants' February 20, 2008 earnings release, Defendants' statements at the February 21, 2008 conference call, and in PSI's 2007 Form 10-K Report were deliberately or recklessly misleading to PSI investors. Plaintiffs allege that Jacobs' admission that PSI's reserves should have been increased in its prior quarterly financial statements demonstrates that PSI's Forms 10-K and 10-Q filed with the SEC during the Class Period violated GAAP. Id. at ¶ 92.

Plaintiffs allege these statements about PSI's 2008 performance to be false and in reckless disregard of PSI's actual operations and financial condition by failing to disclose and concealing from investors or recklessly ignoring material risks to PSI's financial viability. Plaintiffs cite the foregoing statements as recklessly and materially misleading:

> • PSI's attribution of its strong growth, revenues and margins to PSI's "focus on execution" or its "successful strategy and [] highly experienced management team," was in fact due to PSI's understaffing and underfunding of psychiatric facilities below levels of compliance with regulatory licensing and accreditation standards and requirements;
>
> • PSI's reported financial results did not reflect the true costs to operate its

42

facilities consistent with all regulatory, licensing and accreditation standards and requirements;

• PSI's reported financial results continued to under-reserve for medical malpractice and other professional liability claims in violation of GAAP; and

• The financial guidance provided in the April 30 earnings release and discussed on the May 1 conference call lacked a reasonable basis because it failed to account for malpractice and professional liability expenses that had been incurred and were reasonably expected to continue to be incurred at levels above the amounts reserved for such expenses, and because the guidance was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment.

• Defendants' statement that PSI was "on track to achieve [its] earnings guidance for full year 2008" and PSI's guidance for 2009 lacked a reasonable basis because the published guidance failed to account for the actual and reasonably anticipated expenses and lost business arising from the Riveredge investigation or the administrative hold imposed by DCFS, continuing malpractice expense claims, or a decline in patient occupancy that began in October 2008. The guidance was also misleading and lacked a reasonable basis because it was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment. Id. at ¶ 145.

Id. at ¶ 117.

As to the material omissions about PSI's actual business practices, Plaintiffs allege:

• The statements omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate treatment or care to those patients, including proper around the clock monitoring of patients with suicidal tendencies or who otherwise presented a risk of harm to themselves or other patients or staff. Id. at ¶ 102.

• By failing to disclose that annual revenue growth of 7% to 9% was predicated upon practice of cutting expenses and staffing below the levels necessary to prevent physical and sexual assaults on patients, that PSI's assertions of its "high quality" of treatment or care and safe environment for patients was misleading. Id. at ¶ 112;

43

• As of May 2008, serious patient care deficiencies were still occurring at PSI hospitals in California. Id.

• Turner knew or recklessly disregarded that his statements at the December 5, 2008 investor conference were misleading and contributed to a fraud upon investors, because Turner lacked a factual basis to state that PSI's operations of its facilities would be "viewed very favorably" once the core measure data was released, and lacked a basis for stating DCFS's hold at Riveredge would be lifted in the fourth quarter of 2008. Id. at ¶ 153.

Plaintiffs allege that Defendants' statements did not provide a truthful or accurate account of the Illinois' investigation of Riveredge that UIC's investigation had expanded to include facilities other than Riveredge and was therefore unlikely to be completed before the end of the year. Id. at ¶ 146. Thus, Plaintiffs allege Defendants lacked any factual basis to assert that the state hold at Riveredge would be lifted in the fourth quarter 2008, nor the 80% likelihood of such occurring. According to the minutes of the September 10, 2008 PSI Medical Executive Committee meeting, PSI had also been informed of the results of a federal agency survey of the facility that "the hospital was close to being placed in immediate jeopardy" based upon "a significant amount of concern for the hospital's reputation within the community and the quality of care provided to patients." Id. Defendants also failed to disclose the continuing violations at its other facilities nor PSI efforts to dissuade state officials from imposing fines or sanctions at PSI's Pines facility. Id.

According to the amended complaint, at the end of the Class Period, PSI investors learned the extent to which the administrative hold had increased PSI's expenses and resulted in lost business that combined with steadily increasing malpractice expenses. The decline in PSI's financial performance caused an immediate 35% drop in the value of PSI's stock. Id. at ¶¶ 9, 67-73, 200-213.

