**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) | |
| Plaintiff, | ) ) | |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREA PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civil Action No. 3:09-cv-00882-WJH<br><br>Senior District Judge William J. Haynes, Jr. |
| Lead Plaintiff, | ) ) | CLASS ACTION |
| v. | ) ) | |
| PSYCHIATRIC SOLUTIONS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE
AND UNSEAL JUDICIAL DOCUMENTS**

**The Interested Parties**

Beverly Kern is the daughter and Administrator of the Estate of Donna Kern. Donna Kern's granddaughter, Amy Kern, brutally killed Donna Kern with a tire iron and killed William Chapman with a gun on February 7, 2009, in Jupiter, Florida. Amy Kern has a long history of severe mental illness, with diagnoses of schizophrenia, bipolar disorder, and psychosis. At the time of the killings, she was psychotic and delusional. Twelve days before these tragic events, on January 26, 2009, the last day of inpatient treatment covered by her insurance, Amy Kern was released from Focus by the Sea, a psychiatric hospital in St. Simons, Georgia, owned and operated by the Defendant in this case, Psychiatric Solutions, Inc. ("PSI"). Amy Kern had spent

29 days in the facility during three separate inpatient stays in the previous three months before the discharge that led to two tragic but avoidable deaths.

On February 4, 2011, Beverly Kern, on behalf of herself and her siblings, and as Administrator of the Estate of Donna Kern ("Interested Parties"), filed a lawsuit against PSI, among others, in the State Court of DeKalb County, Georgia. (*Kern ex. rel Kern v. Universal Health Servs. Found. Inc.*, *et al.*, Case No. 11A35015-2 (State Court of DeKalb County, Georgia).) Ms. Kern alleged that PSI knew or should have known that Amy was a harm to herself and/or others when she was discharged on January 26, 2009 and thus never should have been discharged. Ms. Kern later dismissed her suit against PSI without prejudice *based on PSI's representations that it was not involved in any way in the operation of Focus by the Sea*.

### The Glynn County Litigation & PSI's Denials

After Ms. Kern independently discovered evidence of PSI's involvement in the facility that discharged Amy Kern, Ms. Kern filed a renewal complaint against PSI in the State Court of Glynn County, Georgia, on May 6, 2014. (*Kern ex rel. Kern v. Universal Health Servs., Inc., et al.*, Case No. CV20140117 (State Court of Glynn County, Georgia.) PSI was subsequently added to the original complaint by an Order of the Court on April 30, 2015. A true and accurate copy of Ms. Kern's operative complaint against PSI and the entity that acquired PSI in 2010, Universal Health Services, Inc., is attached as **Exhibit A**. Ms. Kern's decision to renew the complaint was based in part on the discovery (not from PSI) of a "Management Services Agreement" between PSI and Focus by the Sea. A true and accurate copy of the terms of the Management Services Agreement between PSI and Focus by the Sea is attached as **Exhibit B**. Pursuant to that contract, PSI performed a host of management services for Focus by the Sea, including clinical consulting, managing relationships with insurance companies, and consultation

on patient relationships, among many other services. (Ex. B at 2-5.) In return, Focus by the Sea agreed to provide a laundry list of monthly reports and other information about its medical care to PSI. (*Id.*) This evidence, which was independently obtained by Donna Kern's counsel and not produced by PSI, is directly contrary to PSI's representations in the Glynn County suit that it had nothing to do with Focus by the Sea.

In its pleadings in the Glynn County litigation, PSI attempts to point the finger downward to subsidiaries of subsidiaries of subsidiaries, claiming that PSI has never owned or operated Focus by the Sea and that PSI did not "operate that facility from November 2008 through January 2009 [*i.e.*, when Amy Kern was a patient]." (Affidavit of Mia Melonia ¶ 14 (Aug. 11, 2014), Ex. C to PSI Mot. Summ. J. True and accurate copies of PSI's Answer and Motion for Summary Judgment are attached as **Exhibit C**.) Indeed, to both the State Court of Glynn County and Ms. Kern, PSI's position has been that it had no role or involvement in the psychiatric care that Amy Kern received at its facility. PSI's denials continued into written discovery, with PSI producing only corporate articles of incorporation and amendments and denying any role in the operation of the facility that discharged Amy Kern.

### Former Employees of the Facility Contradict PSI's Denials

Faced with such stonewalling in discovery, the Interested Parties independently contacted former employees of Focus by the Sea. The former employees' testimony sheds light on PSI's denials and PSI's attempts to disown the facility and any involvement with what happened there. Former Head of Staffing at the facility, Ms. Elizabeth Rice, testified that PSI's Joey Jacobs called the CEO of the facility, Ms. Kim Whitelock, so often that "there was a code," referring to a text message Ms. Rice would send to Ms. Whitelock warning her of Ms. Jacobs' call. (Deposition of Elizabeth Rice 68:6-69:9 (April 28, 2015). The relevant portions of Ms. Rice's

3

deposition transcript are attached as **Exhibit D**.)  Mr. Jacobs' calls always received top priority.  (Ex. D at 69:16-17.)  And Ms. Rice herself, while she worked at Focus by the Sea, participated in regional PSI conference calls, led by the corporate office in Tennessee and joined by multiple HR staff at PSI's facilities in the Southeast United States.  (Ex. D at 63:4-64:4.)  Ms. Rice also testified that she signed for FedEx packages from PSI in Franklin, enclosing the policies and procedures pursuant to which the facility was to be operated.  (Ex. D at 38:17-40:25.)