44

## B. The Parties' Class Certification Proof

According to Plaintiffs, Lead Plaintiff Central States, an institutional investor formed in 1955, administers multi-employer Taft Hartley pension funds. (Docket Entry No. 150, Lee Declaration at ¶ ¶ 1, 2). Central States has an operating budget of $35 million and manages $17 billion in pension funds for more than 210,000 persons. Id. During the class period, Central States purchased 190,945 shares of PSI's common stock from the NASDAQ at prevailing market prices. Those purchases are with the assistance of professional investment advisors. Id. at ¶ ¶ 5-6.

PSI's weekly turnover rate for its shares traded on the market is 10% of all of its outstanding shares. (Docket Entry No. 148 at 24 and Docket Entry No. 149, Herman Declaration at Exhibits 1A and 1B). There were at least 16 market analysts who prepared and distributed reports on PSI and 19 market analysts participated in the conference calls cited and quoted supra. Id.; Docket Entry No. 149, Herman Declaration at Exhibits 1 and 5) During the class period, more than 237 market makers (that agree to purchase or sell securities on demand) engaged in trading more than one million shares of PSI stock. Id. at 25; Docket Entry No. 149, Herman Declaration at Exhibit 6). Plaintiffs charted the market's reactions to PSI's announcement reflecting a "statistically significant result". Id at 25-26; Docket Entry No. 149, Herman Declaration at Exhibit 8). PSI filed the SEC's S-3 form that the SEC allows only to companies with $75 million in capitalization and a history of SEC filings. Id at 25. During this class period, PSI had capitalization of more than $600,000 million and exceed $1.3billion.PSI's average "Bid-Ask" spread (the difference between price of a willing buyer and willing seller of a stock) was $0.04. Id. According to PSI's annual proxy statements, insiders owned less than 2% of the outstanding shares issued by PSI. Id.; Docket Entry No. 149, Herman Declaration at Exhibit 9)

45

The Defendants submitted a summary of Central States's purported transactions in PSI common stock that was bought and sold on different dates from February 22, 2008 to January 16, 2009 totaling of 82,254 shares that yielded an alleged "net gain" of $1,903,529. 27. (Docket Entry No. 152-1). Defendants contend these transactions show that Central States is a net gainer and did not suffer a loss rendering Central States's subject to a unique defense that is inapplicable to other class members. The author of this document is not identified and the document is not authenticated. According to Defendants' proof Central States's certification under the federal securities laws reflects its status as a class representative in 6 other class actions. Id. Defendants cite Central States's representative's Congressional testimony that in 10 to 15 years Central States may not survive. (Docket Entry No. 152-4). Defendants also cite Central States's designated agent's testimony that Central states's counsel actually controls, finances and manages the litigation that from Defendants' perspective evinces Central States's actual lack of interest and control of this litigation so as to disqualify Central States as an adequate representative for the purported class. (Docket Entry No. 155 at 10-11; Exhibit B).

Central States responds that under a 2011 Supreme Court decision, loss causation is not an issue at class certification. As a factual matter, Plaintiffs calculate their losses at $2.5 million. (Docket Entry No. 42-3). As to the Defendants' cited sales and purchases of PSI common stock, Plaintiffs note that Defendants' failure to calculate under recognized "First in First Out" ("FIFO") or Last-In First Out" ("LIFO") methods. In addition, Defendants' calculations do not account for transactions costs in arriving at their purported net gain figure. As to any net seller status, Central States contends that as a matter of law, a net seller is not precluded from proving damages to the class.

46

### III. Conclusions of Law

Class actions "vindicat[e] the rights of individuals who otherwise ought not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost.'" <u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 99 n. 11 (1981) (quoting <u>Deposit Guar. Nat'l Bank v. Roper</u>, 445 U.S. 326, 338 (1980)). A class action concentrates the litigation in one forum and avoids inconsistent adjudications, thereby advancing "the efficiency and economy of litigation which is a principal purpose of the procedure." <u>Am. Pipe & Constr. Co. v. Utah</u>, 414 U.S. 538, 553 (1974). Any judgment in such an action operates as <u>res judicata</u> against the claims of any other class member. <u>Duncan v. State of Tenn.</u>, 84 F. R. D. 21, 27 (M.D. Tenn. 1979).