The former employees of Focus by the Sea also provided a number of PSI documents that are inconsistent with PSI's denials and disclaimers in the Glynn County Litigation.  For example, PSI established a "Code of Conduct" for "all PSI leaders, employees, contractors and associates."  (A true and accurate copy of the Code of Conduct is attached as **Exhibit E**.)  PSI also established a "Corporate Compliance Program" complete with a hotline that facility employees could call to anonymously report violations of rules and regulations in patient care or the overall operation of the hospital—a hotline that former employees of Focus by the Sea actually used to report violations at the facility.  (A true and accurate copy of PSI's Corporate Compliance Program is attached as **Exhibit F**.)  And PSI's "Code of Ethics" imposed, among other things, a duty of loyalty on all "employees" to advance PSI's "legitimate interests when the opportunity to do so arises."  (PSI Code of Ethics ¶ 6.  A true and accurate copy of PSI's Code of Ethics is attached as **Exhibit G**.)

Astonishingly, *PSI continues to deny any involvement "whatsoever" in Focus by the Sea and the treatment of Amy Kern* to both the State Court of Glynn County and Ms. Kern.  Based on the evidence that Ms. Kern has discovered on her own, the Interested Parties believe that PSI's representations to the Georgia court, and to counsel, are false.  They therefore request permission from this Court to intervene in this action to reveal the truth about PSI's involvement in Focus by

4

the Sea and that facility's treatment of Amy Kern in 2008 and 2009, including PSI's role in the decision that resulted in the tragic deaths of Donna Kern and William Chapman.

Specifically, the Interested Parties seek to intervene for the limited purpose of unsealing the materials that were submitted in support of and in opposition to PSI's Motion for Summary Judgment. Based on the Amended Complaint in this action and the information that is publicly available on the Court's docket, the Interested Parties believe that the summary judgment materials will be instrumental in exposing the truth about PSI's involvement in Focus by the Sea and finally put an end to PSI's materially false representations to the Georgia court. The Interested Parties have requested these documents from PSI in the Glynn County Litigation, but PSI again refused to produce anything. (PSI Resp. to Pls. Third Req. Prod. No. 1 (April 13, 2015).)

As discussed more fully below, the materials filed with the Court in connection with PSI's Motion for Summary Judgment in this case never should have been sealed in the first place. The Lead Plaintiff in this case, Central States, Southeast and Southwest Area Pension, agrees. And PSI cannot now offer the kind of "compelling reason" required to overcome the presumption in favor of public access to judicial documents, a presumption that is firmly grounded in the common law and the First Amendment to the U.S. Constitution. The Interested Parties respectfully request permission from the Court to intervene for this limited purpose, which is well-established under binding law.

### Lead Plaintiff's Allegations Against Psychiatric Solutions, Inc.

According to Lead Plaintiff's Amended Complaint, PSI provided behavioral healthcare services at 95 hospitals and residential treatment centers in 31 states, Puerto Rico, and the U.S. Virgin Islands. (Am. Compl. ¶ 2 (DE No. 109).) The number of facilities that PSI owned and

5

operated before its acquisition by UHS in 2010 was due to an aggressive roll-up strategy implemented from 2002 to 2007. (*Id.*) During this time, PSI acquired over 85 mental health facilities, taking its revenue from $76 million to $1.5 billion, all while promising investors continued growth and profitable returns. (*Id.*)

Lead Plaintiff's Amended Complaint is replete with allegations of PSI's direct involvement in the operation of its psychiatric facilities, *including the same facility that discharged Amy Kern*. According to the Amended Complaint in this case, one of the individual defendants, PSI's then-President and CEO Joey Jacobs, *visited Focus by the Sea in April or May of 2008 to discuss staffing*. (*Id.* ¶ 38.) Managers at Focus by the Sea informed Mr. Jacobs that "the hospital needed more staff," but Mr. Jacobs refused, claiming that PSI would "love to do more," but that Focus by the Sea "had all the staff that PSI could afford." (*Id.*) This is the same individual that Ms. Rice testified made frequent calls to the CEO of the facility, Ms. Whitelock.

According to Lead Plaintiff's complaint, at the time that PSI (Joey Jacobs, in particular) made staffing cuts at Focus by the Sea in 2008, PSI was under immense pressure from investors to deliver on its promises of continued revenue growth. (Am. Compl. ¶ 38 (DE No. 109).) As one might expect, in the Glynn County Litigation, a physician working at Focus by the Sea at the time confirmed that PSI executives put pressure on the facility to make medical decisions based on money, not patient needs, with an unidentified CEO of Focus by the Sea "dictat[ing]" that patients be discharged when their insurance ran out, regardless of the patient's mental health. (*See* Deposition of Dr. Jackie Cox Thompson (May 7, 2014) at 59-63. The relevant excerpts from Dr. Cox Thompson's deposition transcript is attached as **Exhibit H**.) Notably, PSI admitted in the Glynn County litigation that Joey Jacobs, PSI's President and CEO and an individual defendant in this case, was the CEO of Focus by the Sea in 2008 and 2009. (PSI

Resp. Pl.'s Second Req. Admit Nos. 24, 26.) And Jack Polson, another individual Defendant in this case, was the CFO of Focus by the Sea and CAO of PSI. (*Id.* at Nos. 27-28.)