To fulfill the requirements for class certification, Plaintiffs must first show compliance with Rule 23(a) of the Federal Rules of Civil Procedure that applies to all class actions. Once Plaintiffs have met this requirement, Plaintiffs must show that class certification is proper under one of the subdivisions of Rule 23(b). <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 621 (1997). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 178 (1974) (quoting <u>Miller v. Mackey Int'l, Inc.</u>, 452 F.2d 424, 427 (5th Cir.1971)(quotation marks omitted). Plaintiffs bear the burden "to show the Court that the requirements of Rule 23 are met." <u>Duncan</u>, 84 F.R.D. at 27. Mere recitation of the statutory language contained in Rule 23 will not satisfy the requirements of these rules. <u>Sims v. Parke Davis Co.</u>, 334 F.Supp. 774 (E.D. Mich. 1971), <u>aff'd</u> 453 F.2d 1259 (6th Cir. 1971).

47

Beyond Plaintiffs' initial burden of persuasion on "all four of the prerequisites contained in Rule 23(a)'", Plaintiffs must also "'demonstrate that the class [they] seek[] to represent falls within one of the subcategories under Rule 23(b)." Steelman v. Strickland, 78 F.R.D. 187, 189 (E.D. Tenn. 1977) (Neese, D.J.) (quoting Senter v. Gen. Motors Corp., 532 F.2d 511, 522 (6th Cir. 1976)). This burden is not by a preponderance of the evidence, as that standard applies only to proving the existence of the class at the time of trial. See Paxton v. Union Nat'l Bank, 519 F. Supp. 136, 171 (E.D. Ark. 1981), rev'd in part on other grounds, 688 F.2d 552 (8th Cir.1982). In determining the appropriateness of class certification, a court should accept the complaint's allegations as true. See Reeb v. Ohio Dep't of Rehab. & Corr., 81 Fed. Appx. 550, 555 (6th Cir. 2003).

In reaching a determination on class certification, preliminary hearings on the merits are disfavored. Eisen, 417 U.S. at 177-78; Duncan, 84 F.R.D. at 28. The Supreme Court, however, counsels that in determining class action issues, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 160 (1982) (emphasis added). A limited factual inquiry into the class allegations, including the deposition of the named plaintiff, is appropriate for actions involving complex claims. See, e.g., Kirkpatrick v. J.C. Bradford, 827 F.2d 718, 723 (11th Cir.1987) (securities action). To be sure, the court must engage in a rigorous analysis of the class certification motion, but given the Supreme Court's warning in Eisen, at this point, the Court's duty is to determine only if there is a sufficient factual showing to support the class sought to be certified.

48

## A. Rule 23(a) Prerequisites

Rule 23(a) sets forth four prerequisites that must be met for maintenance of a class action suit. To maintain a class action, Plaintiffs must show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

The Supreme Court requires that a district court engage in a "rigorous analysis" of whether the Rule 23 prerequisites are met before certifying a class. In re Am. Med. Sys., Inc., 75 F.3d 1069, 1078-79 (6th Cir. 1996)(citing General Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)). The district court has broad discretion in deciding to certify a class, but it must apply the Rule 23 framework. Id. at 1079(citing Gulf Oil Co., 452 U.S. at 100)).

## 1. Numerosity

To meet the first requirement of class certification under Rule 23(a), Plaintiffs must demonstrate that the putative class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a).

> There is no strict numerical test for determining impracticability of joinder. Senter, 532 F.2d at 523 n. 24 (and citations therein). Rather, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." General Tel. Co. v. EEOC, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980). When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone. 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3.05, at 3-26 (3d ed. 1992)

In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir.1996).

Here, Plaintiffs contend that the proposed class is a nationwide class of investors in PSI stock during the class for approximately one year. Given the parties' proof on the number of traders, market analysts and sales of PSI stock across the country of which less than 4% is owned by insiders, the Court concludes that Plaintiffs have satisfied the numerosity requirement of Rule 23(a).