According to Lead Plaintiff's Amended Complaint, PSI executives made monthly and annual visits to each of PSI's facilities to assess the facilities' compliance with PSI's various policies and procedures. (Am. Compl. ¶¶ 165-66 ("Former employees of PSI confirmed that facility site visits were conducted on a monthly basis by Division-level officers, including CEOs or Clinical Services Directors, who reported to PSI's most senior executives, and on an annual basis by PSI's Vice President of Environmental Safety and Compliance who reported to [the] Executive Vice President of Quality and Compliance.").) Based on Lead Plaintiff's investigation and statements of former PSI employees, a "relatively small number of people operating out of [PSI's] Franklin, Tennessee headquarters" controlled its business of providing psychiatric care to mentally-ill patients. (*Id.* ¶ 160.) This is consistent with the testimony from former employees of Focus by the Sea. (*See, e.g.*, Ex. D.)

Joey Jacobs, Brent Turner, and Jack Polson each had "direct and supervisory involvement in the day-to-day operations of [PSI]." (*Id.* ¶ 217; *see also id.* ¶ 237.) Several former PSI employees described PSI and Focus by the Sea CEO Joey Jacobs, in particular, as "one of the most 'hands-on' CEOs they have ever worked for." (*Id.* ¶ 175 ("Jacobs was 'unequivocally the most hands-on CEO' and 'the most involved [I have worked with],' particularly when it came to financial issues, said one [former employee]. '*Some (CEO's) manage though delegation, less so Joey.*' ") (emphasis added).)

According to Lead Plaintiff's Amended Complaint, Joey Jacobs had "direct authority" over PSI's 11 Divisions, each of which consisted of approximately ten psychiatric facilities—a "number specifically set by [PSI] as the appropriate quantity of facilities for efficient and

7

effective oversight." (*Id.* ¶ 216.) According to the Amended Complaint, Mr. Jacobs directly supervised Kathy Bolmer, PSI's Executive Vice President, Quality and Compliance, and she "*exercised constant oversigh*t over the regulatory compliance and risk management *at each of PSI's inpatient facilities*." (*Id.* ¶ 216 (emphasis added).)

In addition to describing how PSI executives micromanaged the psychiatric facilities, the Lead Plaintiff's Amended Complaint details numerous PSI-imposed meetings between PSI division officers and PSI executives in Tennessee, including Mr. Jacobs and Mr. Polson. (*Id.* ¶ 177(a).) This is all in addition to the numerous reports that facility managers prepared for "corporate" in Tennessee and conference calls between hospital managers and the "corporate" risk management department in Tennessee. (*Id.* ¶¶ 177(a), 177(c), 177(e), 177(g), 177(h).)

The Lead Plaintiff's Amended Complaint also describes PSI's active attempts to conceal embarrassing information about the inadequate care patients received in its facilities. (*E.g.*, *id.* ¶ 57 (describing report that revealed PSI's "organized scheme to cover up violence, suicide attempts and medication errors at a Charlottesville facility for juveniles"); *id.* ¶ 78 (describing report that revealed "several efforts by PSI/Riveredge officials to avoid having to report sexual assaults of patients as 'sentinel events,' which . . . would have focused unwanted attention on the hospital's problems"); *id.* ¶ 102 (PSI "actively worked to conceal or recklessly ignored[] conditions which created material and significant risks to [PSI] and the patients under its care"); *id.* ¶ 148 (describing PSI's "substantial efforts to conceal such [regulatory] violations").) Despite PSI's best efforts, however, suicide attempts, incidents of sexual abuse, and other problems in PSI's facilities came to light in the media, with the *Chicago Tribune*, *Los Angeles Times*, *Dallas Morning News*, and *Pro Publica* all reporting on PSI's facilities in 2008 and 2009. (*Id.* ¶ 8.)

8

## The Stipulated Protective Order

On August 29, 2011, Lead Plaintiff, PSI, and the individual defendants moved the Court for entry of a stipulated Protective Order. (Joint Mot. Prot. Order (DE No. 142).) The Court granted the motion the next day and entered the Protective Order. (August 30, 2011 Order (DE No. 144); Stip. Prot. Order (DE No. 145).) The Protective Order governs "confidential" and "highly confidential material." (DE No. 145 at §§ 3.1, 3.2.) In the stipulated order, the parties defined "confidential" material as anything produced in discovery and any deposition testimony that "qualifies for protection under applicable law" and that a party "considers to constitute confidential, sensitive or proprietary business information or documents, the disclosure of which might adversely affect a Party's competitive position, business operations, economic interests or personal private information." (*Id.* at § 3.2.) The parties defined "highly confidential" material as anything produced in discovery and any deposition testimony that "contains Protected Patient Information pursuant to HIPAA and/or 42 U.S.C. § 290dd-2." (*Id.* at § 3.1.)

The parties also agreed to file any confidential or highly confidential material under seal. (*Id.* at § 14.) Although the parties stated that confidential and highly confidential material "shall be filed in accordance with § 5.07 of the Administrative Practices and Procedures for Electronic Case Filing," the Protective Order basically gutted § 5.07 of its main protection against abuse of the sealing process: No *motion* was required to file documents under seal, and the requirement of a motion to seal is central to § 5.07. *See* Admin. Order 167 at § 5.07 (M.D. Tenn.) ("A party seeking to file documents under seal must (1) electronically file a motion for leave of Court to do

so via the Court's [ECF] system . . . .  Any documents purported to be filed under seal without leave of Court will automatically become part of the public record.").[1]

The parties also agreed that the "confidentiality obligations" imposed by the Protective Order continue "until a Designating Party agrees otherwise in writing or a Court order otherwise directs."  (DE No. 145 at § 5.)  Each party can challenge any designation of material as "confidential" or "highly confidential" by moving the Court for order to withdraw the designation, after first writing to the other party and explaining its position.  (*Id.* at §§ 8.1-8.2.)  After the Court entered the stipulated Protective Order, the parties began filing documents under seal.  (*See* DE Nos. 155, 158, 165, 169, and 172.)