## 2. Commonality

To satisfy the second requirement of Rule 23(a), Plaintiffs must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement is interdependent with the impracticability of joinder requirement, and the 'tests together form the underlying conceptual basis supporting class actions.'" In re Am. Med. Sys., Inc., 75 F.3d at 1080 (quoting 1 Newberg, supra at § 3.10, at 3-47).

> The class-action was designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Class relief "is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they turn on questions of law applicable in the same manner to each member of the class."

Id. (citation omitted). The commonality test requires only a single issue common to all class members. 1 Newberg supra at § 3.10. A class meets the commonality requirement even if questions peculiar to individual class members remain after a determination of defendant's liability. Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir.1988).

> The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, we have said that there need only be one question common to the class. American Med. Sys., 75 F.3d at 1080. It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.

50

Sprague v. General Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998). "[W]here the nature of the legal claims are such that individuals would have to submit separate proofs to establish liability, class actions are disapproved due to lack of commonality." Saur v. Snappy Apple Farms Inc., 203 F. R. D. 281, 287 (W.D. Mich. 2001). Once commonality is established, "differences in the amounts of damages sustained by class members will usually not defeat certification...However, there must be a workable system for determining damages for class members if claims for monetary damages are to proceed." Id. (citations omitted).

Here, Plaintiffs assert that the common claims for the putative class against the Defendants are as follows:

a.   Whether Defendants acted with the requisite scienter in their statements to investors or in their failures to provide material facts that under the circumstances was misleading to investors;

b.   Whether Defendants' misrepresentations and/or omissions were material
c.   Whether the market for PSI common stock was efficient so as to presume reliance by investors;and

d.   Whether the Defendants' cited misrepresentations and/or omissions caused Plaintiffs and class members a loss during the class period

(Docket Entry No. 148, Plaintiffs' Memorandum in Support of Motion for Class Certification at 17).

Here, based upon its earlier Memorandum denying the Defendants' motion to dismiss, as well as the Plaintiffs' proof on the number of stock transactions on NASDAQ, Defendants' S-3 registration, market capitalization levels, the low bid-ask spread of PSI's common stock, the low percentage of PSI common stock held by insiders, the number of stock analysts, market researchers on PSI's common stock, the Court concludes that Plaintiffs have made a sufficient

51

showing that the Defendants operated in an efficient market for the sales of PSI common stock.

These factors are relevant on the existence of an efficient market to create commonality for class

certification under the presumption of reliance doctrine in Basic Inc.v. Levinson, 485 U.S. 224

(1988). See Krogman v. Sterritt, 202 F. R. D. 467, 472-784 (N.D. Tex. 2001); In re Bexar Cty

Health Facility Dev. Corp. Sec. Litig, 130 F.R. D. 602, 607 (E.D. Pa. 1990).

      Moreover, the Defendants' "rollup acquisition strategy", their public statements about its

business practices and their cited failures to disclose their actual practices prior to the

governmental findings of widespread deficiencies in Defendants' provision of medical care

services, create common issues of fact and law for the investor class.

      The Defendants argue that based upon the various publication dates about its business

practices, the Court should create subclasses. At this stage in the proceeding, the Court must

determine whether commonality exists without a determination of the merits of Plaintiffs' claims.

To the extend the proof develops otherwise, the Court can later create subclasses. Fed. R. Civ. P.

23 (c)(5).

      As to the Defendants' assertion that Central States's "net gain" or "net seller" status

precludes commonality with the class, the Supreme Court has held that loss causation in a

securities action is not an issue for class certification. Erica P. John Fund v. Halliburton Co., 131

S. Ct. 2179. 2183 (2011) ("The question presented in this case is whether securities fraud

plaintiffs must also prove loss causation in order to obtain class certification. We hold they need

not."). Here, with disputed and unauthenticated proof, the Defendants inappropriately injects this

loss causation issue into a class certification analysis. To the extent any variation or distinction

from Halliburton exists, the Court declines to make merits findings in the context of a class

52

certification. From the court's review of the cited decisions, this "net gain" issue usually arises in the selection of a lead plaintiff[1], but the Defendants did not raise this issue earlier in these proceeding when the lead plaintiff issue was before the Court. Finally, even if Central states were a "net seller", such a fact does not preclude proof of loss so as to qualify a plaintiff as a lead plaintiff. Frank v. Dana Corp., 237 F.R.D.171, 73 (N. D.Ohio 2006) ("though the [proposed class representative] may have been a net seller, it should have no trouble proving damages and , therefore, is qualified to serve as lead plaintiff").