The parties later amended the Protective Order, although the key definitions, the agreement to file documents under seal, the duration, and the challenge process were unchanged.  (Joint Mot. Am. Prot. Order (DE No. 199) (August 30, 2012); September 10, 2012 Order (DE No. 202); Stip. Am. Prot. Order (DE No. 203).)

### Psychiatric Solutions, Inc.'s Motion for Summary Judgment

On April 14, 2014, PSI and the individual defendants moved for summary judgment.  (Def.'s Mot. Summ. J. (DE No. 259).)  While PSI did not file the motion itself under seal, it filed its memorandum of law, statement of undisputed material facts, and 78 exhibits under seal.  (DE Nos. 260-269.)  With PSI designating virtually every document "confidential" or "highly confidential," Lead Plaintiff followed suit in its response, filing its opposition brief, response to

---

[1] Although not directly challenged here, the terms of the Protective Order raise concerns about whether the Protective Order itself complied with Sixth Circuit law, as parties cannot privately agree to file documents under seal.  *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) ("Rule 26(c) allows the sealing of court papers only 'for good cause shown' to the court that the particular documents justify court-imposed secrecy.  In this case, the parties were allowed to adjudicate their own case based upon their own self-interest.  This is a violation not only of Rule 26(c) but of the principles so painstakingly discussed in *Brown & Williamson* [*Tobacco Corp.*, 710 F.2d 1165 (6th Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)].").

the statement of undisputed material facts, and 23 exhibits under seal.  (DE Nos. 285-286, 289.)

PSI again filed its reply brief, reply to Lead Plaintiff's response to the statement of undisputed

material facts, and 22 reply exhibits under seal.  (DE Nos. 297-300.)

Although it is impossible to know the contents of the summary judgment materials

because they are under seal, the allegations in the Lead Plaintiff's complaint and the information

that is available raises concerns about the propriety of an ongoing veil of secrecy shielding these

documents from public scrutiny.  PSI should not be allowed to perpetrate a fraud on the Georgia

court by hiding behind the veil of secrecy in filings in this Court.

Most concerning, PSI filed matters of public record under seal in this case.  (*See, e.g.*, Ex.

B (Form 10-K) (DE No. 262); Ex. RR (news article) (DE No. 266); Ex. UUU (Form 10-K

excerpts) (DE No. 269); Exs. GGGG (Form 10-Q), IIII (Joint Commission on Accreditation of

Health Organization response to U.S. Government Accountability Office) (DE No. 299).)  And

the majority of PSI's exhibits consist of deposition transcripts and exhibits.  (*See, e.g.*, Exs. A, C,

F, I-J (DE No. 262); Ex. K-O, R-T (DE No. 263); Exs. U-DD (DE No. 264); Exs. EE-NN (DE

No. 265); Exs. OO-PP, SS, UU, WW (DE No. 266); Exs. ZZ--BBB, DDD-HHH (DE No. 267);

Exs. III, KKK, OOO-PPP, RRR (DE No. 268); Exs. SSS, VVV (DE No. 269); Exs. BBBB-

EEEE, (DE No. 299); Exs. PPPP-RRRR, VVVV (DE No. 300).)  This includes the depositions

of key PSI executives, including Mr. Jacobs.  (Ex. R (Deposition of Defendant Jack Polson) (DE

No. 263); Ex. V (Deposition of Defendant Joey Jacobs) (DE No. 264); W (Deposition of

Defendant Brent Turner) (DE No. 264).)

## **Lead Plaintiff's Motion to Unseal**

After PSI's Motion for Summary Judgment was fully briefed, Lead Plaintiff made its position on sealing the summary judgment materials clear. On July 2, 2014, Lead Plaintiff filed a motion for an order to require refiling of summary judgment materials in the public record. (Pl.'s Mot. Order (DE No. 324).) In support, Lead Plaintiff described PSI's disturbing practice of "indiscriminately mark[ing] virtually every (if not all) document they produced in this litigation as confidential or highly confidential." (Pl.'s Memo. Supp. Mot. Order at 3(DE No. 324-1).) PSI designated hundreds of trivial emails as confidential, *including emails about a PSI chili cook off*. (*Id.*) PSI also deemed spam emails "confidential," and 30 of PSI's exhibits submitted with its Motion for Summary Judgment were matters of public record. (*Id.*) The majority of documents that PSI designated "confidential," Lead Plaintiff (who saw/reviewed them) stated, related to "stale and outdated financial information" and "*e-mails about staffing and quality issues at PSI's psychiatric hospitals*." (DE No. 324-1 at 7 (emphasis added).) Relying on the good-faith requirement of the protective order, the First Amendment, and the common law, Lead Plaintiff requested an order unsealing the summary judgment materials. (*Id.* at 4-8.)

While Lead Plaintiff's motion for an order to require refiling in the public record was fully briefed, the parties settled the case before the Court ruled. The parties submitted a proposed settlement agreement to the Court on October 15, 2014, which the Court approved after a settlement conference on January 15, 2015. (Pl.'s Mot. Prelim. Appr. Settl. (DE No. 447); Text Entry (Jan. 15, 2015).)