### 3. Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). In the Sixth Circuit, to satisfy typicality, the plaintiff "must be a member of the class he claims to represent . . . [or s]tated another way, the plaintiff must have standing to represent the class." Reid v. White Motor Corp., 886 F.2d 1462, 1471 (6th Cir. 1989) (quotation marks omitted).

Typicality limits the class claims to those fairly encompassed by the named plaintiffs' claims. General Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980). See also Senter, 532 F.2d at 525 n. 31 ("[t]o be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law"). A necessary consequence of the typicality requirement is that the representative's interests must align with those of the represented group, and in pursuing his own claims, the named plaintiff will advance the interests of the class

---

[1]Other Courts have rejected this method of calculating plaintiffs' losses to further the appointment of the group and its counsel. See In re Cendant Corp. Litig., 264 F.3d 201, 266-67 (3d Cir. 2001); In re XM Satellite Radio Holdings Sec. Litig., 237 F.R.D. 13, 18 (D.D.C. 2006).

53

members. 1 <u>Newberg</u>, <u>supra</u>, § 3.13, at 3-75. In <u>In re Am. Med. Sys.</u>, the Sixth Circuit stated:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, **a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims** of other class members, and if his or her claims are based on the same legal theory.

75 F.3d at 1082 (quoting 1 <u>Newberg</u>, <u>supra</u>, § 3-13, at 3-76 (footnote omitted)with emphasis added)). Further,

> [t]he typicality requirement, so explained, tends to merge with the commonality requirement. <u>Falcon</u>, 457 U.S. at 158 n. 13. Nevertheless, it is a separate inquiry and in particular focuses attention on differences between class representative claims and class claims which would defeat the representative nature of the class action. <u>Fuller v. Fruehauf Trailer Corp.</u>, 168 F.R.D. 588, 598 (E.D.Mich.1996).

<u>Saur</u>, 203 F.R.D. at 288. <u>See also</u> <u>In re Direct General Corp. Sec. Litig.</u>, No. 3:05-0077, 2006 WL 2265472 at *3 (M.D. Tenn. Aug. 8, 2006) (citing <u>In re Am. Med. Sys., Inc.</u>, 75 F.3d at 1082).

Here, the Court concludes that commonality and typicality overlap on Plaintiffs' and class members claims. In the Sixth Circuit, the test for typicality is whether a named plaintiff's claims "arises from the same event or practice **or course of conduct** that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." <u>In re Am. Med. Sys.</u>, 75 F.3d at 1082 (quoting <u>Newberg</u>, <u>supra</u>, § 3-13 at 3-76) (emphasis added). For the reasons stated on commonality, the Court concludes that the claims of the named Plaintiffs are typical of those of the class and Plaintiffs have satisfied the showing of typicality under Fed. R. Civ. P. 23(a)(3).

### 4. Adequacy of the Class Representative

Rule 23(a) demands that the named representatives "fairly and adequately protect the

54

interests of the class." Fed. R. Civ. P. 23(a)(4).

> This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members. Hansberry v. Lee, 311 U.S. 32 (1940); 1 Newberg, § 3.21, at 408. See also Smith v. Babcock, 19 F.3d 257, 264 n. 13 (6th Cir.1994)("[n]o class should be certified where the interests of the members are antagonistic, because the preclusive effect of the verdict may deprive unnamed class members of their right to be heard").

Trollinger v. Tyson Foods, Inc., No. 4:02-CV-23, 2006 WL 2924938 at * 7 (E.D. Tenn. Oct. 10, 2006).

In Falcon, the Supreme Court reiterated its core requirement that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." 457 U.S. at 156 (citations and quotation marks omitted). Inquiry into the adequacy elements requires the Court to consider whether "'(1) the representative[s] ... have common interests with unnamed members of the class, and (2) it [] appear[s] that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" In re Am. Med. Sys, Inc., 75 F.3d at 1083 (quoting Senter, 532 F.2d at 525) "Rule 23(a)(4) tests 'the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent'". Id.(quoting Cross v. National Trust Life Ins. Co., 553 F.2d 1026, 1031 (6th Cir. 1977)); Falcon, 457 U.S. at 157 n. 13 ("adequacy-of-representation requirement . . . also raises concerns about the competency of class counsel and conflicts of interest").