## **Argument**

**A.    The Interested Parties Should Be Permitted to Intervene Because
Their Motion is Timely and the Claims Share Common Questions of
Law and Fact.**

*Timeliness*.  Under Federal Rule of Civil Procedure 24, on timely motion, the Court may permit anyone to intervene in an action who "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  Whether a motion to intervene is timely is "determined from all the circumstances."  *NAACP v. New York*, 413 U.S. 345, 366 (1973); *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990) (timeliness is evaluated in the "context of all relevant circumstances") (citing *Bradley v. Milliken*, 828 F.2d 1186, 1191 (6th Cir. 1987).  Relevant factors include the following:

> (1) the point at which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Jansen*, 904 F.2d at 340 (citing *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989)).  The Interested Parties' motion to intervene is timely under this standard.

First, the fact that the Lead Plaintiff and PSI have settled the main action does not weigh against intervention.  The Court approved the settlement agreement less than two months ago, on January 15, 2015.  And the extent to which the lawsuit has progressed is less important here, where the Interested Parties seek to intervene for the limited purpose of unsealing the summary judgment materials (*i.e.*, the Interested Parties will not assert claims, defenses, or otherwise litigate any issues in the case).  Courts frequently permit parties to intervene in cases after settlement, both to request that documents be unsealed and to seek other remedies.  *See, e.g.*, *United States v. Detroit Int'l Bridge Co.*, 7 F.3d 497, 503 (6th Cir. 1993) (permitting intervention

to seek preliminary injunction nine months after the parties settled the case); *Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.*, 823 F.2d 159, 164 (6th Cir. 1987) (reversing district court's decision denying motion to intervene to unseal tapes of recorded conversations seven months after the parties settled the case); *see also, e.g.*, *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (permitting intervention three years after the parties settled the case, noting that "[t]he most important circumstance in this case is that intervention was not on the merits, but for the sole purpose of challenging a protective order"); *Bank of Am. Nat'l Trust and Savings Assoc. v. Hotel Rittenhouse Assocs.*, 844 F.2d 1050, 1051-52 (3d Cir. 1988) (holding that motion to intervene was not untimely two years after the case was settled).

Second, the Interested Parties seek to intervene for the limited purpose of unsealing documents submitted to the Court in connection with PSI's motion for summary judgment. They do not seek to disturb the settlement agreement, any order of this Court, or the merits of Lead Plaintiff and PSI's positions in the case. Rather, the Interested Parties only seek to shed light on what they believe are lies about PSI's involvement in Focus by the Sea, the treatment of Amy, and the decisions that led to the tragic events of February 7, 2009.

Numerous decisions permit parties to intervene for the limited purpose of unsealing judicial documents. *E.g.*, *Meyer Goldberg, Inc. of Lorain v. Fisher Foods, Inc.*, 823 F.2d 159, 162 (6th Cir. 1987); *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1169 (6th Cir. 1983); *see also Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 778 (3d Cir. 1994) ("[T]he procedural device of permissive intervention is appropriately used to enable a litigant who was not an original party to an action to challenge protective or confidentiality orders entered in that action."). Indeed, "*every circuit court that has considered the question has come to the conclusion that nonparties may permissively intervene for the purpose of challenging*

14

*confidentiality orders*." *Equal Employment Opp. Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) (citing cases) (emphasis added).

Third, the Interested Parties learned of their limited interest in this case no earlier than February of 2015, having searched Pacer for lawsuits involving PSI and examining the limited information available on the Court's docket. The mere fact that Lead Plaintiff commenced a securities class action against PSI was not, by itself, enough to alert the Interested Parties to the overlapping factual and legal questions in the two cases.

Fourth, permitting the Interested Parties to intervene cannot prejudice either Lead Plaintiff or PSI. The case is closed. *See Pub. Citizen v. Liggett Group*, 858 F.2d 775, 786 (1st Cir. 1988) (considering prejudice in the context of a motion to intervene filed 12 weeks after adjudication on the merits, noting that "[b]ecause [the intervenor] sought to litigate only the issue of the protective order, and not to reopen the merits, we find that its delayed intervention caused little prejudice to the existing parties in this case"), and Lead Plaintiff itself moved the Court for an order unsealing the summary judgment materials (DE No. 324). Finally, important First Amendment concerns about an important public policy issue militate in favor of intervention. *See infra* Part C (discussing First Amendment-based reasons for unsealing judicial documents submitted to courts of record in connection with dispositive motions).

The Interested Parties' motion to intervene is timely.

*Common Questions of Law and Fact.* The Interested Parties' also have "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The key issue of fact in the Interested Parties' lawsuit against PSI is the adequacy of PSI's treatment and care of Amy Kern, *but PSI continues to deny any involvement whatsoever in the operation of Focus by the Sea*. As shown *supra,* PSI's management and operation of its

15

psychiatric facilities were central issues in Lead Plaintiff's claims against PSI. Lead Plaintiff

alleged that a core group of PSI executives (one of whom the Interested Parties now knows made

frequent telephone calls to the facility that discharged Amy Kern) had direct supervisory control

over the day-to-day operations of its facilities, with regular visits to each facility to assess

staffing needs and compliance with PSI-imposed policies and procedures. The summary

judgment materials currently under seal include testimony from that PSI executive, Joey Jacobs,

as well as PSI emails about staffing and quality issues at PSI's facilities. (DE No. 324-1 at 7

(emphasis added).) Overlapping questions of key facts abound.