Absolute identity of claims among class members, however, is not required, Like v. Carter, 448 F.2d 798, 802 (8th Cir. 1971), particularly as to the amount of damages. Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200-01 (6th Cir. 1974). The adequate representation

55

requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members. Falcon, 457 U. S. at 157 n. 13.

Here, the Defendants' proof reflects that Central States has been found by six other district courts (Docket Entry No. 152-1) to be an adequate class representative. The Defendants' cited financial woes of Central States is based upon a projection ten to fifteen years hence and does not reflect Central States's current resources. This action will not be pending for ten years. Central States has the requisite resources to fund this litigation as reflected by the record in this action. If at any point, a class member or the Defendants can show otherwise, the Court can reconsider its current finding.

Defendants cite the indemnification agreement and advancement of costs disables Central States as an adequate representative. The Private Securities Litigation Reform Act contemplates counsel proving payment of fees and litigation expenses. 15 U.S.C. §78u-4(a)(8) ("the court may require an undertaking from the attorneys for the plaintiff class ... in such proportions and at such times as the court determines are just and equitable, for the payment of fees and expenses that may be awarded under this subsection"). See also H.R. Conf. Rep. No. 104-369 at 40-41 (1995) This Court and others have rejected contentions concerning contingency fees, advancement of costs and indemnification agreement. See Beach v. Healthways Inc., 3:08-0569, 2010 WL 1408791 at *5 (M.D. Tenn. April 2, 2010); City of Ann Arbor Emps. Ret. Sys. v. Sonoco Prods. Co., 270 F.R.D. 247, 252-53 (D.S.C. 2010) (rejecting plaintiff's indemnification agreement as an indicator of lack of adequacy).

As to Central States's cited lack of control over this litigation, such concerns do not

preclude a finding of adequacy of Central States that receives reports on the litigation from its counsel. See, Sonoco, 270 F.R.D. at 252-53 ( rejecting plaintiff's "deferral to counsel" on litigation issues as showing the lack of adequacy);  Johnson v. Aljian, 257 F. R. D. 587, 596 (C.D. Cal. 2009) ("attacks on the proposed Class Members's knowledge of and willingness or ability to supervise the litigation and on the adequacy of proposed counsel are, at best, hyperbolic and,at worst, consist of taking deposition testimony out of context and presenting in a manner that borders on misleading"); In re UTStarcom Sec. Litg., No. C04-04908 JW, 2010 WL 1945737, at * 8 (N. D. Cal. May 12, 2010) (rejecting a contention of the plaintiff class representative's inadequacy based upon a "portfolio monitoring" agreement under which plaintiff agreed for its lead counsel to monitor its securities portfolio for potential claims).

In sum, the Court concludes, as have other courts, that Central states is an adequate class representative, and that Central States's lead counsel are experienced and will protect the interests of the class.

## B. Rule 23(b)(3) Requirements

To certify a class under Rule 23(b)(3), Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." Amchem Products, 521 U.S. at 615 (internal quotation marks omitted).  For the

reasons stated on commonality under Rule 23(a), the Court concludes that common questions of fact and law predominate this action and any individual concerns of Central State .

For these same factual circumstances and based upon the legal authorities cited on commonality under Rule 23(a)(2), the Court concludes that the fraud on the market theory for this action is appropriate given the open and efficient market for PSI common stock. This theory will predominate in this action. As to whether a class action is a superior method for the fair and efficient adjudication of this action, the Court concludes that certification of this action as a class action is a vastly superior method of adjudication because the common issues will only have to be heard and decided once, thereby promoting judicial efficiency. Separate actions would run the risk of inconsistent judgments. Thus, the Court finds that certification is appropriate under Rule 23(b)(3).

## IV. Conclusion

For these collective reasons, the Court concludes that Plaintiffs' motion for class certification should be granted.

An appropriate Order is filed herewith.

**ENTERED** the _29th_ day of March, 2008.

William J. Haynes, Jr.
United States District Judge

58