The Interested Parties' motion to intervene is timely and their claims share common

questions of fact and law with the main action. They should thus be permitted to intervene for

the limited purpose of requesting that the Court unseal the summary judgment materials.

> **B. The Summary Judgment Materials Should Be Publicly Available Because the Public Has a Right of Access to Judicial Documents under the Common Law.**

While a court has discretion over its own records and files, *Nixon v. Warner Commc'ns,*

*Inc.*, 435 U.S. 589, 598 (1978), its discretion is "circumscribed by a long-established legal

tradition," *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1177

(6th Cir. 1983). This longstanding tradition is the "presumptive right of the public to inspect and

copy judicial documents and files." *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 474

(6th Cir.1983) (citing *Nixon*, 435 U.S. at 597); *In re Application of Nat'l Broadcasting Co., Inc.*

*(United States v. Criden I)*, 648 F.2d 814, 819 (3d Cir. 1981); *In re Nat'l Broadcasting Co., Inc.*

*(United States v. Myers)*, 635 F.2d 945, 949 (2d Cir. 1980); *United States v. Mitchell*, 551 F.2d

1252, 1258-60 (D.C. Cir. 1976), *rev'd on other grounds sub nom*, *Nixon*, 435 U.S. at 607-08).

This right of access goes back to the nineteenth century, when the D.C. Circuit Court of Appeals

recognized that "[a]ny attempt to maintain secrecy, as to the records of this court, would seem to be inconsistent with the common understanding of what belongs to a public court of record." *Ex Parte Drawbraugh*, 2 App. D.C. 404, 407 (1894).

This presumption in favor of public access to judicial documents is rooted in fundamental public policies of a democracy. As the Second Circuit Court of Appeals put it:

> The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice. Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke. [. . .] [P]rofessional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior. Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). Consistent with this policy, the Sixth Circuit Court of Appeals has stated that public access is necessary to ensure that the public can "analyze and critique the reasoning of the court." *Brown & Williamson*, 710 F.2d at 1178 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 592 (1980)). Decisions of the courts will be "more readily accepted, or corrected if erroneous," the Sixth Circuit noted, "if the public has an opportunity to review the facts presented to the court." *Id.* (quoting *Richmond Newspapers*, 448 U.S. at 592). The need for public access includes *civil* cases, because "the resolution of private disputes frequently involves issues and remedies affecting third parties or the general public." *Id.*; *see also Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) (recognizing the longstanding tradition of public access to judicial documents).

Once summary judgment material is made part of a court's documents, only the "most compelling reason" can warrant "total foreclosure of public and professional scrutiny." *Brown & Williamson*, 710 F.2d at 1180 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982); *see also In re Perrigo Co.*, 128 F.3d 430, 446 (6th Cir. 1997) (Moore, J., concurring in part, dissenting in part) ("Sealing court records . . . is a drastic step, and only the most compelling reasons should ever justify nondisclosure of judicial records."); *see also Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982) ("[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal *absent the most compelling reasons*.") (emphasis added); *accord Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir. 2006). The burden of overcoming the presumption in favor of public access is on the party opposing access. *United States v. Beckham*, 789 F.2d 401, 419 (6th Cir. 1986). PSI cannot overcome this presumption.

> **C.  The Summary Judgment Materials Should Be Publicly Available Because the Public Has a Right of Access to Judicial Documents under the First Amendment to the U.S. Constitution.**

The Interested Parties also have a qualified right to access certain judicial documents under the First Amendment. *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1177 (6th Cir. 1983); *Applications of Nat'l Broadcasting Co., Inc.*, 828 F.2d 340, 343 (6th Cir. 1987). The U.S. Supreme Court has established a two-part test to determine whether a First Amendment right to judicial documents exist: experience and logic. *Press-Enterprise Co. v. Sup. Ct.*, 478 U.S. 1, 8 (1986); *In re Search of Fair Finance*, 692 F.3d 424, 429 (6th Cir.2012) ("Notwithstanding its origin in criminal proceedings, courts have also applied the 'experience and logic' test to determine whether a First Amendment right of access in a wide variety of other contexts."). Under the experience part, courts consider whether the document has historically been available to the press and the public. *Press-Enterprise Co.*, 478 U.S. at 8. And the logic

18

part asks "whether public access plays a significant positive role in the functioning of the particular process in question."  *Id.*

The qualified First Amendment right of access to judicial documents applies to materials submitted in connection with motions for summary judgment.  *See Lugosch*, 435 F.3d at 124 (concluding that "there exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion"); *In re New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) (noting that "[o]ther circuits that have addressed this question have construed the constitutional right of access to apply to *written documents submitted in connection with judicial proceedings* that themselves implicate the right of access"); *Joy*, 692 F.2d at 893 (summary judgment proceedings implicate the right of access).  Again, absent a compelling reason, the public has a right to access the summary judgment materials. *Joy*, 692 F.2d at 893 ("[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons.").  PSI cannot offer such a compelling reason, and the summary judgment documents should be unsealed.

### D.     Lead Plaintiff Agrees with the Interested Parties and PSI Cannot Justify Filing the Summary Judgment Materials under Seal.

It is evident from Lead Plaintiff's motion for an order requiring public filing of the summary judgment materials that it agrees with the Interested Parties.  With the exception of Patient Identifying Information protected by HIPAA and/or 42 U.S.C. § 290dd-2, which can be redacted, Lead Plaintiff does not believe any of the summary judgment materials warrants an ongoing veil of secrecy.  (Pl.'s Mot. Order at 8 (DE No. 324).)  The Interested Parties concur.

In response to Lead Plaintiff's motion for an order requiring public filing of the summary judgment materials, PSI tried to avoid the issue and kick it down the road until the parties exchanged trial exhibits.  (*See* Def.'s Resp. Pl.'s Mot. Order at 5 (DE No. 347)

("[B]ecause of the impending trial in this case and the vast amount of pre-trial work in which both parties are currently engrossed, Defendants have proposed addressing this issue in the context of trial exhibits . . . ."). PSI asked the Court to "let the parties resolve this issue when they exchange trial exhibits, as it is the confidentiality of those exhibits that will be relevant at trial." (*Id.* at 6.) PSI misses the point, though. The issue is *not* what "will be relevant at trial," but whether the material in question warrants non-disclosure to the public, whether there is a "compelling reason" to overcome the longstanding presumption in favor of public access to judicial documents. *Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n*, 710 F.2d 1165, 1180 (6th Cir. 1983).

Taken to task on filing public records under seal, PSI offered a wholly inadequate rationale for acting inconsistently with one of most well-grounded principles in the law. "[F]or the Court's *ease and convenience*," PSI stated, "Defendants filed documents under seal so that they would be submitted in the order that they appeared in Defendants' Statement of Material Facts." (Def.'s Resp. Pl.'s Mot. Order at 3 (DE No. 347) (emphasis added).) This falls far short of the kind of interest that requires protection from public disclosure. *See, e.g.*, *Brown & Williamson*, 710 F.2d at 1179 ("The exceptions to the practice of maintaining openness in the courtroom fall into two broad categories: those based on the need to keep order and dignity in the courtroom and those which center on the content of the information to be disclosed."). Again, PSI missed the point of public access to documents filed in courts of record.

The allegations in Lead Plaintiff's complaint raise serious and embarrassing questions about how PSI operated its psychiatric facilities, including the adequacy of its treatment of mentally ill patients like Amy Kern. While PSI is understandably concerned about protecting its reputation and public image, courts cannot accommodate this kind of interest. Acknowledging

20

the "natural desire of parties to shield prejudicial information" from the public eye, the Sixth

Circuit has said that

> [t]his desire . . . cannot be accommodated by courts without seriously
> undermining the tradition of open judicial system. Indeed, common sense tells us
> that *the greater the motivation a corporation has to shield its operations, the
> greater the public's need to know*. In such cases, a court should not seal records
> unless public access would reveal legitimate trade secrets . . . .

*Id.* at 1180 (emphasis added). So too here: The nature of the subject matter of Lead Plaintiff's

litigation against PSI bears on critically important issues in today's society, as evidenced by the

numerous press reports devoted to PSI's facilities and the broader issue of the proper treatment

and care of persons afflicted with mental illness. *Cf. id.* at 1179 ("Civil cases frequently involve

issues crucial to the public—for example, discrimination, voting rights, antitrust issues,

government regulation, bankruptcy, etc."). The public needs to know and has a firmly

established right to do so. The Court should therefore unseal the summary judgment materials.

### E. In Any Event, PSI Agrees that Certain Portions of the Summary Judgment Materials Should Be Unsealed.

Likely recognizing that its blanket approach to designating documents as "confidential"

or "highly confidential" would not pass muster, PSI conceded that some of the materials it filed

under seal should, in fact, be made publicly available. This includes "all publicly available

documents." (Def.'s Resp. Pl.'s Mot. Order at 2-3 (DE No. 347).) Although PSI stated that it

would provide the Clerk with a list of documents to be unsealed, all documents remain under

seal. (*Id.* at 3.) PSI also acknowledged, at least implicitly, that employee complaints should be

made publicly available. (*See id.* (noting that "[c]ertain summary judgment exhibits divulge

complaints that were made by specific employees, either through the ValuesLine or by other

means" and that, "at a minimum, information identifying complainants should be redacted").)

These concessions support Lead Plaintiff's motion for an order and the Interested Parties' motion

to unseal, as even PSI seems to agree that both the public records and employee complaints that were filed under seal should be made publicly available, even if some limited information in the latter category is redacted. (*See also* Am. Prot. Order at § 5 (DE No. 145) (agreeing that the confidentiality obligations last only until "a Designating Party agrees otherwise in writing").)

  **F.**  **The Summary Judgment Materials Should Be Unsealed for the Reasons Stated in Lead Plaintiff's Motion for an Order Requiring Public Filing of Summary Judgment Materials.**

  Pursuant to Federal Rule of Civil Procedure 10(c), the Interested Parties hereby adopt by reference the arguments contained in sections III.A and III.B of Lead Plaintiff's motion for an order requiring public filing of the summary judgment materials (DE No. 324) and sections II.A-II.D of Lead Plaintiff's reply brief in support of its motion (DE No. 374-1).

**<u>Conclusion</u>**

  For the foregoing reasons, the Interested Parties respectfully request that the Court permit the Interested Parties to intervene for purposes of asserting the common law and First Amendment rights of access and enter the Interested Parties' proposed unsealing order, submitted with this memorandum.

  This 13th day of May, 2015.

                **HARRIS PENN LOWRY LLP**

                */s/ Darren W. Penn*
                Darren W. Penn (*seeking admission phv*)
                Georgia Bar No. 571322
                Jed D. Manton (*seeking admission phv*)
                Georgia Bar No. 330315
                Gregory W. Traylor (*seeking admission phv*)
                Georgia Bar No. 771220

22

400 Colony Square
1201 Peachtree Street, NE, Suite 900
Atlanta, Georgia 30361
T:  (404) 961-7650
F:  (404) 961-7651
darren@hpllegal.com
jed@hpllegal.com
greg@hpllegal.com

**HOLLINS, RAYBIN & WEISSMAN, P.C.**

*/s/  Benjamin Raybin*_____
Benjamin Raybin
Tennessee Bar No. 029350

Fifth Third Center
424 Church Street, Suite 2200
Nashville, Tennessee 37219
T:  (615) 256-6666
F:  (615) 254-4254
braybin@hollingslegal.com

*Attorneys for Beverly Kern*

23

## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing Memorandum of Law in Support of Motion to Intervene and Unseal Judicial Documents was filed electronically with the Clerk of Court and has been served by operation of the Court's CM/ECF filing system upon the following:

| | |
|---|---|
| Todd R. David | todd.david@alston.com |
| Jessica Perry Corley | jessica.corley@alston.com |
| Lisa R. Bugni | lisa.bugni@alston.com |
| Stephen Glasgow | stephen.glasgow@alston.com |
| Bernard Taylor, Sr. | bernard.taylor@alston.com |
| Daniel E. Bacine | dbacine@barrack.com |
| Mark R. Rosen | mrosen@barrack.com |
| Wade B. Cowan | wcowan@dhhrplc.com |
| George Edward Barrett | gbarrett@barrettjohnston.com |
| Douglas S. Johnston, Jr. | djohnston@barrettjohnston.com |
| Timothy L. Miles | tmiles@barrettjohnston.com |
| Jerry E. Martin | jmartin@barrettjohnston.com |
| Stephen R. Basser | sbasser@barrack.com |
| Samuel M. Ward | sward@barrack.com |
| Darren J. Robbins | darrenr@rgrdlaw.com |
| David C. Walton | davew@rgrdlaw.com |
| Tor Gronborg | torg@rgrdlaw.com |
| Tricia L. McCormick | triciam@rgrdlaw.com |
| Julie A. Kearns | jkearns@rgrdlaw.com |
| Catherine J. Kowalewski | katek@rgrdlaw.com |
| Robert K. Lu | rlu@rgrdlaw.com |
| Dennis J. Herman | dennish@rgrdlaw.com |
| Daniel J. Pfefferbaum | dpfefferbaum@rgrdlaw.com |
| Christopher M. Wood | cwood@rgrdlaw.com |
| James E. Barz | jbarz@rgrdlaw.com |
| David J. Harris | dharris@rgrdlaw.com |
| Brian E. Cochran | bcochran@rgrdlaw.com |

Case 3:09-cv-00882   Document 470   Filed 05/13/15   Page 24 of 26 PageID #: 36944

| | |
|---|---|
| Jonah H. Goldstein | jonahg@rgrdlaw.com |
| James M. Hughes | jhughes@motleyrice.com |
| William S. Norton | bnorton@motleyrice.com |
| Gregg S. Levin | glevin@motleyrice.com |
| William H. Narwold | bnarwold@motleyrice.com |
| Robert J. Dyer, III | bob@dyerberens.com |
| Jeffrey A. Berens | jeff@dyerberens.com |
| Michael J. VanOverbeke | mvanoverbeke@vmtlaw.com |
| Thomas C. Michaud | tmichaud@vmtlaw.com |
| James Gerard Stranch, III | jstranch@branstetterlaw.com |
| James Gerard Stranch, IV | gstranch@branstetterlaw.com |
| Steven A. Riley | sriley@rwjplc.com |
| Milton S. McGee, III | tmcgee@rwjplc.com |
| Rachel Marie Thomas | rthomas@rwjplc.com |
| Gary Orsbeck | gorseck@robbinsrussell.com |
| Larry Robbins | lrobbins@robbinsrussell.com |
| Alison Barnes | abarnes@robbinsrussell.com |
| Ariel Lavinbuk | alavinbuk@robbinsrussell.com |

This 13th day of May, 2015.

**HOLLINS, RAYBIN & WEISSMAN, P.C.**

*/s/ Benjamin Raybin*
Benjamin Raybin
Tennessee Bar No. 029350

25

## CERTIFICATE OF SERVICE CONT.

I hereby certify that on this day the foregoing Memorandum of Law in Support of Motion to Intervene and Unseal Judicial Documents has been served via U.S. mail upon the following:

| | |
|---|---|
| Theodore E.G. Pound, Esq.<br>Kathleen W. Simcoe, Esq.<br>OWEN, GLEATON, EGAN ET. AL., LLP<br>1180 Peachtree Street, NE, Suite 3000<br>Atlanta, GA 30309-3531<br>*Counsel for Psychiatric Solutions, Inc.* | Andrew Efaw, Esq.<br>Stephen Oertle, Esq.<br>WHEELER TRIGG O'DONNELL LLP<br>370 Seventeenth Street, Suite 4500<br>Denver, CO 80202<br>*Counsel for Psychiatric Solutions, Inc* |
| Robert E. Boston<br>Waller, Lansden, Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, Tennessee 37219 | |

This 13th day of May, 2015.

**HARRIS PENN LOWRY LLP**

*/s/ Darren W. Penn*_____
Darren W. Penn (*seeking admission phv*)
Georgia Bar No. 571322

26